```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3   MARIANO JUAREZ ROSALES      .
                                 . H-03-CV-1016
 4         vs.                   . HOUSTON, TEXAS
                                 . APRIL 28, 2008
 5                               . 1:30 P.M.
     NATHANIEL QUARTERMAN        .
 6   . . . . . . . . . . . . . . .

 7
                   TRANSCRIPT OF EVIDENTIARY HEARING
 8            BEFORE THE HONORABLE VANESSA GILMORE
                   UNITED STATES DISTRICT JUDGE
 9                       VOLUME 1 OF 2

10

11

     A P P E A R A N C E S:
12
     FOR THE PETITIONER:
13
           Christina Swarns
14         NAACP Legal Defense Fund
           99 Hudson Street
15         Suite 1600
           New York, New York  10013
16
           Joshua B. Gray
17         Attorney at Law
           Four Times Square
18         New York, New York  10036-6522

19         Mary Hunter
           Pro Bono Co-Counsel
20         Four Times Square
           New York, New York  10036
21
           David R. Dow
22         University of Houston Law Center
           100 Law Center
23         Houston, Texas  77204

24   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
25                            - - - - -
```

2

1    A P P E A R A N C E S:   (Continued)

2

     FOR THE RESPONDENT:
3
          Tina J. Miranda
4         Thomas Jones
          Assistant Attorney General
5         PO Box 12548
          Austin, Texas   78711-2548
6         713-718-4600

7    OFFICIAL COURT REPORTER:

8         Cheryll K. Barron, CSR, CM, FCRR
          U.S. District Court
9         515 Rusk Street
          Room 8016
10        Houston, Texas   77002
          713-250-5585
11        reporter@oplink.net

12   ALSO PRESENT:

13        Mariano Rosales (By Video teleconference)

14   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
15                           - - - - -

16

17

18

19

20

21

22

23

24

25

1
<u>INDEX</u>

2
<u>PAGE</u>

3
<u>PETITIONER'S WITNESS</u>

4
Norma Davenport

5
Cross-Examination by Mr. Gray                 15

6
- - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  Good afternoon, everybody.  Please be

3    seated.

4              MR. WILLIAMS:  The judge would like the camera viewed

01:44   5    in closer if possible.  We're not seeing the defendant's face

6    very clearly.  Is it possible to bring the view in closer?

7              A PRISON GUARD:  Well, all we can do is move it

8    closer.  We don't have a -- one that we can --

9              MR. WILLIAMS:  Zoom in?

01:44   10             Okay.  If it's -- is it possible to maybe bring

11   the view in?  Because we would like to get a better, closer

12   view.

13             THE COURT:  I can't make out his face, and I need to

14   be able to see his face.

01:45   15             MR. WILLIAMS:  Yes, ma'am.

16        *(The camera is being adjusted by prison guards)*

17             THE COURT:  Okay.  That's a little better.  I can see

18   him.  Okay.

19             All right.  Mariano Juarez-Rosales versus

01:45   20   Nathaniel Quarterman.  Who's here for the petitioner, please?

21             MS. SWARNS:  Good afternoon, your Honor.  I am

22   Christina Swarns on behalf of the NAACP --

23             THE COURT:  Are you addressing the Court?

24             MS. SWARNS:  Yes.

01:45   25             THE COURT:  Stand up.

01:45  1          MS. SWARNS:  I apologize, your Honor.

2                    Good afternoon.  My name is Christina Swarns.

3     I'm from the NAACP Legal Defense Fund; and I, along with David

4     Dow and Joshua Gray, are here on behalf of the petitioner,

01:45  5     Mariano Rosales.

6          THE COURT:  Who's is sitting next to you?

7          MS. SWARNS:  This is Mary -- I'm blank -- Mary Hunter.

8          THE COURT:  Also counsel, as well?

9          MS. SWARNS:  She's assisting us.

01:45  10          THE COURT:  Okay.  Also counsel, as well?

11          MS. HUNTER:  Yes, your Honor.

12          THE COURT:  Okay.  I wanted to be sure.

13                    And for the respondent, please?

14          MS. MIRANDA:  Tina Miranda and Tom Jones.

01:46  15          THE COURT:  All right.  For the respondent.

16                    You-all heard me complain a moment ago about

17     the -- I just wanted to make sure that I was able to see the

18     petitioner's face clearly.

19                    Ms. Swarns, Mr. Dow, can you-all confirm for me

01:46  20     that, in fact, that is Mr. Rosales who is appearing before us

21     today by video teleconference?

22          MS. SWARNS:  It is, your Honor.

23          THE COURT:  All right.  Mr. Rosales, can you hear me

24     clearly?

01:46  25          MR. ROSALES:  Yes, ma'am.

01:46    1          THE COURT:  All right.

         2          MR. ROSALES:  Yes, ma'am.

01:46    3          THE COURT:  All right.  If you have any difficulty

         4    hearing anything that anybody is saying during the course of

01:46    5    these proceedings, could you just go ahead and interrupt and

         6    interject and tell us that you can't hear us, please?

         7          MR. ROSALES:  Yes, your Honor.  Yes.

         8          THE COURT:  All right.  I just wanted to make sure.

         9    Don't wait.  Feel free to cut in if at any point in time the

01:46   10    sound gets bad or if someone doesn't raise their voice high

        11    enough for you to be able to hear.

        12          MR. ROSALES:  I will.  All right.

        13          THE COURT:  All right.  We are here today on a hearing

        14    that the Court authorized following briefing.  And the single

01:47   15    issue that the Court has before it today has to do with the

        16    petitioner's question of whether the prosecution used its

        17    peremptory challenges in a racially discriminatory manner.

        18               The petitioner requested an opportunity to do

        19    some written discovery, and you guys got a chance to do that.

01:47   20    Is that right, Ms. Swarns?

        21          MS. SWARNS:  Yes, your Honor.

        22          THE COURT:  Did you get all the written discovery that

        23    the Court authorized previously?

        24          MS. SWARNS:  Yes, your Honor.

01:47   25          THE COURT:  Okay.  And then, subsequent to that time,

01:47  1    requested that they have an opportunity to -- the Court made

2    findings that -- based on the subsequent briefing, that it

3    would take additional evidence with respect to those issues.

4    And that is the purpose of the hearing that we're on here

01:48  5    today.

6                I have a witness list from the petitioner that

7    has just three witnesses on it.  Is that right?

8                MS. SWARNS:  Yes, your Honor.

9                THE COURT:  And, then, do you guys have a -- an

01:48 10   exhibit list for me as, well as?

11               MS. SWARNS:  Your Honor, we have, for the convenience

12   of the Court and counsel, bound the hard copies of the

13   documents that we provided to your Honor by DVD.  And I can run

14   through what we have organized for you.

01:48 15               THE COURT:  Perfect.  I'll take them right now.

16               MS. SWARNS:  Okay.  We have what is characterized as

17   Joint Exhibits 1 through 4.

18               THE COURT:  "Joint exhibits" meaning that they're

19   going to be exhibits for both the petitioner and respondent?

01:49 20               MS. MIRANDA:  Yes, your Honor.

21               THE COURT:  You guys just came together with a set of

22   exhibits?

23               MS. SWARNS:  Yes.  Yes, your Honor.  And I'll just

24   briefly summarize for your convenience what they are.

01:49 25               THE COURT:  Do you have an exhibit list for me?

01:49  1          MS. SWARNS:  We do not have a printed copy of the

2     exhibit list, I'm sorry to say; but I can summarize for the

3     Court what each one is.

4          *(Sotto voce discussion between Court and staff)*

01:49  5          THE COURT:  Okay.  You'll need to go ahead and fill

6     out an exhibit list for me.

7          MS. SWARNS:  Okay.

8          THE COURT:  I need something for the record.  I

9     actually need an actual exhibit list.  So, let's just wait.

01:49 10          MS. SWARNS:  Okay.

11          THE COURT:  Why do I have the first one Joint Exhibit

12     2?  Are they out of order?

13          MS. SWARNS:  It's just out of order.  The large ones

14     are 1A and 1B.

01:50 15          THE COURT:  Oh, I got it.  So, how many exhibits do I

16     have, then?

17          MS. SWARNS:  A total of five; although, it's four --

18     there's 1A and 1B.

19          THE COURT:  1A.

01:50 20          MS. SWARNS:  The binders are 1A and 1B.

21          THE COURT:  1B.

22          And 2 is just the small affidavit binder?

23          MS. SWARNS:  Yes, your Honor.

24          THE COURT:  And 3 is the depositions, and 4 is --

01:50 25          MS. SWARNS:  The Harris County Batson hearing.

01:50     1                    THE COURT:  Oh, the hearings that were in Harris

          2      County.

          3                    MS. SWARNS:  Yes, your Honor.

          4                    THE COURT:  All right.  And, then, there is no --

01:50     5      since these are joint exhibits, there's no objection to any of

          6      these exhibits.  Is that correct?

          7                    MS. MIRANDA:  No, your Honor.  Right.

          8                    THE COURT:  All right.  So, then, the Joint Exhibits

          9      1A, 1B, 2, 3, and 4 are admitted.  I'll mark them on the

01:50    10      exhibit list as soon as we get the exhibit list, and mark them

         11      all as admitted.

         12                    And there is -- there's no separate set; you guys

         13      just decided to combine the whole set of exhibits.  Is that

         14      correct?

01:51    15                    MS. MIRANDA:  Yes, your Honor.

         16                    THE COURT:  All right.  All right.  Well, while --

         17      she'll get that exhibit list for us, and she'll make the

         18      exhibit list for us and mark those all as admitted exhibits.

         19                    Are we ready to proceed, then?

01:51    20                    MS. SWARNS:  I just want to address one -- or two

         21      other minor housekeeping matters.

         22                    THE COURT:  All right.  Yes, please.

         23                    MS. SWARNS:  Our witnesses are three, I think, as

         24      between both parties.  We have the trial prosecutors, Keno

01:51    25      Henderson and Norma Davenport.

01:51   1          THE COURT:  Right.

        2          MS. SWARNS:  And for the petitioner, we are calling

        3   attorney Craig Washington as a layperson.  I would just state

        4   for the record he has no crimen falsi and there's no

01:51   5   convictions that qualify his impeachment under the rules.

        6          THE COURT:  Okay.

        7          MS. SWARNS:  Based on my conversation with

        8   Ms. Miranda, it is our plan to have the affidavits that

        9   Mr. Henderson and Ms. Davenport have previously submitted,

01:51  10   which are included in Exhibit 1A --

       11          THE COURT:  Right.

       12          MS. SWARNS:  -- to serve as their direct testimony.

       13   And we will begin actual questioning with their

       14   cross-examination.

01:52  15          MS. MIRANDA:  And, then, your Honor, we would reserve

       16   the right to redirect once they've had the opportunity to

       17   cross-examine those affidavits.

       18          THE COURT:  Oh, okay.  That's fine.

       19          MS. MIRANDA:  That was our understanding, that the

01:52  20   hearing was to enable them the opportunity to cross-examine the

       21   testimony that was asserted in their affidavits.

       22          THE COURT:  It doesn't matter to me, actually.  I

       23   mean, if that's the case, then I just need to reread the

       24   affidavits myself.  If you guys told me that ahead of time, I

01:52  25   would have read them.  But, I mean, I read them at one point in

01:52  1    time a little while back.

2                    MS. SWARNS:  They're actually in 1A, the front of 1A.

3                    THE COURT:  What affidavits are these?

4                    MS. SWARNS:  Those are addressing the race of some of

01:52  5    the jurors.

6                    THE COURT:  Okay.

7                    THE COURT REPORTER:  Can you-all speak up for me?

8                    MS. SWARNS:  I'm sorry.

9                    Yes, the prosecutors' affidavits are in Tab 1 and

01:52  10   Tab 2 of Exhibit -- Joint Exhibit 1A.

11                   THE COURT:  Okay.  Yeah.  I already have these

12   affidavits.  I read these in the context of the -- yeah, I read

13   these both in the context of the previous briefing that we had

14   on this.  Right.  Okay.

01:53  15                  MS. SWARNS:  Just so your Honor knows, our plan is to

16   begin with Ms. Davenport.  My colleague, Mr. Gray, will

17   cross-examine her; and then we will proceed with Mr. Henderson,

18   and I will cross-examine him.  And I will present the testimony

19   of Mr. Washington.

01:53  20                  THE COURT:  Okay.  Hold on a second.  I just want to

21   make sure I remember all of this.  Just give me a second just

22   to refresh my recollection.  I remember reading all this; but

23   since you're going to start with cross, let me just go over it

24   again really quickly.

01:53  25                  MS. SWARNS:  Sure.

01:53    1           THE COURT:  All right.  They both -- each individual

2   person.  Okay.

3      *(Sotto voce discussion between Court and staff)*

4           THE COURT:  All right.  Who will be starting?

01:55    5   Mr. Gray?

6           MR. GRAY:  Your Honor, may we have the Court's

7   permission to have bottles of water at the table for the folks

8   who are asking the questions?

9           THE COURT:  Absolutely.  Did you guys bring some?

01:55   10           MR. GRAY:  Yes.  I just wanted to make sure it's okay.

11           THE COURT:  Unfortunately, you know, the government is

12   cheap.  We don't have any water for you guys anymore.

13           MR. GRAY:  Our resourceful paralegal found some in the

14   building.

01:55   15           THE COURT:  Okay.  Perfect.

16            Okay.  What are we going to start with?

17           MR. GRAY:  We call Ms. Davenport, Norma Davenport.

18           THE COURT:  Is she out in the hallway?

19            Okay.  I just didn't know.

01:56   20           MR. GRAY:  Your Honor, is it okay if I question

21   Ms. Davenport sitting at this table?

22           THE COURT:  Absolutely.  Except that I want to make

23   sure -- where is the witness going to be?  Is the witness --

24   how did we set it up?  We set it up with the witness to be

01:56   25   there?

*Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

01:56   1          THE CASE MANAGER:  Yes, Judge.  Because I was -- I was
2      still having difficulty as to where to put them.
3              THE COURT:  Well, the only --
4              THE CASE MANAGER:  She won't be seen?
01:56   5          THE COURT:  Yeah.  Here's my only objection.  This is
6      just me personally.  I mean, maybe you guys don't care; but I
7      would really like Mr. Rosales to be able to see the witnesses,
8      because right now --
9                  Mr. Rosales, the only person you can see is me,
01:56   10     correct?
11             MR. ROSALES:  Yes, your Honor.
12             THE COURT:  Okay.
13             MR. ROSALES:  Yes, your Honor.
14             THE COURT:  Can we put the witness here?  And I'll
01:56   15     just move back.  I mean, I don't think it matters to you guys;
16     but, I mean, I think Mr. Rosales should be able to see the
17     witnesses.
18         (Discussion off the record)
19             THE COURT:  Okay.  What should we put down here to
01:57   20     make it easier now so we don't have to keep climbing up?  What
21     should the witness be able to have in front of her?
22             MR. GRAY:  The most important ones will be --
23             THE COURT:  1A?
24             MR. GRAY:  1A for sure.
01:57   25         THE COURT:  Okay.  That one on the bottom.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:57    1          MR. GRAY:  And 3.  But please have the others in

         2    reach, as well.

         3          THE COURT:  All right.

         4          MS. MIRANDA:  Is that her deposition?  Is that 3?

01:57    5          MR. GRAY:  Yes, ma'am.

         6          THE COURT:  Okay.  So, now -- so, Mr. Rosales, can you

         7    see the witness now?

         8          MR. ROSALES:  Yes, ma'am.  Yes, your Honor.

         9          THE COURT:  All right.  And your lawyer is off to my

01:58   10    left and -- so you won't be able to see your lawyer, but I

        11    think that it's really mostly important for you to be able to

        12    see the witness during this part of the proceedings.  All

        13    right?

        14          MR. ROSALES:  Yes, ma'am.  Yes, ma'am.  Yes, your

01:58   15    Honor.

        16          THE COURT:  Would you stand?

        17          THE CASE MANAGER:  Raise your right hand, please.

        18           Do you solemnly swear the testimony you give in

        19    the case now before the Court will be the truth, the whole

01:58   20    truth, and nothing but the truth, so help you God?

        21          THE WITNESS:  I do.

        22          THE CASE MANAGER:  Take a seat.

        23          MR. GRAY:  Ms. Reporter, are you ready?

        24          **NORMA DAVENPORT, DULY SWORN, TESTIFIED:**

        25                    **CROSS-EXAMINATION**

*Gray Cross of Davenport*

1   BY MR. GRAY:

2   Q.  Ms. Davenport --

3   A.  Yes, sir.

4   Q.  -- have you read the pretrial proposed findings of fact

5   submitted by the State in this matter?

6          THE COURT:  Ask the witness to state her name for the

7   record, please.

8   BY MR. GRAY:

9   Q.  Please state your name for the record.

10  A.  My name is Norma Davenport.

11         MR. GRAY:  Was the witness sworn in, your Honor?

12         THE WITNESS:  Yes.

13  BY MR. GRAY:

14  Q.  Have you read the pretrial proposed findings of fact

15  submitted by the State in this matter?

16  A.  No, I have not seen them.

17  Q.  Have you read the pretrial proposed findings of fact

18  submitted by Mr. Rosales in this matter?

19  A.  I have not seen them.

20  Q.  Have you read the transcript of Mr. Henderson's deposition?

21  A.  I have not.

22  Q.  Have you reviewed any other pleadings in this case?

23  A.  I have not.

24  Q.  Mrs. Davenport, when did you begin working at the Harris

25  County District Attorney's Office?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

01:59   1    A.   In November of 1979.

        2    Q.   And when did you leave that office?

        3    A.   In July of 1986.

        4    Q.   Briefly, could you recap the positions that you held during

01:59   5    your tenure at the office?

        6    A.   I started out as the Number 3 prosecutor in the misdemeanor

        7    court.   I went through all three of the positions in

        8    misdemeanor.   I went through all three positions in the court

        9    in felony division.   At one time I was deputy chief of

02:00   10   misdemeanor.

        11   Q.   Is that all?

        12   A.   That's it.

        13   Q.   Okay.   Ms. Davenport, what did you look for when selecting

        14   jurors?

02:00   15   A.   I looked for people who I thought would understand what we

        16   were trying to prove, who would follow the law, and whom I felt

        17   comfortable that they would do so.

        18   Q.   Could you please turn to Exhibit 3, Tab 1, which contains a

        19   copy of your deposition transcript?

02:00   20   A.   (Complies).

        21        THE COURT:   It's the little one, over there to the

        22   right.

        23        THE WITNESS:   Oh, I'm sorry.

        24        Okay.

02:01   25        MS. MIRANDA:   Just for the record, to facilitate,

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:01   1    there's no exhibit numbers on those.  So, if you refer to them
        2    by number --
        3                THE COURT:  Yes, there are.  They're on the side.
        4                MS. MIRANDA:  Oh, I'm sorry.  I apologize.  I didn't
02:01   5    see them from the side.
        6    BY MR. GRAY:
        7    Q.  Ms. Davenport, at Page 63, Line 6, you say you're looking
        8    for jurors with a stake in the community, probably a steady
        9    job, maybe a family?
02:01   10   A.  Yes.
        11   Q.  Is that accurate?
        12   A.  That's accurate, too.
        13   Q.  On Page 82, you say -- on Line 24, you say that you would
        14   like jurors who can identify with you, believe you, or trust
02:02   15   you or feel like you were somebody that they could talk to if
        16   the circumstances were different.  Do you agree with that
        17   statement?
        18   A.  I do.
        19   Q.  On Page 37, please, Line 13, you testified that, "whether
02:02   20   they agreed with capital punishment, whether they thought it
        21   was necessary, or whether they disagreed with it but still
        22   thought it was necessary."
        23                Do you still agree with that statement?
        24                That's Page 37, Line 13.
02:02   25   A.  Well, yes.  I was looking for their feelings, what they

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:02  1   thought about it, whether they thought it was necessary,

2   whether they disagreed with it, I just -- yes, I agree with the

3   statement.

4   Q.  Was it important to you to have a juror who agreed with

02:02  5   capital punishment?

6   A.  Yes.  They're not qualified to be on a capital jury if they

7   don't.

8   Q.  Was it important to you to have a juror who felt that

9   capital punishment was necessary?

02:03  10   A.  Yes.  Pretty much.

11   Q.  Was someone who felt that capital punishment was necessary

12   more important than having someone who actually believed in

13   capital punishment?

14   A.  I don't know that I particularly see the difference.

02:03  15   Q.  Okay.  What kinds of people were you trying to exclude from

16   serving as jurors?

17   A.  Well, those people who could not follow the law, who gave

18   evasive answers that I wasn't comfortable with, those people

19   who -- well, those who were all struck for cause because of

02:03  20   biases.

21   Q.  Anything else?

22   A.  Well, I'm sure there are; but I don't know that I can I

23   think of them right now but --

24   Q.  Could you please turn to Page 63, Lines 10 through 12, of

02:04  25   your deposition?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:04  1    A.   Ten through twelve?

2    Q.   Yes, ma'am.

3    A.   Okay.

4    Q.   You said that you were cautious about people who you

02:04  5    perceived to be alcoholics or who drank too much or engaged in

6    occupations like prostitution.  Is that an accurate statement?

7    A.   That's an accurate statement.

8    Q.   Could you please turn to -- same page, Lines 13 through 15.

9              You testified, "I did not think preachers made

02:04  10   very good State jurors because I thought they were too

11   kindhearted and forgiving."

12             Is that an accurate statement of your views?

13   A.   Yes.

14   Q.   And on Line 17 through 19, you said, "And I suspected that

02:04  15   painters didn't make very good jurors because I thought they

16   drank frequently."

17             Is that an accurate statement of your views?

18   A.   Yes, that's something that we -- or that I encountered

19   occasionally in picking juries; and, yes, I don't think

02:05  20   painters made good jurors.

21   Q.   Okay.  And on Lines 10 through 12, you said, "If I had

22   enough people from whom I could choose, I wouldn't put teachers

23   on my juries either."

24             That's Page 69, Lines 10 through 12.  Is that an

02:05  25   accurate statement of your views?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:05   1    A.  Yes.  Same reason, basically.

        2    Q.  Okay.  Do you have a view as to what age group -- whether

        3    the age group that the person taught made a difference as to

        4    whether a teacher was likely to be a good juror?

02:05   5    A.  No.  I don't think so.

        6    Q.  Were there other suspect professions, in your mind, other

        7    professions that raised concerns for you?

        8    A.  I think engineers are a little picky.

        9    Q.  What did you mean when you said -- sorry.  Excuse me.  Do

02:05   10   you have another?

        11   A.  No.

        12   Q.  What did you mean when you said, "occupations like

        13   prostitution"?  What did you have in mind when you made that

        14   assertion?

02:06   15   A.  Well, I think you had asked me what types of people I

        16   didn't want on a jury --

        17   Q.  Correct.

        18   A.  -- what certain occupations.  And I said, "An occupation

        19   like prostitution."

02:06   20              Wasn't that the answer?

        21   Q.  Correct.

        22              Were you concerned that people were engaged in

        23   criminal activities?

        24   A.  Well, I don't know that prostitution necessarily means that

02:06   25   somebody is such a criminal that you're not going -- that

*Gray Cross of Davenport*

02:06   1   you're going to know what their occupation is.  But if I were
2   to know, I wouldn't want to put a prostitute on a jury.
3   Q.   Okay.  Do you consider lawyers to be favorable jurors?
4   A.   Sometimes.
02:06   5   Q.   Are federal postal workers favorable jurors?
6   A.   Sometimes.
7   Q.   Under what circumstances would a lawyer be a favorable
8   juror?
9   A.   In most criminal cases, I think they are.  As a civil
02:07   10   lawyer, I'm not sure I would put them on a jury -- or want them
11   on a jury.
12   Q.   And under what circumstances would a federal postal worker
13   be a favorable juror?
14   A.   It just depends on their personality, on their
02:07   15   individuality.
16   Q.   Are there circumstances in which you wouldn't want a
17   federal postal worker as a juror?
18   A.   I think I've had postal workers on juries before, who hung
19   up juries.  And that's why I'm not real comfortable with them.
02:07   20   Q.   Ms. Davenport, were you able to judge jurors that you might
21   not want based on their appearance, things you could tell about
22   a juror based on their appearance, that would send you a signal
23   that you did not want them?
24   A.   Sometimes, yes.
02:07   25   Q.   Were there some people who it was so clear to you that you

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:07   1   would not connect with them that you could strike them even

       2   without asking questions?

       3   A.   I don't know that I did that in this case; but, yeah, I

       4   think that's -- that's possible.

02:08   5   Q.   Okay.  If you could please turn to Page 57, Line 15, of the

       6   deposition transcript.

       7   A.   Line 15?

       8   Q.   Yes, ma'am.

       9   A.   Okay.

02:08  10   Q.   You say, "It's got to be someone you feel like you can

      11   interact with.  I don't like jurors -- men, young men in

      12   particular -- who come in and slouch down in the pew.  I know

      13   it's not comfortable; but they slouch down, and they have this

      14   air of, 'I'm wasting my time here.'  I can strike them without

02:08  15   asking a question."

      16   A.   I didn't find the right page, but that sounds right.

      17   Q.   Page 57, Line 15.

      18   A.   Fifty-seven?

      19            Okay.  I see it.

02:08  20   Q.   Do you agree with that statement?

      21   A.   I do.

      22   Q.   Okay.  Other than young men who slouch down in the pew,

      23   were there other types of jurors who you knew you weren't going

      24   to be able to connect with?

02:09  25   A.   There are some times when a juror -- potential juror takes

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:09   1    the stand or is in a roomful of veniremen, you can tell by the

      2    way they're looking at you, if they're sending friendly vibes

      3    or critical vibes or crossed arms or won't meet your eye

      4    contact.

02:09   5    Q.  Okay.  Did you look for clues that a potential juror might

      6    be an alcoholic?

      7    A.  I don't think I did in this case, no.

      8    Q.  Did you look for clues that a potential juror might be a

      9    prostitute?

02:09  10    A.  No.

    11    Q.  Would the neighborhood that the person lived in send you a

    12    clue, a neighborhood with a certain kind of reputation?

    13    A.  No.

    14           And you asked me some questions about why I made

02:09  15    notations about neighborhoods.

    16    Q.  Yes, ma'am.

    17    A.  On every one of those first forms, there was a place for

    18    them to either put their address or the location in town in

    19    which they lived.  And if they didn't fill that out, I noticed

02:10  20    that I wrote in there a lot where -- what part of town it was.

    21           And there are apparently two forms that were

    22    used.  One of them asked for the address; one of them asked for

    23    the part of town.  I don't know why they're different.

    24    Q.  Okay.  Is it your understanding that there were juror forms

02:10  25    that did not contain an address?  Is that --

*Gray Cross of Davenport*

02:10   1   A.  Yes.  One of the forms asked for the address, right under

2   the name.  Some of the other forms, instead of asking for the

3   address, asked for the part of town they were from.

4   Q.  And is it your understanding that some of the potential

02:10   5   jurors in this case did not fill their addresses out on the

6   juror card?

7   A.  That's right.  That's on the long form.

8   Q.  On the long form or the short form?

9   A.  The long form.

02:11   10   Q.  How many capital cases have you prosecuted?

11   A.  Two.

12   Q.  And what was the other capital case that you prosecuted?

13   A.  I told you on the deposition, and I'm not thinking of his

14   name right now.

02:11   15   Q.  Would it refresh your recollection, Mr. Tompkins' trial?

16   A.  Yes.

17   Q.  Do you recall the year of the Tompkins trial?

18   A.  No.  It was before this one.  So, it was '83, maybe, '82.

19   I don't know.

02:11   20   Q.  Okay.  What was your position during the Tompkins trial?

21   A.  I was sitting second chair.

22   Q.  And who was first chair?

23   A.  Tommy Royce.

24   Q.  What do you recall about the Tompkins trial?

02:11   25   A.  You mean the fact situation?

*Gray Cross of Davenport*

02:11  1    Q.  Yes, ma'am.

2    A.  I remember that he was a young man who had been in prison

3    in Virginia before.  He followed someone -- a woman home from

4    the Medical Center.  I can't remember if she was a pharmacist

02:12  5    or what her position there was; but he followed her home, out

6    toward Missouri City, and ran into the back of her car.  And

7    when she got out to check, he abducted her and took her out

8    south of the Astrodome and tied her to a tree and raped her and

9    gagged her and killed her, used her ATM card.

02:12  10   Q.  Was Mr. Tompkins convicted?

11   A.  Yes.

12   Q.  Was he sentenced?

13   A.  Yes.

14   Q.  What sentence did he receive?

02:12  15   A.  He received the death penalty.

16   Q.  Do you know whether Mr. Tompkins was executed?

17   A.  No, he was not.

18   Q.  Why wasn't he executed?

19   A.  His sentence was commuted to life because of an expert

02:12  20   witness who testified on behalf of the State, who gave false --

21   well, she didn't give false testimony except as to her

22   credentials.  She had been in the position of a psychologist, I

23   believe, at the penitentiary where he had been incarcerated and

24   had treated him there.

02:13  25              And she held herself out to have -- her college

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:13   1   credentials were in psychiatry or psychology.  I've forgotten.

2   And she made an expert -- a wonderful expert witness; but,

3   unfortunately, she only had an art degree.  I don't know where

4   she learned her trade, but she was not -- she didn't have the

02:13   5   qualifications she held herself out to have.

6   Q.  As a result of that, the sentence was reduced?

7   A.  As far as I know, that's the reason, yes.

8   Q.  Ms. Davenport, how many times have you been required to

9   testify at a Batson hearing prior to today?

02:13   10   A.  I think I testified once.

11   Q.  Do you recall the circumstances under which that happened?

12   A.  No, sir.  I told you at the deposition I don't even

13   remember which case it was.

14   Q.  I think at the deposition I showed you a copy of the Batson

02:14   15   hearing transcript from the Tompkins case.

16   A.  Okay.  If that's the one it was, then that's --

17   Q.  Okay.  Are you familiar with that transcript?

18   A.  Have I read it?  No.

19   Q.  Have you read it?

02:14   20   A.  No, have not.

21   Q.  Okay.  You left the deposition with a copy of that

22   transcript, to my recollection.  Is that correct?

23   A.  No, I did not.

24   Q.  You did not take a copy of the transcript?

02:14   25   A.  No, I didn't -- I didn't have a copy of it.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:14  1    Q.  Okay.  Do you have any recollection as to whether any

2    African-American jurors sat on the jury in Mr. Tompkins' trial?

3    A.  I have no recollection.

4    Q.  Okay.  Did you have any discussions prior to this hearing,

02:15  5    with anyone about the Tompkins Batson hearing?

6    A.  (Shaking head).

7    Q.  Did you discuss that hearing with anyone?

8    A.  No, I did not.

9    Q.  If you could please turn to Exhibit 4, Tab 2, Page 161.

02:15  10   A.  Tab 2, 161?

11   Q.  Yes, ma'am.

12        Okay.  I'd like to focus on the question that

13   begins at the bottom of -- or Line 20 of that page.  This is

14   counsel for Mr. Tompkins asking Mr. Royce, "While you were an

02:15  15   assistant district attorney, did you ever have conversations

16   with other assistant district attorneys or been privy to

17   conversations with other assistant district attorneys,

18   concerning the undesirability of minorities on juries, where

19   you had a choice?"

02:16  20        Mr. Royce responded, "I guess, you know,

21   everybody talks about those things.  I don't think there's any

22   question that you don't."

23        Do you recall conversations with Mr. Royce

24   concerning the undesirability of minorities on juries?

02:16  25   A.  I do not.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:16  1          MS. MIRANDA:  Your Honor, if I may at this point, I'm

2      not objecting to the admission of this exhibit, because she

3      testified in here.  And to the extent that they want to use it

4      to cross-examine her regarding what's relevant in this case, we

02:16  5      have no objection but to the extent that they're admitting it

6      for other people's testimony in here when we don't have the

7      opportunity to cross-examine Mr. Royce.

8          THE COURT:  Well, it was just a question about whether

9      or not she recalls any conversation like that.  I don't think

02:16  10     that that's an objectionable question at this point.

11         MS. MIRANDA:  Thank you, your Honor.

12         THE COURT:  But feel free to, you know, let me know if

13     you think that there's another problem; but I don't think that

14     there's any objectionable question there.

02:16  15              Did you have an opportunity to answer that

16     question?

17         THE WITNESS:  I did, your Honor.

18         THE COURT:  Okay.  Could you give your answer again,

19     please?  Did you say you did or you did not?

02:17  20         THE WITNESS:  I did not.

21     BY MR. GRAY:

22     Q.  Ms. Davenport, do you agree with Mr. Royce that there is

23     not any question that -- question that assistant district

24     attorneys discuss, quote, the undesirability of minorities on

02:17  25     juries?

*Gray Cross of Davenport*

02:17  1   A.  Well, I'm sure some of them do.  I don't remember ever

2   having those conversations, but apparently he does.

3   Q.  Mr. Royce was your supervisor at some point?

4   A.  He was the chief of that court, yes.

02:17  5   Q.  Was he a respected prosecutor?

6   A.  Yes, he was.

7   Q.  Do you have any reason to doubt the credibility of

8   Mr. Royce's statement?

9   A.  No, sir.

02:17  10  Q.  Okay.  If you could, please turn to Page 162.

11          THE COURT:  In that same deposition?

12          MR. GRAY:  Yes, ma'am.  Yes, your Honor.

13  BY MR. GRAY:

14  Q.  Lines 11 through 16, Mr. Royce was asked, "Do you recall

02:17  15  being privy to a conversation or at least the general feeling

16  that Blacks were more inclined -- Blacks or minorities were

17  more inclined to be lenient to defendants?"

18          Answer by Mr. Royce, "I think that's a

19  possibility and something you have to look at, yes."

02:18  20          Ms. Davenport, did you have conversations with

21  Mr. Royce concerning a general feeling that Blacks or

22  minorities were inclined to be more lenient to defendants?

23  A.  I have no idea if I did or not.

24  Q.  Okay.  Do you agree with him that if Blacks or minorities

02:18  25  would be more inclined to be lenient with defendants is

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:18   1   something you have to look at?

2   A.   I would agree with him if -- if the defendant is someone

3   with whom I think that they might connect with, yes.

4   Q.   So, would -- when you were selecting jurors, you would

02:18   5   consider the possibility that a juror might identify with the

6   accused person?

7   A.   Yes.   And sometimes it didn't have anything to do with

8   race.

9              MR. ROSALES:   Your Honor?   Your Honor?

02:18   10             THE COURT:   You can't hear?

11             MR. ROSALES:   I didn't hear.   Yes, I heard; but I

12   couldn't understand the previous question that they asked her,

13   about connecting with your --

14             THE COURT:   Okay.   I will ask -- I will ask Mr. Gray,

02:19   15   your lawyer, if he'll keep his voice up.

16             I can hear you fine but -- is that the mic down

17   there?

18             MR. GRAY:   We can move this over, your Honor.

19             MR. ROSALES:   I didn't hear her.   I didn't hear the

02:19   20   answer that, your Honor.   I didn't hear the answer that she

21   gave.

22             THE COURT:   Okay.   All right.   We'll do that last

23   question and answer again for you a little bit louder so that

24   you can hear.

02:19   25             THE CASE MANAGER:   This is the only mic.

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

*Gray Cross of Davenport*

02:19  1          THE COURT:  Oh, this is the only mic in the room?

       2          *(Sotto voce discussion between Court and staff)*

       3          MR. GRAY:  I will try to speak up, your Honor.

       4          THE COURT:  Okay.  Mr. Gray, could you speak up for

02:19  5   us?

       6          And I'm sorry, Ms. Davenport.  Could you speak

       7   up, too?

       8          THE WITNESS:  Certainly.

       9          THE COURT:  I think that the -- can you go back to the

02:19  10  last question that you had just started asking, which I think

       11  was about Line 11 or so.

       12         MR. GRAY:  Line 11?  Okay.  Okay.

       13         THE COURT:  Keep your voice up a little bit.  I can

       14  hear you fine, but I wasn't thinking in terms of it not

02:20  15  necessarily carrying.

       16  BY MR. GRAY:

       17  Q.  We're at Page 162, Line 11; and I'm reading from questions

       18  that were asked of Mr. Royce, Ms. Davenport's supervisor and

       19  co-counsel in this particular trial, by an attorney for the

02:20  20  defendant in that case.

       21         "Do you recall being privy to a conversation or

       22  at least a general feeling being that Blacks were more

       23  inclined -- Blacks or minorities were more inclined to be

       24  lenient to defendants?"

02:20  25         And Mr. Royce answers, "I think that's a

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:20  1    possibility and something you have to look at, yes."
      2                    I'll repeat the question, Ms. Davenport.  Did you
      3    ever have conversations --
      4    A.  I have no idea if I had a conversation with Mr. Royce about
02:20  5    that.
      6    Q.  Okay.  Do you --
      7    A.  But, yes, I am familiar with that feeling -- with that --
      8    Q.  Did you have conversations with other prosecutors in the
      9    office, along those lines?
02:20 10    A.  I don't know.  I don't remember any.
     11    Q.  You don't remember any specific conversations?
     12    A.  No.
     13    Q.  But it wouldn't surprise you that conversations like that
     14    took place in the office --
02:21 15    A.  No, sir.
     16    Q.  -- in the early Eighties?
     17    A.  No, sir.
     18    Q.  Do you agree with Mr. Royce that Blacks and minorities
     19    being more inclined to be lenient to defendants is something
02:21 20    that you have to look at, Ms. Davenport?
     21    A.  Yes, I agree with you --
     22    Q.  Could you explain the basis of your agreement?
     23    A.  Well, if you have two people who are from the same
     24    background and have the same outlook on life, if they see
02:21 25    someone they identify with, then you may -- you'd probably have

*Gray Cross of Davenport*

02:21 1 a hurdle, to get over that personal identification with them.

2 Q.  When you were interviewing potential jurors, how did you

3 take this concern into account?

4 A.  Well, we didn't have very many Hispanic male jurors, as I

02:21 5 recall.  And several of them were struck for cause.  So, I

6 didn't have to take it into account.

7           There was one Hispanic male juror, whose name was

8 Mr. Rodriguez, who the defense lawyer struck.  So, I didn't

9 have to take that one into account.

02:22 10           We had at least one Hispanic male juror who was

11 selected to be on the jury.  And I don't remember how I

12 evaluated him, but I thought he could be fair.

13 Q.  What kinds of questions did you ask to discern whether a

14 juror might identify with the defendant?

02:22 15 A.  I don't know that I asked any.

16 Q.  Were there groups that -- other than Hispanics -- that you

17 were concerned about that might identify with a defendant?

18 A.  With this defendant --

19 Q.  Yes.

02:22 20 A.  -- or any defendant?

21 Q.  For instance, would you be concerned that a male potential

22 juror might identify with a male defendant, particularly in a

23 crime of passion?

24 A.  Not particularly, no.

02:22 25 Q.  What would be your reason for thinking that a Hispanic

*Gray Cross of Davenport*

02:23  1    potential juror might identify with a defendant, but a male

2    potential juror was not particularly likely to identify with

3    the defendant?

4    A.  Well, not unless the male was Hispanic, also.

02:23  5    Q.  So, you think it's more likely that the identification

6    would be a basis of ethnic background rather than gender?

7    A.  Could be, yes.

8    Q.  Okay.  Who is Bob Moen?

9    A.  He is a man who used to be a prosecutor.  I don't know what

02:23  10   he is now.

11   Q.  Was Mr. Moen a respected prosecutor?

12   A.  As far as I know, he was.

13   Q.  Could you please turn to Page 18 of the transcript you have

14   in front of you, ma'am?

02:23  15   A.  Under Tab 2?

16   Q.  Yep.  If you'd please look at Line 20, Mr. Moen testifies,

17   "Because of the poor relationship historically the police have

18   had with minority members of our community, as a general rule,

19   be aware of selecting minorities, depending on the type of

02:24  20   case, because they're not likely to feel ingratiated toward you

21   as a prosecutor or perhaps your police officers who will

22   testify as witnesses, because historically the problems that

23   police officers have had and because essentially so many, from

24   a personal standpoint, of the people we prosecuted as

02:24  25   prosecutors are members of the Black community."

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:24   1                  Did you read that Ms. Davenport?
        2   A.  Yes, I read it.
        3   Q.  Do you agree with Mr. Moen's statement that assistant
        4   district attorneys had, as a general rule, to be aware of
02:24   5   selecting minorities?
        6   A.  It wasn't as it applied to me.  I wasn't aware of that type
        7   of feeling, no.  And I didn't have that type of problem.
        8   Q.  Did you ever hear other prosecutors express the view that
        9   Mr. Moen recognizes in that passage?
02:25  10   A.  No.  But I wasn't at the same level as Mr. Moen, either.
       11   He was several years ahead of me.  And if he and the group that
       12   he went in had that problem, it wasn't my experience.
       13   Q.  Okay.  Was he ever a supervisor of yours?
       14   A.  No.
02:25  15   Q.  Okay.  If you could please turn to Page 132 of your
       16   deposition.
       17   A.  Is that Number 3?  Tab 1?
       18          THE COURT:  Tab 2.
       19          THE WITNESS:  One hundred thirty-three?
02:26  20          THE COURT:  He said 132, I think.
       21          MR. GRAY:  Yes.  Excuse me.  Did I say 132?
       22          THE COURT:  I think so.  That's what I turned to.
       23          MR. GRAY:  Okay.  Yes.  Correct.
       24   BY MR. GRAY:
02:26  25   Q.  Line 10, you testified that, "Blacks tend to be more

*Gray Cross of Davenport*

02:26  1    sympathetic towards Blacks just as any other group tends to be

2    more sympathetic to people in that group.  It doesn't matter

3    what kind of group it is."

4              THE COURT:  Wait a minute.  What page are you on

02:26  5    again?

6              MR. GRAY:  Your Honor, I'm on Page -- Ms. Davenport's

7    deposition transcript, Page 132, Line 10.

8              THE COURT:  Oh, you switched exhibits.

9              MR. GRAY:  Yes, ma'am.

02:26  10             THE COURT:  I'm sorry.

11             MR. GRAY:  I apologize for not making that clear.

12   BY MR. GRAY:

13   Q.  Ms. Davenport, is that clear to you, I'm now in Exhibit 3?

14   A.  This?

02:26  15             THE COURT:  Three.

16             THE WITNESS:  Tab 1?

17             THE COURT:  Tab 1?  Oh, Tab 1.  I'm sorry.  I'm all

18   messed up.

19             MR. GRAY:  This is her deposition transcript.

02:27  20   BY MR. GRAY:

21   Q.  So, you shared some of Mr. Moen's concern that group

22   sympathy could affect a juror's decision maybe?

23   A.  That was my opinion.  I don't know if it's his opinion.

24   Q.  Ms. Davenport, prior to the Batson decision, were you aware

02:27  25   of any law that prevented you from striking an individual juror

*Gray Cross of Davenport*

02:27  1   on the basis of race?

2   A.  Not that I recall.

3   Q.  Okay.  Following your testimony at the Tompkins hearing,

4   are you aware of any appellate litigation that followed?

02:27  5   A.  I wasn't aware of it.  I wasn't in the loop; so, I don't

6   know.

7   Q.  Are you familiar with a decision of the Court of Criminal

8   Appeals?

9   A.  No.

02:28  10  Q.  You weren't curious as to what happened after your

11  testimony in Tompkins' Batson hearing?

12  A.  Sure, I was curious; but I still didn't know what happened.

13  Q.  Okay.

14  A.  And by that time, I was probably gone from the DA's office.

02:28  15  Q.  So, you didn't ask anybody about what the result of that

16  case was or what the Court of Criminal Appeals had said about

17  your testimony in that hearing?

18  A.  No.

19  Q.  Did you ever hear that the United States Supreme Court had

02:28  20  granted review of the Batson issue in Tompkins?

21  A.  No.

22  Q.  Do you know whether -- anyone who attended oral argument

23  when that case was argued in front of the United States Supreme

24  Court?

02:28  25  A.  No, I do not.

*Gray Cross of Davenport*

02:28   1    Q.   Okay.   I'd like to turn to the topic of jury selection in

        2    Mr. Rosales' trial.   What was the name of the trial judge in

        3    Mr. Rosales' trial?

        4    A.   That was Judge Joe Kegans.

02:29   5    Q.   Were you assigned to a courtroom at the time?

        6    A.   Yes, I was.

        7    Q.   What was your position at the time of the trial?

        8    A.   I was the chief prosecutor.

        9    Q.   And who was your direct supervisor at the time of

02:29   10   Mr. Rosales' trial?

        11   A.   I think my bureau chief was Keno Henderson.   You know, I

        12   really can't remember if it was Keno or if it was Rusty Hardin.

        13   I don't remember, but they were both bureau chiefs.

        14   Q.   Okay.   Who was -- were you the first chair at Mr. Rosales'

02:29   15   trial?

        16   A.   Yes, sir.

        17   Q.   Did you have primary responsibility for the prosecution?

        18   A.   I did.

        19   Q.   Had you done most of the work to prepare for trial?

02:29   20   A.   Yes.

        21   Q.   Was this your first capital prosecution as first chair?

        22   A.   Yes.

        23   Q.   And who was second chair, Ms. Davenport?

        24   A.   Keno Henderson.

02:30   25   Q.   Had you previously tried any cases with Mr. Henderson?

*Gray Cross of Davenport*

02:30   1   A.  No.

2   Q.  How did you come to work on this trial with Mr. Henderson?

3   A.  Well, bureau chiefs normally sat second with the chief

4   prosecutor.  And if one of them was busy, usually another one

02:30   5   sat in.  So, that's why I don't remember if Keno was my bureau

6   chief or not.

7   Q.  What do you recall about the potential jurors that you

8   interviewed in Mr. Rosales' trial?  Do you remember their

9   dress?

02:30   10   A.  No.

11   Q.  Physical appearance of any of the jurors that you

12   interviewed?

13   A.  No.

14   Q.  Can you recall the way any individual juror looked at you?

02:30   15   A.  Not particularly, no.

16   Q.  Do you recall what the potential jurors' voices sounded

17   like?

18   A.  No.

19   Q.  Okay.  Could you please turn to Exhibit 1, Tab 1?  That's

02:30   20   in the first binder, the big one.

21          Do you have a copy of the affidavit that you

22   submitted in this matter?

23   A.  I do.

24   Q.  Is that affidavit based on a refreshed recollection of the

02:31   25   voir dire of Mr. Rosales' trial?

*Gray Cross of Davenport*

02:31  1   A.  Well, part of it is.  What I looked for in the veniremen

2   was not a refreshed memory but it was a refreshed memory of

3   each one of them as I read through their -- through the

4   transcripts.

02:31  5   Q.  So, could you explain to me what part of it was not based

6   on a refreshed memory?

7   A.  Those items, on the first page, that I told you what my

8   evaluation was based on, the things I looked for.

9   Q.  Those things described your general practices?

02:32  10  A.  Yes.

11  Q.  Okay.  But with respect to the specific jurors, the reason

12  that you struck the individual jurors, what is the basis for

13  your recollection of those things?

14  A.  Partly the transcript, partly my notes that I made on their

02:32  15  information sheets that I had that were in the file.

16  Q.  Is there anything else that you reviewed to refresh your

17  recollection about the reasons you may have struck specific

18  jurors?

19  A.  No.  I don't have anything else to refresh my memory.

02:32  20  Q.  Apart from the transcripts and the notes on the juror

21  cards, do you have an independent recollection of the voir dire

22  of any of the Batson jurors in this trial?

23  A.  I remembered parts of it as I was reading through it, yes.

24  Q.  Do you recall whether any of the prospective jurors

02:32  25  slouched in the pew?

*Gray Cross of Davenport*

02:32  1   A.  They weren't in the pew.  They were in the witness --

2   witness chair right by the judge's bench.

3   Q.  Do you recall the posture of any of the jurors when you

4   were talking to them?

02:33  5   A.  Not specifically, no.

6   Q.  Are the reasons that you state in the affidavit speculation

7   about what you think might have been the basis of your strikes,

8   based on a review of the transcript?

9   A.  Do I think it was speculation on my part?

02:33  10  Q.  Yes, based on a review of the transcript.

11       THE COURT:  Could you ask the question again?  I'm

12  sorry.  I just want to make sure I understood it.

13  BY MR. GRAY:

14  Q.  Yes.  Are the justifications in the affidavit speculation,

02:33  15  based on a review of the transcript?

16  A.  Well, I wouldn't call it "speculation."

17  Q.  Could you describe the -- do you have an independent

18  recollection of those justifications, apart from a review of

19  the transcript?

02:33  20  A.  Just as they relate to the notes I wrote down.  That wasn't

21  speculation.  That was observing what I had written and seeing

22  how it pertained to that individual.

23  Q.  Other than the notes, are the justifications based on a

24  review of the transcripts and your guess as to what was likely

02:34  25  the reason you struck the jurors?

*Gray Cross of Davenport*

02:34 | 1   A.   Sure.

2   Q.   Okay.  Did you review any of the documents concerning the

3   seated jurors?

4   A.   The transcript, you mean?

02:34 | 5   Q.   Yes.

6   A.   Yes, I did.

7   Q.   Okay.  At your deposition you had not reviewed those.  Was

8   that prior to this hearing you reviewed documents?

9   A.   Yes.

02:34 | 10   Q.   Do you recall the names of the seated jurors whose

11   transcripts you reviewed?

12   A.   Yes.  I remember specifically when -- a Ms. Willett.

13   Q.   Anyone else?

14   A.   I can't think of all their names right now, but that one

02:34 | 15   stuck in my mind.

16   Q.   Did you read the transcript and the juror card of

17   Ms. Willett?

18   A.   Yes.

19   Q.   Did you read the transcripts of any other jurors?  And I

02:34 | 20   recognize you may not remember their names at this point.

21   A.   Yes.  Yes, I did read them.

22   Q.   Roughly, how many other transcripts did you review?

23   A.   There were several others, Plander, Poe -- I think it was

24   Poe.

02:35 | 25           I can't think of the rest of them.

*Gray Cross of Davenport*

02:35   1    Q.   Okay.  And did you read the juror cards of Ms. Plander and

        2    Ms. Poe, as well?

        3    A.   Not prior to today's hearing.  I did before the deposition.

        4    Q.   At your deposition, my recollection is you testified that

02:35   5    you hadn't read the cards of any of the seated jurors.

        6    A.   And I have -- well, I guess I haven't, then, because I

        7    didn't review any of the written information cards prior to

        8    this hearing.

        9    Q.   Okay.  Did you read the transcripts for any of the jurors

02:35  10    that were passed by the prosecution but struck by the defense?

       11    A.   Yes.

       12    Q.   Do you remember approximately how many of those jurors'

       13    transcripts you read?

       14    A.   I read most of them.  I mean, I read most all the

02:36  15    transcripts.

       16    Q.   Okay.  And did you discuss the affidavit that you submitted

       17    in this matter with Ms. Miranda?

       18    A.   You mean prior to submitting it?

       19    Q.   Yes, ma'am.

02:36  20    A.   Yes.  I sent her a draft of it.

       21    Q.   Okay.  Approximately how many times do you think you

       22    discussed that affidavit with Ms. Miranda?

       23    A.   Once or twice.

       24    Q.   Okay.  I'd like to discuss the timing of the voir dire

02:36  25    process.

*Gray Cross of Davenport*

02:36    1    A.   Okay.

         2    Q.   You received the voir dire materials prior to questioning

         3    individual jurors.   Is that right?

         4    A.   Yes, in groups.   There were, like, four, five, or six

02:36    5    groups that were brought into the -- in groups of 10 or 12 at a

         6    time.

         7    Q.   And, possibly, that was as soon as the same day that you

         8    questioned the juror.   Is that right?

         9    A.   Yes.

02:36   10    Q.   Was it sometimes just before you were able to see the juror

        11    individually?

        12    A.   Yes.

        13    Q.   When you got the juror materials, how did you review them?

        14    A.   Quickly as I could.   I went down and just circled or

02:37   15    underlined anything that stuck out that I wanted to ask about

        16    or just take note of.

        17    Q.   So, you were under time pressure?

        18    A.   You betcha.

        19    Q.   Getting ready to ask questions?

02:37   20    A.   Yes.

        21    Q.   Getting ready to make a decision about whether you wanted

        22    that juror?

        23    A.   (Nodding head).

        24    Q.   Did you look for responses that contained particularly

02:37   25    important information?

*Gray Cross of Davenport*

02:37   1    A.   A lot of it was not important, no.

        2    Q.   What were you looking for?

        3    A.   Just anything that stuck out.

        4    Q.   Okay.  Could you please turn to Page 32 of your deposition,

02:37   5    which is in Exhibit 3?

        6    A.   Page 32?

        7    Q.   Yes, ma'am.  Line 10.

        8    A.   Okay.

        9    Q.   You list how long they lived there, whether they were

02:38  10    married, whether they were employed, whether they had been a

       11    victim of a crime or a witness or a complainant in a criminal

       12    case, whether they'd ever served on a jury, and how old they

       13    are.

       14              Are those things that are pretty important to

02:38  15    you, that you list there?

       16    A.   Those are things that -- that I note, yes.

       17    Q.   And those were -- were those things that you would be

       18    looking for when you were quickly reviewing juror cards under

       19    time pressure --

02:38  20    A.   Yes.

       21    Q.   -- in the courtroom?

       22    A.   Correct.

       23    Q.   Ma'am, did you note the race of the juror when you were

       24    reviewing juror cards?

02:38  25    A.   Sometimes I did.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:38   1    Q.  Why would you do that?

        2    A.  Well, because Mr. Boyd brought that up in our case.  At the

        3    end of each venireman who was struck or accepted, he would note

        4    on the record whether this was a Black male, a Hispanic female,

02:38   5    a redheaded White woman.  And, so, I kept -- started keeping

        6    track, as well.

        7    Q.  Okay.  I'd like you to turn to Tab 20, please, of Binder 1.

        8    A.  The big -- the one --

        9    Q.  Yes, ma'am.

02:39  10                And the first page -- this is the tab that

       11    contains the juror materials for Esmerelda Lopez.

       12    A.  Okay.

       13    Q.  The first page of her questionnaire, there's a handwritten

       14    note, "MF" --

02:39  15    A.  I must be on the wrong page.

       16    Q.  Take your time here.  I'm going -- I'm in Tab 20, and I'm

       17    on the third page in.

       18    A.  Oh, okay.  Third page in.  Okay.

       19    Q.  Okay.  It says "MF 38."  And you previously testified that

02:39  20    "MF" stood for "Mexican female"?

       21    A.  Yes.

       22    Q.  Do you recall when you interviewed Potential Juror

       23    Esmerelda Lopez?

       24    A.  When I interviewed her?

02:40  25    Q.  Yeah.  What -- in the voir dire order, when was she

*Gray Cross of Davenport*

02:40   1   interviewed?

2   A.   I couldn't tell you without looking at my list.

3   Q.   Okay.  Do you recall when Mr. Boyd first raised the Batson

4   objection -- the pre Batson objection in this trial?

02:40   5   A.   When he first raised the pre Batson?

6   Q.   When was that objection entered into the record of this

7   trial?

8   A.   I don't know.

9   Q.   I'll represent to you it was the beginning of the second

02:40   10   day of voir dire.  And Esmerelda Lopez was the first juror that

11   you interviewed on the first day of voir dire.

12          So, my question to you is why would you be noting

13   the race of a juror that you interviewed on the first day of

14   voir dire if the Batson objection hadn't been entered yet into

02:40   15   the record.

16   A.   I'm not following you.

17   Q.   Well, ma'am, you testified that the reason you noted the

18   race of the jurors on the questionnaires is because the defense

19   lawyer had raised a Batson objection, for lack of a better

02:41   20   term, and that that caused you to note the race of some of the

21   jurors on the cards.

22          This juror was the first juror you interviewed,

23   and it was one day before that objection had been entered.  So,

24   my question is why would you be noting, on the first juror card

02:41   25   you saw, the race of Ms. Lopez if the objection had not been

*Gray Cross of Davenport*

02:41  1   entered yet.

2   A.  Are you telling me that he did not put on the record that

3   the -- the race and sex of each individual as they testified?

4   Q.  Once he raised the objection, the judge put that

02:41  5   information on the record the second day of voir dire.

6   A.  Okay.  And Ms. Lopez came the second day?

7   Q.  No.  Ms. Lopez came -- was the first juror the first day.

8   A.  Oh, I don't know.

9   Q.  So, you're not sure why you noted that she was a Mexican

02:42  10   female?

11   A.  No.  But I assumed it was because of the notations that

12   Mr. Boyd was putting on the record.

13   Q.  Okay.  The note below "MF," reads, "Lives N of downtown."

14   You previously testified that Ms. Lopez -- excuse me -- that

02:42  15   you noted that on jurors where there was a missing address on

16   their juror forms.

17   A.  You see the second line there?  It says, "What part of town

18   or county do you live?"  And it says, "North."

19   Q.  Right.  My question to you is where is the missing address

02:42  20   on this juror questionnaire.

21   A.  Well, it just says "north."  And I don't know where "north"

22   is.

23   Q.  Does this form call for Ms. Lopez' address?

24   A.  No.  The other one that I told you about has -- that second

02:42  25   line asks for the address rather than the part of town.

*Gray Cross of Davenport*

02:42  1   Q.  Okay.  If you could please turn to Esmerelda Lopez' juror
       2   card, on the prior page, at the top card [sic].
       3   A.  Okay.
       4   Q.  Does that card contain a printed copy of her address?
02:43  5   A.  I'm sure it does, but it's blacked out; so, I can't read
       6   it.
       7   Q.  All right.  But to your recollection -- one can make out
       8   that there is something written there; and it looks like her
       9   name and three lines, the way an address would be.
02:43  10              Is it your recollection, that the address was
       11  provided on these juror cards?
       12  A.  Yes, they are on those juror cards.
       13  Q.  Okay.  So, why would you be needing to note "north of
       14  downtown" if the address is already provided on the juror
02:43  15  cards?
       16  A.  It's just a way of knowing where they live, what part of
       17  town they live in, so that we don't end up with jurors who are
       18  familiar with the -- the location of the murders.
       19  Q.  Was it your -- could you -- was that because you didn't
02:43  20  want to have jurors that came from the same place as the crime
       21  scene --
       22  A.  Yes.
       23  Q.  -- where the crime had taken place?
       24  A.  Yes.
02:44  25  Q.  Do you recall where Mr. Rosales' crime had taken place?

*Gray Cross of Davenport*

02:44    1   A.   I think it was in -- seems like it was in Pasadena, but I'm

         2   not really sure.

         3   Q.   Is Pasadena anywhere near north of downtown?

         4   A.   No, it's not.

02:44    5   Q.   What other clues of the jurors' potential race were you

         6   looking for?

         7          MS. MIRANDA:   Your Honor, I object to the form of that

         8   question.

         9          MR. GRAY:   The question is withdrawn.

02:44   10          THE COURT:   Okay.

        11   BY MR. GRAY:

        12   Q.   Did you look for other clues, such as where the juror was

        13   born, when you were reviewing the juror questionnaires?

        14   A.   Only if it was something unusual.

02:44   15   Q.   Would you look at what the jurors -- what publications the

        16   juror read?

        17   A.   Sometimes.

        18   Q.   If you could please turn to Tab 22, which contains the

        19   juror information for Alicia Taylor.

02:45   20   A.   Okay.

        21          THE COURT:   I'm sorry.  What exhibit were you in?

        22          MR. GRAY:   I'm sorry.  I'm in Tab 22 of Volume 1, and

        23   I'm -- one, two -- three pages in.  It's the first page of

        24   Ms. Taylor's juror questionnaire.

02:45   25          THE COURT:   Okay.  Oh, I see.

*Gray Cross of Davenport*

02:45  1    BY MR. GRAY:

2    Q.  Your note in the upper left-hand corner, "Educated BF,

3    articulate."  Does the notation stand for "Black female"?

4    A.  It does.

02:45  5    Q.  And do you recall why you noted that on Ms. Taylor's card?

6    A.  I have no idea.  Because it was obvious.

7    Q.  Do you recall any relevance to Mr. Rosales' trial?

8    A.  Relevance of what?

9    Q.  The -- her race, was there a relevance -- was it relevant

02:46  10   to the issues in Mr. Rosales' trial?

11   A.  No.  But you have to make notations so you can remember who

12   people are.

13   Q.  Could you please turn to Tab -- actually, no.  We'll move

14   on to the next one.

02:46  15               In Volume 1B I'd like to turn to Tab 38, please.

16   A.  Volume --

17   Q.  It's the smaller of the two large bound volumes.  And --

18   A.  Tell me the tab again.

19   Q.  Okay.  In the first page of Mr. Alcover's --

02:47  20   A.  I'm sorry.  I don't know what tab.

21               THE COURT:  I don't either.

22               MR. GRAY:  I'm sorry.  Tab 38.

23   BY MR. GRAY:

24   Q.  Again, on the first page of the juror questionnaire, you

02:47  25   circled "Puerto Rico."  Do you recall why you circled "Puerto

*Gray Cross of Davenport*

02:47   1   Rico" on his juror questionnaire?

2   A.   It's unusual.

3   Q.   What's unusual about being born in Puerto Rico?

4   A.   Well, I don't know that I'd ever had any other people

02:47   5   report for jury duty who had been from Puerto Rico.

6   Q.   Okay.  Do you recall any relevance to Mr. Rosales' trial --

7   A.   No.

8   Q.   -- of being born in Puerto Rico?

9   A.   No.

02:47   10   Q.   Okay.  Could you please turn to Tab 17 in the first volume?

11   A.   Okay.

12   Q.   Tab 17 relates to the materials for Mr. Mohamed Deen?

13   A.   Yes.

14   Q.   And at the top of Mr. Deen's questionnaire, you circled

02:48   15   that he lived in Guyana -- or excuse me -- that he was born in

16   Guyana?

17   A.   Yes.

18   Q.   Do you recall why you circled that?

19   A.   Because it was unusual.

02:48   20   Q.   Do you recall any relevance to Mr. Rosales' trial --

21   A.   No.

22   Q.   -- the mention of Guyana?

23        Okay.  Ms. Davenport, you testified that you

24   noted the jurors' races so that you could remember who they

02:48   25   were.  In a death penalty case, how does one voir dire jurors?

*Gray Cross of Davenport*

02:48   1    Does it take place in groups or individually?

2    A.  No.  It's individual.

3    Q.  Why was it necessary to remember who a juror was when you

4    were voir-diring them individually?

02:49   5    A.  Because at the end of the day, when we would sit back to

6    see what we had done, we couldn't remember who we talked to.

7    Sometimes it takes two weeks to get a jury; and the jury walks

8    in, you see them all together for the first time, you don't

9    even recognize them.

02:49   10   Q.  So, at the time of trial you wanted to be able to remember

11   the jurors that you had voir-dired?

12   A.  I was just trying to remember everything I could about each

13   juror.

14   Q.  Wouldn't it be more convenient to go by a juror's name if

02:49   15   you wanted remember in trial who they were?

16   A.  If I could remember all their names, that would be nice.

17   Q.  Would you have a list of the names of the jurors?

18   A.  Yes.

19   Q.  Okay.

02:49   20   A.  And we went through 65 names.

21   Q.  But by the time they were seated, you were down to 13?

22   A.  Yes.

23   Q.  And you knew who they were?

24   A.  Yes.

02:50   25   Q.  Do you recall whether you ever noted the race of a White

*Gray Cross of Davenport*

02:50   1    prospective juror when you were interviewing them?

2    A.  I don't know.  I didn't notice any.

3    Q.  Okay.  We were discussing previously the neighborhood in

4    Houston where prospective jurors lived, and you said that you

02:50   5    sometimes noted the neighborhood of Houston on -- where a juror

6    lived on the prospective juror's card so that you could ask

7    them relevant hypothetical questions based on landmarks from

8    their neighborhood that might be familiar to them.  Is that

9    correct?

02:50   10   A.  Sometimes, yes.

11   Q.  And why would that be helpful to you?

12   A.  Sometimes it's just helpful in making conversation when

13   you're not asking anything particularly about the law that's

14   involved in a case or the facts involved in a case.

02:51   15   Q.  Could you point us toward any example of a hypothetical

16   question that you asked in this voir dire process based on a

17   landmark from a juror's neighborhood?

18   A.  No, sir.

19   Q.  Okay.  I'd like to please turn to Volume 1B, Tab 40.

02:51   20              THE WITNESS:  Is that the big one?

21   A.  I'm sorry.  Is that the big one?

22   BY MR. GRAY:

23   Q.  That's the smaller of the two large volumes, ma'am.

24   A.  Okay.  1B, Tab 40?

02:51   25   Q.  I need to catch up with you here.  I apologize.  Just one

*Gray Cross of Davenport*

02:52   1   second.

2                      No.  I'm sorry.  I mean Tab 41.  Excuse me.

3                      Okay.  And this is -- on the first page of the

4   juror questionnaire for Lorene Thornton, you noted, "North of

02:52   5   downtown"?

6   A.  Yes.

7   Q.  All right.  Was this the same part of Houston that we --

8   you had in mind when you made that notion on Esmerelda Lopez'

9   card?

02:53  10   A.  I don't know.  I just know what it says.

11   Q.  Okay.  And on -- okay.  Tab 21 in the first volume, please,

12   ma'am.

13                      This is the juror questionnaire for Edward Saenz?

14              THE COURT:  "Saenz."

02:53  15              MR. GRAY:  "Saenz"?  Thank you, your Honor.

16   BY MR. GRAY:

17   Q.  On Mr. Saenz' juror questionnaire you noted "North of

18   downtown" next to his address.  Is that the same part of town

19   that you had in mind when you made that notion on Esmerelda

02:54  20   Lopez' card?

21   A.  I can't tell you.  It says, "North of downtown."

22   Q.  How did you know that 507 Post Street was north of

23   downtown?

24   A.  I don't know.  Because I don't know that address.

02:54  25   Q.  Post Street is a pretty small street.  It's only a couple

*Gray Cross of Davenport*

02:54  1   of blocks long.  Do you recall how you were able to find out
       2   what part of Houston --
       3   A.  I don't know.
       4   Q.  -- Post Street was located in?
02:54  5               Is that something you would ask your office to
       6   look up when your office ran background checks on prospective
       7   jurors?
       8   A.  We didn't run background checks on prospective jurors.
       9   Q.  Do you recall if you used a map or anything else to look up
02:54 10   the addresses of jurors and found out where they lived?
      11   A.  I don't know how I did that, because it doesn't even have a
      12   zip code on it.  I don't know.
      13   Q.  Was it your practice to bring in a map of an index of the
      14   city -- the streets in the City of Houston during voir dire?
02:54 15   A.  No.
      16   Q.  If you could, turn to Tab 13, Line 7.  Sorry.  Page -- it's
      17   the -- I'm sorry.  It's the second page in, Line 2.
      18               This is Mr. Solorzano's juror questionnaire.  And
      19   there is a note at the end, which we previously discussed; and
02:55 20   you said -- it says, "Deep Montrose."
      21   A.  Okay, yes.
      22   Q.  How did you know that 504 Richmond Street was "deep
      23   Montrose"?
      24   A.  Well, I know Richmond.
02:55 25   Q.  You know Richmond?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:55  1    A.  Uh-huh.

2    Q.  Okay.  Do you know the street numbers on Richmond?

3    A.  Yes.

4    Q.  Other than "Montrose" and "North of downtown" and

02:55  5    "Northeast of downtown," do you recall whether you noted any

6    other neighborhoods on the juror cards or juror questionnaires

7    in this voir dire process?

8    A.  I don't know.  I'm sure they're reflected on there if I

9    did.

02:56  10   Q.  Okay.  To my knowledge, there's no other neighborhoods

11   noted on the cards and questionnaires in this record.

12           MS. MIRANDA:  And, your Honor, I'm going to object to

13   him putting that testimony in the record.  We intend -- I mean,

14   I think that the record will state for itself --

02:56  15           MR. GRAY:  The record will speak for itself.

16           MS. MIRANDA:  -- what's there.

17               Thank you.

18   BY MR. GRAY:

19   Q.  Were you concerned that people who lived in Montrose or

02:56  20   north of downtown or northeast of downtown might not identify

21   with you, Ms. Davenport?

22   A.  No.

23   Q.  Were you concerned that people who lived in Montrose and

24   north of downtown or northeast of downtown might sympathize

02:56  25   with the accused person in a trial?

*Gray Cross of Davenport*

02:56  1    A.  Not because of where they lived, no.

2    Q.  In what sense might they sympathize with the accused?  What

3    about them might cause them to sympathize with the accused?

4    A.  I said, "Not because of where they lived, no."

02:56  5    Q.  Was there something that might cause them to sympathize

6    with the accused?

7            THE COURT:  Wait a minute.  Who are we talking about

8    now?

9            I'm completely lost.  I mean, you asked about the

02:57  10   neighborhoods.  Now, what else are we talking about?  Which

11   jurors are we talking about?

12           MR. GRAY:  Why she was -- I'll withdraw the question,

13   your Honor.

14   BY MR. GRAY:

02:57  15   Q.  My question was whether there was something about the

16   neighborhoods that was -- caused you to be concerned about

17   whether the people who lived in those neighborhoods might

18   sympathize with the accused.

19           THE COURT:  I thought she already answered that

02:57  20   question.

21           MR. GRAY:  Okay.  Let's move on.

22   BY MR. GRAY:

23   Q.  I'd like to please turn onto -- move to Tab 7, which

24   contains the juror materials for Jeanette Lewis.

02:57  25           Okay.  At the bottom of the first page of

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

02:57  1  Ms. Lewis' juror questionnaire, you wrote, "Really don't have

2  any problems."

3              Do you recall why you made that notation on

4  Ms. Lewis' card?

02:58  5  A.  Not unless Keno and I were writing notes to each other.  I

6  don't know.

7  Q.  Do you think that might have been a note that you were

8  writing to Keno?

9  A.  Could be.

02:58  10  Q.  Why did you expect that you might have a problem with

11  Jeanette Lewis?

12  A.  I don't know that I expected to have any problems with

13  Jeanette Lewis.

14  Q.  Okay.  Ms. Lewis had the strongest support for capital

02:58  15  punishment, on her capital punishment survey, of any juror that

16  you interviewed.  Is that correct?

17  A.  I don't know.

18  Q.  She was a 5 and a 4?

19  A.  She was a 5 and a 4?

02:58  20  Q.  Please turn to the "Capital Punishment Attitude

21  Questionnaire" for Ms. Lewis, which is a few pages forward from

22  where you are.

23              She checked 5, "I'm strongly in favor of capital

24  punishment as an appropriate penalty" and, 4, "I would usually

02:59  25  vote for the death penalty in a case where the law allowed me

*Gray Cross of Davenport*

02:59    1   to."

         2   A.  Yes.  Okay.

         3   Q.  Are those favorable responses?

         4   A.  Yes.

02:59    5   Q.  Are those among the strongest responses you -- one might

         6   expect to see from a juror during voir dire?

         7   A.  I think so.

         8   Q.  Ms. Lewis is an African-American.  Is that correct?

         9   A.  Yes, she is.

02:59   10   Q.  Did you write "I really don't have any problems" on the

        11   cards of White jurors who were obviously very good jurors for

        12   the State?

        13   A.  I don't know that I wrote that on anybody else's card at

        14   this time.

02:59   15   Q.  Did you seat any other African-American jurors in this

        16   trial?  Did you allow any other African-Americans to be seated?

        17   A.  Did I allow any to be seated?

        18   Q.  Yes.  Were there any other African-Americans who --

        19   A.  Not that I recall.

02:59   20   Q.  Please turn to Tab 13 for Mr. Solorzano's materials.

        21            If you could, please, look at the notes at the

        22   bottom of the page.  The first line of the notes at the bottom

        23   of the page is, "Is his heritage Asian or Mexican or both?"

        24   Why did you write that question, Ms. Davenport?

03:00   25   A.  Obviously, because I don't know.  It was a question.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

03:00   1   Q.  To whom did you address that question?

2   A.  Probably myself.

3   Q.  Why did you want to know whether Mr. Solorzano was Asian or

4   Mexican?

03:00   5   A.  Just curious, frankly.

6   Q.  Was -- were you at all concerned that he might identify

7   with the accused?

8   A.  Well, if I was, it wasn't too concerning, since he ended up

9   on the jury.

03:00   10   Q.  But that was possibly a concern of yours?

11   A.  I don't know that I would say it was a concern.  That's

12   your word.

13   Q.  But you did write a note asking at the bottom of the page,

14   "Would he identify with the defendant."

03:01   15           If you look at the last line of -- just before

16   where the Xerox stops.

17   A.  Okay.  Yes, I see that.

18   Q.  Does your note reflect a concern that he might identify

19   with the accused?

03:01   20   A.  I was wondering about it, yes.

21   Q.  Okay.  Please turn to Tab 19, which contains the juror

22   materials for Yvette Holmes.

23           If you please would look at the second page, and

24   it's Item Number 24 at the bottom of the second page there.

03:02   25   A.  Okay.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

03:02   1    Q.  Ms. Holmes indicated that she read four publications,
        2    "Ebony," "Jet," "Newsweek," and "Post."  Do you see that?
        3    A.  Yes.
        4    Q.  Okay.  And you underlined "Ebony" and "Jet" but not
03:02   5    "Newsweek" and "Post."  Do you see that?
        6    A.  Yes.
        7    Q.  Do you recall why you underlined "Ebony" and "Jet" in
        8    Ms. Holmes' answer to that question?
        9    A.  No.  I just thought it was interesting.
03:02   10   Q.  Did you know that Ms. Holmes was probably Black?
        11   A.  I suspected she was.  I mean, she was sitting right in
        12   front of me.  I could see her.
        13   Q.  Do you think that you -- your recollection is you
        14   underlined those two publications when you were speaking with
03:02   15   Ms. Holmes or when you were reviewing the juror questionnaire?
        16   A.  When I was speaking with her.
        17   Q.  How do you have a recollection of when you made that
        18   underlining?
        19   A.  Because I didn't have it ahead of time.  I got them when --
03:03   20               THE COURT:   (Indicating).
        21               THE WITNESS:  I would love some water.  Thank you.
        22               MR. GRAY:  Please, take a break.
        23               THE WITNESS:  Thank you.
        24               Did I answer your question?
03:03   25               THE COURT:  I don't remember.  I forgot.

*Gray Cross of Davenport*

03:03    1    BY MR. GRAY:

2    Q.  We were discussing whether you got the questionnaire prior

3    to seeing the individual juror and having an opportunity to

4    interview the individual potential juror.

03:03    5    A.  Yeah.  I think I filled them out just as they were coming

6    in.  And while -- and while the judge is reading her two or

7    three page speech to each individual juror, I have a couple

8    minutes to do that.

9    Q.  Okay.  Do you know whether any of the notations you made on

03:03   10    Ms. Holmes' form were made before the potential juror entered

11    the room or after?  Do you have a recollection of that today?

12    A.  I think it's after she enters the room.

13    Q.  What's the basis for your recollection that it was after

14    she entered the room?

03:04   15    A.  I just don't remember having all 10 or 12 of them at the

16    same time.

17    Q.  And my question was what's your recollection for recalling

18    the time when you made the notations on this form as compared

19    to the times when you first saw Ms. Holmes.

03:04   20    A.  I would first see Ms. Holmes when she came in, in a group

21    of 10 to 12 people.  I would see her for a few minutes -- all

22    of them for a few minutes.

23           And I can't remember if the bailiff gave us all

24    of their information in a big stack or one at a time.  I just

03:05   25    don't remember.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

03:05  1         But I wouldn't have time to go through hers until

2    we got to her.

3    Q.  At the time that the group of -- the panel came into the

4    courtroom, would you know the names of the panelists when they

03:05  5    were first instructed by the judge?

6    A.  No.  No.  Not until they handed us the sheets.  Because

7    they were not individually voir-dired then.

8    Q.  Okay.  Okay.  Do you -- please move to Page 1221 of

9    Ms. Holmes' testimony.

03:05  10   A.  Where is Page 1221?

11   Q.  If you'd go to the transcript of Ms. Holmes' voir dire

12   testimony, which is after the blue sheet, behind that tab,

13   please go to 1221.

14   A.  Okay.

03:06  15   Q.  You asked Ms. Holmes whether she thought it was fair that

16   the same burden of proof should apply in both a traffic case

17   and in a capital case.  Do you see that?

18   A.  Okay.

19   Q.  Doesn't your question imply that there ought to be a

03:06  20   greater burden of proof in a capital case than in something as

21   minor as a traffic case?

22   A.  I'm not implying that there should be.  I'm asking whether

23   she thinks that there should be.

24   Q.  And how did Ms. Holmes answer your question?

03:06  25   A.  I asked her if she thought that was fair; and she said,

*Gray Cross of Davenport*

03:06   1    "Say that again."

2                        And I asked her again; and she said, "I agree."

3    Q.   Okay.   Is there something about Ms. Holmes' view that

4    "beyond a reasonable doubt" is a fair burden, that causes you

03:07   5    any concern?

6    A.   Not from what's written on the page, no.

7    Q.   Okay.   You then asked whether she would hold the State to a

8    greater burden, such as "beyond all doubt."

9                        And Ms. Holmes answered, "I think it," meaning

03:07  10    "beyond a reasonable doubt," "is right, based on the evidence."

11                        Does that answer cause you any concern?

12    A.   I don't know if that's what "it" refers to or not.

13    Q.   Oh, okay.   What do you think "it" might refer to if it's

14    not "beyond a reasonable doubt"?

03:07  15    A.   "Would you make us prove it to you beyond all doubt, for

16    instance?"   Maybe she meant that's what's all right.   I don't

17    know.

18    Q.   You then asked Ms. Holmes whether she feels like the burden

19    of proof "beyond a reasonable doubt" -- excuse me -- we're now

03:07  20    on Page 1222, Line 10 -- feels like the burden of proof "beyond

21    a reasonable" doubt is fair from -- for the penalty portion or

22    in the penalty portion would she require the State to prove a

23    little bit more than just "beyond a reasonable doubt."

24                        I'd like to focus on the phrase "a little bit

03:08  25    more than just 'beyond a reasonable doubt.'"   Do you recall why

*Gray Cross of Davenport*

03:08   1   you used the word "just" to describe the highest standard of
        2   proof in our legal system?
        3   A.  You know, a lot of people think that the burden of proof is
        4   "beyond all doubt" or "beyond a shadow of the doubt."  And we
03:08   5   have to deal with that on voir dire because some veniremen
        6   think that's what we have to prove.
        7   Q.  Were you -- how did Ms. Holmes respond to your question?
        8   A.  She said, "If you have proved it beyond a reasonable doubt,
        9   then that would be adequate."
03:09  10   Q.  Are you satisfied with her answer to that question?  Is
       11   that a question -- answer that raises any concern for you?
       12   A.  No.
       13   Q.  Okay.  I would like to talk about the justifications for
       14   the strike against Ms. Holmes, that you gave during your
03:09  15   deposition.  If you could please turn to --
       16            THE COURT:  You know what?  This is a good place for a
       17   break.
       18            Gentlemen with Mr. Rosales, we're going to take a
       19   break.  How long do we need to give you to be able to have a
03:09  20   reasonable break?  Is ten minutes enough?
       21            Mr. Rosales, could you -- could you get the
       22   attention of --
       23            MR. ROSALES:  Yes, your Honor.
       24            THE COURT:  I'm trying to get the attention of the
03:09  25   gentlemen that are behind you, the guards that are with you.

*Gray Cross of Davenport*

03:09   1          What's a reasonable break for us to be able to
        2   take for you guys to take a break?  Can we do it in ten minutes
        3   or do you need more than that?
        4          A PRISON GUARD:  We don't go anywhere, ma'am.  We'll
03:09   5   just stay right here.
        6          THE COURT:  Oh, okay.  There's no place that they
        7   can -- okay.  So, then, let's just take a break for just ten
        8   minutes, then.
        9          A CLERK:  All rise.
03:21   10      (Recess taken from 3:09 to 3:31 p.m.)
        11         THE COURT:  All right.  Please be seated, everyone.
        12             We ready to go?  Mr. Gray?
        13         MR. GRAY:  Thank you, your Honor.
        14         THE COURT:  Yes.
03:31   15   BY MR. GRAY:
        16   Q.  Ms. Davenport, are ready to resume testimony?
        17   A.  Yes, sir.
        18         THE COURT:  Could you keep your voice up.  I could
        19   barely hear you that time.  I just want to make sure that
03:31   20   Mr. Rosales can still continue to you hear you.
        21         MR. GRAY:  Okay.
        22         THE COURT:  So, what did you just say?  Did you say,
        23   "Are you ready to resume testimony?"
        24         MR. GRAY:  "Are we ready to resume testimony," yes,
03:32   25   your Honor.

*Gray Cross of Davenport*

03:32    1              THE COURT:  All right.

         2    BY MR. GRAY:

         3    Q.  We were about return to the justifications that you gave

         4    during your deposition for the peremptory strikes that you

03:32    5    exercised against Ms. Holmes.  And if you could please turn to

         6    Tab 1 of Exhibit 3, Page 44, Line 12.

         7    A.  Exhibit 3, page what?

         8    Q.  It's the exhibit that contains your deposition.

         9    A.  Okay.  I got that.

03:32   10    Q.  Behind Tab 1.

        11    A.  Okay.

        12    Q.  Page 44, please.  Are you with me on Line 12?

        13    A.  Okay.

        14    Q.  You answered that, "You'll notice a number of times in

03:32   15    there the Court has interjected to either clarify what she

        16    thought was -- I was trying -- excuse me -- what she thought I

        17    was saying or to tell the witness or the juror that, 'You've

        18    got to tell us.  We can't read your mind.'  And when that

        19    happens on a number of times, the atmosphere in the room would

03:33   20    get tense and the juror or veniremen would get tense and a

        21    little insulted and angry and the judge would, as well.

        22              "I remember a number of times when that happened,

        23    when the judge kept inserting comments in there.  And sometimes

        24    it was just not worth the chance of putting a juror on trial --

03:33   25    on jury, who was already angry at the judge or me."

*Gray Cross of Davenport*

03:33    1          Did you exercise a peremptory strike against

    2    Ms. Holmes because she was already angry at the judge or

    3    yourself?

    4    A.   I think the real reason I exercised a peremptory on

03:33    5    Ms. Holmes is that I think that Mr. Boyd -- Walter Boyd thought

    6    that she would hang the jury for us.

    7    Q.   Okay.  Did you previously testify that you believed that

    8    you struck Ms. Holmes because you thought she was angry at the

    9    judge or yourself?

03:33   10    A.   Yes, I did.  And that's probably part of it, too.  But I

   11    think that Mr. Boyd was counting on her to hang the jury.

   12    Q.   Okay.  If you could please turn to Page 48, Lines 11

   13    through 16?

   14          THE COURT:  Are you attempting to impeach the witness

03:34   15    by going through her deposition?  Why can't you just ask this

   16    witness questions?  I mean, you've already gone through this.

   17    Ask her some questions.  We don't have to just keeping reading

   18    through deposition testimony.

   19          It's relevant if it's there for impeachment; but

03:34   20    you're just, like, reading the testimony.  That's not

   21    appropriate.  Come on, now.

   22          MR. GRAY:  Okay, your Honor.  I'll move forward.

   23          Actually, your Honor --

   24          THE COURT:  I mean, we don't even have a question on

03:34   25    the floor.  Just going and reading through the deposition is

*Gray Cross of Davenport*

03:34    1    completely inappropriate.

2          I mean, I let you do it for the first couple of

3    hours.  But, good grief, we're going to be here five days if we

4    keep doing this.

03:34    5          MR. GRAY:  Okay.

6          THE COURT:  This is not appropriate, to just to keep

7    going through the deposition just reading.  You can ask this

8    witness questions.  We clearly understand this is her direct

9    testimony.

03:34    10         Ask her a question.  If it relates to the direct

11    testimony, great.  But you don't have to just keep reading

12    through the deposition.

13          MR. GRAY:  Okay.

14    BY MR. GRAY:

03:35    15    Q.  Okay.  Sitting here today, Ms. Davenport, do you know

16    whether Ms. Holmes was angry at you or the judge?

17    A.  No, I didn't.

18    Q.  Do you know whether Ms. Holmes' being angry was a reason

19    that you exercised a peremptory stroke against here -- strike

03:35    20    against her?

21    A.  I think the reason I exercised a strike against her is what

22    I told you a moment ago.  I think that Mr. Boyd wanted her on

23    the jury, and I think she would have hung the jury for him; and

24    I think that's what he was counting on.

03:35    25    Q.  Okay.  So, your -- that's the sole justification for why

*Gray Cross of Davenport*

03:35   1   you struck an -- exercised a peremptory strike against
        2   Ms. Holmes?
        3   A.   That's what I can remember 23 years later, yes.
        4   Q.   And the other things we discussed in your deposition --
03:35   5   A.   Yes.
        6   Q.   -- are not reasons that you think you exercised a
        7   peremptory strike against Ms. Holmes?
        8   A.   Well, I -- they could be reasons.  I don't just have to
        9   have one reason for striking someone.
03:35  10   Q.   Do you have more than one reason for striking Ms. Holmes,
       11   is my question.
       12   A.   Anything I explained to you in the deposition and what I've
       13   told you today.
       14   Q.   Your answer is not clear to me.  I don't know whether
03:36  15   Ms. Holmes being angry at you or Judge Kegans was a reason you
       16   exercised a strike or peremptory --
       17   A.   I don't know if she was angry at anybody, but it gets
       18   uncomfortable when a judge reprimands someone who is on the
       19   witness stand.
03:36  20   Q.   Was it common for Judge Kegans to participate in
       21   questioning potential jurors?
       22   A.   Oh, yes.  I'm sure you read that all the way through there.
       23   Q.   Did Judge Kegans participate in questioning jurors who you
       24   allowed to be seated on the jury?
03:36  25   A.   She didn't question them.  She explained what she thought

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

03:36   1   the lawyers in the case were trying to ask the jurors.

        2   Q.  But she interjected --

        3   A.  Yes --

        4   Q.  -- and participated in the manner she did with Ms. Holmes?

03:36   5   A.  -- she did.

        6   Q.  Was there something different about the way she

        7   participated in the questioning of Ms. Holmes --

        8   A.  Not particularly.

        9   Q.  -- and the other jurors you seated, that raised a

03:36  10   particular concern for Ms. Holmes?

       11   A.  Not particularly, that I can remember.

       12   Q.  Okay.  Is a reason that you struck Ms. Holmes that she did

       13   not have particularly good answers on Special Issue 1 -- on

       14   special issues, particularly with respect to temporary insanity

03:37  15   due to voluntary intoxication?  Was that a concern?

       16   A.  I think it was the overall feeling we had about Ms. Holmes.

       17   I don't know if it was those particular reasons about special

       18   issues or not.

       19   Q.  When did you recall that you struck Ms. Holmes because

03:37  20   Mr. Boyd thought that she might hang the jury?

       21   A.  When I was reading through all of these again prior to this

       22   hearing.

       23   Q.  Would you have been concerned if Mr. Boyd asked similar

       24   questions of White jurors and they testified that they would

03:38  25   maintain their position even if they disagreed with some of the

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

*Gray Cross of Davenport*

03:38  1   other jurors on a panel?

2   A.  Depends on how he asked them.  Mr. Boyd could get quite

3   animated when he would get excited when he thought he had

4   something to work with.

03:38  5   Q.  Do you recall whether Mr. Boyd was animated in his

6   conversation -- or his interview of Ms. Holmes?

7   A.  Specifically?  No, I didn't.

8   Q.  Could you please turn to the transcript of Cheryl

9   Williamson, which is at Tab 15 and at Page 47, please?

03:39  10  A.  Okay.

11  Q.  This is during the examination of Ms. Williamson by

12  Mr. Boyd.  Please turn to Line -- the question that begins on

13  Line 4.

14          Mr. Boyd begins, "Let me ask you this.  If you

03:39  15  were called upon to do so, would you be able, if you were the

16  only juror standing" --

17          MS. MIRANDA:  I'm sorry.  Could you hold on?  She's

18  having trouble finding the page.

19          MR. GRAY:  Oh, excuse me.  I apologize.

03:39  20          THE COURT:  I think it's Page 47.

21          THE WITNESS:  Thank you.

22              Okay.  Sorry.

23  BY MR. GRAY:

24  Q.  Are you with me, Ms. Davenport?

03:39  25  A.  Okay.

*Gray Cross of Davenport*

03:39  1    Q.   Line 4, "Let me ask you this.  If you were called upon to

2    do so, would you be able to, if you were the only juror

3    standing for one proposition and 11 jurors stood against you

4    but yet you were unpersuaded to the very end that the 11 were

03:39  5    right and you were very persuaded your stand was right, would

6    you have the courage to stand with that decision forever?"

7            And Ms. Williamson answers, "Yes."

8            Why wasn't that answer a concern for you?

9    A.   Because you're taking it out of context.  And we had to

03:40  10    evaluate jurors based on everything they said during that hour

11    and everything that we noted about them, how they sounded, how

12    they looked, the whole 9 yards.

13            Based on that one -- that one question?  I can't

14    answer your question.

03:40  15    Q.   Could we turn back to the transcript of Ms. Holmes, please,

16    which is at Tab 19?  Okay.  And at Page 1239, Line 16, please.

17            No?

18         THE COURT:  Page what?

19         MR. GRAY:  Excuse me.  That's not the right page.

03:41  20         THE COURT:  Maybe 1239 or --

21         MR. GRAY:  No.  It's 1243, please.  I apologize.

22    BY MR. GRAY:

23    Q.   Okay.  When Mr. Boyd asked a similar question to

24    Ms. Holmes, "If you were the one -- if you had a position

03:42  25    and -- well, let me start over.  If you were on the jury and

*Gray Cross of Davenport*

03:42   1   you stood for a certain position and you felt a certain way but

2   11 other jurors felt the opposite way on a particular issue

3   that the jury is called upon to pass judgment on, would you be

4   able to persist in your view until you were persuaded that the

03:42   5   11 other jurors were correct and you were wrong?"

6                And she answers, "Unless they could show me where

7   I was wrong, I would not be persuaded."

8                Is there a difference, between Ms. Holmes' answer

9   and Ms. Williamson's answer, that causes you to favor

03:42   10  Ms. Williamson and have a concern about Ms. Holmes?

11  A.  What's different is that Mr. Boyd started out by asking

12  her -- that's his first question, and that's not how he started

13  out with everybody else.

14  Q.  Would you agree with me that Ms. Holmes expressed a

03:42   15  willingness to be persuaded, based on the facts, in her

16  conversations with other jurors?

17  A.  That Ms. Holmes expressed a willingness --

18  Q.  The statement, "Unless you could show me where -- that they

19  could show me where I was wrong," indicated a willingness to be

03:43   20  persuaded by her fellow jurors?

21  A.  Yes.

22  Q.  Okay.  And I'd like to turn back to Tab 15 for Page 47,

23  which is Ms. Williamson again.  I apologize for all the

24  shifting back and forth.

03:43   25               Mr. Boyd asks, at the bottom of the page on Page

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

03:43   1   21, "Any decision you reach in a case would have to be just as

2   if you were the only juror sitting on the jury.  Do you have

3   the courage to reach that sort of decision and to persist in

4   your beliefs indefinitely?"

03:43   5       And Ms. Williamson answers, "Yes."

6       Do you see a difference between Ms. Williamson's

7   answer and Ms. Holmes' answer that would affect your decision

8   about which juror to allow to be seated?

9   A.  Wasn't his first question to her.

03:44   10  Q.  Could you please turn to the transcript of Beverly Willett,

11  at Tab 14?

12      And at Page 312, Mr. Boyd asks, "But could you

13  persist for an indefinite time to hold your views if you were

14  unpersuaded to take another view, even though 11 other jurors

03:45   15  might stand against you?"

16      "It wouldn't be the first time.  Not that

17  particular number, no.  But if I believe I'm right, I'm willing

18  to stand up for it."

19      And Mr. Boyd follows up, "And if you believed you

03:45   20  were right about a reasonable doubt, you would stand up for it,

21  would you not?"

22      And she replies, "Yes, sir."

23      Why was this response not a concern for you if

24  you were concerned about Ms. Holmes?

03:45   25  A.  It wasn't the first question he asked her.  And it --

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

03:45   1   frankly, I don't really understand, just from reading the bare

2   record, why we accepted Ms. Willett.  It just shows you that

3   something else was going on, besides the written word, that

4   made us feel like we could trust her as a fair juror.

03:45   5   Q.  Based on the transcript, you're not sure why you selected

6   Ms. Willett?

7   A.  That's right --

8   Q.  You can't --

9   A.  -- if you just read the written words in here.

03:46   10   Q.  Okay.  Did race play any part in your decision to strike

11   Ms. Holmes?

12   A.  I don't believe it did, no.

13   Q.  Would you be surprised if Mr. Henderson initially testified

14   that he did not know why you struck Ms. Holmes?

03:46   15   A.  Would it surprise me?

16   Q.  Yes.

17   A.  No, sir.

18   Q.  At the time of Ms. Holmes' examination, 11 jurors had been

19   seated and the prosecution had used 12 of it's peremptory

03:46   20   strikes; and Ms. Holmes was the 13th strike.

21              Did you strike Ms. Holmes because you were

22   opposed to seating a second Black juror after you had already

23   seated Ms. Lewis?

24   A.  No.

03:46   25   Q.  Two other Batson jurors, Marianne Walker and Mohamed Deen,

*Gray Cross of Davenport*

03:46  1  were also struck after Ms. Lewis was seated.  Were those

2  strikes made because you were opposed to seating additional

3  jurors of color after you had seated Ms. Lewis?

4  A.  No.

03:46  5  Q.  Okay.  I'd like to turn the discussion to Batson Juror

6  Mohamed Deen, whose materials are at Tab 17.  Did you strike

7  Mr. Deen based on his responses to the first special issue?

8  A.  Part of it.

9  Q.  What was the other part of the reason you struck Mr. Deen?

03:47  10  A.  (No response).

11  Q.  What was the other reason that you struck Mr. Deen?

12  A.  Well, you can see in my affidavit that Mr. Boyd tried to

13  rehabilitate him and he went back and forth.  And it became

14  apparent to us -- or to me that he would make a good juror for

03:47  15  the defense, and so I struck him.

16  Q.  With respect to Special Issue 1, was the problem that

17  Mr. Deen thought that the words "intentionally" and

18  "substantially" had the same meaning -- sorry --

19  "intentionally" and "substantially" had the same meaning as

03:48  20  "deliberately"?

21  A.  No, I wouldn't say that.

22  Q.  Was the problem that he thought that "intentionally" -- if

23  someone had done something intentionally, he was likely to find

24  that they also did it deliberately?  Was that your concern?

03:48  25  A.  No.  My concern mainly was that he couldn't -- he couldn't

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

03:48   1   make up his mind which way he was going to go, and it was

2   obvious to me that Mr. Boyd wanted him.  He only asked five

3   questions.  That was very unusual for Mr. Boyd.

4   Q.  Okay.  Did you explain that reason in your affidavit you

03:48   5   submitted as direct testimony in this matter?

6   A.  Yes, I did.

7   Q.  Could you draw my attention to the place where you

8   explained that Mr. Boyd wanting Mr. Deen was the reason you

9   struck him?

03:48   10   A.  It's on the second page of the affidavit.

11   Q.  Okay.  What about Mr. Boyd's questioning of Mohamed Deen

12   led you to think that he would be a good juror for the defense?

13   The number of questions he asked, and is there anything else?

14   A.  None of those questions were even substantive.

03:49   15   Q.  Okay.  Was Mr. Deen's answers to the first special issue

16   any part of the reason that you struck him?

17   A.  It may have been at the time, but I can't tell you that

18   now.

19   Q.  Could you explain to me what your concerns were with

03:49   20   respect to the first special issue?

21   A.  No.

22   Q.  You don't have any recollection of what you were concerned

23   about with respect to the first special issue?

24   A.  No, I really don't.

03:49   25   Q.  You say in your affidavit that --

*Gray Cross of Davenport*

03:49  1   A.  Well, but I put in the affidavit that he repeatedly said he
       2   would always answer "yes" to it.
       3   Q.  Could you point to me where you say that he would
       4   repeatedly always answer "yes"?
03:50  5   A.  Right under his name, the first sentence.
       6   Q.  Right.  Okay.  Why was that a concern for the prosecution,
       7   that he was likely to answer the first special issue "yes"?
       8   A.  Means he couldn't be a fair juror.
       9   Q.  Okay.  Did you raise that concern with the judge?
03:50 10   A.  No.  Why would I raise it with the judge?
      11   Q.  Did you move to strike Mr. Deen for cause?
      12   A.  Yes, we did.  I believe we did.
      13   Q.  What was the judge's decision on that?
      14   A.  Well, I believe Mr. Boyd rehabilitated him with a series of
03:50 15   questions.
      16   Q.  Okay.  Did you want Mr. Deen to answer "no" to the first
      17   special issue?  Would that be favorable to the prosecution if
      18   he was inclined to -- if he answered "no" to the first special
      19   issue?
03:50 20   A.  If he answers "no" always or "yes" always, he's not a fair
      21   juror.
      22   Q.  Understood.  And you raised that concern with the judge,
      23   and how did the judge decide that concern?
      24   A.  I'm not following you.
03:51 25   Q.  Did the judge -- how did the judge rule on your motion to

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

03:51   1   strike him for cause?

2   A.  Well, after Mr. Boyd rehabilitated him, she denied the

3   cause.

4   Q.  So, she believed that he was an acceptable juror?

03:51   5   A.  He made the right answer, yes.

6   Q.  And my question is, from the perspective of the

7   prosecution, if the judge believes that he's an acceptable

8   juror, why would you want to exclude a juror who was likely to

9   answer the first special issue "yes"?

03:51   10   A.  Because we didn't have to agree with the judge on her

11   opinion.  That didn't necessarily meant -- mean she thought he

12   was a good potential juror.  It means he answered the question

13   correctly.

14   Q.  As a matter of trial strategy, would -- were you looking

03:51   15   for jurors to answer special issues "yes" or "no"; which result

16   were you looking for?

17   A.  Well, the result we wanted was "yes."

18   Q.  Correct.  And the factor that we're discussing would have

19   inclined Mr. Deen to answer the first special issue "yes."  Is

03:51   20   that correct?

21   A.  That's right.

22   Q.  Okay.  Why was that a problem for the State?

23   A.  Because it means he wouldn't be a fair juror.

24   Q.  But the judge had already decided that when she -- or

03:52   25   voiced that when she said he could be a fair juror.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

03:52  1    A.  After he was rehabilitated, yes.

2    Q.  At that point why would the State not want to have a juror

3    who was inclined to answer "yes" to the first special issue,

4    according to his understanding of the words "intentionally" and

03:52  5    "deliberately"?

6    A.  Well, after we had moved for cause to strike him and after

7    Mr. Boyd asked him five non-substantive questions when it was

8    his turn to question him, we did not think he was a good juror

9    for us and it was obvious to us that Mr. Boyd thought he was a

03:52  10   good juror for him.

11   Q.  Did you always exercise peremptory strikes against jurors

12   who you had moved to strike for cause?

13   A.  No.

14   Q.  What was different about the motion to strike for cause in

03:52  15   Mr. Deen's case --

16   A.  I don't remember.  I couldn't tell you.

17   Q.  -- from the other cases?

18   A.  I couldn't tell you.

19   Q.  Could we please turn to Tab 16, where there is the juror

03:53  20   materials for Joyce Wojdyla.  If you'd please turn to Page 456,

21   Line 19.

22   A.  Four fifty-six?

23   Q.  Yes, ma'am.  Line 19, Ms. Wojdyla was asked, "And can you

24   conceive there might be a situation where Special Issue

03:53  25   Number 1 could be answered 'no' even though you found that he

*Gray Cross of Davenport*

03:53  1   had done -- he, the defendant, had done an act intentionally?"

2   And she responds, "I don't think so."

3   The next question, "Okay, now.  I'm not asking

4   you to come up with any type of situation, but would you agree

03:54  5   with me that there may be such a situation or could be such a

6   situation?"

7   Answer, "Well, there probably could be, only

8   because I know there's got to be a gray area -- gray area.  But

9   just, you know, from my experience, as limited as they are, I

03:54  10  wouldn't say so."

11  Why was Ms. Wojdyla's answer acceptable to the

12  State?

13  A.  I don't know, unless it's because she's not -- she's not

14  absolutely convinced of it.  She said she can't think of one,

03:54  15  there could be one, there's a gray area.

16  Q.  Is your understanding that her view on Special Issue 1

17  differs from Mr. Deen's issue on Special 1 [sic] after he was

18  questioned by Mr. Boyd?

19  Do you see a distinction between the way those

03:54  20  two potential jurors saw Special Issue 1?

21  A.  I don't really know.  I don't think she ever came out and

22  said exactly what she would do.

23  Q.  Line 23, she says, "I don't think so."

24  A.  And then there's another question; and she said, "There

03:55  25  probably could be."

*Gray Cross of Davenport*

03:55  1   Q.  Right.  And she concludes, "Based on my limited experience,

2   I would say -- I wouldn't say so.  I would not say so."

3            Okay.  I'd like, please, now to turn to Exhibit

4   4, Tab 2.

03:55  5   A.  Exhibit 4?

6   Q.  Which is back to the transcript of the Tompkins Batson

7   hearing.  Starting on Page 96 --

8   A.  Just a minute.  Just a minute.

9   Q.  Takes me awhile to get there, too.

03:55  10  A.  Four, two.

11           Okay.  Then where?

12  Q.  Page 96, starting at Line 7.

13           Okay.  This passage, Mr. Royce is discussing a

14  struck Black potential juror by the name of Ms. Sutphen.  And

03:56  15  Attorney Jones is reading from Mr. Royce's examination of

16  Ms. Sutphen.

17           MS. MIRANDA:  Your Honor, I know he hasn't asked this

18  question yet; but I do want to object.  I'm not sure what

19  someone else's questioning of a juror in another case --

03:56  20           THE COURT:  Well, I don't think that I can rule unless

21  I hear what the question is yet, right?  It might be a relevant

22  question.

23           MR. GRAY:  May I read the passage into the record

24  before I ask my question?

03:56  25           THE COURT:  Pardon me?

*Gray Cross of Davenport*

03:56  1          MR. GRAY:  May I --

2          THE COURT:  Well, I mean, if it relates to the

3     question that you're going to ask, sure.

4          MR. GRAY:  Yes.  Thank you.

03:56  5     BY MR. GRAY:

6     Q.  All right.  So, Attorney Jones asks -- reads, "The Court is

7     not going to give you any definition.  You are saying that in

8     every case that you found someone guilty of capital murder you

9     would automatically answer Question Number 1, 'Yes.'"

03:57  10          Mr. Royce responds, "Okay.  She did say that."

11          And then Mr. Jones asks, "Okay.  And from the

12     point of view as having a death qualified juror, absent any

13     additional explanation, as a tactical matter, would you say

14     that a juror was more prone, at least in response of that sort,

03:57  15     [sic] to favor the State?"

16          Mr. Royce responds, "If you ask that question by

17     itself, with no history behind it, the question at all, yes."

18          Mr. Jones says, "Okay."

19          And Mr. Royce continues his answer, "But in this

03:57  20     case, this time, that question was asked to strike her for

21     cause because I did not want her and I did not want to use any

22     of my strikes against her at that time.  I had made up my mind

23     from the very beginning I did not want her."

24          My question is, Mr. Royce admitted -- did

03:57  25     Mr. Royce admit that he was using the question concerning

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

03:57  1   Special Issue 1 to generate a cause strike because he did not

2   want the juror?

3          MS. MIRANDA:  Objection, your Honor.  I don't know how

4   that's relevant to this case.

03:58  5          THE COURT:  And it calls for complete and total

6   speculation.  Objection sustained.

7          MR. GRAY:  Okay.  May I move on to another topic, your

8   Honor?

9          THE COURT:  Yeah.  But ask her about what she did.

03:58  10  How about that?

11  BY MR. GRAY:

12  Q.  Did Mr. Royce's description of what happened here, is it

13  the same question that you were -- same decision that you were

14  making with respect to Mr. Deen?

03:58  15         MS. MIRANDA:  Your Honor, again, I'm going to object

16  as to the form of that question.  I think if you want --

17         THE COURT:  Objection sustained.

18  BY MR. GRAY:

19  Q.  Ms. Davenport, were you using Special Issue Number 1 as a

03:58  20  pretext to strike Potential Juror Deen?

21  A.  No.

22  Q.  Okay.  I'd like to turn to Potential Juror Alicia Taylor,

23  whose materials are at Tab 22 of the first volume.

24         Please turn your attention to the notes at the

03:59  25  bottom of the page on Ms. Taylor's juror questionnaire.

*Cheryll K. Barron, CSR, CM, FCRR*                *713.250.5585*

*Gray Cross of Davenport*

03:59  1    A.  Okay.

2    Q.  You note if -- in reference to the two special issues, "If

3    they should be 'yes,' she can't see herself answering 'no,'

4    said she wouldn't answer 'no.'"

03:59  5         Is that a favorable answer from the point of

6    view -- from your point of view?

7    A.  Yes.

8    Q.  Okay.  You noted on Ms. Taylor's questionnaire that she

9    could feel it if the proper case came up.

04:00  10        Please turn your attention to the "Capital

11   Punishment Attitude Questionnaire."  Your notation says, "What

12   kind?  Could feel it if proper case came up."  Why did you note

13   that statement?

14   A.  Apparently she -- that's what she said.

04:00  15   Q.  Did you think that was a good answer?

16   A.  That she could feel what kind of case that she would not

17   vote for the death penalty?  No.

18   Q.  That she would vote for the death penalty in a proper case,

19   if she could feel it?

04:00  20   A.  "There are some kinds of cases in which I know I could not

21   vote for the death penalty even if the law allowed me to but

22   others in which I would be willing to consider voting for it."

23        Not really, no, not particularly good.

24   Q.  Excuse me.  Was that a favorable answer or not favorable

04:01  25   answer, that she could feel it if the proper case came up?

*Gray Cross of Davenport*

04:01  1   A.  I don't know that it's either.  It's kind of neutral.
2   Q.  Okay.  The judge, after the answer -- after receiving that
3   answer, described it as a good answer.  If you -- would you
4   disagree with Judge Kegans that that was a good answer?
04:01  5   A.  I wouldn't call it a good answer.
6   Q.  Mr. Henderson, after receiving that answer, described it as
7   a good answer at Page 106, Line 7.  Do you have a different
8   view from Mr. Henderson as to whether that's a favorable answer
9   or not?
04:01  10   A.  I wouldn't call it a good answer, no.
11   Q.  Do you doubt that Ms. Taylor supported capital punishment?
12   A.  She says she's in favor of capital punishment.
13   Q.  Did you question whether she was willing to give a death
14   verdict in an appropriate case?
04:02  15   A.  I don't know.
16   Q.  I'm sorry.  I didn't hear your answer.
17   A.  I don't know.
18   Q.  You don't know whether or not you would question whether
19   she would give a death verdict in an appropriate case?
04:02  20   A.  I don't -- I don't remember.
21   Q.  Okay.  Were you concerned that she might not answer the
22   first special issue "yes" in an appropriate case?
23   A.  I don't really remember what I thought about her.
24   Q.  Okay.  Could we please turn to Tab 22, Page 110?
04:03  25               Mr. Henderson asked -- see the line, "Can you

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:03  1   tell me if your belief with regard to the death penalty comes

2   from any religious belief that you might have or is it a moral

3   belief?"

4            And she answers, "I think it is a moral belief.

04:03  5   It's a moral belief.  It's hard to see why someone killing

6   another individual and I can't" --

7       *(Video screen goes blank.)*

8            THE COURT:  Oh, stop.  What happened here?  Where is

9   my guy?

04:03  10           Oops.  Give me one second.  Let me find my

11  technical folks.

12           Lawyers, while we're waiting, we're clearly not

13  going to finish today.  I'm good for first thing in the

14  morning.  Is everybody still good for first thing in the

04:04  15  morning?

16           MS. SWARNS:  Yes.

17           THE COURT:  Everybody?

18           MS. MIRANDA:  Yes.

19           THE COURT:  Okay.  Good.

04:05  20      *(Sotto voce discussion between Court and staff)*

21           THE COURT:  All right.  We've got you back online.

22  Can you see us again, Mr. Rosales?

23           MR. ROSALES:  Yes, your Honor.  Yes.

24           THE COURT:  Okay.  Sorry about that.  We stopped the

04:06  25  proceedings when we realized that we had lost the connection

*Gray Cross of Davenport*

04:07  1   with you; so, you have not missed anything.

2          MR. ROSALES:  All right.  Thank you.  Thank you.

3          THE COURT:  All right.  Do you remember where you

4   were?  I think you were on Page --

04:07  5          MR. GRAY:  Page 110, your Honor.

6          THE COURT:  -- 110.

7          MR. GRAY:  Yes.  Okay.  We were discussing that

8   Ms. Davenport doesn't recall whether she doubted -- whether or

9   not she doubted Ms. Taylor's willingness to impose the death

04:07  10  sentence in a proper case.

11         THE COURT:  Right.

12  BY MR. GRAY:

13  Q.  And in response to that, we were looking at the passage

14  that starts on Line 3, where Ms. Taylor is asked, "Your feeling

04:07  15  with regard to the death penalty, I suppose, is justified in

16  your mind in some way.  Can you tell me if your belief with

17  regard to the death penalty comes from any religious belief you

18  might have or is it a moral belief?

19         Ms. Taylor responds, "I think it is more of a

04:07  20  moral belief.  It's a moral belief.  It's hard for me to see

21  someone killing another individual, and I can't for any

22  particular -- and I can't say for any particular reason.  There

23  may be reasons; but still, I don't think it's reason enough to

24  take another person's life and then just get away with it scot

04:08  25  free.  They may go to prison; but, to me, sometimes that's not

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:08  1    enough.  To me, it is a deterrent to crime.  If you know if you

2    commit a crime all you're going to do is go to prison, it's

3    going to be -- I don't mean a lost cause, but I see it as the

4    ultimate deterrent to crime at this point in time."

04:08  5           And then she's asked, "Have you held these

6    beliefs for a very long time?"

7           And she answers, "Yeah."

8           Is there anything in these statements that casts

9    doubt on Ms. Taylor's support for capital punishment?

04:08  10   A.  Not particularly, no.

11   Q.  Is there anything that suggests she might be unwilling to

12   impose the death verdict in an appropriate case?

13   A.  Not in that exchange, no, on that question.

14   Q.  In your affidavit, you also wrote that Ms. Taylor had

04:08  15   trouble understanding "beyond a reasonable doubt."  Was

16   Ms. Taylor's testimony about the burden of proof one of the

17   reasons you exercised a strike against her?

18   A.  It's one of the reasons, yes.

19   Q.  Okay.  If we could, please, turn to Page 117 at Tab 22.

04:09  20   And at the top of that page -- yes.  Okay.

21          Mr. Henderson asks, "Okay.  Well, I'm not

22   understanding, then.  Would you agree with me that the burden

23   is not 'beyond any or all doubt' or the legislature could have

24   put it in there?"

04:09  25          She answers, "I think it's fair of them to say

*Gray Cross of Davenport*

04:09  1   'beyond a reasonable doubt.'"

2              Mr. Henderson asks, "Okay.  So, it would seem

3   fair to you that a person could be found guilty and receive the

4   death penalty based upon evidence beyond a reasonable doubt as

04:09  5   opposed to evidence beyond all doubt or any doubt?"

6              And Ms. Taylor's responds, "Exactly."

7              "You think that's fair?"

8              "Yes."

9              Is this an acceptable answer to the State on

04:10  10  "beyond a reasonable doubt"?

11  A.  It was.  But that's not what she said the first time she

12  was asked.

13  Q.  Well, is it your practice to strike jurors who gave

14  equivocal answers or answers that made you uncomfortable and

04:10  15  then gave a firm answer that was favorable to the State?

16  A.  It depends on all the other circumstances involving that

17  person, the things we could see and hear and feel in the

18  courtroom.

19              THE COURT:  I'm sorry.  Do you know is there -- oh,

04:10  20  it's back again.  Sorry.

21              MR. GRAY:  Can you hear us, Mr. Rosales?

22              MR. ROSALES:  No.

23              THE COURT:  You cannot hear us?

24              MR. ROSALES:  Yeah, I hear -- now I can hear you.

04:10  25              THE COURT:  Okay.  Great.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:10    1                      Speak up a little bit.

         2              MR. GRAY:  Can you hear me, sir?

         3              THE COURT:  Did you just hear your lawyer?

         4              MR. ROSALES:  What?

04:10    5              MR. GRAY:  Could you hear me, sir?

         6              MR. ROSALES:  Just barely.  I can't hear that good.

         7              MR. GRAY:  Okay.

         8              THE COURT:  Not that good?

         9                      Okay.  Speak up for him.  I'm sorry, Mr. Gray.

04:11   10      BY MR. GRAY:

        11      Q.  Could you please turn to Tab 14?

        12                      This is Accepted Juror Beverly Willett.  And

        13      please turn your attention to Page 276.

        14                      We could start, please, at Line 8.  Ms. Willett

04:11   15      is asked, "Okay.  And would you have to be convinced beyond all

        16      doubt in a case involving the death penalty?"

        17                      Response, "I believe so.  I believe that's the

        18      law."

        19                      The Court interrupts, "No.  The law says 'beyond

04:11   20      a reasonable doubt.'  The law does not say 'beyond all doubt.'

        21      Well, beyond" --

        22                      And then you ask, "Now, if you disagree with the

        23      law in this area, that's fine.  You certainly have a right to

        24      do that.  Do you think it's fair that a person facing a death

04:12   25      penalty, when the State has only proved the case beyond a

*Gray Cross of Davenport*

04:12  1    reasonable doubt instead of beyond all doubt" --

2              Response, "No.  I think if I had any qualms at

3    all, I couldn't, you know.  If I was on the jury and we did not

4    find the defendant -- and we did find the defendant guilty but

04:12  5    there was any doubt, you know, possible doubt, then, no, I

6    could not say, 'Yes, take his life.'"

7              Why was this juror acceptable to the State?

8    A.  I have no idea.  I told you earlier that I -- when I read

9    through her complete questioning, she didn't give the right

04:12  10   answers to -- to almost anything.

11             I have no idea why we accepted her, unless it was

12   what is contained in the courtroom that I've tried to explain

13   to you, the way she said it, the way she looked, the way she

14   acted, what our gut feeling was about her.

04:12  15   Q.  So, you would agree with me -- I'm sorry.

16             Did you finish?

17   A.  I agree with you that from reading the words she does not

18   sound like a good State's juror.

19   Q.  Would you agree with me that Ms. Taylor's answer on "beyond

04:13  20   a reasonable doubt" was substantially more favorable to the

21   State --

22   A.  Yes, once she finally --

23   Q.  -- than Ms. Willett's?

24   A.  Once she finally got it right, yes.

04:13  25   Q.  Okay.  You noted that -- the fact that the defendant killed

*Gray Cross of Davenport*

04:13    1    more than one person wouldn't help on future dangerousness.

2                        We're again talking about Ms. Taylor here.

3                        Why wouldn't the State want a juror who could

4    find future dangerousness based on a single killing?

04:13    5    A.  Well, we would.

6    Q.  So, was Ms. Taylor's view that she could find future

7    dangerousness on the basis of a single killing favorable to the

8    State in this instance?

9    A.  Well, I don't know where you're reading exactly; but I

04:14   10    would think so, yes.

11    Q.  If you could turn to Tab 22, please, the notes on -- it's

12    also in your affidavit.

13                        THE COURT:  Pardon me?

14    BY MR. GRAY:

04:14   15    Q.  Okay.  It's on her questionnaire; but it's also,

16    Ms. Davenport, at the bottom of the page of -- 3 of your

17    affidavit.

18                        "As to future dangerousness, the fact that the

19    defendant killed more than person -- one person wouldn't help

04:14   20    her?"

21                        Answer, "Yes."

22    A.  Under Ms. Taylor?

23    Q.  Yes.

24                        THE COURT:  Page --

04:14   25    A.  Oh, okay.

*Gray Cross of Davenport*

04:14  1          THE COURT:  Got it.

2     A.  Well, I would want her to answer -- to answer "yes" to that

3     question.

4     BY MR. GRAY:

04:14  5     Q.  Why did you want her to answer "yes" to that question?

6     A.  Because there were more than one person killed in this --

7     in this crime.

8     Q.  Okay.  Would an answer that she was going to find future

9     dangerousness on the basis of a single killing disqualify her?

04:15  10    A.  No.  But I don't know that she did that.

11    Q.  Okay.  Could you please turn to Tab 15?

12    A.  Fifteen?

13    Q.  Yes, ma'am, 15, Page 22.  And we're again talking about

14    Ms. Williamson.  Line 22.

04:15  15    A.  I'm sorry.  Who are we talking about?  Ms. Williamson?

16    Q.  Ms. Williamson.  The question begins on Line 18.

17              "Would it make any difference to you" --

18         MS. MIRANDA:  I'm sorry.  What page are you on?  I

19    missed that.

04:15  20         MR. GRAY:  Excuse me.  Page 22 behind Tab 15.

21         THE COURT:  Tab 15?  Okay.

22    BY MR. GRAY:

23    Q.  "Would it make any difference to you that more than one

24    person may have been killed, as to whether or not you would be

04:16  25    more in favor of capital punishment or less?"

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:16   1          Answer, "No."

2                  Was that an acceptable answer for the State?

3    A.  Well, obviously, it was, at least taken in -- in total of

4    all the said -- of the circumstances involving this woman,

04:16   5    because I believe she was on the jury.

6    Q.  Okay.  Why was this an acceptable answer and Ms. Taylor's

7    answer not acceptable?

8    A.  Well, there continued on more questions about that.

9    Perhaps that was it.

04:16   10   Q.  Ms. Taylor also testified that the fact that a child had

11   been killed would matter to her on the future -- future

12   dangerousness.  Would that be relevant to the State's

13   assessment --

14   A.  Yes.

04:16   15   Q.  -- of whether she would be a favorable juror on this issue?

16   A.  Yes.

17   Q.  Would that be a favorable characteristic?

18   A.  Yes.

19   Q.  And just to your recollection, was there a pregnant woman

04:17   20   involved in --

21   A.  There was a young pregnant girl, yes.

22   Q.  Okay.  Is an educated juror good for the prosecution?

23   A.  Usually, yes.

24   Q.  Okay.  You noted on Ms. Taylor's juror questionnaire,

04:17   25   "Educated Black female, articulate, but not totally."

*Gray Cross of Davenport*

04:17    1          Do you recall why you noted that she was
         2   educated, what characteristic she had indicated to you that she
         3   was educated?
         4   A.   No.   It must be on here somewhere.
04:17    5   Q.   Please turn to Tab 22.
         6   A.   But I don't know where.
         7          It says she graduated from Ohio State University.
         8   Q.   In 1981.
         9          Do you recall why you wrote, "Articulate, but not
04:18   10   totally"?   What was the reason for writing that comment?
        11   A.   I must have changed my mind after I wrote part of it.
        12   Q.   Okay.   Do you recall what part of her testimony made you
        13   believe that she was not totally articulate?
        14   A.   No.   And I further wrote that it got worse as she went
04:18   15   along with Keno during the questioning.
        16   Q.   Do you recall what part of her testimony caused you to
        17   write that?
        18   A.   No.
        19   Q.   All right.   I would like to turn to juror -- Potential
04:18   20   Juror Marianne Walker, at Tab 24.   Ms. Walker had a Master's in
        21   educational administration from the University of California.
        22   She's a member of the League of Women Voters; is on two church
        23   committees, hospitality and new members; and she has been a
        24   school teacher for 16 years.   She also testified that she
04:18   25   taught second grade.

*Cheryll K. Barron, CSR, CM, FCRR*                              *713.250.5585*

*Gray Cross of Davenport*

04:18   1          Do any of those characteristics suggest that she

2     might be a good juror for the prosecution?

3     A.  Yes, they do.  Her answers looked -- looked acceptable as

4     they are written in the written form; but, obviously, there was

04:19   5     some reason we didn't feel comfortable with her.  I think that

6     she was even struck before Mr. Boyd began questioning.

7     Q.  Do you recall the reason that you struck her before

8     Mr. Boyd began questioning?

9     A.  Not -- unless we already had made up our minds and didn't

04:19  10     want to waste the time.

11     Q.  All right.  In your affidavit you say that one reason that

12     you struck Ms. Walker was that she's a teacher and teachers are

13     naturally sympathetic, make good jurors for the defense.  What

14     do you mean by "naturally sympathetic"?

04:19  15     A.  I think I explained to you before that my parents were both

16     teachers.

17     Q.  Yes, ma'am.

18     A.  So, that's who I grew up with.  And they just -- they just

19     are.

04:20  20     Q.  Okay.

21     A.  In my viewpoint.

22     Q.  You accepted Jacklynn Lyles, who is a school teacher.  Do

23     you recall why you allowed Ms. Lyles to be seated but not

24     Ms. Walker?

04:20  25     A.  No, I don't.

*Gray Cross of Davenport*

04:20  1    Q.  Okay.

2    A.  She was the one who was then excused when she didn't want

3    to serve?

4    Q.  For medical reasons.

04:20  5    A.  Okay.

6    Q.  That's correct.

7            Ms. Lyles taught at the Katy Independent School

8    District for five years.  She taught sixth grade English, and

9    she had an education certificate and a Bachelor of Fine Arts

04:20  10   from Abilene Christian University.

11           Ms. Walker's -- would you agree that Ms. Walker's

12   Master's degree was a more advanced degree than Ms. Lyles'?

13   A.  Yes.

14   Q.  Was there a difference, in your mind, between a second

04:20  15   grade teacher and a sixth grade teacher?

16   A.  I don't remember.  Probably not.

17   Q.  All right.  Is there anything that you could point to in

18   Ms. Walker's voir dire testimony that suggests that she's, in

19   fact, naturally sympathetic?

04:21  20   A.  Not in particular, no.

21   Q.  You also state that you struck Ms. Walker because her

22   stance on premeditation bothered you.  Is that correct, that

23   that's a reason that you exercised a peremptory strike against

24   Ms. Walker?

04:21  25   A.  I wrote that her stance on the issue of premeditation

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:21   1    bothered me.

2    Q.  Yes, ma'am.  Is that a -- is that a reason that you struck

3    her?

4    A.  I don't know the total reason why we struck her.  It must

04:21   5    have been all these things together.  And it may have been the

6    way she looked at us.  I don't know.  I don't know what the

7    vibes were in the courtroom.

8    Q.  Well, that was the reason you stated in your affidavit that

9    you struck her.

04:21   10   A.  I told you everything that was in my affidavit was

11   everything I could think of when I wrote it.

12   Q.  Okay.  And is that based on a refreshed recollection, based

13   on usual practices, what you usually do in the practice of voir

14   dire?

04:22   15   A.  Yes.  The items on the first page are, yes.

16   Q.  Are you saying that you're not sure that the reason that

17   you struck Ms. Walker was that her stance on premeditation

18   bothered you?

19   A.  I'm telling you that this was 23 years ago and I can't tell

04:22   20   you for certainty what all my reasons were for any of them.

21   Q.  Do you recall -- when you wrote that in your affidavit, do

22   you recall what you meant by "her stance on premeditation

23   bothered you"?

24   A.  Well, it bothered me when I read through the questions and

04:22   25   answers.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:22   1   Q.   Okay.   Can you point us towards what in her questions and
        2   answers caused you concern?
        3   A.   Do we have it here?
        4          MS. MIRANDA:   I think it's probably --
04:23   5   A.   Do you know what page it's on where we talked about that?
        6   BY MR. GRAY:
        7   Q.   Well, I can point you towards one place where she talks
        8   about premeditation.   I would actually first point you to her
        9   capital punishment attitude survey, which is the last page
04:23  10   before the blue sheet.
       11          And if you look at Item 23 on that page, the
       12   first column is "Agreed" and the second column is "Disagreed."
       13   A.   Okay.
       14   Q.   And she made a checkmark under the "Disagreed" column for
04:23  15   the statement, "Capital punishment is justified only for
       16   premeditated murder."
       17          Does that cause you concern?
       18   A.   No.
       19   Q.   And if we could, turn to Page 515 of her transcript.   And
04:23  20   on Line 9 she says, "I think I'd be leaning towards accepting
       21   the maximum penalty if I was aware of the circumstances, the
       22   circumstances tended to prove that there was some type of
       23   malicious forethought."
       24          And Mr. Henderson interjects, "Okay.   You're
04:24  25   talking perhaps about premeditation?"

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:24  1              And she responds, "Yes, uh-huh."

2              Would you agree that the word "premeditation" was

3    Mr. Henderson's not yours, not your own?

4    A.   Would I --

04:24  5    Q.   I'm sorry.  Not "Mr. Henderson's."  Not the juror's.

6    A.   He's the first one to say "premeditation."

7    Q.   Right.

8    A.   He said, "Are you talking about premeditation?"

9              And she said, "Yes."

04:24  10   Q.   Right.  Would you agree that the word "premeditation" was

11   Mr. Henderson's word, not the prospective juror's word?

12   A.   Yes.

13   Q.   Okay.  If you could, please turn to Page 517, Line 7.

14   There's a -- there's a discussion about -- where the Court

04:25  15   interjects there, says, "That's not the capital murder

16   situation."

17             And then she says, "Okay.  Well, I'm trying to

18   follow your line of reasoning.  I would not have any" --

19             And Mr. Henderson says, "Requirement of that, any

04:25  20   premeditation?"

21             And she agrees, "Right."

22             I guess, in fairness, we should start on the

23   answer that's above that, where she says, Line 1, "No, that

24   wouldn't be necessary.  I have heard of situations where

04:25  25   persons were killed or seriously injured because of

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:25   1   carelessness and they weren't necessarily aiming the gun at

        2   them."

        3           And that's the point where the Court explains

        4   that might not be capital murder, and then she agrees with

04:25   5   Mr. Henderson that she wouldn't have any requirement of

        6   premeditation.

        7           Does that answer -- resolve any concern you might

        8   have about whether Ms. Taylor would require premeditation in a

        9   capital case?

04:26  10   A.   No.   It just took two and a half pages to get there.

       11   Q.   But you were satisfied with her statement, which is

       12   consistent with what she said on her checkmarked questionnaire,

       13   that she wouldn't require premeditation?

       14   A.   Yes.

04:26  15   Q.   Do you know whether any seated White jurors indicated on

       16   their capital punishment attitude surveys that premeditation

       17   would be required for capital punishment?

       18   A.   I couldn't tell you.

       19   Q.   Okay.   In your experience, do non-lawyers understand the

04:26  20   difference between "intentional" and "premeditated" before it's

       21   explained to them?   Is that something that a lot of people

       22   generally understood?

       23   A.   A lot of them don't understand.

       24   Q.   So, in your experience, in voir dire was it frequently

04:27  25   necessary to explain the difference between intentional actions

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

*Gray Cross of Davenport*

04:27  1   and premeditated actions so that laypeople could understand it?

2   A.  I don't think they were confusing "premeditated" and

3   "intentional" with each other, but those two terms both were

4   always -- always explained.

04:27  5   Q.  When you're interviewing potential jurors, is confusion

6   about complicated legal concepts that laypeople don't

7   understand typically a concern of yours?  Is that something

8   that would cause you to exercise a strike against a juror?

9   A.  That it has to be explained?  No.

04:27  10  Q.  Yes.

11  A.  No.

12  Q.  All right.  Would you agree that Ms. Walker was a very

13  strong supporter of the death penalty?

14  A.  I really don't remember, but she probably was.  She -- she

04:28  15  looks like a very good State's juror, on paper.

16  Q.  Okay.  Is there anything that you could point to that would

17  cause you to be concerned about her support of the death

18  penalty?

19  A.  No, sir.

04:28  20  Q.  You said that Ms. Walker had trouble answering questions

21  regarding the second special issue.  Do you recall what you

22  mean by that statement?

23          It's on Page 4 of your affidavit.

24  A.  About the "intentional" versus "deliberately"; is that what

04:29  25  you asked?

---

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:29   1   Q.   Well, I'm asking, if you look at Page 4 --

        2   A.   Oh, of my --

        3   Q.   -- of your affidavit --

        4   A.   Okay.

04:29   5   Q.   -- you said she had trouble -- it's the second sentence of

        6   the second paragraph, "She also had trouble answering questions

        7   regarding Special Issue Number 2."

        8   A.   Okay.

        9   Q.   Do you recall what you meant by that statement?

04:29  10   A.   I don't know, unless it was things had to be explained to

       11   her or cleared up by the Court.

       12                I don't remember.  I didn't quote it.

       13   Q.   Okay.  When she was asked whether she would always answer

       14   Special Issue Number 2 "no," she said, "It would depend on what

04:30  15   the State would show me."

       16                Is that an acceptable answer?

       17                If you need a record citation, it's Page 527,

       18   Lines 19 through 20.

       19   A.   It's probably all right, yes.

04:30  20   Q.   Okay.  She said that she could answer the second special

       21   issue based on the facts of the crime alone.  Is that an

       22   acceptable answer?

       23   A.   Yes, it is.

       24   Q.   And she said that in a capital felony murder case she would

04:30  25   tend to answer the second special issue "yes."  Is that an

*Gray Cross of Davenport*

04:30 1    acceptable answer?

2    A.   Yes.

3    Q.   Okay.  I'd like to move on to your statement that you

4    struck Ms. Walker because her answer to Mr. Henderson's

04:30 5    question concerning an innocent pregnant victim -- could you

6    please turn to Tab 24 --

7    A.   Okay.

8    Q.   -- Line -- I'm sorry.  We're at Tab 24, Page 513.  And at

9    Line 17, Mr. Henderson asks -- well, first of all, is that a

04:31 10   reason that you struck Ms. Walker?  Do you recall whether the

11   answers to the questions concerning an innocent pregnant woman

12   were one of the reasons you struck Ms. Walker?

13   A.   I don't know.

14   Q.   You don't know.  Okay.

04:31 15            It says on your affidavit that that's one of the

16   reasons.

17   A.   It says on my affidavit that I was uncomfortable with that

18   answer.  And it means I'm uncomfortable with that answer as I

19   read through this.  I don't remember what my feeling was at the

04:31 20   time, 23 years ago.

21   Q.   Okay.  So, you're not sure whether that was the reason 23

22   years ago that you struck Ms. Walker?

23   A.   No, I don't remember 23 years ago all my feelings on each

24   one, no.

04:32 25   Q.   When you read that section of the transcript today, is

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:32  1    there something about it that you can point to that makes you

2    think that, based on your usual practices, this would have been

3    unacceptable and you would have said, "We've got to exercise a

4    peremptory strike against this potential juror"?

04:32  5    A.  And you're talking about Line 17?

6    Q.  Well, I'm talking about what starts at Line 17 and

7    continues to the following page.  I'll give you a minute to

8    read it if you like.

9    A.  Okay.

04:32  10           She was having trouble with the word "innocent."

11    She thought if you had -- you had to have intent to kill that

12    person and if somebody else was killed, she couldn't quite put

13    that all together.

14    Q.  Is it correct that she asked Mr. Henderson to clarify the

04:32  15    question because she couldn't understand it?

16    A.  Apparently.

17    Q.  Did he ever do so?

18           Let me direct your attention, please, to Page

19    514, Line 13, where she asked, "So, would you rephrase your

04:33  20    question, please?"

21           And Mr. Henderson responds, "Let me just ask you

22    another one."

23    A.  Right.

24    Q.  Was any misunderstanding that that -- that she may have had

04:33  25    about the doctrine of transferred intent or what an innocent

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:33   1   pregnant victim might mean clarified for her?  Was she allowed

2   an opportunity to answer that question?

3   A.  I don't know if it was clarified for her or not.

4   Q.  Okay.  I'd like to turn to Tab 20, which contains the juror

04:33   5   information about -- for Esmerelda Lopez.

6           THE COURT:  Which one, now, please?

7           MR. GRAY:  Tab 20, your Honor.  This is Esmerelda

8   Lopez.

9           THE COURT:  Okay.

04:34   10  BY MR. GRAY:

11  Q.  Would you agree with me that Ms. Lopez strongly supported

12  capital punishment?

13  A.  That's what she indicated on her attitude questionnaire.

14  Q.  Okay.  Ms. Lopez was the victim of a robbery.  Three men

04:34   15  had held a gun to her head while she was working at a liquor

16  store.

17           Would you consider a crime victim to be

18  potentially a good juror for the prosecution?

19  A.  In and of itself, yes.

04:34   20  Q.  You state in your affidavit that you struck Ms. Lopez

21  because she had conflicting written answers on her "Capital

22  Punishment Attitude Questionnaire."  Is that a reason that you

23  struck Ms. Lopez?

24  A.  It could have been a contributing reason, yes.

04:35   25  Q.  Okay.  Do you recall what you meant by that?

*Gray Cross of Davenport*

04:35   1   A.  Well, evidently, some of them conflicted with each other.

2   And I listed the numbers.

3   Q.  Right.  You listed 5, her answer that we've been

4   discussing, that she strongly favored capital punishment as an

04:35   5   appropriate penalty, and, then, four other responses on the

6   scale, 2 --

7   A.  On the next page, yes, she said, "Capital punishment is

8   absolutely never justified.  I don't believe in capital

9   punishment, but I'm not sure it isn't necessary."

04:35  10          She checked, "yes," "We must have capital

11   punishment for some crimes."  And she checked that, "Capital

12   punishment is just and necessary."

13          So, you know, those conflict with each other.

14   Q.  Would you agree with me that 5 is consistent with --

04:36  15   certainly consistent with 10 and 17?

16   A.  That, "Capital punishment cannot be regarded as a sane

17   method for dealing with crime"?

18   Q.  No.  "We must have capital punishment for some crimes" and

19   "capital punishment is just and necessary"?

04:36  20   A.  I'm sorry.  I'm not following you.  Say that again.

21   Q.  Okay.  Well, my understanding --

22   A.  Oh, 5 on the page before?

23   Q.  Yes, 5 --

24   A.  Okay.

04:36  25   Q.  -- on the survey --

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:36   1    A.   Okay.

        2    Q.   -- and 10 and 17 on the scale.

        3    A.   Yes.   Yes.

        4    Q.   And would you agree with me that 9, "I don't believe in

04:36   5    capital punishment, but I'm not sure it isn't necessary," is

        6    not inconsistent with any of the other responses that we've

        7    been discussing?

        8    A.   Well, it said she -- it says, "I don't believe in capital

        9    punishment"; and I think that is inconsistent.

04:37  10    Q.   But she suggests that it might be necessary?

       11    A.   Yes.

       12    Q.   Okay.   So, the inconsistency that we're talking about is

       13    that she checked Number 2, "Capital punishment is absolutely

       14    never justified"?

04:37  15    A.   Yeah, 2 and 9 just don't agree with 10 and 17.

       16    Q.   Okay.   You're -- do you agree with me that Number 9 is

       17    potentially consistent with 5, 10, and 17?

       18    A.   No, not particularly.

       19    Q.   Okay.   Ms. Lopez also agreed with the following statements

04:37  20    supporting capital punishment.   "We must have capital

       21    punishment for some crimes," "Capital punishment is just and

       22    necessary," "Capital punishment should be used more often than

       23    it is."   That's 24.   Would you agree with me that her response

       24    on 24 is a favorable answer for the State?

04:37  25    A.   Yes.

*Gray Cross of Davenport*

04:37   1   Q.   Turning to Ms. Lopez' testimony, please turn to Page 19,
       2   Line 13.
       3              Mr. Henderson asks, "I'm going to ask you about
       4   some of the questions with regard to your answers here.   On the
04:38   5   sheet, you said to the question, 'Capital punishment is
       6   absolutely never justified,' you have agreed with that.   Since
       7   there are so many questions here and you've already gone
       8   through so many, I guess it might be a little confusing.   But
       9   probably would you say that capital punishment is justified in
04:38  10   some cases?"
      11              Answer, "In some, not in all."
      12              Does that question clarify why -- that Ms. Lopez
      13   may have checked Number 2 by accident?
      14   A.   Well, it doesn't explain why she would have checked
04:38  15   anything by accident.   It explains what she's saying right
      16   here.
      17   Q.   Does it clarify Ms. Lopez' view on whether capital
      18   punishment is justified?
      19   A.   It says what it says, "In some, but not in all."
04:39  20   Q.   All right.   Is it normally your practice to give in-court
      21   testimony weight over checked boxes?   Weighing a response to a
      22   checked box and a list of items, would you be more likely to
      23   weigh a verbal answer in court or the checked box?
      24   A.   That's one of those things you have to -- you have to
04:39  25   determine when you're listening to it.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

04:39  1    Q.   Okay.   Please turn to Tab 8, which contains -- no.

2             Actually, we'll turn to Tab 11 -- excuse me --

3    which contains juror information for Seated Juror Pearl

4    Plander.

04:40  5             THE COURT:   Did you say 8, Tab 8?

6             MR. GRAY:   No.   Excuse me, your Honor.   If I said

7    that, I misspoke.   Tab 11, for Pearl Plander.

8             THE COURT:   Okay.

9    BY MR. GRAY:

04:40  10   Q.   Okay.   Ms. Plander checked that she agreed with Item 11, "I

11   think that return to the whipping post would be more effective

12   than capital punishment," and with Item 19, on the next page,

13   "Capital punishment is the most hideous practice of our time."

14   And the latter response, 19, was both circled and underlined.

04:41  15            Based on those responses, why was Ms. Plander an

16   acceptable juror?

17   A.   I don't know, unless we just felt like, from listening to

18   her and watching her, that she would be fair.

19   Q.   Do you recall whether you asked her about her response to

04:41  20   Item 19, "Capital punishment is the most hideous practice of

21   our time"?

22            Or -- excuse me.

23   A.   Was she asked about it on voir dire?   I don't know.

24            THE COURT:   Wait a minute.   I'm sorry.   I must have

04:41  25   the wrong page written down.   Tab --

*Cheryll K. Barron, CSR, CM, FCRR*                        *713.250.5585*

*Gray Cross of Davenport*

04:41    1          THE WITNESS:  Tab 11.

2          MR. GRAY:  I'm sorry, your Honor.  We are at Tab 11.

3          THE COURT:  Right.

4          MR. GRAY:  And we're talking about the sheet of paper

04:41    5  that's just before the blue thing, the blue sheet that divides

6  the juror questionnaires and the testimony transcripts.

7          THE COURT:  Okay.  I got you.  I just got lost.

8          MR. GRAY:  All right.  And the response we've been

9  discussing is the first response on the top of the second page.

04:42   10          THE COURT:  Right, Number 19.  I was in the wrong

11  place.

12              So, what was the answer?  Why was she an

13  acceptable juror?

14          THE WITNESS:  I can't tell him from that -- from that

04:42   15  question.  I don't know.

16          THE COURT:  Does that question make it sound like she

17  would be a good juror for the State?

18          THE WITNESS:  No.  No, it's not particularly a good

19  answer for the State.  But that's not the only thing we

04:42   20  consider.  And when you -- you can pick everything to pieces

21  like that; but it's the totality of the one hour we get to

22  spend with them and watch them and listen to them, see if they

23  feel comfortable with themselves.

24  BY MR. GRAY:

04:42   25  Q.  Well, you obviously noticed that answer when you reviewed

*Cheryll K. Barron, CSR, CM, FCRR*                      *713.250.5585*

*Gray Cross of Davenport*

04:43   1   her materials.  In your normal practice, would you have asked a

2   juror about an answer like that?

3   A.  Probably, yeah.

4   Q.  Before accepting them?

04:43   5   A.  Yes.

6   Q.  But you don't recall whether you asked her about that in

7   this instance?

8   A.  No.  And I don't remember even which one of us questioned

9   her.

04:43   10            I did.

11   Q.  Are we ready to move on to the next topic in the affidavit?

12   A.  Sure.

13   Q.  In your declaration, you state that you struck --

14            THE COURT:  Well, I tell you what.  Let's call it a

04:44   15   day here.  I was going to quit at 4:45 so I could talk to these

16   folks for a few minutes.  So, we're almost there.  So, let's

17   stop with that.

18            Gentlemen, sir, who's there with Mr. Rosales,

19   please?  Sir?

04:44   20            MR. McKEE:  I am.

21            THE COURT:  Hi.  Good afternoon, sir.  What's your

22   name?  I'm sorry.

23            MR. McKEE:  Richard McKee [phonetic].

24            THE COURT:  Mr. McKee, we're going to have to resume

04:44   25   in the morning; and I wanted to know what is the earliest time

04:44  1   that we could potentially resume in the morning, in terms of

2   your being able to get Mr. Rosales there for us.

3          MR. McKEE:  I'm going to have to see if we're going to

4   have somebody here tomorrow.  I'm not here tomorrow.

04:44  5          THE COURT:  Okay.

6          MR. McKEE:  And if we've got somebody here, we can

7   resume probably as early as 8:30, 9:00 o'clock, 10:00 o'clock,

8   whenever you want to resume.

9          THE COURT:  Okay.  Well, I was --

04:44  10         MR. McKEE:  But we'll have to --

11         THE COURT:  I was hoping that we could potentially

12  resume at 9:00 in the morning.

13         MR. McKEE:  We'll have to get that okay'd through

14  Huntsville still.

04:45  15         THE COURT:  Could you say that one more time?

16         MR. McKEE:  Huntsville has still got to okay that for

17  us to do that.

18         THE COURT:  All right.  And what is that process?

19  What will that involve in terms of making sure we can get

04:45  20  that --

21         MR. McKEE:  The same as setting up as for today.

22  You-all will have to get with Huntsville and ask them if they

23  can do it today and get their okay.  I can't okay it.

24         THE COURT:  Oh, they just gave you the order to get it

04:45  25  done?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:45   1              MR. McKEE:  Yes, ma'am.

2              THE COURT:  All right.  And, so, we would have to go

3       back through the same process?

4              MR. McKEE:  Yes, ma'am.

04:45   5              THE COURT:  Can we do that before the end of the day?

6              THE CASE MANAGER:  I can move on it.

7              THE COURT:  All right.  So, you're saying it won't be

8       you, it will be whoever Huntsville says for -- to get it done.

9       Is that correct?  To get Mr. Rosales there.

04:45   10             MR. McKEE:  I'm the one that's supposed to be doing

11      it, but I'm going to be in Austin tomorrow.

12             THE COURT:  Okay.  So, if you're not there, will there

13      be somebody else who can get him over there for me?

14             MR. McKEE:  I will make sure that they are, yes,

04:46   15      ma'am.

16             THE COURT:  Thank you.  Thank you, Mr. McKee.

17             MR. McKEE:  You're welcome.

18             THE COURT:  So, we're going to go ahead and adjourn

19      for the day.  Well, just give us one second.

04:46   20             Lawyers, anything else, then, that we need to

21      talk about today?  Because my only issue is I got to get

22      Esthela -- she's got to get out of here to make sure she gets

23      that done.

24             So, let's just make this assumption.  Let's make

04:46   25      the assumption that we should start at -- maybe we should push

04:46   1    it back to what?  To 9:30?  What do you think?

2              THE CASE MANAGER:  That's fine.

3              THE COURT:  You think?

4              THE CASE MANAGER:  I'll see if I can get them to do it

04:46   5    for 9:00 but --

6              THE COURT:  Okay.  Let's just try to be here for 9:00

7    o'clock; and, hopefully, we'll be able to have everything in

8    place to start at 9:00 o'clock or thereabouts.  And, you know,

9    we'll do what we can to make sure we have it all in place for

04:46   10   him to be able to be here by 9:00 o'clock in the morning.  So,

11   let's just sort of plan on being here at 9:00 o'clock; and

12   we'll just start as soon as we can.

13             And if it doesn't work for 9:00 o'clock, at least

14   we'll know at 9:00 o'clock in the morning what time you guys

04:47   15   need to come back here.

16             So, go ahead, get that done.

17             So, Mr. Rosales, hopefully we will be resuming at

18   9:00 in the morning.  We're going to be checking with the folks

19   up in the Huntsville right now to make sure we can get you

04:47   20   pulled to come over and do this video teleconference with us

21   first thing in the morning.

22             MS. SWARNS:  Your Honor?

23             MR. ROSALES:  Thank you, your Honor.

24             THE COURT:  Hold on one second, Mr. Rosales.

04:47   25             MS. SWARNS:  I just wanted to bring to your attention

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:47  1   that Mr. Dow has argument in the Fifth Circuit tomorrow; so, he
       2   is not going to be able to be with us.  But myself and Mr. Gray
       3   will be here and ready to proceed.
       4           THE COURT:  Okay.  That's fine.  And that's okay with
04:47  5   you guys?
       6           MS. SWARNS:  Yes.
       7           THE COURT:  Okay.  So, then, we'll go ahead and resume
       8   first thing in the morning, because it's just -- obviously, it
       9   just takes a little bit longer to get through all of this
04:47 10   evidence.  There's just a lot to get through.
      11           So, we'll make sure that we get started hopefully
      12   tomorrow.  And if we can't get the folks in Huntsville on tap
      13   to get it done tomorrow, it will have to be the next day.
      14           I know you're from out of town, but --
04:48 15           MS. SWARNS:  With respect to scheduling, I have an
      16   appearance in Arkansas on the 1st.
      17           THE COURT:  What day is that?
      18           MS. SWARNS:  That's Thursday.
      19           THE COURT:  That's Thursday, isn't it?
04:48 20           MS. SWARNS:  So, yes.  I'm scheduled to fly out on --
      21           THE COURT:  It's up to you guys.  I mean, you-all
      22   are -- you-all are the ones that are sort of setting the pace
      23   for this thing.  If we stop reading all the depositions, we
      24   could get through it all.
04:48 25           MS. SWARNS:  Yes.  I understand, your Honor.  We're

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:48   1    trying.  As you know, it's a very long voir dire proceeding.

        2    We're trying to get through it as quickly as we can.

        3              I guess the proposition would be that if we're

        4    unable to finish, your Honor, by tomorrow, could we reschedule

04:48   5    for another day after this week, just because I have to be

        6    in -- I'm ordered to be in court in Arkansas.

        7              THE COURT:  Well, I don't know.  I have to ask

        8    Esthela.  She's the boss.

        9              MS. SWARNS:  Okay.  I understand.  But we could --

04:48  10              THE COURT:  I don't have a clue.  She had to run

       11    upstairs to figure out what was going on tomorrow.

       12              MS. MIRANDA:  And I don't have any objection to that.

       13    I was just wondering, for clarification, if we have all day

       14    tomorrow or if we only have in the morning.

04:48  15              THE COURT:  Tomorrow, I'm free.  I have one thing late

       16    in the day tomorrow.

       17              MS. MIRANDA:  Okay.

       18              THE COURT:  Something at, like, 4:00 o'clock in the

       19    afternoon.  So, that's what Esthela was running up to check on

04:49  20    for me a little bit earlier.  And, so, you know, I'm

       21    potentially free basically the whole day tomorrow.

       22              MS. SWARNS:  Okay.

       23              MS. MIRANDA:  Okay.

       24              MS. SWARNS:  We're fine the whole day.

04:49  25              MS. MIRANDA:  Yeah, us, too.

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:49   1          THE COURT:  Okay.  So, you know, maybe we can get

       2   through by the end of the day tomorrow.

       3          But I'm potentially free the whole day.  I have

       4   one thing on my calendar for tomorrow.  It was 4:00 o'clock in

04:49   5   the afternoon.  And, so, you know, presumably we'll be tired by

       6   4:00 o'clock in the afternoon.

       7          So, I'll see you guys 9:00 o'clock in the

       8   morning.

       9          A CLERK:  All rise.

      10      (Proceedings recessed for evening)

      11                    *  *  *  *  *

      12              COURT REPORTER'S CERTIFICATION

      13      I certify that the foregoing is a correct transcript from
           the record of proceedings in the above-entitled cause.

      14

      15   Date:  July 21, 2008

      16

      17                    /s/   Cheryll K. Barron

      18              Cheryll K. Barron, CSR, CMR, FCRR
                      Official Court Reporter

      19

      20

      21

      22

      23

      24

      25