```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   MARIANO JUAREZ ROSALES        .
                                   . H-03-CV-1016
 4        vs.                      . HOUSTON, TEXAS
                                   . APRIL 29, 2008
 5                                 . 9:00 A.M.
     NATHANIEL QUARTERMAN          .
 6   . . . . . . . . . . . . . . . .

 7
                     TRANSCRIPT OF EVIDENTIARY HEARING
 8               BEFORE THE HONORABLE VANESSA GILMORE
                    UNITED STATES DISTRICT JUDGE
 9                        VOLUME 2 OF 2

10

11
     A P P E A R A N C E S:
12
     FOR THE PETITIONER:
13
          Christina Swarns
14        NAACP Legal Defense Fund
          99 Hudson Street
15        Suite 1600
          New York, New York  10013
16
          Joshua B. Gray
17        Attorney at Law
          Four Times Square
18        New York, New York  10036-6522

19        Mary Hunter
          Pro Bono Co-Counsel
20        Four Times Square
          New York, New York  10036
21

22

23   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
24                              - - - - -

25
```

1    A P P E A R A N C E S:   (Continued)

2

     FOR THE RESPONDENT:
3
          Tina J. Miranda
4         Thomas Jones
          Assistant Attorney General
5         PO Box 12548
          Austin, Texas  78711-2548
6         713-718-4600

7    OFFICIAL COURT REPORTER:

8         Cheryll K. Barron, CSR, CM, FCRR
          U.S. District Court
9         515 Rusk Street
          Room 8016
10        Houston, Texas  77002
          713-250-5585
11        reporter@oplink.net

12   ALSO PRESENT:

13        Mariano Rosales (By Video teleconference)

14   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
15                         - - - - -

16

17

18

19

20

21

22

23

24

25

1                            <u>INDEX</u>

2                                                      <u>PAGE</u>

3       <u>PETITIONER'S WITNESSES</u>

4       Norma Davenport (Continued)

5           Cross-Examination by Mr. Gray              125

6           Redirect Examination by Ms. Miranda        148

7           Recross-Examination by Mr. Gray            170

8       Craig Washington

9           Direct Examination by Ms. Swarns           184

10          Cross-Examination by Ms. Miranda           205

11          Redirect Examination by Ms. Swarns         213

12                          - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

09:13   1

2      THE COURT:  Good morning, everybody.  Please be

3 seated.

4         All right.  I think we are ready to proceed.

09:14   5 Mr. Rosales, can you hear us, sir?

6        MR. ROSALES:  Yes, ma'am.  Yes, your Honor.

7        THE COURT:  All right.  Good.

8          Then, are we ready to go, Mr. Gray --

9        MR. GRAY:  Yes, your Honor.

09:14  10      THE COURT:  -- where we left off yesterday?

11    **NORMA DAVENPORT, DULY SWORN, CONTINUED TO TESTIFY:**

12           **CROSS-EXAMINATION**

13 BY MR. GRAY:

14 Q.  Ms. Davenport, are you ready to begin?

09:14  15 A.  I'm ready.  Tell me which book.

16 Q.  You're the same person who left off testifying yesterday?

17 A.  I'm afraid so.

18 Q.  We were discussing Batson Juror Esmerelda Lopez.

19      THE COURT:  What number was that, again?  I forgot

09:14  20 where we were.

21      MR. GRAY:  Ms. Lopez was at Tab 20.

22      THE WITNESS:  Okay.

23 BY MR. GRAY:

24 Q.  Ms. Davenport, in your declaration you state that you

09:14  25 struck Ms. Lopez because Ms. Lopez answered twice that she

*Gray Cross of Davenport*

09:14  1   would require a defendant to testify, before changing her

2   answer.  Is Ms. Lopez' answer concerning a defendant's right

3   not to testify a reason that you exercised a peremptory strike

4   against her?

09:15  5   A.  As I've explained to you a number of times, that's one of

6   the reasons --

7   Q.  It's a reason --

8   A.  -- that went into the whole ball of wax.

9   Q.  But it is of the reasons you --

09:15  10  A.  It's one of the reasons.

11  Q.  Okay.  After the law concerning a defendant's right not to

12  testify was explained to Ms. Lopez, she stated that she would

13  follow the law.  Is that correct?

14  A.  I don't know where you're reading; but if you say that

09:15  15  that's what she said, I'll take your word for it.

16  Q.  Okay.  If you could turn, please, to Page 24, starting at

17  Line 25, behind Tab 20.

18  A.  Page 24?

19  Q.  Okay.  She was asked, "Would you be able to find somebody

09:16  20  guilty of a criminal offense without hearing both sides of the

21  story, so to speak?"

22          Her answer was, "No, I don't think so."

23          The next question, "Would you be able to find the

24  defendant guilty without hearing from the defense," I believe

09:16  25  begins on Line -- Page 25, Line 8.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

09:16   1    A.   Yes.

2    Q.   Are you following, Ms. Davenport?

3    A.   I am.

4    Q.   Okay.

09:16   5              "In other words, if you are only going to hear

6    one side of the story or will you have to hear something from

7    the defense in order to make a decision one way or the other?"

8              "I would like to hear something from the other

9    side in order to make a decision."

09:16   10             "Okay."

11   A.   She said "I would have to," not "like to."

12   Q.   "Have to."  Thank you.

13             "Okay.  Well, the law would say that if the State

14   proves its case beyond a reasonable doubt and if you are

09:16   15   satisfied with that in your mind, you must find the defendant

16   guilty, regardless of any other evidence.  Would you be able to

17   follow the law?"

18             "Yes."

19             "Okay.  So, if the defendant didn't testify and

09:17   20   we proved the case beyond a reasonable doubt, you say you will

21   be able to find the defendant guilty?"

22             "Yes."

23             Do you agree that she, after the law had been

24   explained to her, clearly testified twice that she would be

09:17   25   able to follow the law and find the defendant guilty if he

*Gray Cross of Davenport*

09:17  1  didn't testify?

2  A.  That's what she said.

3  Q.  Okay.  Please turn to Tab 11, Page 244.  This is the tab

4  relating to Seated White Juror Pearl Plander.

09:17  5            If you could begin, please, at Line 19 at the

6  bottom of Page 244.

7            MR. GRAY:  Can you hear me?

8            THE COURT REPORTER:  I'm having trouble.  If you could

9  speak up, please.

09:17  10            MR. GRAY:  Okay.

11  BY MR. GRAY:

12  Q.  Page 244, Line 19, "Would you be able to listen to only one

13  side -- one side and not hold it against the defendant if he

14  doesn't testify and make a decision on that or would you

09:18  15  require him to testify before you could say?"

16            Answer, "I'm not sure."

17            "Okay.  Can we start by agreeing that you would

18  like to hear from the defendant?"

19            "Right."

09:18  20            "And you understand that the law says he doesn't

21  have to?"

22            "Right."

23            "Okay.  Now, it doesn't matter if you agree with

24  the law or not.  You have an absolute right to believe whatever

09:18  25  you want to believe, and none of us are going to argue with

*Gray Cross of Davenport*

1   you."

2           "Uh-huh."

3           "If your personal belief is that he ought to

4   testify and you would want to hear before you could make a

5   decision, all you have to do is tell us."

6           "Right.  I would like to hear."

7           "Now, granted that you would like to hear, would

8   you require him to testify before you could make a decision?"

9           "I believe so."

10          "And in doing so, if he does not testify, would

11  you hold it against -- hold that against him; you know, if he

12  doesn't testify, he must be hiding something?"

13          "No, I don't think I would hold it against him."

14          "Would you just, then, be unable to make a

15  decision without hearing all the facts?"

16          "I probably would be."

17          And he continues testifying on this page and is

18  asked -- or she continues testifying on this page and is asked,

19  "Okay.  I can appreciate that.  But as you sit here right now,

20  what is your feeling as to what you would do?"

21          "Well, I could probably go on without his

22  testimony; but I would say that I would do that.  But now, if

23  you came right down to it, I don't know if I would or not."

24          "So, are you saying there's a chance that you

25  wouldn't make a decision absolutely not?"

*Gray Cross of Davenport*

09:19  1    "There's a chance."

2    Sorry.  Excuse me.

3    "So, you're saying there's a chance you wouldn't

4    make a decision or you -- or you absolutely not [sic]?"

09:19  5    Answer, "There's a chance."

6    Was Ms. Plander's testimony on this issue

7    acceptable to you?

8    A.   Evidently it was by the time we got through, because we

9    accepted her as a juror and she was able to make a decision

09:19  10   without hearing from the defendant.

11   Q.   Okay.  Do you see a distinction between Ms. Plander's

12   testimony, on the one hand, that she -- there's a chance, that

13   she wasn't sure, and Ms. Lopez' testimony that she could?

14   A.   Sure.  But there were other things that came into play with

09:19  15   Ms. Lopez.

16   Q.   Many of which we discussed yesterday?

17   A.   Some of which we did, yes.

18   Q.   Okay.  On this issue, do you agree that Ms. Lopez' answers

19   were clearer and more favorable than those of Ms. Plander?

09:20  20   A.   On that one issue, yes.

21   Q.   When you reviewed Ms. Lopez' juror questionnaire, you noted

22   that she was a Mexican female, lives north of downtown.

23   Did the fact that Ms. Lopez was a Mexican woman

24   who lived in an Hispanic neighborhood of Houston play any part

09:20  25   in your decision to exercise a peremptory strike against her?

*Gray Cross of Davenport*

09:20   1    A.  No, I don't believe so.  But it did make a difference that

2    she had six children in Little League and Mr. Rosales was a

3    Little League coach.

4    Q.  How do you know that Mr. Rosales was a Little League coach?

09:20   5    A.  Because we did background checks on him.  That's one of the

6    things they kept telling us, "He's a good guy.  He's a Little

7    League coach."

8    Q.  Is that a reason that's stated in your affidavit?

9    A.  I don't believe so.  Affidavit for --

09:20  10    Q.  Okay.  Do you recall that -- do you remember that that

11   might be a reason that you struck Ms. Lopez?

12   A.  Yeah.  I told you at the deposition I couldn't remember

13   everything that I did 23 years ago.  And it comes back

14   gradually.

09:20  15    Q.  Did we discuss Ms. Lopez in your deposition?

16   A.  I don't know.  Probably.

17   Q.  I'd like to turn to Mr. Hamilton, James Hamilton.  You

18   don't need to go there yet, but his materials are at Tab 18.

19            In your affidavit, at Page 2 you state that

09:21  20   Mr. Hamilton gave conflicting answers on his short and long

21   juror forms concerning the question "whether you, a family

22   member, or a close friend has been involved in a criminal case

23   as the defendant, victim, witness."  What did you mean by that?

24   A.  Just exactly what it says.

09:21  25   Q.  Okay.  Were you referring to his answers on his short form

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

09:21   1   juror form?

2   A.   The short and the long form.

3   Q.   Okay.   Is this your note?

4           If you turn to the third page, second sheet of

09:21   5   paper in Mr. Hamilton's section, behind Tab 18.

6   A.   Okay.

7   Q.   Is this your note, "Yes on long," next to his answer on the

8   short form?

9           THE COURT:   What page are you on, again, please?

09:22   10          MR. GRAY:   Your Honor, the third page -- it's the one

11   with the short juror forms --

12          THE COURT:   Okay.

13          MR. GRAY:   -- three forms in a page, and

14   Mr. Hamilton's is the second short form down, the top of the

09:22   15   page.

16          THE COURT:   Right.

17   A.   Where the "yes" is circled?   Is that what you're talking

18   about?

19   BY MR. GRAY:

09:22   20   Q.   "Yes on long" in the box where it says -- where it asks the

21   question about criminal cases.

22   A.   Yes.

23   Q.   Okay.   Do you recall why you wrote that note, "Yes on

24   long"?

09:22   25   A.   Because that's what he told us.

*Gray Cross of Davenport*

09:22   1   Q.  Okay.  The card asked the juror whether the -- the card

2   asked whether the juror has been an accused, a complainant, or

3   a witness; and Mr. Hamilton checks "no."  Is that correct?

4                   If you'd please read the question where

09:22   5   Mr. Hamilton checked "no" on that card.

6   A.  Are you talking about the small card now?

7   Q.  Yes, ma'am.

8   A.  It says, "Have you ever been a party to a lawsuit?"

9                   And he said, "No."

09:23   10                   "Any bodily injury ever sustained requiring

11   medical attention by you, by your family?"

12                   "No."

13   Q.  I'm looking for -- if you go down, it's the third box on

14   the left-hand side of the short form.  It says, "Have you ever

09:23   15   been an accused, complainant, or witness in a criminal suit?"

16                   Mr. Hamilton checked "no."

17   A.  Okay.  I see that.

18   Q.  Is that an accurate answer, from what we know about

19   Mr. Hamilton?

09:23   20   A.  Well, I don't remember now.  I don't know if he testified

21   in his brother's case.

22                   If -- he answered "yes."  But, "Have you or

23   somebody else ever been involved in a criminal case as a

24   defendant, witness, or complainant?"  And he said "yes."

09:23   25   Q.  Okay.  Is it possible that Mr. Hamilton was answering "no"

*Gray Cross of Davenport*

09:23    1   because he had never been accused as a criminal defendant
         2   himself?
         3   A.  I have no idea.  But it also asks if he had ever been a
         4   witness.
09:24    5   Q.  Okay.  But do we know whether Mr. Hamilton was a witness?
         6   A.  I don't know.
         7   Q.  Okay.  Could you please turn to Mr. Hamilton's long form
         8   juror questionnaire on Page 2?
         9   A.  Okay.
09:24   10   Q.  And the question in the middle of the page appears, "Have
        11   you, a family member, a close friend ever been personally
        12   involved in a criminal case as a defendant, victim, witness, or
        13   complainant?"
        14           And Mr. Hamilton indicates "yes."  Would you
09:24   15   agree with me?
        16   A.  I don't see where you're reading.
        17           THE COURT:  I don't either.
        18   BY MR. GRAY:
        19   Q.  It's the juror questionnaire, Page -- if you go by the
09:24   20   pagination in the upper right-hand corner, Page 22 of 47, and
        21   the next page is 23 of 47.
        22   A.  Okay.
        23   Q.  Go halfway down that page.
        24   A.  Of which, Page 22 or 23?
09:24   25   Q.  Twenty-three, please, ma'am.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

09:24    1    A.  Okay.

         2         THE COURT:  Oh, 23.

         3         MR. GRAY:  Yes.

         4    BY MR. GRAY:

09:24    5    Q.  "Have you, a family member, a close friend" -- it's right

         6    below where he's written in the response "The United States Air

         7    Force."

         8    A.  Okay.  That's the one we've been talking about that he

         9    has -- the "yes" was circled.

09:25   10    Q.  Right.

       11    A.  Is that right?

       12    Q.  "Yes" was circled, and he later testified to the fact that

       13    his brother had been involved in a criminal case.

       14         Is that an accurate answer, based on what we know

09:25   15    about his testimony?

       16    A.  I believe so.

       17    Q.  Okay.  Is there necessarily a conflict between his answer

       18    about whether he had been involved in a criminal case, on the

       19    short form, and whether he or anyone that he knew had been

09:25   20    involved in a criminal case, on his long form?

       21    A.  The short form asked if he had been "an accused, a

       22    defendant, or a witness."

       23    Q.  Right.

       24    A.  I don't know if he was a witness in his brother's case or

09:25   25    not.  I've said that twice now.

*Gray Cross of Davenport*

09:25   1   Q.  Right.  Well, then, how do you know that he was a witness

2   if you don't know -- how do you know?

3   A.  I don't know.  I said I don't know if he was a witness.

4   So, that is a conflict if he were.  So, I had to inquire.

09:26   5   Q.  Anything that suggests that he might have been a witness in

6   his brother's case?

7   A.  Sounds reasonable to me, but that's just pure speculation.

8   Q.  Okay.  Pure speculation.

9            In your affidavit, you said that you struck

09:26  10   Mr. Hamilton because he testified that in the event of

11   conflicting testimony he might hold the State to a higher

12   burden than "beyond a reasonable doubt."  That's on Page 2 of

13   your affidavit.

14            Is that a reason that you struck Mr. Hamilton?

09:26  15   A.  It was probably one of them.

16   Q.  All right.  Do you know that Mr. Hamilton would impose a

17   higher burden?

18            How do you know that Mr. Hamilton would impose a

19   higher burden?  Excuse me.

09:26  20   A.  I don't know that for sure.

21   Q.  Okay.  What's the basis for your belief that he might

22   impose a higher burden?

23   A.  Evidently, from reading through the question and answer.

24   Q.  Okay.  Anything more specific you have in mind?

09:26  25   A.  No.  I don't remember all of Mr. Hamilton's questions and

*Gray Cross of Davenport*

09:26    1    answers.

    2    Q.  Could you turn your attention, please, to Page 20 of his

    3    transcript?

    4                Beginning at Line 10, you asked, "Do you think

09:27    5    it's a fair burden to put on the State involving a death

    6    penalty case that we have -- we only have to prove beyond a

    7    reasonable doubt a person's guilt when you know that they may

    8    have -- may face the death penalty?

    9                And he answers, "I think it's fair."

09:27   10                "Okay.  It's not too strong?"

   11                "No."

   12                "And it's not too lenient?"

   13                "No."

   14                "Well, during the guilt stage, I take it, then,

09:28   15    you wouldn't have any trouble with 'beyond a reasonable

   16    doubt.'"

   17                "No, I wouldn't."

   18                Is there anything about Mr. Hamilton's answers to

   19    the -- your questions there that causes you concern?

09:28   20    A.  Not so far.

   21    Q.  Okay.  You then go on to pose a hypothetical about a car

   22    accident, at the bottom of Page 20 and the top of 21.

   23                And if you would, please turn your attention to

   24    the bottom of Page 22, where Mr. Hamilton tries to give an

09:28   25    answer to the hypothetical.

*Gray Cross of Davenport*

09:28  1            He says, "I would have to make sure I am

2      understanding what you are saying, because you are talking

3      about a red car and then a black car and whether it had two

4      doors or four doors.  It's more than one black car out there,

09:28  5      and there is more than one red car out there.  If we are just

6      going on the assumption that the car was red or black, then I

7      probably would need something else."

8            And the Court interrupts and instruct the witness

9      not to get hung up on the illustration and restates the burden

09:29  10      of proof.

11            Take a minute.  Is there something about that

12      exchange that suggests that Mr. Hamilton was retracting from

13      his previous clear answers that he could follow the appropriate

14      burden of proof in the penalty stage?

09:29  15      A.  Certainly wasn't as clear and strong, was it?

16      Q.  Is it possible that he was just having difficulty

17      understanding a complex hypothetical?

18      A.  Yeah.  And that's another problem.

19      Q.  Does Judge Kegans' attempt to clean up the problems with

09:29  20      the illustration suggest that she was concerned he didn't

21      understand the hypothetical?

22      A.  Probably.

23      Q.  Please turn to Tab 15, which contains the juror information

24      for Cheryl Williamson.

09:30  25            Okay.  Ms. Williamson testified initially that

*Gray Cross of Davenport*

09:30  1   the burden on the State would be higher in death penalty cases.

2   That was her first testimony.  At Line -- Page 26, Lines 3

3   through 7 --

4   A.  I'm sorry.  What?

09:30  5   Q.  Page 26, Lines 3 through 7.  The question starts at Line

6   25.

7            "Well, 'beyond a reasonable doubt' is the burden

8   of proof that is required in any criminal case.  It doesn't

9   make any difference if it's shoplifting or burglary or capital

09:30  10  murder.  We have to prove beyond a reasonable doubt.  Are you

11  saying because of the case, that it's a capital murder case and

12  the death penalty is involved, you would require a higher

13  standard than 'beyond a reasonable doubt'?"

14            "Yes.  My initial feeling would be 'yes.'"

09:31  15           Would you agree with me that Ms. Williamson's

16  answers -- initial answer on the burden of proof was more

17  problematic than Mr. Hamilton's?

18  A.  It wasn't as strong.

19  Q.  Wasn't as strong?

09:31  20           Was Ms. Williamson's initial answer one that

21  would be acceptable to the State?

22  A.  If we stopped right there, probably not.

23  Q.  Okay.  As we discussed yesterday, Beverly Willett also

24  testified that she believed she would have to be convinced

09:31  25  beyond all doubt in a death penalty case and stated that if she

*Gray Cross of Davenport*

09:31  1    had any qualms at all, "I couldn't, you know -- if I was on the

       2    jury and we didn't -- did find the defendant guilty but there

       3    was any doubt, you know, a possible doubt, then I couldn't say,

       4    'Yes, take his life.'"

09:31  5              Is that an acceptable answer for the State?

       6    A.  No.  And I explained about Ms. Willett yesterday.  I have

       7    no idea, just reading the bare transcript, why we accepted her.

       8    Q.  Okay.  Could we please turn to Raymond Trevino?  He's at

       9    Tab 23.

09:32 10             In your affidavit, you said that you struck

      11    Mr. Trevino because of conflicting answers on his short and

      12    long juror forms, concerning the difference between civil and

      13    criminal trials.  What did you mean by that?

      14    A.  Evidently, there's some conflicting answers.

09:32 15    Q.  Okay.  Was Mr. Trevino asked about an apparent conflict,

      16    during voir dire?

      17    A.  I don't remember.

      18    Q.  At the bottom of Page 2 of your affidavit, you say you

      19    struck -- you exercised a peremptory strike against Mr. Trevino

09:32 20    because friends and cousins had been to prison.  Is that

      21    correct?  Is this a reason that the State exercised a

      22    peremptory strike against Mr. Trevino?

      23    A.  Where are you reading that?

      24    Q.  The bottom of Page 2 of your affidavit.

09:33 25    A.  Okay.  I see it.

*Gray Cross of Davenport*

09:33  1                That's -- that's a factor.  It's a factor.

2  Q.  That was factor?

3            THE COURT:  Is that behind Tab 15?

4            THE WITNESS:  I don't know if it's in here or not.

09:33  5            MR. GRAY:  That's behind Tab 1, your Honor.  It's just

6  one of the reasons on -- I've already stated what the affidavit

7  says --

8            THE COURT:  Okay.  Okay.  Okay.

9            MR. GRAY:  -- "friends and cousins have been to

09:33  10  prison."

11           THE COURT:  Okay.  I was just looking in --

12           MR. GRAY:  Actually, it is behind Tab 15, your Honor,

13  if you go to the third page, the last line.

14           THE WITNESS:  It's just hard to find all that real

09:33  15  fast.

16           MR. GRAY:  Yeah, I know.

17           THE COURT:  Tab 15 in the first book?

18           MR. GRAY:  Third page.

19           THE WITNESS:  Twenty-three.

09:34  20           THE COURT:  Oh, 23.  I'm sorry.

21           THE WITNESS:  Yes.

22           THE COURT:  I'm on Tab 15.  I'm on the wrong tab.

23           MR. GRAY:  I apologize.

24  BY MR. GRAY:

09:34  25  Q.  And, then, turning to Mr. Trevino's testimony at Page 145,

*Gray Cross of Davenport*

09:34  1   he was asked, "Do you think the criminal justice system, the

2   prosecutors' office or the police or whatever, treated those

3   people unfairly or do you think that they had a fair shake with

4   the law?"

09:34  5          And responded, "I think it was fair, the

6   punishment that was assessed to them."

7          "Okay.  Do you hold any animosity toward the

8   police, the district attorney's office, or the criminal justice

9   system in those cases?"

09:34  10          "No, sir."

11          Do you have any concerns about Mr. Trevino's

12   answers to these questions, concerning his friends and cousins?

13   A.  I'm sorry.  Was that a question?

14   Q.  Yes.  Do you have concerns about Mr. Trevino's answers

09:35  15   about his friends' and cousins' involvement with the criminal

16   justice system?

17   A.  Well, not -- just reading it, I don't know.  Listening to

18   him at the time, I don't know if I believed him or not.

19   Q.  Does his answer suggest that he would not be biased as a

09:35  20   result of his association with people who had been involved in

21   the criminal justice system?

22   A.  That's what it looks like.

23   Q.  And I know we discussed Ms. Willett yesterday, but are you

24   aware that she had brothers who had been accused of unspecified

09:35  25   crimes and that she was corresponding with an individual who

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

09:35   1   was incarcerated --

2   A.   I am.

3   Q.   -- at the time of the trial?

4              Okay.  Still, with respect to Mr. Trevino, in

09:35   5   your affidavit you also indicate that Mr. Trevino was not firm

6   in his opinions of requiring either motive or premeditation.

7   Is that a reason you struck Mr. Trevino?

8   A.   It was one of the factors, I'm sure.

9   Q.   What do you mean by "not firm in his motive or

09:36  10   premeditation"?

11   A.   Just that.

12   Q.   That he -- it wasn't clear to you that he would require

13   motive or premeditation or --

14   A.   I guess it was not clear to me that he was clear.

09:36  15   Q.   Would not require --

16              I'm sorry.

17   A.   Yeah.

18   Q.   Okay.  If you could, please turn to Tab 11, which contains

19   the juror materials for Pearl Plander.

09:36  20   A.   Okay.  Are we going back to Mr. Trevino so I should save

21   that?

22   Q.   Probably not.

23              THE COURT:  Tab 11?

24              MR. GRAY:  Tab 11, Pear Plander's juror material.

09:36  25   BY MR. GRAY:

*Gray Cross of Davenport*

09:36   1   Q.  If you'd turn just to the sheet just before -- just before

2   the blue divider, in Ms. Plander's materials.

3   A.  Okay.

4   Q.  This is the capital punishment attitude scale.  And

09:37   5   Ms. Plander checks that she agrees that capital punishment is

6   justified only for premeditated murder.

7           Do you know why you accepted Ms. Plander

8   notwithstanding her belief that premeditation would be required

9   for the death penalty?

09:37   10  A.  Well, premeditation really didn't bother me because I

11  thought we had premeditation pretty clearly in this case.

12  Q.  Okay.  Was that a reason that you struck Mr. Trevino?

13  A.  No.  I think the real reason we struck Mr. Trevino was,

14  before he got through, he wanted the judge to ask the defendant

09:37   15  if he knew him, because he thought he had seen him at his

16  church and he knew him and he wouldn't be fair.

17  Q.  If that was the real reason you struck him, why did you

18  list a reason having to do with premeditation and motive?

19  A.  That's a factor.  It's a factor.  It's not the reason.

09:38   20  Q.  Okay.

21  A.  And I also put that in my affidavit.

22  Q.  Okay.  Could you please turn to Tab 16, which contains the

23  juror materials for Joyce Wojdyla?

24  A.  For who?

09:38   25  Q.  Let me just ask you.  When you asked Ms. Wojdyla whether

*Gray Cross of Davenport*

09:38   1   she had a problem if the State could not prove motive,

2   Ms. Wojdyla answered, "Well, again, I think if you could prove

3   motive that would make the case a little better, more well

4   defined."

09:38   5            Was that -- Ms. Wojdyla's answer acceptable to

6   you?

7            It's on Page four fifty -- actually, I'm not

8   sure.  It's on Page -- between 451 and 453 of Tab 16.

9   A.  Well, again, it's okay.

09:39  10   Q.  It's at the bottom portion of --

11   A.  It's okay.  It's okay.  We had motive, too.

12   Q.  Okay.  I'd like to turn to Edward Saenz, Juror Saenz.  In

13   your affidavit, you said that you struck Mr. Saenz because of

14   conflicting answers on his short and long juror form between

09:39  15   civil and criminal trials.

16            Do you recall whether he was asked about that

17   apparent conflict, during his voir dire?

18   A.  I don't remember.

19   Q.  Okay.  Did you strike any potential juror at Mr. Rosales'

09:39  20   trial because of race?

21   A.  No, sir.

22   Q.  Not even in part?

23   A.  No, sir.

24   Q.  And you're sure that race was not a reason behind any of

09:39  25   the strikes?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Cross of Davenport*

09:40   1   A.  It wasn't a reason behind any of my strikes, no.

2   Q.  Okay.  Did anyone ever instruct you to note the race of

3   potential jurors on the questionnaires --

4   A.  No.

09:40   5   Q.  -- and juror cards?

6   A.  No, sir.

7   Q.  During your deposition, you testified that you would not

8   ask minority jurors about their attitude towards the police

9   because you didn't want to create an appearance of -- even an

09:40   10   appearance of improper questioning on the basis of race.  Is

11   that an accurate statement of your practice?

12   A.  That's what I said.

13   Q.  Okay.  If you were concerned about a juror's attitude

14   towards the police, how could you resolve that concern without

09:40   15   asking questions?

16   A.  Well, sometimes you have to even if you don't normally do

17   it.

18   Q.  In those situations, you would ask questions?

19   A.  If I had to, yes.

09:40   20         MR. GRAY:  That's the end of questioning.  Thank you

21   very much.

22         THE COURT:  Are you going to have any redirect?

23         MS. MIRANDA:  Yes, ma'am.  Yes, ma'am.

24         THE COURT:  Ms. Miranda --

09:41   25         MS. MIRANDA:  Yes, ma'am.

*Gray Cross of Davenport*

09:41  1          THE COURT:  -- are you ready to go?

2          MS. MIRANDA:  Before we do, your Honor, I would like

3     to mark one exhibit.

4          THE COURT:  Let me do something before we do that.

09:41  5     Let me move the mic over from that side of the room to the

6     other; and then, that way, we can hear you a little bit better.

7          MS. MIRANDA:  I would like to introduce Exhibit 5.

8     It's another juror questionnaire.

9               I mistakenly thought the binders contained all of

09:41  10    them.  So, we would like to introduce this extra one.

11         THE COURT:  Okay.  Who is it?

12         MS. MIRANDA:  The questionnaire is for Juror Donna

13    Douglas Cooper.

14         THE COURT:  Pardon me?

09:41  15         MS. MIRANDA:  Donna Douglas Cooper.

16         THE COURT:  Okay.  And everybody has had a chance to

17    see that?

18         MS. MIRANDA:  Yes.  And she has a copy, and this can

19    be your copy.

09:41  20         THE COURT:  So, where is -- oh, this will be a whole

21    separate exhibit.

22         MS. MIRANDA:  Yes.

23         THE COURT:  We're going to do this Exhibit Number 5,

24    and it's the juror questionnaire of Donna Douglas Cooper.

09:42  25    That's marked as Exhibit Number 5.

*Gray Cross of Davenport*

09:42   1          Any objection, then, from the petitioner?

2          MR. GRAY:  No.  No, your Honor.

3          THE COURT:  All right.  Then, we'll just put that,

4     then, as Joint Exhibit 5, then.  Joint Exhibit 5 is admitted.

09:42   5          All right, Ms. Miranda.

6                    **REDIRECT EXAMINATION**

7     BY MS. MIRANDA:

8     Q.  Ms. Davenport, yesterday Mr. Gray asked you whether you

9     were guessing or speculating about the reasons that you're

09:42  10     offering to this Court for your strikes during the trial of

11     Mr. Rosales.

12          Can you tell us how difficult it is to try and

13     remember the exact reasons why you struck a juror?

14          THE COURT:  Okay.  Let's just assume that it's

09:42  15     difficult to remember something 25 years ago.  Move on to

16     something else.

17          MS. MIRANDA:  Okay.

18          THE COURT:  That's called "bolstering."

19          MS. MIRANDA:  Okay.

09:42  20          THE COURT:  I think I can take judicial notice of it.

21          MS. MIRANDA:  Okay.  Thank you, your Honor.

22          THE COURT:  We all slept since then, right?

23     BY MS. MIRANDA:

24     Q.  Are your reasons for liking or disliking a juror always

09:43  25     easy to articulate?

*Miranda Redirect of Davenport*

09:43   1    A.   No.

2    Q.   Are they always apparent on the face of a cold record?

3    A.   Sometimes they're never apparent on the face of just a cold

4    written record.

09:43   5    Q.   Okay.  How often in picking a juror does your reason for

6    striking that juror come down to one precise reason?

7    A.   Not very often.

8    Q.   Is it -- okay.

9    A.   Unless they really make a statement that backs them into a

09:43   10   corner that they can't get out of.

11   Q.   Okay.  In picking a jury, do you get to sit and compare all

12   of the jurors at once in a capital case or do you have to sort

13   of take them in the order that they come?

14   A.   You have to take them in the order they come.  And they

09:43   15   came in groups of 10 to 12, and I believe there were seven

16   groups that came in.

17   Q.   Okay.

18   A.   And we didn't know who -- any of the other groups that

19   would follow.  We only dealt with one group at a time.

09:44   20   Q.   Okay.  I want to talk a little bit about your notes that

21   you took.  Were those notes made contemporaneously with your

22   examination of the individual voir dire jurors?

23   A.   Yes, they were.

24   Q.   Okay.  Did you ever write things on the notes that weren't

09:44   25   really important, that were more just curiosity?

*Miranda Redirect of Davenport*

09:44   1   A.  Sometimes I just wrote things just to keep myself awake.

        2   Q.  Did you ever doodle on the notes?

        3   A.  Pardon me?

        4   Q.  Did you ever doodle on the notes?

09:44   5   A.  I did on several of them.

        6   Q.  Okay.  Did you ever use those notes to communicate with

        7   your co-counsel?

        8   A.  Sometimes, yes.

        9   Q.  Okay.  Do you remember exactly why you made all the

09:44   10  notations that you made?

        11  A.  A lot of them were just because it -- I don't know.  I

        12  don't know why I made a lot of them, actually.

        13  Q.  Okay.  I want to talk for a second about your notations

        14  regarding the neighborhoods.  Now, yesterday it was implied

09:45   15  that you made notes on the neighborhood as a way to track

        16  minority jurors.  Do you recall that testimony?

        17  A.  I do.

        18  Q.  Okay.  If you will, look with me at Mr. Kelley's juror

        19  questionnaire behind Tab Number 5.  And to your recollection,

09:45   20  was Mr. Kelley a minority juror in this case?

        21  A.  He probably wasn't.  Nobody has mentioned it today.

        22          THE WITNESS:  We just lost him, Judge.

        23              No.  He's back again.

        24          THE COURT:  There it is.

09:46   25              You can still see us and hear us, right,

*Miranda Redirect of Davenport*

09:46   1    Mr. Rosales?

2         MR. ROSALES:  (Indicating).

3         THE COURT:  Can you still see us and hear us sir?

4         MR. ROSALES:  Yes, ma'am.

09:46   5         THE COURT:  Okay.  All right.

6    BY MS. MIRANDA:

7    Q.  Can you tell us whether you made any notations on

8    Mr. Kelley's juror questionnaire, regarding the neighborhood in

9    which he lived?

09:46  10    A.  I did.

11    Q.  Okay.  What notation did you make?

12    A.  Excuse me.  I put, "Cypress."

13    Q.  Okay.  If you would, please, look at Charles Smith's juror

14    affidavit behind Tab Number 12.

09:46  15    A.  Charles Smith?

16    Q.  Yes, ma'am.

17         Did you make any notations on his juror

18    questionnaire, regarding the neighborhood or area of town in

19    which he lived?

09:47  20    A.  I don't -- I don't see any that you're talking about.

21    Q.  Okay.

22    A.  It looks like I may have written "Houston", H-O-U.

23    Q.  Okay.  And what's next to that?

24    A.  "78."

09:47  25    Q.  All right.  Do you have any recollection of what that is?

*Miranda Redirect of Davenport*

```
09:47    1   A.  I don't think it's his age.  I don't know if it's the end
         2   of a zip code.
         3   Q.  Okay.  Okay.  Was Mr. Smith a minority juror, to your
         4   knowledge?
09:47    5   A.  No, he wasn't.
         6   Q.  Okay.  If we would look at the juror questionnaire for
         7   Lorene Thornton, which is in the other binder.
         8           THE COURT:  When you say "other," what do you mean?
         9           THE WITNESS:  The other black one.
09:47   10           MS. MIRANDA:  I apologize, your Honor.  Exhibit --
        11   Joint Exhibit 1B.
        12   BY MS. MIRANDA:
        13   Q.  Now, to your knowledge, was Ms. Thornton a minority juror
        14   in this case?
09:48   15           THE COURT:  I don't know what tab you're on.
        16           MS. MIRANDA:  I apologize.  Forty-one.
        17   A.  No, I don't think she was.
        18   BY MS. MIRANDA:
        19   Q.  Okay.  Did you make a notation regarding --
09:48   20   A.  Yes.  I said, "north of downtown."
        21   Q.  Okay.
        22   A.  She had not filled it in.
        23   Q.  Okay.  And, then, if you would, please, look for me at
        24   Exhibit 5, what has been marked as Joint Exhibit 5.
09:48   25   A.  Okay.
```

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Miranda Redirect of Davenport*

09:48    1    Q.  For Ms. Cooper, did you make a notation on her
         2    questionnaire?
         3    A.  I did.  I put, "Deer Park."
         4    Q.  Okay.  And to your knowledge, was she a minority juror in
09:48    5    this case?
         6    A.  No, Ms. Cooper was not.
         7    Q.  Okay.  All right.  I'd like to talk now about some of the
         8    individual jurors that were struck and the reasons in your
         9    affidavit.  And we'll start in the back with Mr. Saenz.
09:49   10    A.  Okay.
        11    Q.  How many reasons did you articulate in your affidavit for
        12    striking Mr. Saenz?
        13    A.  I gave eight little paragraphs.  Some of them contain more
        14    than one reason, I guess.
09:49   15    Q.  Okay.
        16          THE COURT:  I'm sorry.  You know what?  Could we -- I
        17    forgot where her affidavit is.  Which is it?
        18          MS. MIRANDA:  Her affidavit -- I apologize, your
        19    Honor -- is in -- I believe it's Joint Exhibit A, Tab 1.
09:50   20          THE COURT:  A?
        21          MS. MIRANDA:  Joint Exhibit 1A, Tab 1.
        22          THE COURT:  Oh, okay.
        23          That's right.  I forgot.  I just -- I've been
        24    reading it in different places.  I couldn't remember where it
09:50   25    was.

*Miranda Redirect of Davenport*

09:50   1              Thank you.

2              MS. MIRANDA:  Okay.

3              THE COURT:  Would you ask your question again, please?

4              MS. MIRANDA:  Yes.

09:50   5              I believe my question was how many different

6      reasons she gave for striking Mr. Saenz.

7              THE COURT:  Mr. who?

8              MS. MIRANDA:  "Saenz."

9              THE COURT:  "Saenz"?

09:50   10             MS. MIRANDA:  "Saenz."  Sorry.  "Saenz."

11             THE WITNESS:  And I responded that I had eight short

12     paragraphs.

13     BY MS. MIRANDA:

14     Q.  Okay.  Okay.  Now, Mr. Gray asked you about one of those

09:50   15     reasons in particular, the fact that Mr. Saenz gave conflicting

16     answers.  Was that, in fact, the only reason that you struck

17     him?

18     A.  No.

19     Q.  Okay.

09:51   20     A.  No.

21     Q.  By looking over your affidavit, can you tell us what was

22     the most troubling part of his voir dire testimony, most

23     concerning part to you as a prosecutor?

24     A.  Well, there are probably two of them.

09:51   25     Q.  Okay.

*Miranda Redirect of Davenport*

09:51  1   A.  He kept changing his mind about whether or not he could

2   consider the death penalty and the fact that Walter Boyd chose

3   not to question him at all and just accepted him.

4   Q.  Okay.  Okay.  Let's talk now about Mr. Trevino.  Now,

09:52  5   during his testimony in voir dire, I believe you stated earlier

6   Mr. Trevino indicated that he might know the defendant from his

7   church?

8   A.  Yes.

9   Q.  If you would look with me behind Tab Number 23 and Page

09:52  10  Number -- starting on Page Number 166 of his voir dire

11  testimony -- and I'm just going to give you a moment to review

12  the next couple of pages, if you would just read over those

13  quickly.

14  A.  Okay.

09:53  15  Q.  Okay.  And, specifically, if you'll look at Page 166, Line

16  Number 7, can you tell the Court what Mr. Trevino indicated to

17  the Court?

18  A.  Basically, that he thought maybe the defendant was somebody

19  he recognized from his church.  He couldn't think of his name,

09:54  20  and wanted the judge to ask Mr. Rosales if he knew Mr. Trevino

21  and recognized him.  And then he wanted to know where he lived

22  and wanted questions to find out if that was the person he

23  thought it was from his church, because he goes to several

24  different Catholic churches.

09:54  25  Q.  Okay.

*Miranda Redirect of Davenport*

09:54  1   A.  And the judge would not do that.

2   Q.  Okay.  And when Mr. Trevino was asked whether or not he

3   could be a fair juror if this was indeed the person he thought

4   it was, what did Mr. Trevino indicate to the Court?

09:54  5   A.  He said, "No, I don't think I could."

6   Q.  Okay.  And if you'll continue reading, did Mr. Trevino give

7   that answer more than once?

8   A.  He did.  He repeated it at least three or four times.  I've

9   forgotten.  He did it a number of times.

09:54  10  Q.  Okay.  And, ultimately, I believe, if you keep going, after

11  further questioning, Mr. Trevino did, in fact, finally concede

12  that he could be a fair juror.

13         As a prosecutor, were you comfortable with that

14  assurance?

09:55  15  A.  No.  I didn't believe him.

16  Q.  Okay.  Now, Mr. Gray asked you about a couple of different

17  jurors, Ms. Plander and Mr. -- I'm sorry -- Ms. Plander and

18  Ms. Wojdyla specifically and whether or not their answers were

19  similar to the ones that Mr. Trevino had given during his voir

09:55  20  dire.

21         To your knowledge, do either -- did either one of

22  those jurors demonstrate during their voir dire an indication

23  that they too knew the defendant and didn't think that they

24  could be fair?

09:55  25  A.  No.  Mr. Trevino was the only one who did that.

*Miranda Redirect of Davenport*

09:55    1   Q.  Okay.  So, in your opinion, would you consider these jurors

      2   similar?

      3   A.  No.

      4         THE COURT:  Which -- you said Ms. Plander and

09:55    5   Mr. Trevino were similar?  Is that what you were asking?

      6           I just want to make sure.

      7         MS. MIRANDA:  Sure.  Sure.

      8         THE COURT:  You said --

      9         MS. MIRANDA:  Ms. Plander and Ms. Wojdyla.  I'm not

09:55   10   sure if that's how you say her name.  W-O-D -- I think it's

    11   J-O-Y-L-A.

    12           It was another juror that he had asked questions

    13   about and their responses indicating that they were similar to

    14   Mr. Trevino.

09:56   15           And my question was whether either one of those

    16   jurors, similar to Mr. Trevino, thought they knew the defendant

    17   and couldn't be fair jurors.

    18         THE COURT:  Oh, okay.

    19           And what was your answer, ma'am?

09:56   20         THE WITNESS:  The answer was "no."

    21         THE COURT:  I got confused on who we were talking

    22   about, you said so many names.

    23         MS. MIRANDA:  I apologize.  It's difficult.  It's a

    24   lot of names.

09:56   25   BY MS. MIRANDA:

*Cheryll K. Barron, CSR, CM, FCRR*           *713.250.5585*

*Miranda Redirect of Davenport*

09:56  1    Q.  Now, with respect to Mr. Hamilton, did you have just one

2    reason for striking this juror?

3    A.  Well, I gave four reasons in my affidavit.  And there could

4    be more that I'm just not aware of at this time.

09:57  5    Q.  Okay.  The first reason that you have listed in there, it

6    says, "His brother killed his wife and kid, found NG and sent

7    to Rusk."

8              Could you tell us why this would concern you as a

9    prosecutor?

09:57  10   A.  That's just violence pretty close to home, isn't it?

11   Q.  Okay.  Was there any kind of relationship between

12   Mr. Hamilton's case or any similarities between Mr. Hamilton's

13   brother's case and the instant case?

14   A.  I don't know all the facts of the brother's case, but there

09:57  15   was more than one person killed and it involved a child.

16   Q.  Okay.

17   A.  A family.

18   Q.  Okay.  Are you aware of any other jurors that were

19   presented in this case that had this particular type of violent

09:57  20   situation this close to home?

21   A.  Not that I can -- not that I can think of, no.

22   Q.  Okay.  Let's turn to Ms. Lopez.  In your affidavit you

23   noted that your handwritten notes indicated that during her

24   testimony you thought -- and this is a quote -- "she was not

09:58  25   too bright."

*Miranda Redirect of Davenport*

09:58  1        Okay.  Can you tell us why, as a prosecutor, that
2   might cause you concern?
3   A.  Well, I wanted my -- the jurors to understand what the
4   theories of law that we were going on were, what they meant,
09:59  5   and whether -- whether they would be able to understand what
6   was going on.
7   Q.  Okay.  And why might the conflicting answers bother you?
8   A.  It indicates she either didn't understand what the
9   questions were or she didn't really know what she thought about
09:59  10  them.
11  Q.  Okay.  And if you'll look again with me at what has been
12  marked as Joint Exhibit 5, the questionnaire --
13  A.  Okay.
14  Q.  -- of Ms. Cooper.  Did you make any similar notations
09:59  15  regarding Ms. Cooper regarding her -- what you perceived to be
16  her intelligence?
17  A.  I wrote, "Not too sharp," along with a bunch of other
18  notes.
19  Q.  Okay.  And did you strike Ms. Cooper; do you recall?
09:59  20  A.  I did.
21  Q.  Okay.  And was Ms. Cooper, to your knowledge, a minority?
22  A.  I don't believe she was.
23  Q.  Do you remember?
24        Okay.  I'd like to look at Alicia Taylor.  And if
10:00  25  you'll look at your affidavit, which is behind Tab Number 1 in

10:00   1    Joint Exhibit 1A.

        2    A.  Tab 1?

        3    Q.  Yes, ma'am.

        4            And it might actually be easier if you pulled the

10:00   5    affidavit out for now and just kind of hold onto it so you

        6    don't have to keep looking for it.

        7    A.  I've got a copy of the affidavit right here.

        8    Q.  Okay.  Okay.

        9    A.  Okay.

10:00  10    Q.  Look at your affidavit, under Ms. Alicia Taylor.

       11    A.  Okay.

       12    Q.  And the second thing that you noted in the bullet point

       13    was, "Had trouble understanding 'beyond a reasonable doubt.'"

       14    And I just wanted to make clear for the Court, was that

10:01  15    something that you put in your affidavit or was that a notation

       16    that you made at the time that Ms. Taylor was testifying?

       17    A.  Those were notes I wrote at the time she was testifying.

       18    Q.  Okay.  Now, yesterday Mr. Gray had you look at the voir

       19    dire testimony of Ms. Taylor to see whether the cold record

10:01  20    actually reflected whether she had trouble understanding the --

       21    "beyond a reasonable doubt."  Do you recall that?

       22    A.  Yes.

       23    Q.  Okay.  Now, regardless of what we now see when we look at

       24    the record, what was your contemporaneous understanding of

10:01  25    Ms. Taylor as you were listening to her testimony?

*Miranda Redirect of Davenport*

10:01  1    A.   That she had trouble understanding the concept of "beyond a

2    reasonable doubt."

3    Q.   Okay.  And, again, as to the third bullet point, the future

4    dangerousness, the fact the defendant killed more than one

10:02  5    person wouldn't help her answer, regardless of what comes

6    across to us now as we read the cold record, at the time that

7    you were listening to Ms. Taylor's testimony, what do your

8    notes indicate that your impression was of her testimony as she

9    was testifying?

10:02  10   A.   From looking at my notes that I wrote as she was

11   testifying, evidently I didn't think that she would understand

12   or conform her jury deliberations to "beyond a reasonable

13   doubt," the "future dangerousness" issue, the Special Issues 1

14   and 2.

10:03  15   Q.   Okay.  All right.

16   A.   Apparently, it took several pages before she finally said

17   she could follow the law.

18   Q.   Okay.  And continuing on with Ms. Taylor, if you'll look at

19   her voir dire testimony, which I believe is behind Tab Number

10:03  20   22, and if you'll look with me at Page -- starting on Page 106

21   of her testimony.

22            Beginning on Line 7, if you -- I'll just give you

23   one second -- two seconds to read that section of voir dire on

24   that page and continuing on to the next page to refresh your

10:04  25   memory before I ask you a couple of questions.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Miranda Redirect of Davenport*

10:05   1   A.  Okay.

  2   Q.  Okay.  Specifically, looking at Page 107, Line 16, what did

  3   Ms. Taylor indicate she would do if, on the penalty phase, the

  4   evidence proved that the answers to the special issue should be

10:05   5   "yes" but she nevertheless felt that the death penalty was

  6   inappropriate in that case?

  7   A.  Well, she had just received the information that, if both

  8   those were answered "yes," the death penalty would

  9   automatically be assessed by the Court.  And she said, if that

10:05 10   were the case, paraphrasing, that she could not answer them

11   "yes," she would answer "no."

12   Q.  And that was if she felt that the death penalty was not

13   appropriate.  Is that --

14   A.  Well, the question was if you felt like the person

10:06 15   shouldn't receive the death penalty.  She said she would answer

16   "no" and --

17   Q.  Does that cause you concern as a prosecutor?

18   A.  That if she felt that if -- wait a minute.

19   The question was, "I'm concerned that this might

10:06 20   be one of those cases that, even though the evidence and the

21   law said the answers were 'yes,' that it might be one that you

22   felt like the person shouldn't receive the death penalty."

23   And she said, "I would answer 'no.'"

24   So, yes, that concerns me as a prosecutor.

10:06 25   Q.  Okay.  So, going back to an answer that -- and a reason

*Miranda Redirect of Davenport*

10:06   1   that you struck -- or you stated that you struck Ms. Taylor was

2   that she would just have to feel whether the death penalty was

3   appropriate.  Can you tell us why that concerned you with

4   relation to this particular juror?

10:06   5   A.  Because in this question and answer we just went through,

6   she felt like it wouldn't be appropriate even if the law said

7   it should be answered "yes."

8   Q.  Okay.  Now, if, upon further follow-up questioning,

9   Ms. Taylor nevertheless indicated that she would, in fact,

10:07   10   follow the law, does this alleviate your concerns regarding her

11   as a juror?

12   A.  No, it doesn't.

13   Q.  Okay.  Let's look for a second at Ms. Holmes, who I believe

14   is behind Tab Number 19.  Yesterday you were asked a couple of

10:08   15   questions about the questioning of this juror.

16          First of all, did you question Ms. Holmes during

17   voir dire?

18   A.  Yes, I did.

19   Q.  Okay.  And I believe one of the indications yesterday was

10:08   20   that you asked Ms. Holmes questions in a manner that you

21   necessarily wouldn't have asked of non-minority jurors.  In

22   fact, I think the specific example was, when questioning her

23   about the burden of proof "beyond a reasonable doubt" -- and

24   I'm going to be on Page 1220 -- and if you'd start on Line

10:09   25   20 --

*Miranda Redirect of Davenport*

10:09  1    A.  Okay.

       2    Q.  -- and read that question.

       3         The question was regarding your use of the word

       4    "just beyond a reasonable doubt."  Do you recall that question?

10:09  5    A.  Yes.

       6    Q.  Okay.

       7    A.  I do.

       8    Q.  And whether or not, by asking that question, you were, in

       9    fact, attempting to lead this juror in a -- in a manner to give

10:09 10    them --

      11         MS. MIRANDA:  I apologize.  I'll withdraw that

      12    question.

      13    BY MS. MIRANDA:

      14    Q.  Do you recall that being asked, whether your using the word

10:09 15    "just" was an attempt to lead this juror to a response that

      16    would allow you to find a reason to strike them?

      17    A.  I remember the question.

      18    Q.  Okay.  All right.  I would like you to take a look at

      19    Ms. Plander's voir dire testimony, which is behind Tab Number

10:09 20    11.

      21         Do you recall whether Ms. Plander was a White

      22    juror that was seated in this case?

      23    A.  I believe she was.

      24    Q.  And if you'll look for me on Page 243, beginning on Line

10:10 25    14.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Miranda Redirect of Davenport*

10:10  1    A.  Okay.

2    Q.  And can you read that and tell me whether, in fact, you

3    asked a substantially similar question to a White prospective

4    juror in this case?

10:10  5    A.  It's substantially similar, but I used the word "only"

6    instead of "just."

7    Q.  Okay.  But that's pretty much the only difference --

8    A.  Yes.

9    Q.  -- between the questions that you asked?

10:10  10    A.  Yes.

11    Q.  Okay.  You were also asked about why you persisted in

12    questioning Ms. Holmes about the burden of proof after she had

13    already given apparently satisfactory answers.  In particular,

14    you were asked why you pressed her about the burden of proof in

10:11  15    the penalty phase and this was, again, suggesting that the

16    questioning was tailored to minority jurors in an attempt to

17    find a reason to strike them.

18         Do you recall that questioning?

19    A.  I think I do, yes.

10:11  20    Q.  Okay.  All right.  If you will, turn to Mr. Arndt's voir

21    dire testimony.  And he is behind Tab Number 3, on Page 92 of

22    his voir dire testimony behind Tab Number 3.

23         Okay.  Starting on Line 17, you asked the juror

24    whether he thought it was fair that the burden of proof was

10:12  25    "beyond a reasonable doubt"; and did he give you a satisfactory

*Miranda Redirect of Davenport*

10:12  1   answer to that?

2   A.  Yes.  I asked if it was fair if the burden of proof by the

3   State is to prove a person guilty just beyond a reasonable

4   doubt, and he said "yes."

10:12  5   Q.  Okay.  Again using the word "just"?

6   A.  Yes.

7   Q.  Okay.  And nevertheless, despite this answer, did you not

8   continue to question him and ask him whether he thought the

9   death penalty was appropriate in the penalty phase?

10:12  10  A.  Yes.

11  Q.  Okay.  And is that substantially similar to the questioning

12  that you asked Ms. Holmes?

13  A.  Yes.

14  Q.  Okay.  Let's also look at Ms. Wojdyla.

10:12  15      MS. MIRANDA:  How do you-all say that?  I'm sorry.

16      MR. GRAY:  "Wojdyla."

17      MS. MIRANDA:  "Wojdyla."  Okay.  That's probably

18  right.

19  BY MS. MIRANDA:

10:12  20  Q.  Okay.  And hers is behind Tab 16, on Page 445 of her voir

21  dire testimony.  And reading starting in Line 7 and, after you

22  read that, my question is, again, did you ask this White seated

23  juror a question substantially similar to the questions that

24  you asked Ms. Holmes during her voir dire testimony, regarding

10:13  25  whether or not the burden of proof would be -- was fair during

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Miranda Redirect of Davenport*

10:13   1   the penalty phase.

2   A.  Yes, I agree with you.

3   Q.  Okay.  Let me just ask this question.  Did you, in your

4   questioning of the venire members in this case, question

10:14   5   minority jurors in a manner differently than the manner in

6   which you questioned White jurors?

7   A.  I don't believe I did.

8   Q.  Okay.  Did you, in your questioning the venire members in

9   this case, attempt to trick or mislead minority jurors into

10:14  10  responses that would allow you to strike them?

11  A.  No, I did not.

12        MS. MIRANDA:  May I have one moment, your Honor?

13        THE COURT:  Sure.

14     (Sotto voce discussion between Ms. Miranda and Mr. Jones.)

10:15  15  BY MS. MIRANDA:

16  Q.  All right.  I would like for you, if you would, to look at

17  the testimony of Jacklynn Lyles, which is behind Tab Number 8,

18  specifically at the bottom of Page 181, going into the top of

19  Page 182.

10:16  20        And to your recollection, was Ms. Lyles selected

21  to sit on the jury in this case?

22  A.  I believe she was the first juror seated and then unseated.

23  Q.  Okay.  Is there any part of this particular portion of the

24  voir dire where you asked this juror to maybe explain what

10:16  25  types of cases they feel like capital punishment might or might

*Miranda Redirect of Davenport*

10:16   1   not be appropriate in?

2   A.   And you say on Page 181?

3   Q.   At the bottom of Page 181, starting with the question on

4   Line 22.

10:16   5   A.   I see.   Right.   I think Mr. Henderson is asking these

6   questions about any cases where she thinks capital punishment

7   might not be appropriate.

8   Q.   Okay.   So, you're asking her about the types of cases?

9   A.   Yes.

10:17   10   Q.   Or Mr. Henderson is.

11   A.   Yes.

12   Q.   I apologize.

13          Okay.   If you'll look for me at Ms. Willett,

14   behind Tab Number 14.   And I believe this is your questioning.

10:17   15          On Page 273 of her voir dire testimony, again, at

16   the bottom of the page, starting with the question on Line 20,

17   was Ms. Willett asked about the types of capital murder cases

18   that -- where she felt the death penalty was appropriate?

19   A.   Yes.

10:18   20   Q.   Okay.   And one last one, if you can look at Cheryl

21   Williamson's voir dire testimony, behind Tab Number 15, Page

22   20, at the very bottom, Line 25, and then continuing on to the

23   next page, 21, did you ask this juror a question about what

24   types of cases in which capital punishment might be

10:18   25   appropriate?

*Miranda Redirect of Davenport*

10:18  1    A.  Mr. Henderson did, yes.

       2    Q.  I apologize.  You didn't actually do the questioning.

       3            Okay.  If it has been suggested in these

       4    proceedings that you only asked minority jurors questions

10:19  5    regarding the types of cases in which capital punishment was

       6    acceptable, would that be correct, based on the record that you

       7    just saw?

       8    A.  No, it would not be.

       9    Q.  Okay.  Ms. Davenport, yesterday when you testified, you

10:20  10   indicated that as a prosecutor you might be concerned with an

       11   individual of one race identifying with a defendant of the same

       12   race.  Is that correct?

       13   A.  Yes, it's a consideration.

       14   Q.  Okay.  Did you in this case strike a minority juror,

10:20  15   whether Hispanic or African-American or any other descent,

       16   simply because they were the same race as Mr. Rosales?

       17   A.  No, I did not.

       18   Q.  Okay.  If that is a concern for you in a case, how do you

       19   discern whether or not to strike an individual based on that

10:20  20   concern?

       21   A.  Well, it would have to be other things besides race.

       22   Q.  Okay.

       23   A.  And as you can tell, there were minority members on the

       24   jury of both -- three -- at least three different races.

10:21  25   Q.  Okay.  Okay.

*Miranda Redirect of Davenport*

10:21  1    A.  Well, not minority of three races, but three different

2    races on the jury.

3    Q.  Okay.

4           MS. MIRANDA:  Your Honor, I believe I'll pass the

10:21  5    witness at this time.

6           THE COURT:  Any re- -- what is it going to be?

7    Recross, I guess it is, right?

8           MR. GRAY:  Your Honor, we just have a very few

9    questions on issues where we think the record may not be clear.

10:21  10          THE COURT:  Okay.

11          MR. GRAY:  It will just take a minute.

12          THE COURT:  Okay.  That's fine.

13              Let's see.  What time is it?  Can we go?

14              Yeah, let's continue.

10:22  15          MR. GRAY:  Okay.

16          THE COURT:  Is it just going to be a few minutes?

17          MR. GRAY:  I expect so, your Honor, yes.

18          THE COURT:  Yeah.  Yeah, let's keep going.

19              Can we move the mic on over here?

10:22  20                    **RECROSS-EXAMINATION**

21    BY MR. GRAY:

22    Q.  Ms. Davenport, do you have an independent recollection of

23    the demeanor of any of the individual jurors we've been

24    discussing?

10:22  25    A.  I do of one.

---

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

*Gray Recross of Davenport*

10:22  1    Q.  Who's that?

2    A.  I don't remember her name right off the top of my head, but

3    she was the one that we -- that I made a notation about "Queen

4    for a Day."

10:22  5    Q.  Do you recall the demeanor of any other jurors or their

6    appearance?

7    A.  No, I don't.

8    Q.  Hand gestures, tone of voice?

9    A.  No.  Not unless I made a notation of it.

10:22  10   Q.  Ms. Davenport, when the panels of potential jurors were

11   first brought into the courtroom, could you see the -- could

12   you observe the appearance of the potential jurors and observe

13   their race when they first entered the courtroom?

14   A.  Well, I'm sure I could.

10:23  15   Q.  Could you tell when they first came into the courtroom how

16   many jurors of color -- potential jurors of color were included

17   in that panel?

18   A.  In those ten people?  I'm sure I could.

19   Q.  Do you recall, when you made individual handwritten notes

10:23  20   on the juror materials, the exact time that you made them?

21   A.  At the -- the notes I made about -- excuse me -- the person

22   being questioned was during the time they were being

23   questioned.  When I went through and just circled things or

24   underlined things, it was probably while they were being

10:23  25   instructed by the judge before we got to questioning.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Recross of Davenport*

10:23   1    Q.  So, some of your handwritten notes were likely made before

2    the juror began testifying?

3    A.  I didn't say "handwritten notes."  I said where I -- where

4    I underlined or circled things.

10:23   5    Q.  I mean, obviously, if the note concerns the substance of

6    the testimony, it was probably written at the time the person

7    was testifying.  But if it doesn't concern the person's

8    testimony, do you know whether -- when that note was written?

9    A.  It's like I told you.  I think it was written during the

10:24  10    time that they were testifying.

11    Q.  Okay.  And what's the basis for -- other than what it

12    discusses testimony, what's the basis for your knowledge of --

13    A.  I wouldn't have any reason to write anything prior to the

14    time they said anything.

10:24  15            I had circled things to ask questions about or to

16    listen to see if I got answers to without asking questions

17    about.

18    Q.  Do you have information concerning the race of either

19    Mr. Smith or Mr. Kelley?  Do you know what their -- those

10:24  20    potential jurors races were?

21    A.  Do I have information?

22    Q.  Yeah.  Can we -- can anyone point to the record of --

23    information which would identify the race of Mr. Smith or

24    Mr. Kelley?

10:24  25    A.  I don't know.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Recross of Davenport*

10:24  1    Q.  Well, the record reflects, to our knowledge, that those two

       2    jurors' race is unidentified.

       3              MR. GRAY:  And that's all.  Thanks.

       4              THE COURT:  Anything else?

10:25  5              MS. MIRANDA:  No further questions, your Honor.

       6              THE COURT:  All right.  Then, I think we are done with

       7    you.

       8              THE WITNESS:  You're exhausting me.

       9              THE COURT:  I think we are done with you.

10:25  10             All right.  So, is this a good time for a break,

       11   then, lawyers?

       12             Let's -- we're going to just take a break, then,

       13   for about -- let's take a break for 15 minutes.  And it is

       14   about 10:24, 10:25.  So, we will resume about 10:40 this

10:25  15   morning.  Okay?

       16             We'll see you guys at 10:40 this morning.

       17       *(Recess taken from 10:25 to 10:52 a.m.)*

       18             THE COURT:  Okay.  Please be seated, everybody.

       19             All right.  Who's our next witness, please?

10:52  20             Mr. Rosales, you with us?

       21   MR. ROSALES:  Yes, ma'am.

       22             THE COURT:  All right.

       23   MR. ROSALES:  Yes, ma'am.

       24             THE COURT:  All right.  Who's our next witness,

10:52  25   please?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Recross of Davenport*

10:53  1          MS. SWARNS:  Our next witness is going to be Craig

2      Washington, who has not arrived yet.  He is on his way.  We

3      have called him; and we are told that he is, literally, in

4      transit.

10:53  5          THE COURT:  Who else do you have, then?

6          MS. SWARNS:  We have no questions for Mr. Henderson;

7      so, Mr. Washington will be our last witness.

8          THE COURT:  Oh, you're not presenting -- I thought he

9      was on your witness list.

10:53  10         MS. SWARNS:  Yes, he is.  But after consultation, we

11     decided that we have no cross-examination for Mr. Henderson.

12         THE COURT:  Oh.  Were you guys going to -- well, you

13     already had your examination of Mr. Henderson, I guess.

14         MS. MIRANDA:  Yes.

10:53  15         THE COURT:  All right.

16         MS. MIRANDA:  May I tell Mr. Henderson he can go home?

17         THE COURT:  Pardon me?

18         MS. MIRANDA:  May I tell Mr. Henderson he can go home?

19         THE COURT:  Oh, is he outside?

10:54  20         MS. MIRANDA:  Yes.

21         THE COURT:  Yes.  Yes, you can go ahead and let him

22     go.

23              No, no.  Stop.  Before you do that, let me just

24     ask a question at this stage of the proceedings that would be

10:54  25     helpful to me.  This is something that I would have saved

*Gray Recross of Davenport*

10:54  1    for -- this is something I would have saved for, you know,
       2    summation; but let me just ask this question just sort of to
       3    clarify this in my own mind.
       4              In the cross-examination, I guess, of
10:54  5    Ms. Davenport, she was asked about many jurors in terms of --
       6    she was asked about questions posed to one juror and then she
       7    was asked about questions posed to another juror that were in
       8    the similar vein, a number of times, all throughout the course
       9    of the questioning.
10:54  10             One thing that, because it was going kind of
       11   fast, that I wasn't able to discern or make note of was this.
       12   In each of the instances in which you asked her questions about
       13   one witness and then flipped and we asked a similar question
       14   about another witness, was Ms. Davenport the prosecutor who was
10:55  15   asking questions in both instances?
       16             MR. GRAY:  For the jurors that we discussed?
       17             THE COURT:  Yes, for all the jurors that we discussed
       18   over the last two days.
       19             MR. GRAY:  We discussed all of the Batson jurors in
10:55  20   this matter.
       21             THE COURT:  Right.
       22             MR. GRAY:  Ms. Holmes and Mr. Deen were questioned by
       23   Ms. Davenport.
       24             THE COURT:  Hold on a second, then.  Hold on a second.
10:55  25             MR. GRAY:  And I've got a list, and I can tell you for

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Gray Recross of Davenport*

10:55   1    sure who was questioned by whom.

2                 THE COURT:  Okay.

3                 MR. JONES:  I can tell.

4                 MS. SWARNS:  Here we go.  I've got it.

10:55   5                 THE COURT:  Okay.  Holmes and Deen were both by

6    Davenport.

7                 MR. GRAY:  So, for the -- Hamilton, Mr. Hamilton was

8    questioned by Ms. Davenport.

9                      Why don't I just go through the list in the order

10:56   10   in which they were questioned?

11                THE COURT:  No.  No.  That's not helpful to me.

12                MR. GRAY:  Okay.  So --

13                THE COURT:  Listen to my question.  This is what I

14   want to know.  In the instances in which we looked at the

10:56   15   testimony of jurors and we compared one set of answers -- for

16   instance, the answers on whether or not they would be able to

17   make a decision on their own even if 11 other people were

18   against them and the questions on whether or not they would

19   require the defendant to testify or not and other similar

10:56   20   comparisons that we made over the last two days, in each of

21   those instances in which you did a comparison -- was

22   Ms. Davenport the prosecutor asking questions of that juror, in

23   each of those instances?

24                     You've got your categories there.  I just don't

10:56   25   have them in front of me.  You know what I'm talking about.

*Gray Recross of Davenport*

10:56    1           MR. GRAY:  Thank you for repeating your question, your

2    Honor.

3              Ms. Plander was questioned by Ms. Davenport.

4           THE COURT:  And who --

10:56    5           MR. GRAY:  Ms. Willett was questioned by

6    Ms. Davenport.  Ms. Wojdyla was --

7           THE COURT:  Hold on.  Hold on.  Stop, stop, stop,

8    stop, stop.

9             Plander and Willett, were those two that we

10:57    10    compared together?

11           MR. GRAY:  Those are two seated White jurors that we

12    compared to several of the Batson jurors.

13           THE COURT:  Who did you compare them to?

14           MR. GRAY:  Well, I think Ms. Plander and Ms. Wojdyla,

10:57    15    Ms. Walker, Ms. Holmes, and Ms. Taylor.

16           THE COURT:  I'm sorry.  Slow down.

17            Ms. Plander did what, now?  Say it again.

18           MR. GRAY:  I would have to go back to my notes to be a

19    hundred percent correct.

10:57    20           THE COURT:  Okay.  Go back to your notes, and help me

21    out before I let -- before I decide if I'm letting

22    Mr. Henderson go.

23            I mean, you have it by category.  It's not like

24    I'm asking you to do something that would be very difficult for

10:57    25    you to do.  There were certain issues that you were

*Gray Recross of Davenport*

10:57  1    specifically focused on, and you compared two jurors to each

2    other.  So, help me out on those now.

3           MR. GRAY:  Actually, could I take a minute to do this

4    on paper and give you an answer that I'm confident is right?

10:58  5           THE COURT:  Okay.

6       *(Sotto voce discussion between Court and staff)*

7           MR. GRAY:  Your Honor?

8           THE COURT:  Yes, sir.

9           MR. GRAY:  Sorry to interrupt.

11:01  10          THE COURT:  Okay.

11          MR. GRAY:  For the jurors who were questioned by

12   Ms. Davenport --

13          THE COURT:  Right.

14          MR. GRAY:  -- the comparisons that -- to seated jurors

11:01  15   who she questioned during voir dire and who were accepted and

16   seated --

17          THE COURT:  Okay.  I'm ready.

18          MR. GRAY:  -- are Ms. Plander --

19          THE COURT:  And?

11:01  20          MR. GRAY:  -- Ms. Willett and Mr. Arndt --

21          THE COURT:  And who?

22          MR. GRAY:  -- all of whom were questioned by --

23          THE COURT:  I'm sorry.  I didn't hear the last one.

24          MR. GRAY:  A-R-N-D-N-T -- or N-D-T.  Excuse me.

11:01  25          THE COURT:  So, Ms. Davenport questioned Ms. Plander,

*Gray Recross of Davenport*

11:01  1    Willett, and Arndt that were seated?

2              MR. GRAY:  That's correct.  Correct.  And those were

3    all comparisons to Ms. Holmes, whom Ms. Davenport also

4    questioned.

11:02  5              THE COURT:  And what about Deen?  I thought you

6    said --

7              MR. GRAY:  Deen was questioned by Ms. Davenport and a

8    comparison was Ms. Wojdyla, who was also questioned by

9    Ms. Davenport.

11:02 10              THE COURT:  How do you spell "Wojdyla" again?  I know

11   it's spelled two different ways, it's written one way and

12   spelled another way.

13              MR. GRAY:  W-O-J-D-Y-L-A.

14              THE COURT:  W-O --

11:02 15              MR. GRAY:  -- J-D-Y-L-A.

16              THE COURT:  Was also by Ms. Davenport.

17              What about Hamilton?  You got ready to say

18   something about Hamilton.

19              MR. GRAY:  Hamilton was also questioned by

11:02 20   Ms. Davenport.

21              THE COURT:  Okay.

22              MR. GRAY:  And a comparison -- the comparison -- one

23   of the comparisons that we did with Ms. Hamilton was

24   Ms. Willett and -- who was also questioned by Ms. Davenport.

11:02 25              THE COURT:  Did you ask Ms. Davenport this morning

*Gray Recross of Davenport*

11:02  1    about any -- today or yesterday, about any comparison between

2    jurors that she -- where she was not responsible for

3    questioning one juror or the other?

4              MR. GRAY:  Yes, your Honor.

11:02  5              THE COURT:  Who was that?

6              MR. GRAY:  The Batson jurors would be Ms. Taylor, who

7    was questioned by Mr. Henderson; Ms. Walker, who was questioned

8    by Mr. Henderson; and Ms. Lopez, who was questioned by

9    Mr. Henderson.

11:03  10             MR. JONES:  Excuse me.  I believe Trevino was also

11   discussed, was he not?

12             THE COURT:  Yes.

13             MR. JONES:  Who was also by Mr. Henderson.

14             MR. GRAY:  Yes.

11:03  15             Mr. Saenz was also questioned by Ms. Davenport,

16   but there was no comparison juror in my questioning.

17   Mr. Saenz, there was only one point briefly discussed there,

18   your Honor.

19             THE COURT:  So, I have, by Davenport, Holmes, Deen,

11:03  20   Hamilton, Wojdyla, Plander, Willett, and Arndt, in terms --

21             MR. GRAY:  That's correct.

22             THE COURT:  -- of the jurors we discussed over the

23   last couple of days.

24             And by Henderson, Taylor, Walker, Lopez, and

11:04  25   Trevino.

*Gray Recross of Davenport*

11:04  1        MR. GRAY:  Yes.

2         MS. MIRANDA:  Your Honor, if I may, I believe there

3  was also a comparison made to Seated Juror Williamson, who was

4  questioned by Mr. Henderson.

11:04  5        MS. SWARNS:  That's correct.

6         THE COURT:  Williamson.

7         MS. SWARNS:  We're just going to confirm, your Honor,

8  whether there were any more comparables by Mr. Henderson.

9         THE COURT:  Okay.

11:05  10        MS. SWARNS:  We think also Jacklynn Lyles was a

11  comparison, that was questioned by Mr. Henderson.

12         THE COURT:  Lyles?

13         MS. SWARNS:  Uh-huh.  And that --

14         THE COURT:  Is that it, then?

11:06  15        MS. SWARNS:  I'm sorry, your Honor.

16         THE COURT:  Hold on one second.

17     *(Sotto voce discussion between Court and staff)*

18         THE COURT:  All right.  Did you have something else?

19         MS. SWARNS:  Just one more, your Honor.

11:09  20        THE COURT:  Yes.

21         MS. SWARNS:  Bethel Nickles was questioned by

22  Ms. Davenport.  She was a comparison juror.

23         THE COURT:  Nickles?

24         MS. SWARNS:  N-I-C-K-L-E-S.

11:09  25        THE COURT:  N-I-C --

*Gray Recross of Davenport*

11:09   1           MS. SWARNS:  -- K-L-E-S.

        2           THE COURT:  Oh, Nickles, that way.  Okay.

        3               Okay.  All right.  All right, then.  Then, we'll

        4   just go on with the next witness if we're not going to call

11:09   5   Mr. Henderson, if that is the petitioner's choice and decision.

        6               I understand -- Mr. Henderson is here and

        7   available, but the petitioner does not want to call him live as

        8   a witness.  Is that correct?

        9           MS. SWARNS:  That's correct, your Honor.

11:10  10           THE COURT:  All right.  All right.  Who's our next

       11   witness then, please?

       12           MS. MIRANDA:  May I go let Mr. Henderson know that

       13   he's free to go?

       14           THE COURT:  Oh, yes, yes, yes.  I'm sorry.  That's

11:10  15   right.  You asked me that already, and I had forgotten.

       16       *(Ms. Miranda leaves the room.)*

       17           THE COURT:  Did we move of microphone over?

       18           MS. SWARNS:  The microphone is here.

       19           THE COURT:  Okay.  Great.

11:10  20               Did she have to go to another floor to find

       21   Mr. Henderson?

       22           MR. JONES:  No.  She's just right outside the door.

       23           THE COURT:  Okay.

       24           MR. GRAY:  Your Honor, would you like me to call

11:10  25   Mr. Washington?

*Gray Recross of Davenport*

11:10  1          THE COURT:  Well, let's wait until she comes back.  I

2     didn't know if -- that's why I was asking where did she have to

3     go to find Mr. Henderson.

4          *(Ms. Miranda and Mr. Washington enter the room.)*

11:11  5          THE COURT:  Are we ready now?

6          MS. SWARNS:  Yes.

7          MR. WASHINGTON:  Oh, next to the judge?

8          THE COURT:  Yes, absolutely.  You get the hot seat.

9          MR. WASHINGTON:  God morning, your Honor.

11:11  10         THE COURT:  Good morning.  Good morning.

11              This is the only place where Mr. Rosales can

12    actually see you, as well; and I didn't think that in a setting

13    like this that Mr. Rosales should not have the opportunity to

14    see and hear the witnesses.

11:11  15         MR. WASHINGTON:  Yes, your Honor.

16         THE COURT:  All right.  You ready to be sworn, please?

17              Hello?

18         A CLERK:  I'm sorry.

19              Do you solemnly swear the testimony you will give

11:11  20    in the case now before the Court will be the truth, the whole

21    truth, and nothing but the truth, so help you God?

22         MR. WASHINGTON:  So help me God.

23         A CLERK:  Thank you.

24         **CRAIG WASHINGTON, DULY SWORN, TESTIFIED:**

11:11  25              **DIRECT EXAMINATION**

*Swarns Direct of Washington*

11:12 1    BY MS. SWARNS:

2    Q.  Good morning, Mr. Washington.

3    A.  Good morning.

4    Q.  Can you state your name for the record and spell your last

11:12 5    name?

6    A.  My name is Craig Anthony Washington, W-A-S-H-I-N-G-T-O-N.

7    Q.  And in what county do you reside, Mr. Washington?

8    A.  Harris.

9    Q.  And how long have you lived in Harris County?

11:12 10   A.  Since December of 1941.

11   Q.  What's your current occupation?

12   A.  I'm a lawyer.

13   Q.  What is your practice of law?

14   A.  It's a general practice, but about 90 percent of my time is

11:12 15   spent defending people charged with crimes.

16   Q.  How long have you been a practicing attorney?

17   A.  Since December the 15th -- I was licensed on December the

18   15th, 1969.  I began my practice on February 1st of 1970.

19   Q.  And where did you go to law school?

11:12 20   A.  I went to Thurgood Marshall.  It was then called Texas

21   Southern University Law School.

22   Q.  Okay.  When did you graduate from law school?

23   A.  I graduated in 1969.

24   Q.  While you were in law school, did you earn any awards or

11:13 25   distinctions?

*Swarns Direct of Washington*

11:13 1    A.  Yes, several.  I can't remember.  It's been too long ago.

2    Some American Jurisprudence prizes and Westlaw, something for

3    senior with the best average, Who's Who Among Students in

4    College --

11:13 5    Q.  I think you're going to have to speak up --

6    A.  I'm sorry.

7    Q.  -- for the court reporter.

8    A.  I can't remember all of them.  There's --

9    Q.  All right.

11:13 10   A.  I think I won nine AmJur awards: Evidence, Constitutional

11   Law, Criminal Law, Ethics, Administrative Law.

12   Q.  Do you remember what number rank you graduated?

13   A.  I was number one in my class.

14   Q.  What did you do after you graduated from law school?

11:13 15   A.  I was assistant dean of the law school for one semester,

16   the fall semester of 1969.

17   Q.  And then?

18   A.  Then I entered private practice in 1970.

19   Q.  Have you held any elective offices?

11:13 20   A.  I have.

21   Q.  What were those?

22   A.  I was a member of the Texas House of Representatives from

23   January of 1973 until January of 1983.

24            I was a member of the Texas Senate from January

11:14 25   of 1983 until December the 9th, I believe it was, of 1989.  On

*Swarns Direct of Washington*

11:14  1  that day, I was elected to be a representative in the Congress

2  of the United States to represent the 18th District, where I

3  served from December 9th of 1989 until January of 1994.

4  Q.   And did you maintain your law practice while you were in

11:14  5  the legislature?

6  A.   When I was in the State legislature, yes, ma'am, I did.

7  Q.   Okay.  And over your career, did you always practice

8  criminal law?

9  A.   I've always practiced criminal law.

11:14  10  Q.   And what percentage, over your career, of your practice has

11  been criminal law?

12  A.   It's always been the majority.  When you start out like I

13  did, you specialize in what the comes in the door most often.

14  And I practiced a lot of juvenile law.  I became very

11:14  15  interested in that field.  So, it's quasi -- it's a quasi

16  civil, quasi criminal allegations.

17        And I did that along with the criminal cases -- I

18  would say the lowest point was probably about 60 percent

19  criminal and highest probably about where it is now, about 90

11:15  20  to 95 percent criminal.

21  Q.   Okay.  Where do you hold licenses to practice law?

22  A.   I'm licensed by the Supreme Court of the State of Texas.

23  I'm also licensed to practice in the United States District

24  Court for the Southern District, the Northern District, the

11:15  25  Eastern District, and the Western District of the districts of

*Swarns Direct of Washington*

11:15  1   Texas; United States Court of Appeals for the Fifth Circuit;

2   and the United States Supreme Court.

3   Q.  In 1995 were you honored by the State Bar of Texas as the

4   Outstanding Criminal Defense Lawyer of the Year?

11:15  5   A.  Yes, ma'am, I was.

6   Q.  Okay.  Do you practice in Harris County?

7   A.  I do.

8   Q.  How long have you practiced in Harris County?

9   A.  Since February 1st of 1970.

11:16  10  Q.  Okay.  And how many criminal cases have you tried?

11  A.  Probably close to a thousand.  Seems like an awful lot, but

12  it's probably close to a thousand.

13  Q.  How many death penalty cases have you tried?

14  A.  I believe it's either nine or ten to verdict.  I've handled

11:16  15  others that didn't go to trial, and I've handled appeals on two

16  that I didn't try.

17  Q.  And the ten that went to verdict, were those to juries?

18  A.  Yes, ma'am, they were.

19  Q.  And were those in Harris County?

11:16  20  A.  I believe eight of them were in Harris County.  I recall

21  one in Brazos County and one in Liberty County, but I believe

22  all the other death penalty cases that I've handled have been

23  in Harris County.

24  Q.  During your -- from your experience in capital cases, in

11:17  25  trying capital cases, have you ever noticed any patterns in the

*Swarns Direct of Washington*

11:17  1   way that Harris County prosecutors use peremptory challenges?

2   A.  You would have to be a bit more specific.  I've noticed

3   several different patterns on several different aspects of

4   criminal cases.

11:17  5   Q.  Okay.  What patterns have you noticed?  Just give a list.

6         MS. MIRANDA:  Your Honor, I'm going to object at this

7   point to -- to limiting it to those issues or whatever patterns

8   are relevant.

9            I mean, I understand what you're trying to do;

11:17  10  and we're not going to object to it but --

11        THE COURT:  Okay.

12        MS. MIRANDA:  -- you know, I mean, just kind of --

13        THE COURT:  Well, let me hear what he has to say.  We

14  can narrow it down after we kind of get --

11:17  15       MS. MIRANDA:  Okay.

16        THE COURT:  -- what they are.  Who knows what they are

17  at this point in time?

18        MS. MIRANDA:  Okay.

19  A.  I've noticed during -- in the cases that I've tried, the

11:17  20  ones that I've had the first person singular experience of

21  participating in and watching, the assistant district

22  attorneys, both in capital and non capital cases, would

23  endeavor to eliminate as many minorities from the jury as they

24  could.

11:18  25  BY MS. SWARNS:

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:18   1    Q.  And what vehicle did they use to eliminate as many minority
2    prospective jurors as they could?
3    A.  Attempting to get the venire person to disqualify herself
4    and himself on some aspect of the case, other than to have to
11:18   5    use a challenge, a peremptory challenge, challenges for cause.
6           I noticed that they would approach -- "they"
7    meaning the assistant district attorneys in my cases -- would
8    approach the questioning of minority persons in a different way
9    than they did people who were not of the minority persuasion,
11:19  10    in an attempt to get them to disqualify themselves on some
11    reason that would prevent them from having to use a peremptory
12    challenge on them.
13    Q.  Was it -- in your experience, did the Harris County
14    prosecutors use a disproportionate number of their peremptory
11:19  15    challenges against people of color?
16    A.  Whenever they were on the panel and available, if they
17    couldn't get them for cause, then they would use a
18    disproportionate number of peremptory challenges on minority
19    persons, yes.
11:19  20    Q.  And in your experience, did the Harris County prosecutors
21    use those strikes to exclude otherwise acceptable or eligible
22    African-Americans and Hispanics?
23    A.  They would be acceptable in that they would have passed the
24    muster or the qualification which eliminated a basis for
11:20  25    challenging them for cause.  So, they would be acceptable as

11:20   1    jurors, except that they would use a peremptory challenge upon

2    them.

3    Q.  And did they use peremptory challenges to exclude potential

4    jurors of color who you perceived to be -- have offered

11:20   5    responses that were favorable to the State?

6    A.  Yes.  In some instances, they were some of the, if you

7    could -- it's kind of lawyer talk, but they would be strong as

8    mustard seed, in my opinion.  I would be -- frankly, a couple

9    of the cases I can recall, I would have stricken them myself

11:20   10   except that I knew the State was going to use a strike on them

11   and they had to go first.

12   Q.  How did you know the State was going to use a strike on

13   them?

14   A.  Because they were Black or Hispanic.

11:20   15   Q.  So, in your experience, did you withhold a peremptory

16   challenge or did you know that you didn't have to use a

17   peremptory challenge because the State was going to use one?

18   A.  Well, it never came to that because under the State system

19   they have to declare -- the State has to declare its intentions

11:21   20   first.  The venire person is examined by the Court and then by

21   the prosecution and then by the defense.

22           In many instances, you could tell from the -- the

23   way they were asking the questions that they were going to --

24   they were going to -- they wanted to get rid of the juror by

11:21   25   whatever means were necessary.  And, so, basically, you could

11:21   1    relax and not have to spend a lot of time rehabilitating or

2    preparing the witness to be a potential juror.

3                    For instance, if I know a person is going, I

4    could spend another 30 minutes with that person, talking about

11:21   5    empowerment; if you get to be a juror, having your own opinion;

6    mitigation; whatever the factors were.  But basically, in a lot

7    of instances, I wouldn't have to waste my time on that because

8    you can -- you can close your eyes and -- without even knowing

9    what race the person is, and you can tell whether the

11:22   10   prosecution is trying to eliminate them by some other means.

11                   And if they're trying to eliminate them on a --

12   for cause, then you can pretty much bet that if the cause

13   attempt fails that they're going to exercise a peremptory on

14   them; so, I can kind of save my jaws from moving a lot.

11:22   15   Q.  So, you tailored the extent to which you questioned venire

16   persons of color, based on your experience with the Harris

17   County prosecutors?

18   A.  Sometimes, I did.  Sometimes, I didn't.  Sometimes, you

19   know, you get angry and you want to make a full record because

11:22   20   you get tired of seeing it.

21                   Lawyers have to go around preaching how fair the

22   system is and how fair the system should be.  I don't think any

23   real lawyer would want anything less than a fair trial for

24   everybody concerned.  And we are the -- we're the advocates for

11:23   25   the judicial system.  If we don't believe in it, then the

*Swarns Direct of Washington*

11:23  1  people aren't going to believe in it.

2  And I'd had the dual responsibility of being a

3  representative, a spokesman for people and going about the

4  community, convincing people that the concept of ordered

11:23  5  liberty means something, that it works for people.

6  And it hurts your heart when you see all the

7  Black people get up and have to leave the courtroom because the

8  DA won't accept them as jurors.  It makes my job hard, to go

9  back out in the community and say, "Don't take to the streets.

11:23  10  Believe in the judicial system and it works."

11  Q.  Was it one occasion that you saw these kind of patterns or

12  was it more than one occasion, in your experience?

13  A.  Unfortunately, it was too many occasions.

14  Q.  Was it the majority, was it -- can you give a percentage of

11:23  15  times during your capital and non-capital trial experience that

16  you saw these patterns of strikes when questioning?

17  A.  Well, because I tried many more non-capital cases than

18  capital cases, it would have been -- an advanced majority of

19  situations would have been in non-capital cases.

11:24  20  And it wasn't -- it wasn't always like that.  I

21  mean, every once in awhile -- well, first of all, if there were

22  15 Black people on the panel, then you'd get a different kind

23  of an inquiry because you can't strike them all.  And, so, the

24  prosecutors' tactics were different because the perception

11:24  25  would be, if you struck ten Black people and you left five,

*Swarns Direct of Washington*

11:24  1    that those ten -- those five who were left are not going to be

2    stupid about the fact that the prosecutor struck ten.  So, the

3    methodology would change then.

4                   They would use a different approach altogether

11:24  5    and, in their view, I guess, get the ones that were most

6    acceptable to them, which there's nothing wrong with.  But if

7    you had five, six, or seven, they're going to strike them all.

8    Q.  And was it more common to have five, six, or seven or was

9    it more common to have 15 people of color?

11:25  10   A.  Unfortunately, it's more common to have five, six, or seven

11   and most often not even that many.

12   Q.  Do you recall specific case examples of when something like

13   this occurred in your practice?

14   A.  I can recall two.  There was the State of Texas versus

11:25  15   Calvin Joseph Williams and the State of Texas against Sammy

16   Phelps, Jr., P-H-E-L-P-S.

17   Q.  And can you tell -- describe for the Court what happened on

18   those cases?

19   A.  It's been a long time ago, and I sometimes get the two

11:25  20   confused.  Sammy Phelps was charged with a capital offense for

21   a murder committed during a burglary that occurred in the

22   Montrose area of Houston.  Or Calvin Joseph Williams.  I think

23   I said -- maybe I said Sammy Phelps.  Calvin Joseph Williams

24   was charged with a murder committed during a burglary in the

11:26  25   Montrose area.

11:26   1    Sammy Phelps Jr. was charged with a murder

2 committed during a burglary at night, also in the Montrose area

3 now that I think about it.  The distinction on that case, it

4 was based entirely upon circumstantial evidence with one

11:26   5 fingerprint and was at one time the leading case on fingerprint

6 identification in Texas.

7    But in the Phelps case, I recall that Jack

8 Bodisford -- Bodisford -- may he rest in peace -- was the chief

9 prosecutor.  And he was assisted by Ed Dodd, D-O-D-D, also

11:26   10 deceased, may he rest in peace.  And it was tried in the

11 133rd -- 83rd district court.  Joseph Guarino was the judge.

12   MS. MIRANDA:  Your Honor, at this point I'm going to

13 object to this portion since he's established that neither the

14 two prosecutors at issue in this case were at issue in that

11:27   15 case.

16   THE COURT:  Overruled.

17 A.   There was a man, whose name I cannot remember, an

18 African-American man, who presented himself for jury selection.

19 And he was questioned by Mr. Dodd at length.  And on a scale of

11:27   20 one to ten, on the death penalty alone, he was probably a 12,

21 very, very strong on the death penalty, almost to the point

22 where it would make the hair stand up on the back of your neck.

23 And I had hair then.

24    I was very concerned about him because, frankly,

11:28   25 it put me in sort of a dilemma.  Here, I had been advocating

11:28  1    all my life for inclusion; and I was faced with the aspect of

2    perhaps having to exercise a peremptory challenge on this

3    person.

4              At any rate, at the end of the examination -- he

11:28  5    was examined by Mr. Dodd and then either by myself or Larry

6    Sauer, S-A-U-E-R, who was my co-counsel.  We passed him back

7    after examination on a whole panoply of issues, including death

8    penalty qualifications.

9              You also had to use your one turn at bat to talk

11:28  10   about every aspect of the case, burden of proof and all those

11   things, whatever it was that you wanted to examine the person

12   about as to their ability to follow the law.  Then you passed

13   him back; and the judge says, "What says the State?"  And then,

14   if the State accepts the juror, then it passes to the defendant

11:29  15   for a peremptory challenge; and he says, "What says the

16   defendant?"

17             And I'm holding my breath, waiting for Ed Dodd to

18   accept this juror, which, in my experience, would have been the

19   first time that a Black person had been allowed to sit on a

11:29  20   death penalty case where there was -- at least in my experience

21   and especially where there was a Black defendant and an

22   Anglo-Saxon victim.

23   BY MS. SWARNS:

24   Q.  What year was this case?

11:29  25   A.  I don't know.  Eighty something.  It was in 183rd District

*Swarns Direct of Washington*

11:29   1   Court.  And it was appealed; so, there's a record on -- he

2   received a life sentence and -- so, there's a recorded case.  I

3   just, frankly, don't remember.

4           Anyway, Mr. Botteford struck him -- I mean,

11:30   5   Mr. Dodd struck him.  And it made me very, very, very, very,

6   very, very angry for a number of reasons.

7           First of all, because Mr. Dodd was from

8   Connecticut and I thought that he was a different kind of White

9   guy than the homegrown people that I sometimes found to be

11:30   10   prejudiced.  I didn't think that he was a prejudiced man.

11           But he demonstrated by not accepting that juror,

12   at least in my opinion, that he was a prejudiced man; and I had

13   taken him for something else.  And it hurt my feelings more

14   than anything that I had not evaluated him properly as a human

11:30   15   being.

16           And I don't remember whether he smoked or not,

17   but I did.  And we went outside the courthouse, and we happened

18   to come upon each other out on the sidewalk.  And I was so

19   furious that I let my guard down and told him how I felt, which

11:30   20   I don't usually do as a lawyer.

21           And he apologized to me and said that Jack

22   Botteford told him to strike the man, the significance of which

23   was that Jack Botteford got up and left the room when the man

24   was seated and did not hear one answer to one question asked by

11:31   25   either side.  So, I knew that Jack Botteford told him to strike

11:31   1   him because he was Black.  That was the only thing that Jack

2   Botteford knew about him other than what was on his

3   questionnaire.

4              And he apologized to me for striking him.  We

11:31   5   went back in the courtroom, and I made him say that on the

6   record.  I called him as a witness.  And that is part of the

7   record in this case.  You don't have to take my word for it.

8   His testimony is there.

9              He became angry with me because he told me off

11:31   10   the witness stand that I breached a confidence.  And I didn't,

11   because you don't have a confidence where a man lied to the

12   State.  He shouldn't have told me if he didn't want me to know.

13              But there's a record of him testifying that Jack

14   Botteford told him to strike that man.  I can't remember the

11:31   15   man's name, but I remember the incident like it happened to me

16   yesterday.

17   Q.   And you also mentioned a case of Mr. Williams?

18   A.   Calvin Joseph Williams.  They struck all -- I don't

19   remember as vivid an incident, but I remember that there was a

11:32   20   soliloquy by me that went on for probably 20 or 30 pages.  And

21   this was during Swain against Alabama, where I just was fed up

22   with it.  And I just let them have it as to my feelings about

23   it.

24              And this is a record, too.  I saw it, because I

11:32   25   did a directed appeal on Mr. Williams; and I kind of smiled to

*Swarns Direct of Washington*

11:32  1    myself but -- I think it embodies at least my sense of

2    fairness, that you don't -- you can't call a system fair where

3    you systematically exclude any group of people because of who

4    they are.

11:32  5    Q.  And just so the record is clear, those are not the only two

6    instances you saw this in a capital case?

7    A.  No.  Those are the ones that come to mind most often.

8            Happened in other counties, too; but you're

9    speaking of Harris County.  And I don't recall that there ever

11:32  10    was a Black juror on a capital case that I tried in Harris

11    County, in State Court.

12    Q.  Okay.  Did you notice whether the patterns of strikes and

13    questionings by the Harris County prosecutors changed based on

14    the race or whether the race of the defendant affected the

11:33  15    extent to which the prosecutors struck prospective jurors of

16    color?

17    A.  My personal experience is -- all of the clients that I

18    represented who were charged with a death offense were Black.

19    And I don't remember if there were many times when the death

11:33  20    penalty was sought where a victim wasn't Black.

21            Almost all of the cases I'm aware of, the State

22    reserved the death penalty for Black people who killed White

23    people or people -- or minority people who killed White people.

24    Very seldom -- I don't know of a case -- I have no personal

11:33  25    experience with a case where a defendant killed another Black

*Swarns Direct of Washington*

11:33    1    person and was charged with a death penalty offense.

2              I have many of them where a defendant killed

3    another Black person, and they may have been death eligible

4    after Furman was decided and after the legislature reenacted,

11:34    5    when I was there, a death penalty in Texas.

6              But I don't recall an instance in which the State

7    of Texas, through the district attorney of Harris County,

8    sought the death penalty in the instance of a Black killing

9    another Black person.

11:34   10    Q.  In your experience, did the Batson decision in 1986 -- was

11   there a change or did the manner in which the State exercised

12   its strikes change, before 1986 as compared to after 1986?

13   A.  Well, it changed after -- after Batson was decided by the

14   Supreme Court in -- I believe it was in April, March or April

11:34   15   of 1986.  It changed somewhat.

16   Q.  Did it get better or worse after that?

17   A.  It got -- it got better.

18             I passed a bill in the legislature that set up

19   the provisions in the Texas Code of Criminal Procedures that

11:34   20   outlines a procedure that must be followed when a Batson

21   challenge is made, attempting to make it standardized so it

22   wouldn't be a case by case, judge by judge system of reacting

23   to what they felt was a prima facie case.

24             The statute is clear just -- it still depends

11:35   25   upon the subjective reasoning of the judge to decide whether a

*Swarns Direct of Washington*

11:35   1    pretext has been established and whether a neutral non-racially

2    motivated reason has been established for striking a juror

3    peremptorily.

4    Q.   You indicated that you observed these disparate questioning

11:35   5    and the striking of African-Americans in your own trials.   Did

6    you ever have occasions to watch colleagues try cases and see

7    this kind of pattern occur in other colleagues' cases?

8    A.   There's several other times.   But most of the time, I

9    mean -- it wouldn't be like I would sit through a whole jury

11:35   10   selection process.   But there were other colleagues trying

11   cases, that I had an affinity for, wanted to learn something

12   from, frankly; so, I would go sit and watch some.

13           I can't say that I ever watched another voir dire

14   examination in another capital case from beginning to end.   But

11:36   15   I would selectively watch from time to time other persons who

16   were picking juries in capital cases.   And I saw no difference

17   in the pattern that I have perceived.

18           And mine was a legislative reason in addition to

19   my -- my goal as a lawyer.   I introduced an awful lot of bills

11:36   20   in the legislature, trying to make the criminal justice system

21   equitable.   And that included some empirical data on watching

22   other people try cases.   So, it wasn't just my personal

23   experience that I was relying upon when I introduced bills to

24   try to change the system and prevent what I thought was a gross

11:36   25   injustice.

*Swarns Direct of Washington*

11:36  1   Q.   Okay.   And have you had -- in those years before Batson,

2   did you have conversations with other criminal defense

3   attorneys about this phenomenon of the use of peremptory

4   challenges against prospective jurors of color?

11:37  5   A.   Yes.   I think there was even a Supreme Court case in which

6   I was cited, regarding some experiences I had had, by Mr. --

7   Justice Marshall, about the pattern of selecting juries in

8   Harris County.

9   Q.   Right.   And that was -- you're referring to your testimony

11:37  10   in --

11   A.   Harris versus Texas, I believe was the style of the case.

12   Q.   Exactly.

13              Okay.   And you mentioned, as a part of your job

14   as a legislator and I guess a community member, you spoke

11:37  15   outside -- you spoke about it in the larger community, about

16   this issue of exclusion of African-Americans?

17   A.   Yes.

18   Q.   Can you talk a little about that?

19   A.   Well, several things occurred to me.   First of all, that

11:37  20   the number of persons who presented themselves in a panel was

21   disproportionately low because -- I started practicing in the

22   Seventies.   So, either in the Seventies or the early Eighties

23   when I noticed the pattern, it was my view that the number of

24   minorities who were called for jury service and who showed up

11:38  25   was disproportionately low.

*Swarns Direct of Washington*

11:38   1          Because the single source that was used in Harris

2    County to select jurors was the voter registration roll, but

3    the statute that determines qualifications for jury service

4    does not mention being a registered voter as a qualification.

11:38   5    It was just a handy way of short-circuiting the system to find

6    an available list of people.

7          So, I introduced bills in the legislature,

8    probably ad nauseam as far as my colleagues were concerned, to

9    require the supplementation -- to require other sources, such

11:39   10   as identifiable utility rolls, driver's license rolls, and

11   other sources, to supplement the voter registration rolls so

12   that you would have more people.

13          Because it was well known then and is now, the

14   minorities who are eligible to register to vote register at a

11:39   15   disproportionately lower rate than does the majority community,

16   especially Hispanics and Blacks.

17          I'm not sure that's true of Asians.  I never --

18   the patterns of -- the sizeable number of Asians in this

19   community was much smaller back in the Seventies and Eighties,

11:39   20   before the end of Vietnam and the refugees coming over and many

21   settling in Texas and the like.

22          But I focused on Hispanics and African-Americans,

23   and it was clear through empirical data that they registered to

24   vote at a disproportionately lower rate.  So, I tried different

11:40   25   artifices to increase the numbers who would be in the pool.

*Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

*Swarns Direct of Washington*

11:40  1    Therefore, if you can get a larger number in the pool, then, if

2    you get to the courtroom and that segment of the community --

3    say it's 20 percent among each.  That would be 40 percent.  And

4    if you end up with 10 percent in the pool, then you have a

11:40  5    right to complain that something is wrong with the call process

6    by bringing them to the courtroom.

7           But the idea is, if you increase the number in

8    the pool, then you're going to increase the number that show up

9    in the courtroom; and then you're going to decrease the

11:40  10   likelihood that the district attorney would be able to strike

11   them all, which means that they'll change their pattern of

12   going about their work and they don't try to eliminate all of

13   the Black and Hispanic people but they cherrypick the ones that

14   may appear to be more favorable to their side.  And there's

11:40  15   nothing wrong with that.

16          There's something wrong with striking them all

17   just because you assume that they're going to be more inclined

18   to be sympathetic toward the defendant, which is not true.

19   Q.  And, so, is this -- basically, is it pre Batson you were

11:41  20   trying to increase the number of Blacks and Latinos called for

21   service --

22   A.  Yes.

23   Q.  -- so as to respond to -- reduce the likelihood that the

24   prosecutor would be able to eliminate all of the Blacks and

11:41  25   Latinos through the use of peremptory challenges?

*Swarns Direct of Washington*

11:41  1    A.  Yes.

2    Q.  Okay.  And aside from your work in the legislature, pre

3    Batson, did you, as an attorney, raise challenges --

4    A.  Yes.

11:41  5    Q.  -- against the prosecutors' -- the Harris County

6    prosecutors' use of peremptory challenges?

7    A.  Yes.

8    Q.  Even though there was no law --

9    A.  Right.

11:41  10   Q.  -- that supported it?

11   A.  The judges kept telling me, "Why are you doing this,"

12   because of Swain.  And I would look them in the face and say

13   that Swain was wrong, the Supreme Court was wrong.

14            Well, I turned out to be right.

11:41  15   Q.  And, so, you raised these challenges --

16   A.  The ones I spoke about were pre Batson.  But because the

17   Supreme Court puts the imprimatur of something -- on something,

18   if you know it's wrong, you have to say so.

19            The law never changes unless somebody speaks out.

11:42  20   If the lawyer who represented Batson hadn't made an objection,

21   even in view of Swain versus Alabama, then it would still be

22   the law.  It would.

23   Q.  Thank you.

24            MS. SWARNS:  May I have a moment, your Honor?

11:42  25            THE COURT:  Yes.

*Swarns Direct of Washington*

11:42  1      (*Sotto voce discussion between plaintiff's counsel.*)

2           MS. SWARNS:  I don't have any further questions for

3      Mr. Washington.

4           THE COURT:  Do you have any?

11:42  5           MS. MIRANDA:  Yes, ma'am.

6           THE COURT:  All right, Ms. Miranda.

7                        **CROSS-EXAMINATION**

8      BY MS. MIRANDA:

9      Q.  Mr. Washington, are you familiar with the prosecutors in

11:43  10     this case?

11     A.  Yes, ma'am.

12     Q.  Okay.  Can you tell us who they are?

13     A.  Mr. Keno Hernandez, whom I spoke with this morning, and

14     Ms. Norma Davenport, whom I met -- I knew already, but I

11:43  15     noticed that she was a prosecutor when I assumed she was --

16          THE COURT:  That's not a live mic.  Don't worry about

17     it.

18     A.  I assumed that she was since she was here yesterday.  I

19     know them both.

11:43  20     BY MS. MIRANDA:

21     Q.  Did you ever, in the course of trying cases in Harris

22     County, try cases against either Ms. Davenport or

23     Mr. Henderson?

24     A.  Against both.

11:43  25     Q.  Okay.  How many cases; do you recall?

*Miranda Cross of Washington*

11:43    1    A.  I've slept since then.  Long time ago.

         2    Q.  I understand.

         3            Okay.  Do you have just a general idea or -- and

         4    if you can't answer, that's okay.

11:43    5    A.  I would say several.  Probably less than ten, because we

         6    had eight or ten district courts even back then.  And

         7    Ms. Davenport is probably a little younger -- and I'm glad

         8    she's not here -- probably a lot younger than Mr. Henderson and

         9    myself.

11:44   10    Q.  Okay.

        11    A.  But she would have been considered a baby lawyer.  I may

        12    have tried a misdemeanor or two against her, but I remember

        13    that Mr. Keno Henderson and I tried several jury trials in

        14    felony court.  And we probably had many more cases than that

11:44   15    that didn't result in a trial.

        16    Q.  Okay.  And can you share with the Court what you shared

        17    with me outside, about your opinion of Mr. Henderson as a

        18    prosecutor?

        19    A.  He's a straight-up guy, first class.

11:44   20    Q.  Did you participate -- let me back up.  Not participate in

        21    the voir dire of any case.  But you mentioned that occasionally

        22    you would go, even when it wasn't your case, to kind of sit in.

        23            Was this case, which was Mr. Rosales, Mariano

        24    Rosales, did you at any point have an opportunity to sit in on

11:45   25    the voir dire of this case and see any of the questioning in

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Miranda Cross of Washington*

11:45   1   this case?

2   A.  Tell me who defended him, and I can tell you whether I did.

3   Q.  All I know is Mr. Boyd.  I'm not sure if they're --

4   A.  Wesley Boyd?

11:45   5        THE COURT:  No.

6        MR. JONES:  Mr. Walter Boyd.

7   A.  Oh, Walter.  I know Walter.

8             It doesn't ring a bell.  I don't know

9   Mr. Rosales, and I don't remember -- I didn't know -- I don't

11:45  10   know the facts of the case.  It's likely that I did not -- not

11   to -- let me see.  Let me back up.  I shouldn't say "likely."

12             I don't remember ever having watched Mr. Boyd in

13   a voir dire in a capital case.

14   BY MS. MIRANDA:

11:46  15   Q.  Okay.  Have you at any point spoken to either Mr. Henderson

16   or Ms. Davenport about their questioning in the voir dire of

17   this case?

18   A.  No, ma'am.

19   Q.  Have you spoken to either one of them about their general

11:46  20   practices of voir dire in any case?

21   A.  No, ma'am.  We never had a capital case together.  It would

22   have been non-capital cases with either/or both of them, and I

23   don't -- I don't think that I ever had a case in which they

24   were both involved at the same time.

11:46  25   Q.  Okay.  Did you ever discuss -- even in the non-capital

*Miranda Cross of Washington*

11:46  1    cases, did you ever discuss their voir dire strategies or

2    general practices regarding non-capital cases?

3    A.   No, ma'am.

4    Q.   Okay.   Now, you mentioned this systemic problem that was

11:47  5    obvious to you in the Eighties, around the time of the case

6    that this time was trialed [sic].   In your experience and in

7    your opinion, did all of the assistant district attorneys at

8    Harris County participate in the same discriminatory -- in your

9    opinion, discriminatory practices?

11:47  10   A.   I can't say all, but I can say all that I saw --

11   Q.   Okay.

12   A.   -- would try their best to eliminate minorities from the

13   jury selection because many held the mistaken belief that a

14   Hispanic would not convict a Hispanic and a Black wouldn't

11:47  15   convict a Black.   And I know those things not to be true.

16   Q.   Okay.   Okay.   And I just want to ask you a question about

17   the process in a capital case, as far as the voir dire.

18   A.   Yes, ma'am.

19   Q.   Are they brought in as a group and you voir dire them all

11:47  20   together, so you see the entire panel at once, or are they

21   brought in separately, in individual groups?

22         THE COURT:   In what case?

23         MS. MIRANDA:   Capital cases, in general.

24         THE COURT:   In capital cases, in general, in Harris

11:48  25   County during the Eighties or --

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Miranda Cross of Washington*

11:48  1        MS. MIRANDA:  Yes.  Yes, ma'am.  I apologize.  I'm

2  trying to establish the practices of seeing the entire panel.

3  He made a statement about --

4        THE COURT:  Well, just ask the question.  I just

11:48  5  wanted to make sure that I knew where you were.

6        MS. MIRANDA:  Okay.

7  BY MS. MIRANDA:

8  Q.  Did you understand the question?  You may have been

9  confused, also.

11:48  10  A.  No.  I understood it after the colloquy between you and the

11  Court.

12  Q.  Okay.

13  A.  What would happen is that the Court would send for a group.

14  I hate to -- hesitate to call them a "panel" because that would

11:48  15  connote all the -- from which the jury would be chosen, which

16  is not like they did it in State.  That's how they do it in

17  federal court.  But they would not, say, get 200 people from

18  one call.  During that time, jurors were almost all called on

19  Mondays.  Now the practice has changed.

11:49  20        But they would send for, say, a mini panel for

21  one of them.  I don't know if there was a name for it but --

22  Q.  Sure.

23  A.  -- at the beginning, the first day of jury selection, the

24  Court would, I guess depending on the lawyers and what they

11:49  25  expected the lawyers to be able to cover in a day, may be

*Miranda Cross of Washington*

11:49  1   overly optimistic and call, say, 30 people.

2            Or if the Court had not tried a capital case

3   before and wasn't familiar with the arduous detail required in

4   order to really get down to the real -- where the rubber meets

11:49  5   the road on these cases, they may call 40.  Most often, after

6   they kind of establish a pattern, they'd call about 20 a day.

7            The panel would come in.  The judge would qualify

8   the panel -- in other words, ask the general questions; pass

9   out a questionnaire -- or maybe call enough for the week, maybe

11:50  10   40; pass out a questionnaire; and then, so as to not have

11   inconvenienced them any more than necessary --

12   Q.  Right.

13   A.  -- the citizens and voters in the county, which elected

14   judges, he'd send enough home -- all home but those that they

11:50  15   thought they would be able to handle in one day's time, which

16   was typically three or four in the morning session and then

17   three or four in the afternoon session.

18            They would have the 40 there, ask them the

19   general questions, save some questions that the Court would go

11:50  20   into -- they would cover the general stuff, like burden of

21   proof, presumption of innocence, that it was a capital case,

22   things of that nature; pass out a questionnaire; swear them to

23   answer truthfully on the questionnaire; and then keep enough

24   for that morning session and then parcel out the rest of them

11:50  25   for the next several days or perhaps even the week.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

*Miranda Cross of Washington*

11:50   1           Then they -- and the voir dire was a sequestered

2    voir dire; that is, only one venire person would be in the

3    courtroom, on the witness stand, to be examined at a time.

4    And, then, when examination was finished with that person, the

11:51   5    Court would send for the bailiff to call the next person in.

6    Q.   Okay.  And if they didn't get enough jurors from that

7    initial -- like you said, I'm not sure what the name of it is.

8    A.   Yes, ma'am.

9    Q.   Would they have to then, like, the next week call in an

11:51   10   additional panel or is it --

11   A.   Oh, they --

12   Q.   -- to continue with juror selection --

13   A.   Oh, yes.

14   Q.   -- in a capital case?

11:51   15   A.   They almost never get enough from 40 people.

16   Q.   Okay.

17   A.   To -- I mean, most of the time it takes close to hundred or

18   more --

19   Q.   Sure.

11:51   20   A.   -- to -- before you could pick.

21           So, they -- rather than have all those people

22   inconvenienced -- and I imagine it's a management problem of

23   spacing them out --

24   Q.   Oh, absolutely.

11:51   25   A.   -- two three weeks.

*Miranda Cross of Washington*

11:51  1    Q.  Sure.

2    A.  They'd maybe take one week's worth, a bite so to speak.

3    Q.  Right.

4    A.  And then, if they finish those -- when they finish that

11:51  5    panel, if it were toward the end of the week, they'd just quit

6    for the week and then call in 40 more the next Monday, and

7    continue that process until -- and, then, by that time, the

8    Court can get some rhythm as to how long it's taking the

9    lawyers, how many are going to fall out on the -- what was the

11:52  10   Wistherspoon questions then, that -- you know.

11   Q.  Sure.

12   A.  A lot of people disqualified themselves one way or the

13   other at the very beginning.  And, so, you might have some

14   spaces.  But the Court was trying to keep everything moving by

11:52  15   keeping enough people in the flow, in the pipeline, so to

16   speak, so that you could move through and not inconvenience the

17   citizens any more than necessary.

18            But, then, they knew that they would have to call

19   some more.  Until you get close -- I mean, you got ten jurors

11:52  20   and you're going --

21   Q.  Right.

22   A.  -- to seat 12 and two alternates, maybe you cut back on the

23   number of people you call for the next week, with the

24   expectation that based on -- again, you can look ahead on the

11:52  25   questionnaires and see some of the things that you need to

*Miranda Cross of Washington*

11:52   1   know.

2   Q.   Right.

3   A.   Because once you brought the 40 in, they would all turn in

4   their questionnaires and the lawyers would have access to that

11:52   5   even before the people came.  So, you would have some idea,

6   before you even saw so-and-so in the face, what she or he

7   looked like on paper in terms of how they answered the

8   questions, which had to do with their death qualification and

9   also other aspects of their lives, like what magazines they

11:53   10   read and bumper stickers and things that lawyers are curious

11   about that may -- we may think mean something --

12   Q.   Correct.

13   A.   -- and may or may not mean anything.

14   Q.   Okay.  All right.

11:53   15   (*Sotto voce discussion between defense counsel.*)

16   MS. MIRANDA:  We'll pass the witness, your Honor.

17   THE COURT:  Anything else?

18   MS. SWARNS:  Just a few questions.

19   **REDIRECT EXAMINATION**

11:53   20   BY MS. SWARNS:

21   Q.   Mr. Washington, Ms. Miranda asked you and you shared with

22   the Court your opinion of Mr. Henderson --

23   A.   Yes.

24   Q.   -- and your experience about him as a prosecutor.

11:53   25   Do you have the same opinion of Ms. Davenport

*Swarns Redirect of Washington*

11:53   1   that you have of Mr. Henderson?

2   A.   In fairness, I don't think that I had occasion to work with

3   her.  And it's not a chauvinistic thing or anything like that.

4   It's not a "good old boy" thing.  But I don't -- I don't recall

11:54   5   as vividly any experiences, either negative or positive, with

6   Ms. Davenport.

7           I remember her being in the district attorney's

8   office.  I'm sure that we shared some cases.  But

9   Mr. Henderson -- I think, over the course of many years, you

11:54   10   tend to remember really bad experiences you have with people or

11   really good experiences.  And my experiences with

12   Mr. Henderson, he's a straight-up guy, like I said.  He's a

13   gentleman.  And, unfortunately, there are not enough of us in

14   the legal profession.  He stands out.

11:54   15           Not to say that she -- I just don't have that

16   recollection of my experiences with her.  Not to say that

17   they're bad.  They just don't rise to the level of my either

18   recollection or experience with Ms. Davenport in the same way

19   that I fondly recall Mr. Henderson.

11:54   20   Q.   Okay.  You -- you were discussing how groups of prospective

21   jurors were brought in --

22   A.   Yes.

23   Q.   -- and then individually questioned.

24           Were the lawyers, the prosecutors and the defense

11:55   25   lawyers, present when those groups were instructed by the

*Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

*Swarns Redirect of Washington*

11:55    1    judge?

2    A.  Yes.  They have to be present.  The defendant and both

3    counsel have to be present when they're instructed by the

4    Court.

11:55    5    Q.  And, so, you could look out at the group and you could see

6    how many Black or Latino prospective jurors were in each

7    particular group that was called?

8    A.  Yes.  As a matter of fact, that would be the time to make a

9    motion to shuffle, which was allowed under state law.

11:55    10           If you were -- if you were trying to -- if you

11    had some minority persons in the back and you were trying to

12    shuffle -- if they appeared to be stacked toward the back, for

13    instance, it would be a good thing to maybe want to shuffle --

14    reshuffle the 40 people, which is not inconvenient for the

11:55    15    clerk to just reshuffle their names and change the order in

16    which they're presented, because that's just arbitrary anyway.

17           But you'd get an opportunity to look at the

18    entire 40 group of people; and you would make notations in your

19    mind as to whether there was underrepresentation,

11:56    20    overrepresentation, or no representation in that group of

21    people that were presented.

22    Q.  Okay.  And just as a final question, you talked a lot about

23    your experiences with the district attorney's office striking

24    African-American jurors.

11:56    25           Is your experience the same with that office

11:56   1   striking Latino jurors?

2   A.   Yes.

3        MS. SWARNS:   Okay.   We have nothing further.

4        THE COURT:   All right.   Anything?

11:56   5   MS. MIRANDA:   Nothing.

6        THE COURT:   All right.   Thank you, Mr. Washington.

7        MR. WASHINGTON:   May I be excused?

8        THE COURT:   Yes.

9             No other witnesses from the petitioner?

11:56  10   MS. SWARNS:   No, your Honor.

11        THE COURT:   Anything else from the respondent?

12        MS. MIRANDA:   No, your Honor.

13        THE COURT:   Do you guys want to have an opportunity to

14   make any final arguments to the Court?

11:56  15   MS. SWARNS:   We certainly can or we could --

16        THE COURT:   Don't have to.   I'm just asking.

17             I don't -- people accuse me of -- in bench

18   situations, of short-circuiting the lawyers' opportunity to

19   speak.   I have, literally, been standing up and walking out the

11:57  20   room with lawyers screaming after me, "Wait, wait.   I didn't

21   get a chance to say anything."

22             And, so, I've decided to stop doing that and just

23   to at least ask if you would -- I mean, obviously, there's been

24   a lot of briefing in this case and, obviously, we've read it

11:57  25   all.

11:57   1                    My view probably is that there's not much more

        2       that can be added.  I just don't want to get up and walk out of

        3       the room without giving you the opportunity to provide me any

        4       summation that you might feel is warranted or necessary or that

11:57   5       you think could potentially be helpful.  Don't feel obliged to

        6       say anything.

        7                    MS. SWARNS:  Well, in the process of thinking about

        8       the answer to that question, is your Honor anticipating that we

        9       will be doing post hearing briefing or --

11:57   10                   THE COURT:  We talked about that a little bit

        11      yesterday, my law clerks and I.  And, frankly, I wasn't

        12      thinking that we would need any.

        13                   Was there anything else that you thought that I

        14      didn't have before me?

11:58   15                   Obviously, I'm keeping all these exhibits, and

        16      I'm keeping them the way that you provided them to me because

        17      it's helpful for me, now that I've taken my notes and listened

        18      to the testimony, to utilize the exhibits the way that they've

        19      been numbered for trial as opposed to the way that I had them

11:58   20      in my binder when I came in here yesterday, which was just

        21      attached as exhibits to some of the earlier briefing.

        22                   So, I'm going to be utilizing the exhibit numbers

        23      in the way that we've used them throughout this proceeding.

        24      But I wasn't thinking that I was going to want or need any post

11:58   25      hearing briefing unless there's some issue you think we've

                    Cheryll K. Barron, CSR, CM, FCRR                713.250.5585

11:58   1   missed or that you think you can flesh out more clearly as a

2   result of what we've heard over the last couple of days.

3          What was your thought?

4          MS. SWARNS:  I was anticipating that we would be able

11:58   5   to write, at least briefly, once we received the transcripts of

6   the testimony that we've received today --

7          THE COURT:  Here's what I don't want.  Let me just be

8   honest with you.  Here's what I don't want.  I don't want

9   post-hearing briefing that's, like, basically a summation of

11:59   10   all the briefing that I've gotten before.  That is not helpful

11   to me.  That just, like, means that I just have to go back and

12   look at the exact same thing again that we've already looked

13   at.

14          I was here.  I was paying attention.  You could

11:59   15   tell.  I was looking and taking notes the whole time.  I don't

16   need you to go back and tell me the exact same thing that we

17   heard before.

18          If there's some new issue, however, or something

19   that you think potentially would not be emphasized in the way

11:59   20   that you want it to be emphasized, I'm perfectly willing to

21   look at additional post-hearing briefing.  But I just don't

22   need you just to do me some briefs just to summarize what we

23   heard here the last couple days.  I just don't need it.

24          MS. SWARNS:  Okay.  Why don't we -- if your Honor

11:59   25   would allow us, then -- I don't know what Ms. Miranda's

11:59  1    position would be, but perhaps we could break for lunch and

2    then do a brief closing just so we can give you our thoughts --

3           THE COURT:  Sure.  I mean, I --

4           MS. SWARNS:  -- based on the testimony.  And, then,

12:00  5    once we get the transcript, if there's something that seems to

6    us that's, you know, glaring, that we really, really need you

7    to know that we haven't already said, we'll do a very tiny

8    supplement.

9           THE COURT:  Okay.  I don't know what you mean by "once

12:00 10    you get the transcript," because -- I'm going to be honest with

11    you.  Here's how my little feeble mind works.  I start looking

12    at the issues as soon as I walk out of this room this

13    afternoon; and I start going through the testimony and the

14    briefing and the exhibits to sort of get my thoughts together

12:00 15    and start doing my preliminary outline on my opinion, based on

16    what I've heard.

17           I don't want too many days to pass by, where I've

18    had an opportunity like this, a good opportunity to actually do

19    what I'm charged with doing in this particular instance, which

12:00 20    is to evaluate the credibility of the witnesses with respect to

21    the evidence that's been marshaled and placed before the Court

22    on this issue.

23           So, you know, I'm going to start looking at it

24    right away and probably have substantially outlined my thoughts

12:00 25    on it before -- between now and the end of the week.

12:01  1          So, you know, my thought is we all know what

2    we've heard over the last couple of days.  Let's make a

3    decision today, after lunch sometime, about whether or not

4    we're going to do any post-hearing briefing, so that I can set

12:01  5    a schedule for that and know what it is that I'm anticipating

6    that I'm going to be getting.

7          So, it's 12:00 o'clock.  Let's take a long lunch

8    since we don't have any more witnesses.  Let's just be back at

9    1:30.  It's not a real long lunch, but let's be back at 1:30.

12:01  10   That way, you can actually eat and marshal your thoughts.

11         MS. SWARNS:  Thank you.

12         THE COURT:  And then we'll come back at 1:30.  And,

13   you know, if you decide you have something you want to tell me,

14   great.  If you decide that -- you know, that you've made enough

12:01  15   of a record, that's fine, too.  Doesn't make any difference to

16   me.

17         But let's talk this afternoon about whether or

18   not we want to or need to do any post-hearing briefing, and

19   then we'll set a schedule for doing that this afternoon.

12:02  20         MS. SWARNS:  Okay.  Thank you, your Honor.

21         A PRISON GUARD:  Judge?  Your Honor?

22         MR. ROSALES:  Your Honor?

23         THE COURT:  Oh, I'm sorry.  Yes?

24         A PRISON GUARD:  Do we need to be back at 1:30 or not?

12:02  25         THE COURT:  Yes, please.  Please.  And -- yes, please,

12:02   1   I would like him to be back at 1:30 because if we have

2   additional arguments that the lawyers are going to be making to

3   the Court this afternoon he would need to be present for those

4   arguments, as well.

12:02   5          A PRISON GUARD:  Okay.

6          THE COURT:  Okay?  Thank you very much.

7          MR. ROSALES:  Yes.  Thank you.

8          THE COURT:  Ma'am?

9          A PRISON GUARD:  Okay.  He said, "Thank you."

12:02   10         THE COURT:  Okay.  I was just saying "thank you" to

11   you.

12                Okay.  Thanks.

13       (Recess taken from 12:02 to 1:38 p.m.)

14         THE COURT:  All right.  Good afternoon, everybody.

01:38   15   Please be seated.

16              So, what are we going to do this afternoon?  Are

17   we going to do any summation at all?

18         MS. SWARNS:  Yes, your Honor.

19         THE COURT:  Okay.  Let me hear from petitioner,

01:38   20   please.

21         MS. SWARNS:  Thank you, your Honor.

22              As you know, we are here alleging that

23   Mr. Rosales' -- Mr. Rosales' jury was selected in a racially

24   discriminatory manner, that the prosecutors exercised their

01:39   25   peremptory challenges to exclude Black and Latino jurors on

*Cheryll K. Barron, CSR, CM, FCRR*          *713.250.5585*

01:39  1    account of race and that in doing so they violated Mr. Rosales'

2    right to a fair and impartially selected jury.

3              We believe that the evidence that has been

4    presented through the testimony of Ms. Davenport and

01:39  5    Mr. Washington establishes that there were no race neutral

6    reasons for the exercise of peremptory challenges in this case.

7    And I would begin by saying --

8              THE COURT:  On any of the jurors that were struck?

9              MS. SWARNS:  I'm going to run through as many -- as

01:39  10   much of the evidence as I can.  I don't have much time.  But we

11   think that there's certainly -- there's no question that there

12   were peremptory challenges exercised by Ms. Davenport on the

13   basis of race.  Let me put it that way.

14             I think we need to -- first, Miller-El dictates

01:40  15   that we have to view Ms. Davenport's testimony today through

16   the lens of history; and we know that there's a documented

17   history of racial discrimination in Harris County.  That has

18   been documented by Courts, including the United States Supreme

19   Court and the Texas Court of Criminal Appeals.

01:40  20             In 1984 United States Supreme Court Justice

21   Thurgood Marshall noted that in the 19 years since Swain had

22   then been handed down prosecutorial abuses of peremptory

23   challenges had grown to epidemic proportions in certain regions

24   of the country, and he noted the well-marshaled evidence

01:40  25   presented in Harris that demonstrated that Harris County

01:40   1    routinely excluded Blacks from juries.

2              And during the course of making those findings,

3    Justice Marshall cited to the testimony of Craig Washington,

4    who offered, of course, consistent testimony today.

01:40   5              In 1987 the Texas Court of Criminal Appeals, in a

6    decision entitled "Tompkins versus State," a case that involved

7    specifically Ms. Davenport, found that the defense had

8    established that -- and I quote them -- "Black jurors have been

9    relatively uncommon on capital murder juries in Harris County

01:41   10   during the past several years."

11             The testimony on which that decision and that

12   finding was based was summarized in our findings of fact.  It

13   includes the testimony of Harris County prosecutors, including

14   the district attorney who was at the head of the office during

01:41   15   the time of Mr. Rosales' trial, John Holmes, who testified

16   that -- together these prosecutors testified variously that it

17   was a general rule in that office to be wary of minorities,

18   that there were conversations among prosecutors about the

19   undesirability of minorities on juries, that the prosecutors

01:41   20   commonly believed that Blacks are more inclined to be

21   sympathetic toward other Blacks, and that Blacks or minorities

22   were more inclined to be lenient toward defendants.

23             THE COURT:  Are you saying, then, by your argument

24   that it was wrong for them to have those beliefs, that there

01:42   25   was no basis in fact to any of those beliefs --

01:42   1          *(The video screen goes blank momentarily.)*

2                   THE COURT:  Oh, crud -- oh, there we go.

3                       And that -- so, for them to have that belief or

4       to express --

01:42   5                   A PRISON GUARD:  Your Honor?

6                   THE COURT:  I'm sorry?

7                   MR. ROSALES:  We --

8                   A PRISON GUARD:  We can't hear you.

9                   THE COURT:  Oh, my goodness.

01:42   10                      (Indicating).  Okay.  What about now?

11                  MR. ROSALES:  We can't hear you.

12                  THE COURT:  (Indicating).  Okay.  Hold on one second,

13      then.  One minute.

14          *(Discussion off the record)*

01:43   15                  THE COURT:  Mr. Rosales, can you hear me again?

16                  MR. ROSALES:  Can't hear you.

17          *(Sotto voce discussion at bench with court staff)*

18                  THE COURT:  (Indicating).  Time out.  One minute.

19                      He got that one.

01:46   20          *(Discussion off the record and video has restarted.)*

21                  MR. ROSALES:  We can hear you now.

22                  THE COURT:  Oh, you can hear me?

23                  MR. ROSALES:  We can hear you now.

24          *(Sotto voce discussion at bench with court staff)*

02:01   25                  THE COURT:  All right.  Mr. Rosales, can you hear me

02:01  1   now?

2         MR. ROSALES:  Yes, ma'am.

3         THE COURT:  All right.  And we can hear you fine.  So,

4   we're going to go ahead and -- thank you.  Sorry for the

02:02  5   trouble.

6              Apparently the problem wasn't on our end or your

7   end.  It was somewhere in between.

8         MR. ROSALES:  All right.

9         THE COURT:  Okay.  Here we go.

02:02  10             Ms. Swarns, you were in the middle of making your

11   argument; and I was getting ready to ask you a question.  And

12   my question was this.  You made the argument, I think, that

13   the -- that there existed a culture of discrimination in the

14   district attorney's office.  And one of the examples that you

02:02  15   gave was that Harris County prosecutors had expressed the view

16   that minorities were more sympathetic to defendants than

17   non-minorities.

18             And, so, my question was, if, in fact, that was

19   the basis of their experience, if, in fact, they had suffered

02:03  20   some jury nullification as a result of minority jurors being on

21   a panel, is it your position that it was inherently

22   discriminatory for them to hold that view, that minorities were

23   more sympathetic to defendants than non-minorities if, in fact,

24   that was a belief or a statement that was made on the basis of

02:03  25   their own experiences?

02:03   1            MS. SWARNS:  No, your Honor.  I think that in Batson,
        2    itself, it says that what is unconstitutional is if a
        3    prosecutor holds the view that a person, a Black person, as
        4    referred to in Batson --

02:03   5            THE COURT:  Right.

        6            MS. SWARNS:  -- would be more sympathetic to another
        7    Black person, a Black defendant particularly, simply on a
        8    basis -- on the basis of their shared racial identity and then
        9    that prosecutor takes the additional step of striking Black
02:03  10    jurors based on the assumption that they will be sympathetic
       11    without, you know, having specific indications from individual
       12    questioning of an individual African-American juror that
       13    demonstrates that there is actual sympathy.

       14            THE COURT:  Okay.  So, it's not necessarily prohibited
02:04  15    for them to express or have that belief if they don't act on
       16    it.

       17            MS. SWARNS:  Right.  It's prohibited to act on
       18    race-based stereotypes --

       19            THE COURT:  Okay.

02:04  20            MS. SWARNS:  -- in an assumption and excluding jurors
       21    of color.  And that's specifically addressed by the Court in
       22    Batson, itself.

       23            THE COURT:  Okay.

       24            MS. SWARNS:  And what the Courts that I was speaking
02:04  25    of have actually noted was not that just were these views

02:04  1    commonly held within the Harris County prosecutors, the

2    district attorney's office, but that there was evidence that

3    there was acting on that belief, basically, that they practiced

4    what they preached.

02:04  5              THE COURT:  Okay.

6              MS. SWARNS:  And I would just go on to say that it's

7    not only a broad based evidence of a culture of discrimination,

8    in the language of Miller-El, but there's evidence specific to

9    the trial prosecutor at issue in this case.  One of the cases

02:04  10   that ultimately went to the United States Supreme Court --

11   that's Tompkins --

12             THE COURT:  Versus State?

13             MS. SWARNS:  That's correct.

14             THE COURT:  Okay.

02:05  15             MS. SWARNS:  -- was -- Ms. Davenport was the trial

16   prosecutor.  When that case was litigated -- and that was a

17   Batson challenge -- the Court of Criminal Appeals actually

18   rejected and found unsupported by the record all of the reasons

19   offered by Ms. Davenport, with the exception of one.  They

02:05  20   specifically noted that her justifications were not supported

21   when compared to the record.  They upheld the Batson challenge

22   with respect to one challenge -- with one explanation --

23             THE COURT:  What was the year of Tompkins versus

24   State -- Thompson versus State?

02:05  25             MS. SWARNS:  "Tompkins."

*Cheryll K. Barron, CSR, CM, FCRR*                      *713.250.5585*

02:05  1          THE COURT:  "Tompkins," I mean.  I'm sorry.

2                  What was the year that she tried that case?

3          MS. SWARNS:  We think the trial was '81.

4          THE COURT:  Okay.

02:05  5          MS. SWARNS:  And the hearing -- right -- the Batson

6     hearing was '86 or '87.  So, this is all contemporaneous with

7     Mr. Rosales' trial.

8          THE COURT:  Okay.

9          MS. SWARNS:  The Court of Criminal Appeals ultimately

02:05 10     does uphold the one remaining justification of a strike offered

11     by Ms. Davenport in the Tompkins case, but I -- they

12     specifically reluctantly uphold it.  They say they don't

13     understand it.  They acknowledge that it's race neutral, but

14     they don't understand it.

02:06 15                  And, actually, they admonish the trial Courts to

16     be very critical and careful in their evaluation of the

17     credibility of trial prosecutors because they were struggling,

18     obviously, to understand why the reason offered by

19     Ms. Davenport was actually relevant to the case or -- or

02:06 20     reasonable.

21                  And I would also note that when -- after the

22     Court of Criminal Appeals reached that decision, the attorney

23     general's office abandoned the reason that was offered by

24     Ms. Davenport and proceeded in defending this conviction on

02:06 25     other grounds.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:06   1           So, there is evidence not just that the Harris

2    County District Attorney's Office, in a macro sense, you know,

3    has a culture of discrimination but there's previous evidence

4    that Ms. Davenport, herself, has offered reasons -- purported

02:06   5    to offer race neutral reasons for a strike that were found

6    unjustified by a Court.

7           So, there's both prosecutor specific findings as

8    well as prosecutor's office specific findings which demonstrate

9    the history and a culture of discrimination with which our

02:07   10   claim needs to be viewed -- through which our claim needs to be

11   viewed.

12          With respect to Mr. Rosales' case, the evidence

13   shows this.  Ms. Davenport was lead counsel.  That was her

14   testimony yesterday.  She's testified she was first chair.  She

02:07   15   testified she had primary responsibility for this prosecution.

16   She testified she did most of the work to prepare for this

17   trial.  She testified that Mr. Henderson sat second chair to

18   her in this matter.

19          That testimony is corroborated by comments made

02:07   20   by Mr. Henderson during his deposition; and his deposition, as

21   you know, is an exhibit admitted in this matter.

22          THE COURT:  Right.

23          MS. SWARNS:  And when he speaks with respect to the

24   strike, Ms. Davenport's strike of Juror Holmes, he says -- and

02:07   25   I quote -- "You know, I don't know what was going through

02:07  1    Norma's mind."

2           So, that notion, that she is the lead counsel in

3    this case, is corroborated by Mr. Henderson's testimony.  It's

4    also corroborated by the fact that Ms. Davenport's notes

02:08  5    indicate that she advised Mr. Henderson even with respect to

6    the strikes and the questioning of jurors.

7           THE COURT:  Where is that quotation from Mr. --

8           MS. SWARNS:  That's Page 57 of Mr. Henderson's

9    deposition.

02:08  10          THE COURT:  Of Mr. Henderson's deposition.  Just a

11   second.  Depositions.

12          MS. SWARNS:  It says he offers some reasons -- he

13   begins, when addressing Ms. Holmes and why she was struck on,

14   Page 55.

02:08  15          And he says -- I asked, "Question, Do you recall

16   why it was that you and Ms. Davenport exercised the peremptory

17   challenge against Ms. Holmes?"

18               "Answer:  No."

19          THE COURT:  I'm sorry.  I thought you said Page 57.

02:08  20          MS. SWARNS:  Yes.  I'm just trying to give you the

21   full context.  Yes, at 55.

22          THE COURT:  Where do you start on Page 55?

23          MS. SWARNS:  Line 11.  My question, "Do you recall why

24   it was that you and Ms. Davenport exercised the peremptory

02:08  25   challenge against Ms. Holmes?"

02:08    1          "Answer:  No, I don't.  Unless she had -- I don't

2    know what -- why we did that.  Just give me a second."

3                And then I say, "Sure.  Take your time."

4                And in between Page 55 and 56 he suggests two

02:09    5    possible reasons for the strike.

6                And, then, on Page 57, I say -- I said it's --

7    how many -- I was continuing, actually.  It says he asked me

8    what strike was [sic].  I say she's the 13th strike.

9                THE COURT:  Where are you on Page 57?  I'm lost.

02:09   10                MS. SWARNS:  On Page 57, Line 9, is ultimately where

11    he says, "You know, I don't know what was going through Norma's

12    mind.  But those are a couple of concerns I have, but I don't

13    know what we were -- what we were thinking at the time as to

14    why that strike was executed."

02:09   15                Okay.  Consistent with that, we have notes

16    handwritten by Ms. Davenport indicating that she was advising

17    Mr. Henderson with respect to the jurors that he was

18    questioning.

19                With respect, for example, to prospective

02:09   20    African-American juror who was stricken, Alicia Taylor, that --

21    the record reflects Mr. Henderson was questioning Ms. Taylor;

22    but Ms. Davenport wrote down Black -- she made the specific

23    race notation "BF," Black female.  She writes, "Articulate, but

24    not totally.  She gets worse when she gets along -- goes

02:10   25    along."  So, there's [sic] clear that Ms. Davenport is acting

02:10  1   and functioning as lead counsel with respect to the peremptory

2   challenges exercised in this case.

3           Ms. Davenport begins by offering an affidavit

4   purporting to contain her, supposedly, race neutral reasons for

02:10  5   her challenges.  During the course of her testimony yesterday,

6   she disclaimed many, if not most, of the reasons that were

7   contained in that affidavit.  She added reasons that she had

8   never before mentioned in the affidavit.  And, so --

9           THE COURT:  Why do you -- why do you say she

02:10  10  disclaimed the reasons in --

11          MS. SWARNS:  Because she --

12          THE COURT:  -- the affidavit?

13          MS. SWARNS:  -- she repeatedly --

14          THE COURT:  Wait.  Stop.  We can't talk at the same

02:10  15  time.

16          MS. SWARNS:  I'm sorry.

17          THE COURT:  Let me ask my question again.  Why do you

18  say that she disclaimed the reasons that she listed in her

19  affidavit?

02:10  20          MS. SWARNS:  During Mr. Gray's questioning, he asked

21  her on numerous occasions, "Your affidavit says this is what

22  the reason for the strike was."

23          And her response was, "I have no idea why we

24  struck this juror.  I can't remember.  It was 23 years ago."

02:11  25  On more than one occasion the record will reflect that, when

02:11   1    specifically draw -- her attention was specifically drawn to a

2    reason that was listed in her affidavit, she testified that she

3    didn't know whether that was the reason and/or no longer

4    believed that was the reason and could not recall that that was

02:11   5    the reason.

6          THE COURT:  I'm kind of not remembering it that way.

7    Are you sure that that's what you think?

8          MS. SWARNS:  I'm very sure.

9          THE COURT:  Okay.  I'm not remembering it like that.

02:11  10    I remember that in most instances in which he asked her about

11    her testimony -- or her stated reasons in the affidavit that

12    her response was, "Well, that was one of them" --

13          MS. SWARNS:  Yes.

14          THE COURT:  -- "but there were some other reasons.

02:11  15    And I've had time to think about other things as time has gone

16    on" --

17          MS. SWARNS:  She said --

18          THE COURT:  -- not that she completely disclaimed that

19    that was some reason that she relied on that was listed in her

02:12  20    affidavit, but that she indicated that it was not the only

21    reason in most of those instances.

22          MS. SWARNS:  She said exactly what your Honor has

23    indicated, as well.  But on other occasions, toward the end of

24    the day, in the afternoon, Ms. Davenport specifically said when

02:12  25    asked by Mr. Gray, "Is this the reason that you exercised -- or

02:12   1   one of the reasons that you exercised a strike against" --

2   whichever juror he was speaking of -- she specifically said, "I

3   have no idea.  I don't remember.  It was 23 years ago."  And,

4   so, on numerous occasions she disclaimed the reasons that were

02:12   5   actually listed in her affidavit.

6        She also, as your Honor has briefly, I think,

7   touched upon, relied on occasions, when she said she couldn't

8   remember why she'd exercised a strike, on the assertion that

9   there were reasons that were not apparent from the record,

02:12   10   there were reasons that she couldn't remember that would

11   support her exercise of peremptory challenges.

12        She also testified, of course, that she had no

13   independent recollection of any of those reasons with respect

14   to any of the challenged jurors.  She had no current or

02:13   15   independent recollection or refreshed recollection.  She had no

16   recollection whatsoever of the relevant jurors', the challenged

17   jurors' demeanor, their appearance, non-verbal cues, whether

18   they made eye contact, what the atmosphere in the courtroom was

19   with respect to the challenged jurors.  She had absolutely no

02:13   20   current or refreshed recollection as to any of those factors.

21        Notwithstanding the fact, when she could not come

22   up with a justification for why she struck a person of color

23   for a reason that she accepted a White juror, she frequently

24   retreated to the position that, "It must have been something

02:13   25   that I saw," although she had no independent or refreshed

02:13   1   recollection of what those could be.  And there's nothing in
        2   the record to suggest or to shed light on what those issues
        3   could be.  There's nothing in the record to demonstrate that
        4   Juror Holmes demonstrated poor demeanor, you know, poor
02:13   5   appearance, poor non-verbal cues, etcetera.
        6          And I -- of course, I should have begun at the
        7   beginning, which is, of course, that Ms. Davenport acknowledges
        8   that she, consistent with the prosecutors in her office that
        9   testified in Tompkins and the other matters, shares the view
02:14  10   that prospective jurors of color may sympathize with a
       11   defendant -- are more likely to sympathize with a defendant of
       12   color.
       13          Interestingly, although she testified during her
       14   deposition that that was something that all groups would have
02:14  15   since people from one group would sympathize with a person of
       16   another group, when she was asked whether, for example, a man
       17   would sympathize -- was she concerned about male jurors being
       18   sympathetic to Mr. Rosales, who was a man, or a male defendant,
       19   she specifically said, no, that was not a concern she would
02:14  20   share.
       21          So, when she talked about group identity, her
       22   only concerns with respect to group identity came up in the
       23   context of race.  And, so, she shared and we believe acted upon
       24   and we believe the record reflects acted upon a stereotypical
02:14  25   view, that was not supported by anything the stricken juror

02:15  1    said, that jurors of color would identify with Mr. Rosales; and

2    she struck them on account of that belief.

3          We know that she was very concerned by race not

4    just because she had this view that people of color would

02:15  5    identify with a defendant of color, but we know that because

6    she specifically tracked the race of the potential jurors.

7    Ms. Davenport repeatedly wrote the race and gender of jurors of

8    color in hand -- by hand on the juror questionnaires and cards.

9          Notably, the only jurors' racial identity she

02:15  10   felt compelled to note was that of the jurors of color.

11   Ms. Davenport never felt compelled to note when there was a

12   White juror.  She repeatedly, however, felt compelled to note

13   when a prospective juror was Black or a prospective juror was

14   Latino.

02:15  15         Ms. Davenport initially proffered as a

16   justification for these notes that, "Oh, I was doing it because

17   Mr. Boyd had raised a Batson challenge."  That, however, is

18   completely refuted by the fact that the first juror she

19   questioned, the first juror that was ever questioned by anybody

02:16  20   in this case, happened to be a Mexican-American woman and on

21   that  juror's questionnaire and card, before any Batson

22   challenge or any discrimination challenge has been raised,

23   Ms. Davenport notes the race of that prospective juror.

24         So, Ms. Davenport -- and this is, I should add,

02:16  25   in the context of an individual voir dire, where the juror was

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:16   1   sitting right in front of her, where there was no reason --

2   it's not group voir dire where she was trying to remember who

3   was who in a box of 12.  This is one on one.  So, she didn't --

4   there was no reason to write down the race of a person to whom

02:16   5   she was looking at.  She wrote it down because she was

6   concerned about race, because she was going to strike jurors on

7   a basis of race.

8            THE COURT:  She was then making the strike for each

9   juror individually at the end of that --

02:16   10           MS. SWARNS:  Yes.

11           THE COURT:  -- juror's examination.

12           MS. SWARNS:  Exactly.  So, there was no reason for her

13   to write the -- exactly.  The juror --

14           THE COURT:  As opposed to when you have the entire

02:17   15   group and you're trying to --

16           MS. SWARNS:  Exactly.

17           THE COURT:  -- identify who --

18           MS. SWARNS:  Was who.

19           THE COURT:  -- was sitting where.

02:17   20           MS. SWARNS:  Exactly.  The strike occurred in meeting

21   with the juror sitting right in front of you.  There was no

22   reason to write racial cues.

23           In addition to tracking specifically some gender

24   notes, Ms. Davenport, when she didn't have a juror -- or for

02:17   25   reasons I can't explain, she noted racial cues.  Specifically,

02:17  1    when a juror wrote down the periodicals she read, she wrote

2    down she read "Ebony," she read "Jet," and she read "Newsweek."

3    Ms. Davenport underlined two of the three of those periodicals.

4    Curiously, those would only be "Ebony" and "Jet." She was not

02:17  5    interested at all in the fact that this prospective juror read

6    "Newsweek," but was very interested in the fact that this juror

7    read "Ebony" and "Jet," again corroborating the notion

8    testified by Ms. Davenport that she was concerned about racial

9    identity between prospective jurors and a defendant of color.

02:18  10           We also know that she noted repeatedly when

11   prospective jurors lived in a predominantly Hispanic

12   neighborhood. She said, "Well, I did that because I was

13   concerned about whether jurors -- prospective jurors were

14   living near the crime scene." Well, that explanation is

02:18  15   entirely belied by the fact that she accepted two White

16   prospective jurors who lived in exactly the same neighborhood

17   that this crime occurred -- that was Jurors Willett and

18   Williamson -- and, of course, by the fact that this crime did

19   not occur in -- north of Houston. It occurred in Pasadena.

02:18  20           THE COURT: Well, didn't she also note the residences

21   of several other jurors?

22           MS. SWARNS: She noted, actually interestingly, the

23   residences of jurors in a very overwhelmingly White

24   neighborhood, yes, she did.

02:18  25           THE COURT: And, so, are you saying that the two

02:19 1   people that -- whose neighborhood that she designated as living

2   north of Houston -- which I'm not sure that north of Houston is

3   an overwhelmingly Hispanic neighborhood even today -- but that

4   those were persons that were struck by the prosecution?

02:19 5                 MS. SWARNS:  Yes.  I'm saying that she repeated --

6   well, she repeatedly -- I think it's evidence of tracking of

7   race.  She repeatedly noted when she believed that jurors lived

8   in a -- in a what we believe to be, at that time at least, an

9   Hispanic neighborhood.  And, so, that was continued evidence --

02:19 10                THE COURT:  What are you calling an Hispanic

11   neighborhood?

12                MS. SWARNS:  North of downtown.

13                THE COURT:  Okay.

14                MS. SWARNS:  And she -- yes.  It's further evidence

02:19 15   that she was tracking and considering and being preoccupied by

16   the race of the jurors that were being considered in this case.

17                We know that Ms. Davenport says, for example,

18   that she struck -- when she was asked about specifically Juror

19   Walker, she ultimately said, "I don't really have an excuse for

02:20 20   her.  On paper, she looks like a very good juror."  Those were

21   her words.

22                THE COURT:  Walker was one of the ones that was

23   struck.

24                MS. SWARNS:  Yes, exactly.  And on paper she looks

02:20 25   like a very good State's juror.  Again she retreats to the

1    place that, "It must have been something that I saw that's not

2    reflected by the record.  It's not in my independent

3    recollection, and it's not in my refreshed recollection."

4              Well, that is -- she's -- given the fact that the

5    reasons that she's offered to justify the strikes, for

6    Ms. Walker for example -- she accepted White jurors who shared

7    similar characteristics.  The conclusion to be drawn, of

8    course, is the missing thing that she can't remember is that

9    Ms. Walker was African-American and she struck her on account

10   of race.

11             She also says that she has no idea why she seated

12   White Juror Beverly Willett.

13             THE COURT:  That's the one who --

14             MS. SWARNS:  Yes.

15             THE COURT:  -- who gave that answer on the

16   questionnaire on the last section to --

17             MS. SWARNS:  Yes, "most hideous practice of our time."

18             THE COURT:  Yeah.  She basically gave an answer that

19   would disqualify her under Witherspoon.  What was -- which one

20   was that?  That was --

21             MS. SWARNS:  I was talking about Ms. Willett.

22             THE COURT:  Yeah, Ms. Willett.

23             MS. SWARNS:  She specifically said that she did not

24   have any idea why she struck Ms. Willett -- I mean, she seated

25   Ms. Willett.  Of course, Ms. Willett --

02:21  1          THE COURT:  What tab number was she?

2          MS. SWARNS:  She is Tab Number 14.

3              And she said that over and over.  She said -- I'm

4    sorry.  Plander.  Plander was the one who said, "most hideous

02:21  5    practice of our time."

6          THE COURT:  What tab number is she?

7          MS. SWARNS:  Plander is Tab --

8          MR. GRAY:  Eleven.

9          MS. SWARNS:  -- 11.

02:21  10             Is that right?

11          MR. GRAY:  Yes.

12          MS. SWARNS:  Yes.

13              Who she also seated.

14          THE COURT:  Right.

02:21  15          MS. SWARNS:  So, she seats Ms. Willett, who she

16    testifies she has no idea why she seated; she seats

17    Ms. Plander, whose questionnaire indicates that she believes

18    that capital punishment is the most hideous practice of our

19    time; but, of course, she strikes the African-American

02:22  20    potential jurors who have offered consistently strong support

21    for capital punishment in both their questionnaire and

22    testimony and questioning by Ms. Davenport or Ms. Henderson --

23    no -- Ms. Davenport, Mr. Henderson, and Mr. Boyd during the

24    course of the examination.

02:22  25              It's our contention, of course, that the fact

02:22   1    that she accepted White jurors who offered answers that were

2    much less State friendly than the jurors -- these excluded

3    White jurors is evidence of intentional discrimination on the

4    basis of race.

02:22   5              THE COURT:  What tab is Ms. Willett, again, please?

6              MS. SWARNS:  Ms. Willett is Tab 14.  Yes.

7                  Should I continue?

8              THE COURT:  Yes.

9              MS. SWARNS:  Oh, okay.

02:23   10             In addition, Ms. Davenport, when she testified,

11   she offered reasons for her strikes of the jurors of color --

12   jurors of color that actual -- she testified that when -- that

13   when jurors of color offered reasons or statements that were

14   technically favorable to the State that was a reason for a

02:23   15   strike.

16             So, for example, Ms. Davenport testified that she

17   would strike a potential juror of color because that potential

18   juror believed that you needed to have more than one person

19   killed in order -- that did not believe -- I'm sorry -- that

02:24   20   did not believe you needed to have more than one person killed

21   in order to assess the death penalty.  That, of course, makes

22   no sense.

23             It seems clear that the State would want a juror

24   who would not require it to produce evidence of multiple

02:24   25   homicides, even in a case that involves multiple homicides.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:24    1   You want a juror who believes that the death penalty is

2   appropriate in a case where even one person is killed.

3           The fact that there are more than one person

4   killed here, you know, is icing.  It means that the person who

02:24    5   will accept and impose the death penalty for one murder would

6   certainly impose the death penalty in the face of multiple

7   murders.

8           And, so, the fact that Ms. Davenport suggests

9   that this -- I will only -- that one murder is enough is a

02:24   10   reason for a strike is ridiculous and it makes no sense for a

11   State prosecutor to purport.

12           THE COURT:  What juror said that?

13           MS. SWARNS:  Ms. Taylor -- hang on a second.

14           THE COURT:  Who was it?

02:25   15           MS. SWARNS:  We're just pulling it together right now.

16           Ms. Taylor, stricken Juror Taylor.  She

17   offered -- she offered that explanation for a strike.

18           THE COURT:  What tab number was she?

19           MS. SWARNS:  Twenty-two.

02:27   20           It's just Ms. Taylor.

21           THE COURT:  Okay.

22           MS. SWARNS:  In addition -- I'm sorry.  Oh, yes.

23           In addition, she said that she struck potential

24   jurors of color when they indicated that they would always

02:27   25   answer the first special issue "yes."

02:27  1            The first special issue asks whether a

2      prospective -- the first special issue asks whether or not the

3      criminal -- the facts underlying the criminal conviction

4      establish that the murder was committed deliberately, whereas

02:27  5      the basis upon which the conviction rests is evidence that

6      the -- that the crime was intentional.  And, so, she asks, "Is

7      there a difference in your mind between 'intentional' and

8      'deliberate'?"

9            Those prospective jurors she points to said, "No,

02:27  10     there is no difference," indicating that they would find --

11     they would answer the first special issue "yes" based on the

12     conviction itself, she strikes.  That, of course, makes no

13     sense because the State, once again, would want to have a juror

14     who would be inclined to answer each of the special issues

02:28  15     favorably.

16            But in the face of jurors of color who say that

17     they're more inclined, basically, to impose the death penalty

18     for a defendant who's been convicted of first -- of capital

19     murder, she will -- she strikes them, that's a basis for a

02:28  20     strike.

21            So, again, on two bases at least, she offers

22     reasons -- testimony that should be favorable to the State as

23     reasons for a strike of potential jurors of color.  She also

24     offers reasons for her strikes which are just simply not

02:28  25     supported by the record.  With respect to Juror Hamilton, for

02:28  1    example, she said she struck him because he gave inconsistent

2    answers with respect to his brother's conviction.  That's

3    simply belied by the record.  His answers on the questionnaire

4    are entirely consistent with the testimony that he gave --

02:29  5              THE COURT:  Okay.  I think I don't agree with you on

6    that one.

7              MS. SWARNS:  Okay.

8              THE COURT:  Even when I was reading the

9    questionnaire --

02:29  10             MS. SWARNS:  It was -- we had long --

11             THE COURT REPORTER:  Excuse me.

12             THE COURT:  We can't talk at the same time.  I already

13   told you that one time.

14             MS. SWARNS:  I'm sorry.

02:29  15             THE COURT:  I don't think that I agree with you there

16   because even when I was looking at it I was confused.  And the

17   question required her to make an assumption about whether or

18   not he might have testified as a witness in some particular

19   case, which wasn't clear from the forms.  There was no way of

02:29  20   being able to make that determination about whether or not he

21   might have been a witness in that criminal trial.

22             The assumption might be it's his brother's case,

23   the brother killed the wife or something like that.  I've

24   forgot what the case was about.  It was some case involving the

02:29  25   brother in a criminal case.  And you are asking her to make the

02:29   1    assumption that it would have been unreasonable for her to

        2    assume that he might have been involved in that case somehow.

        3               Which tab was that?

        4          MS. SWARNS:  That's Tab 18.

02:29   5               No.  I'm sorry.

        6          THE COURT:  Pardon me?

        7          MS. SWARNS:  I'm sorry.

        8          THE COURT:  Hamilton is 18.

        9          MS. SWARNS:  Is that right?

02:30   10         THE COURT:  Yeah.

        11         MS. SWARNS:  Yes, Hamilton is Number 18.  Okay.

        12         THE COURT:  Where is the questionnaire?

        13         MS. SWARNS:  The second box -- the first is the juror

        14    information form, which is the second box down.

02:30   15         THE COURT:  On the first page.

        16         MS. SWARNS:  After the -- yes, after the affidavit.

        17              And it indicates -- the question that the juror

        18    information form asks is, "Have you ever been an accused

        19    complainant or witness in a criminal case?"

02:30   20              And he says, "No."

        21         THE COURT:  Hold on a second.

        22              "Have you ever been an accused, complainant, or

        23    witness in a criminal case?"

        24              And he says "no" on this one, but he said "yes"

02:30   25    on the long.

02:30  1          MS. SWARNS:  Right.  Okay.  And on the long form, on

2  Page --

3          THE COURT:  23, right, 23 or 47?

4          MS. SWARNS:  Twenty-three or forty-seven.  The

02:30  5  question is posed, "Have you, a family member, a close friend

6  ever been personally involved in a criminal case as a

7  defendant, a victim, a witness, or a complainant?"

8          And he says, "Yes."

9          Then, when he is asked during the course of his

02:31  10  examination about this, he indicates that his brother was

11  involved in a murder.  There is no testimony indicating that he

12  was a witness to that event.  There is no testimony indicating

13  that Mr. Hamilton was ever asked by Ms. Davenport, who was, in

14  fact, questioning him, whether he was a witness to that event.

02:31  15          The only evidence that we have on this -- on this

16  offense was that his brother was involved in a crime, which he

17  acknowledged, and that he was not involved in a crime, which he

18  acknowledged.

19          Now, is it possible that she speculated that he

02:31  20  was a witness?  It's certainly possible, but there's no basis

21  upon which to assume that that was the case.

22          THE COURT:  Okay.

23          MS. SWARNS:  Okay.  So, clearly Ms. Davenport, if that

24  was an issue of concern to her, could have had the opportunity

02:32  25  to ask Mr. Hamilton whether, in fact, there was an

02:32  1    inconsistency between his questionnaires and his testimony.

2    She chose not to do so.

3             THE COURT:  And she examined him?

4             MS. SWARNS:  Yes.  Yes, she did.

02:33  5             She chose not to do so.  And based on the

6    evidence that he offered in court, there is no inconsistency

7    between what he said and what he wrote on his forms.  So,

8    there's simply no evidence to suggest a conflict.

9             Any evidence -- I mean, you know, we could

02:33 10    presumably assume -- Ms. Davenport could assume that there are

11    lots of conflicts, based on answers given in the

12    questionnaires, if she's allowed to do so with no reason to

13    do -- with no reason for it.

14             Here there's no reason to assume a conflict.

02:33 15    She's assuming a conflict without any reason for that.  And we

16    believe that that assumed conflict -- she's assuming a problem

17    in the face of a juror of color when she would not do so in the

18    face of a prospective White juror.

19             The record reflects that Ms. Davenport, on more

02:34 20    occasions than I had time to compile for this argument, offered

21    reasons for her strikes that simply -- that she simply did not

22    apply to White prospective jurors.  One that leaps out to my

23    mind is that she struck jurors of color who purported to offer

24    some pause with respect to proof -- the "proof beyond a

02:34 25    reasonable doubt" standard; but she specifically accepted

02:34  1    the -- the seated White juror, Ms. Willett, who said

2    consistently and until the end she would -- that the burden she

3    would apply was "beyond all doubt."

4                    Ms. Willett never wavered from that position, and

02:34  5    Ms. Davenport accepted her.  And but she excused prospective

6    jurors of color who said that they would not hold the State to

7    that high of a burden.  And that's just one example of the many

8    times that Ms. Davenport offered reasons for her strikes, that

9    simply do not hold up when compared to the accepted White

02:35  10   jurors in this case.

11                    And on numerous occasions, Ms. Davenport also

12   offered reasons for strikes that she never bothered to ask the

13   prospective jurors about.  We have now identified one with

14   respect to Mr. Hamilton.  That comes up on numerous occasions

02:35  15   throughout.

16                    THE COURT:  Which was -- what was that?

17                    MS. SWARNS:  That when -- she would proffer --

18                    THE COURT:  Oh, you mean about --

19                    MS. SWARNS:  -- a reason for a strike and then the

02:35  20   record reflects she did not ask -- it was not an issue that she

21   inquired about during her examination.

22                    And the Supreme Court, in Miller-El, has noted

23   that all of these things that we have pointed out are evidence

24   of intentional discrimination.  The failure to inquire on an

02:35  25   issue of purported concern; a history of discrimination in the

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:35   1   county; the evidence that an excluded -- a juror was excluded

2   for a reason that -- for a factor, I guess, or a characteristic

3   that was held by seated White jurors; a pattern of strikes

4   against peremptory -- against jurors of color; statements by

02:36   5   the prosecutor, reflecting a consideration of race; the taking

6   of notes reflecting a tracking of race, these are all the

7   factors that the United States Supreme Court, in Miller-El and,

8   more recently, in Snyder, have noted are strong evidence of

9   discrimination.

02:36   10        This is a case where there is an enormous amount

11   of evidence suggesting consideration of race, an enormous

12   amount of unexplained evidence of consideration of race.  And

13   we also have the fact that Ms. Davenport offered, with respect

14   to all of these jurors, a laundry list of reasons which, you

02:36   15   know, over and over were established to be false when, you

16   know, compared to the record, do not hold when compared to

17   seated White jurors, and are unsupported by the record.

18        So, it is our view that, in the words of the

19   United States Supreme Court and, again, in Miller-El -- and I

02:37   20   will quote them -- "At some point the significance of the

21   evidence is open to judgment calls; but when this evidence on

22   the issues raised is viewed cumulatively, its direction is too

23   powerful to conclude anything but discrimination."

24        That's all we have.

02:37   25        THE COURT:  Oh, okay.  I'm sorry.  I didn't know that

02:37  1    you were finished.  I beg your pardon.

2          MS. SWARNS:  Unless your Honor has questions.

3          THE COURT:  No, actually, I don't.  But thank you.

4               I need to take a break.  Five minutes.  Okay?

02:37  5    *(Recess taken from 2:37 to 2:44 p.m.)*

6          THE COURT:  All right.  Thank you, everybody.

7               All right.  Please be seated, everybody.

8               Ms. Miranda, any closing statements from the

9     respondents, please?

02:44  10         MS. MIRANDA:  Yes, your Honor.  First I would like to

11    address Mr. Rosales' counsel's position -- apparent position

12    that Mr. Henderson's testimony in this cause is irrelevant

13    because Ms. Davenport was primarily the one responsible for the

14    strikes made in this case.  And that assertion is disputed by

02:44  15    her deposition testimony, on Page 33, when she was asked by

16    counsel, "Okay.  Who made the final decision on which jurors to

17    strike?"

18               And her response was, "Keno and I would

19    together."

02:44  20               And, so, I just wanted to put that before the

21    Court to say that it is not just the testimony of Ms. Davenport

22    that is relevant here; it is also the testimony of

23    Mr. Henderson.

24               However, to deal with the testimony --

02:45  25         THE COURT:  Was she lead counsel?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:45  1        MS. MIRANDA:  She was, in fact, lead counsel.

2        THE COURT:  Okay.

3        MS. MIRANDA:  Yes.

4        THE COURT:  I just wand to know if there was any

02:45  5   dispute about that.

6        MS. MIRANDA:  No, no.  She was definitely first chair

7   and -- but as far as to the issue of who made the decision on

8   the strikes, I think the record indicates that her and Keno

9   collaborated in deciding which jurors to accept.  This was not

02:45  10  a unilateral decision based on her part.

11            Secondly --

12       THE COURT:  What more would I have gotten from

13  Mr. Henderson's testimony, in your view?

14       MS. MIRANDA:  I think that there is, one, some

02:45  15  corroboration, for lack of a better word.  They had some of the

16  same answers.  Obviously --

17       THE COURT:  I would have gotten that out of the direct

18  testimony of Henderson, which I already have --

19       MS. MIRANDA:  Correct.

02:45  20       THE COURT:  -- in terms of the corroboration.

21       MS. MIRANDA:  Right.  Oh, you're talking about had he

22  testified here today?

23       THE COURT:  You're saying that I don't have any

24  testimony from Mr. Henderson; but, in fact, I actually do.  I

02:46  25  have his direct examination.  And to the extent that there's

02:46  1    corroboration, I assume that it will come out of the direct --

2    MS. MIRANDA:  Sure.

3    THE COURT:  -- examination.

4    So, what more would I have gotten from the -- the

02:46  5    petitioner cross-examining Mr. Henderson?  Because it's not

6    true that I don't have his testimony.

7    MS. MIRANDA:  Okay.  And I --

8    THE COURT:  What more would I have gotten from a

9    cross-examination of Mr. Henderson?

02:46  10   MS. MIRANDA:  Okay.  And I apologize because I believe

11   that I have not communicated my position on that --

12   THE COURT:  Okay.

13   MS. MIRANDA:  -- in the way that I want.

14   My understanding of counsel's argument was

02:46  15   that -- based on their argument, that Ms. Davenport's reasons

16   were the most important because Mr. Henderson was not

17   responsible for making the strikes.  And, so, it was apparent

18   to me from their argument that they were trying to suggest that

19   his reasons were irrelevant altogether, which would make his --

02:46  20   even his direct testimony irrelevant.

21   And my response is simply that his direct

22   testimony is relevant in this court.

23   THE COURT:  Okay.

24   MS. MIRANDA:  To the extent that that's the argument

02:46  25   that they were asserting, that this Court should only look at

*Cheryll K. Barron, CSR, CM, FCRR*                     *713.250.5585*

02:46   1   Ms. Davenport's testimony, my response to that is you should

2   look to -- exactly, to the direct testimony that you already

3   have in the record.

4          THE COURT:  Okay.  Okay.

02:47   5          MS. MIRANDA:  Okay?

6          And, secondly, they asserted that there were no

7   race neutral reasons set out in the record.  That is also

8   incorrect.  They both filed affidavits, they testified in

9   depositions, and they testified -- at least Norma Davenport --

02:47   10  in this court, identifying race neutral reasons, reasons that

11  are neutral on the face of them, for why they struck the juror.

12          The question -- the real question before this

13  Court is whether or not they have now met their burden, because

14  all they have to do is articulate a race neutral reason and

02:47   15  then the burden shifts back to the petitioner to demonstrate

16  that those race neutral reasons are pretextural.

17          And the way that they have asserted that in this

18  case is there is disparate questioning between the jurors.

19  They have alleged that the jurors were questioned differently.

02:47   20  Specifically, in some of their pleadings they said that only

21  minority jurors were questioned further about the types of

22  cases.  And I believe we pointed out through Ms. Davenport's

23  testimony, I also believe just simply reviewing the voir dire

24  testimony will show that that is not, in fact, true, that both

02:48   25  minority and non-minority jurors, depending on the -- there was

02:48  1    the -- the questions -- or the answers that they gave on their

2    questionnaires, were asked about which type of cases they found

3    capital-murder appropriate.

4             Another example is in their pleadings they allege

02:48  5    that only minorities -- that the prosecutors attempted to use

6    religion and religious views in an attempt to ferret out

7    another reason to strike these jurors.  And I believe if you

8    read through the voir dire testimony you'll realize that

9    there's only a short series of jurors that are questioned about

02:48  10   religion.  And it's at the beginning; and it's about four,

11   five, or six of them in a row.  And then they abandon that.

12            And, so, there's just no indication on the record

13   that the questioning about religion had anything to do with the

14   ethnicity of those jurors; but it simply seemed to be something

02:48  15   that they started, tried for about five jurors, and abandoned.

16   In fact, only two of the, I believe, seven minority jurors that

17   we have now were even questioned about their religious views or

18   their religious backgrounds.

19            And that is just yet another example of

02:49  20   allegations that they've made regarding disparate

21   questioning --

22            THE COURT:  Can you still hear us?  Can you hear both

23   of us?

24            MR. ROSALES:  Yes.

02:49  25            THE COURT:  You can hear both of us?

02:49   1          MR. ROSALES:  Yes, ma'am.  I --

2          THE COURT:  I meant to move the mic, but seems that

3     it's fine.  You're speaking pretty loudly.

4          MS. MIRANDA:  Okay.

02:49   5          Again, your Honor, so, that is yet another

6     example of disparate questioning that they have alleged has

7     occurred that does not hold up in the record.

8          And I do believe -- and I know that it's tedious,

9     and we've all had to do it.  But I believe if you read through

02:49   10    the voir dire, at least the jurors that are at issue, the

11    seated jurors and the minority jurors, and you -- and you read

12    through it from start to finish, which is a tough task, but

13    you'll realize that there is actually a very similar pattern of

14    questioning that occurs between each of the jurors.

02:49   15         I think it will become obvious that it takes a

16    little bit of time in the voir dire for them to get their

17    stride; but once they get them, you can almost go to any juror

18    and there is -- unless there's something individual that comes

19    up on their questionnaire that gets them out of their sync, the

02:50   20    patterns of questions are nearly identical.  And there's really

21    no difference in the way that they question the jurors.

22         Now, I think if you want to take an enormous

23    record, an enormous voir dire that happens over several days,

24    possibly several weeks, and you want to break it apart in

02:50   25    minutiae, I don't think there is any voir dire in any capital

02:50  1    case that you are going to be able to find where the prosecutor

2    has been internally consistent about every single thing if you

3    want to pull them apart.

4                  I think what is important is that you look at

02:50  5    this holistic view of the -- the voir dire just -- and, then,

6    in each individual juror.  And that gets me to the second

7    point.  And the second thing that they have attempted to show,

8    discriminatory intent in this case; and that is to argue that

9    there were similarly situated non-minority jurors that were

02:50  10   accepted when minority jurors were rejected.  And not one --

11   for not one of the minority jurors have they actually shown

12   that there was a similarly situated non-minority juror.

13                 What they would do is there would be several

14   explanations offered by the prosecutors for why they struck a

02:51  15   particular juror.  They would take one aspect, and they would

16   compare that to one aspect of one non-minority juror.  And,

17   then, if there was a second aspect, they would take that second

18   aspect and they would compare that to a different non-White

19   minority juror.  But in no case did they take all of the

02:51  20   reasons why they struck -- or allegedly struck that and compare

21   that to a non-minority White juror that was selected and show

22   another juror that contained all of those reasons.

23                 And I believe that's extremely important in this

24   case because you're talking about -- you get 30 minutes.  I

02:51  25   believe the deposition testimony will bear out that in this

02:51   1   case they had 30 minutes a side.  Okay?  And they got 30

2   minutes to question.  And you get -- they're coming in

3   individually.  This is not a non-capital case where you've got

4   the entire panel and you can look at them all at once.  You've

02:52   5   got one juror in front of you; and you've got to decide after

6   30 minutes, "Do I want this juror or not?"

7          THE COURT:  I mean, why would you write their race

8   down when you only have one juror?  Even in cases where I have

9   an entire panel of people in front of me and when they leave

02:52   10  out and we've got to make our strikes in the blind, with nobody

11  sitting in front of me, I write down the race.

12          MS. MIRANDA:  Sure.

13          THE COURT:  It helps me remember who the people are --

14          MS. MIRANDA:  Sure.

02:52   15          THE COURT:  -- when somebody gives a -- particularly

16  if it's somebody who I can tell by their answer that one of the

17  lawyers is going to get up and make a challenge for cause.

18          MS. MIRANDA:  Sure.

19          THE COURT:  So, to give myself a trigger to help me

02:52   20  remember what that person was like, I might write down the race

21  to help me remember because I got 50 people in the room, they

22  all leave, and we have to make our strikes in the blind.

23          What is a good reason in a situation where you

24  don't have any issue like that, you've got one person sitting

02:52   25  in front of you, and you're going to examine that person and

02:52   1   make your strikes at the conclusion of that examination, what

2   is any good reason to write down that person's race?

3   　　　　　MS. MIRANDA:  Okay.  I believe -- and the record will

4   be the best evidence of this, but I believe that what

02:53   5   Ms. Davenport was trying to convey in her answer was the reason

6   she made those notations was because she was -- they were

7   trying -- as they were going through, she would sometimes write

8   down -- first of all, if I can back up and say she only made

9   those notations on two of the jurors.  Okay?  That she did not

02:53   10   make that on all of them.  They sort of implied that there was

11   a ton of them.

12   　　　　　THE COURT:  I know.  But it only matters if they

13   were --

14   　　　　　MS. MIRANDA:  Okay.  Okay.  I --

02:53   15   　　　　　THE COURT:  Wait.  Stop.  We're talking at the same

16   time.

17   　　　　　MS. MIRANDA:  I apologize.

18   　　　　　THE COURT:  If you see my lips moving, stop talking.

19   　　　　　MS. MIRANDA:  Okay.

02:53   20   　　　　　THE COURT:  It only matters if she made those

21   notations with respect to people that she struck that were

22   minorities.  In the two instances, were those people that were

23   struck?

24   　　　　　MS. MIRANDA:  Yes, ma'am.

02:53   25   　　　　　THE COURT:  And were they both minorities?

260

02:53  1          MS. MIRANDA:  Yes, ma'am.

2          THE COURT:  Okay.  Well, then it matters.

3          MS. MIRANDA:  Okay.

4          THE COURT:  It's not irrelevant.  It's completely

02:53  5    relevant to the issues that this Court has to decide today.

6              Why is there any good reason to write down their

7    race in the scenario where you just have that person right in

8    front of you, you do the examination, you make your challenges?

9          MS. MIRANDA:  Absolutely.  And, first of all, I

02:53  10   apologize.  I was not trying to argue they were irrelevant.

11             I believe, from Ms. Davenport's testimony, that

12   what she was trying to say was that as she was questioning

13   those witnesses and she's -- she's just -- they're coming

14   before her and she's appearing [sic] them and she -- she

02:54  15   doesn't know right away whether she's going to strike them.

16   And my impression of what her testimony was, that she tries

17   sometimes to make notations so that two weeks later, when

18   they're trying to remember which of the jurors that they

19   selected, if they pull those questionnaires, she can say, "Oh,

02:54  20   this was this juror.  This was this juror."

21             Because if you'll remember from her testimony --

22         THE COURT:  Then, why wouldn't she write down "White

23   person"?

24         MS. MIRANDA:  I do not know the answer to that, your

02:54  25   Honor.

02:54     1            THE COURT:  If she had done that consistently for

          2    Whites and minorities, that would be a good argument.

          3            MS. MIRANDA:  Okay.

          4            THE COURT:  But it's not a good argument when the only

02:54     5    time she writes down the race is when it's a minority person.

          6            MS. MIRANDA:  And, your Honor, I understand that.  And

          7    I don't want to put words in Ms. Davenport's mouth.

          8            THE COURT:  No, no.  I'm asking you in argument.

          9            Tell me a good reason why she could write down

02:54    10    the identifiers on the minority people to remember them two

         11    weeks later and she wouldn't do the same thing with respect to

         12    the White folks.

         13            MS. MIRANDA:  All I know is that there was one

         14    indication -- and this was -- my initial response was that

02:55    15    there's -- there's not notations on every one of the jurors.

         16    But there is a notation on one of the non-minority jurors,

         17    where she wrote, "wore a headband in her hair."  And, so, I

         18    don't know because we didn't ask her that question; but that

         19    could have been another indication of, "Okay.  That's the

02:55    20    person that I" -- you know, when she pulls it out later and she

         21    sees her name, "Oh, yeah.  That was the one who wore the

         22    headband."

         23            So, all -- but I am going to tell you this

         24    because I want to be honest with you.  That's speculation on my

02:55    25    part because we did not ask her.  But if you want to know my

02:55   1   personal reason about what a good argument was, that would be
        2   my argument.  But obviously, you know, this Court has to assess
        3   the credibility of Ms. Davenport.
        4           THE COURT:  All right.
02:55   5           MS. MIRANDA:  All I can tell you is -- is from what
        6   she said.
        7           THE COURT:  Well, she could have given a race neutral
        8   description of the Black person.
        9           MS. MIRANDA:  Absolutely.  I'm not -- I'm not saying
02:55  10   that that's the way that, you know, I would do it or any of us
       11   would do it.  I'm just -- I'm trying to relate to you what I
       12   believe her reason was.  And I think, ultimately, your Honor,
       13   you have to decide --
       14           THE COURT:  If that was a good reason.
02:56  15           MS. MIRANDA:  -- if that was a good reason.
       16           THE COURT:  It's not a good reason.
       17           MS. MIRANDA:  Okay.
       18           THE COURT:  I'm just -- I want to hear what you think.
       19           MS. MIRANDA:  I know.  I know, your Honor.  And I know
02:56  20   you want to hear -- hear what I think.  But as a -- you know,
       21   as an attorney and as a prosecutor, I mean, I can only give you
       22   what I think is the truth and what I think is reflected in the
       23   testimony.
       24           And I could give you my personal perspective, but
02:56  25   I do not want to be putting words in her mouth.  And I don't --

02:56 1    I don't know.

2                    THE COURT:  Okay.

3                    MS. MIRANDA:  Because I'm not sure, if I was in that

4    situation, I would record them the same way.  So, I apologize

02:56 5    if that's not satisfactory to you.

6                    THE COURT:  No, no, no.  I just want to know what you

7    think.  I mean, it's argument, clearly.  And, you know -- and I

8    had to think about it for a second.  You know, in a situation

9    where there's a whole big panel and you have to make your

02:56 10   strikes in the blind --

11                   MS. MIRANDA:  Sure.

12                   THE COURT:  -- it might make sense to use race as an

13   identifier.  I mean, admittedly, I do it when I'm trying --

14   especially if it's a juror that I think is going to get

02:57 15   challenged by one of the lawyers, I write down something that's

16   going to help me remember who that person was.

17                   MS. MIRANDA:  Sure.

18                   THE COURT:  Although, I take pretty copious notes

19   during voir dire examination; so, I probably have a lot of

02:57 20   things that I can --

21                   MS. MIRANDA:  Right.

22                   THE COURT:  -- use to help me identify a particular

23   witness.

24                   MS. MIRANDA:  Right.

02:57 25                   THE COURT:  But in a scenario where you've just got

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:57  1    one witness in front of you -- one juror in front of you and

2    you're going to make your strikes right then and there, I'm

3    trying to think of a good reason, besides two weeks later I'm

4    going to maybe see them if I don't strike them, that you would

02:57  5    have to designate the person's race.

6                I can't think of a good reason.  And I wondered

7    if you had sort of, like, in formulating your argument, come up

8    with in your mind, in the way of argument, some good reason.

9                MS. MIRANDA:  Some good reason?

02:57  10               And I have to confess, your Honor, that I do not

11   know.

12               THE COURT:  Okay.

13               MS. MIRANDA:  I do not have any reason that I can come

14   up with on that.

02:57  15               THE COURT:  Okay.

16               MS. MIRANDA:  So, I'm sorry I can't help your Honor

17   out with that one.

18               THE COURT:  Okay.

19               MS. MIRANDA:  If I may continue?

02:57  20               THE COURT:  Okay.

21               MS. MIRANDA:  One of the other things that I would

22   like to just emphasize and encourage your Honor, in going back

23   and looking at this case, is -- you indicated that you took

24   copious notes; so, I'm hoping that you have the page numbers

02:58  25   and certain references.  But in several instances during

02:58    1    Ms. Davenport's testimony she was -- she was questioned about

         2    whether or not a particular cited reason -- or a response by a

         3    minority juror would be acceptable to the State and she was

         4    given a short portion of the testimony to look at and she

02:58    5    indicated, "Well, yeah, that was favorable."

         6              And, then, the next follow-up question was,

         7    "Well, why wouldn't you accept this juror?"

         8              And in more than one occasion, that answer that

         9    she was shown was not indicative of the entire conversation

02:58   10    regarding that issue on the record.

        11              THE COURT:  Okay.  I understand that.

        12              MS. MIRANDA:  And there was pages -- and I would just

        13    urge your Honor to, when you're making -- or not just take her

        14    ultimate answer but to go back and realize that sometimes it --

02:58   15    it was very difficult for her to answer that without actually

        16    being able to recollect each individual's entire voir dire.

        17    So, there are some instances, if I may give you one with

        18    Ms. Lopez, Esmerelda Lopez, about her testimony about whether

        19    the defendant -- his right to silence.

02:59   20              And she ultimately testified that she wouldn't

        21    have a problem with it.  And that was the only portion in the

        22    record that was pointed out to her.  And only that portion of

        23    her testimony -- I believe it's somewhere around Page 24 of her

        24    testimony -- was then compared to a non-minority juror, who had

02:59   25    several pages discussing that.  And they said, "Well, isn't the

02:59   1   non-minority juror's actually less favorable to the State?"

2   Whereas, if you look at the totality of Ms. Lopez' discussion

3   on that, it is not.

4           THE COURT:  I understand that.  I mean, clearly I have

02:59   5   to look at the entire thing in context.

6           MS. MIRANDA:  Okay.

7           THE COURT:  I hope you're not suggesting or thinking

8   that I'm just going to look at --

9           MS. MIRANDA:  And I wouldn't think that you would --

02:59   10          THE COURT:  Wait.  Stop.  Did you see me still

11  talking?

12          MS. MIRANDA:  Yes, I did.

13          THE COURT:  Stop talking.

14              I hope you're not suggesting that I would just

02:59   15  look at one individual issue and not look at the person's

16  entire -- you know, the record of the person's examination in

17  some context.

18              But there is one in which there's just one

19  individual issue that sort of particularly bothers me.

03:00   20          MS. MIRANDA:  Okay.

21          THE COURT:  And it's the witness -- the juror who

22  testified -- or, I mean, who checked on her form that capital

23  punishment is the "most hideous practice of our time" and still

24  got accepted.

03:00   25              I understand that's one thing out of that

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:00  1   witness' entire voir dire examination; but that one really

2   bothers me, that that was somebody that could be listed by the

3   prosecution as an acceptable witness [sic] regardless of the

4   rest of the -- putting the rest of it in context.

03:00  5          And, trust me, I'm going to look at the entire

6   thing to put that witness' testimony kind of -- what witness

7   was that?

8          MS. SWARNS:  Plander.

9          THE COURT:  Plander.

03:00  10          Did you look at her in particular and think --

11   anything in particular that you think is redeeming that you

12   want point out to me?

13          Because at this point in time -- because I'm

14   certainly going to go and look at the whole thing.  But tell me

03:00  15   what you think is redeeming about that person, given that

16   particular notation on their juror form, that they believe that

17   capital punishment is the "most hideous practice of our time,"

18   that would make them, a White juror, acceptable over non-White

19   jurors who clearly answered "no" to that particular question.

03:01  20          MS. MIRANDA:  Sure.  And I have two different

21   responses to that.  My first one would be, with respect to

22   Ms. Plander in particular, is to read her voir dire when they

23   questioned her about death penalty issues; and her testimony

24   does not at all reflect that she -- it doesn't necessarily

03:01  25   match up with that.  Her testimony is that there are

03:01   1   appropriate cases for capital punishment in which she could

2   actually impose capital punishment.

3           My second response to that is, if you read

4   Ms. Davenport's deposition and -- and she was questioned

03:01   5   specifically sort of about the role that a person's view on

6   capital punishment would play in her decision to strike a

7   juror.  She indicated that she wasn't always necessarily

8   looking for all those -- it wasn't a question of, "Let's get

9   all the 5's over here, all the strongly in favors, and I'm just

03:02   10   going to put those on the jury."

11           She indicated that she was -- regardless what

12   they expressed, whether they were opposed or in favor of the

13   death penalty, she was looking for someone who could

14   nevertheless, even if they were opposed, set it aside and

03:02   15   follow the law.  And that was more important to her than

16   necessarily someone who might support the death penalty, but

17   just -- she wasn't sure on other issues that they could follow

18   the law.

19           And I would also like to point out on that that

03:02   20   there was a lot of attention that was paid to and

21   Ms. Davenport's was asked many questions about different

22   jurors' views on the death penalty and, "Isn't this particular

23   non-minority juror's views on the death penalty more

24   favorable."

03:02   25           Well, neither Ms. Davenport nor Mr. Henderson, in

03:02    1    their affidavits or in their testimony, have ever specifically

         2    cited someone's underlying views on the death penalty as a

         3    reason why they struck the jurors, not even the minority

         4    jurors.  That was never cited as an issue.

03:02    5                The issues that they cited was their ability to

         6    follow the law on things like burden of proof, things like the

         7    special issues, other things, like the right to remain silent.

         8    And, so, I understand how you can look at it and say, "Okay.

         9    Well, that one is more favorable."

03:03   10                And that would be a legitimate -- I think it's a

        11    legitimate concern, regardless.  But I think it would be more

        12    critical in this case if the prosecutors had actually cited

        13    those reasons or the position on the death penalty in not --

        14    minority jurors as reasons for striking them, but they haven't

03:03   15    done that in this case.

        16                THE COURT:  In any instance?

        17                MS. MIRANDA:  No.

        18                THE COURT:  Okay.

        19                MS. MIRANDA:  No.  It's always based on either their

03:03   20    stance on premeditation, their -- it always had to do with a

        21    particular aspect of the law.

        22                THE COURT:  Okay.

        23                MS. MIRANDA:  Lastly, your Honor, I would just like to

        24    assert that if you look through these jurors and you -- you

03:04   25    read the reasons, in -- in almost every one of them, there is a

03:04   1   single compelling reason that sort of stands out as for why

2   they're struck.  And especially if you look at those reasons in

3   context with their voir dire, there -- there are only,

4   admittedly, a couple that you might look at and shake your

03:04   5   head, say, "I get it on this one.  I get it on this one.  I get

6   it on this one.  But I'm scratching my head on" --

7        THE COURT:  What do you think the single most

8   compelling reason is for Ms. Holmes?

9        MS. MIRANDA:  Well, she would be the one that I think

03:04   10   Ms. Davenport and even Mr. Henderson admittedly have said it's

11   someone that they're looking at and they're, like, "I'm not

12   sure why I struck them."  However --

13        THE COURT:  So, that's one in which there isn't a

14   single compelling reason.

03:04   15       MS. MIRANDA:  Exactly.  And that's why I said "almost

16   all."  I didn't say every single one, because there are.  And I

17   would -- well, I'll get to that in just one second.

18            However, I do want to say that I don't think

19   simply because the prosecutors, 23 years later, couldn't look

03:04   20   at a cold record and come up with a reason, I don't believe

21   that the law anywhere ever suggests, especially in light of the

22   fact that there were compelling reasons to strike other

23   non-minority jurors, that we should assume, because they

24   couldn't immediately articulate something based on the record,

03:05   25   that it was -- the only other reason that was out there was her

03:05  1    ethnicity.

2                    And I think there's no precedent necessarily for

3    that in the law; and I would urge this Court not to make that

4    assumption based simply on that, your Honor.  And I want to

03:05  5    address --

6            THE COURT:  Based simply on the fact that they

7    couldn't articulate a race neutral reason for doing it?

8            MS. MIRANDA:  Well, your Honor --

9            THE COURT:  That's the basis upon which I have to make

03:05  10   the evaluation.

11           MS. MIRANDA:  I'm sorry.  I probably didn't argue that

12   very effectively.  They did -- they have made race neutral

13   reasons.  And I would like your Honor also to take note of the

14   fact that Ms. Holmes was not identified as one of the jurors

03:05  15   that were contested in this issue until after the prosecutors

16   had already filed their initial affidavits.

17                   So, the first time that they were asked this

18   question was in their depositions.  And, granted, they were

19   given time to stop and review; but there's no way, in even 30

03:06  20   minutes, you know -- I mean, you can review their testimony;

21   but it's a difficult thing to do in that short of time without

22   having the entire record.  And I'm not saying --

23           THE COURT:  Okay.  When were those depositions taken?

24                   March 24th.  And here we are -- what are we at?

03:06  25   April what?  The 28th?

03:06 1          Okay.  It's not 30 minutes.  It's 30 days she's

2   had to think about that one again.  She knew that we were going

3   to talk about that today.  So, that's not a valid observation.

4   Come on, now.

03:06 5          MS. MIRANDA:  Well, as far as why they weren't in

6   their initial affidavits.

7          THE COURT:  Okay.

8          MS. MIRANDA:  Not for -- I'm not saying -- I'm just

9   saying that if you're looking at their affidavits, saying

03:06 10  there's no reason offered in there, the reason it's not in the

11  affidavit is because it was not brought to them before that.

12         THE COURT:  Initially.

13         MS. MIRANDA:  Yes.  Yes, your Honor.

14         THE COURT:  Okay.

03:06 15         MS. MIRANDA:  Now, did you have a question that I had

16  not answered?  I'm sorry.  I got off track on that one, as far

17  as just --

18         THE COURT:  No.  I mean, at the end of the day, you

19  can't -- you can't tell me that -- I mean, it seemed to me that

03:07 20  you were suggesting to me that they didn't have to give a race

21  neutral reason for striking Holmes.  And certainly that is not

22  the law, and I hope that that was not what you were suggesting.

23  They still have to give a race neutral reason.

24         MS. MIRANDA:  Absolutely.  And I believe --

03:07 25         THE COURT:  And instead, they gave me no reason.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:07   1          MS. MIRANDA:  Well, I believe that there are reasons

2      that were suggested in the deposition.  Mr. Henderson offered

3      some.

4                  I believe her hesitation -- and this is in the

03:07   5      record, some hesitation that she had over the burden of proof.

6      I believe there's the intoxication issue that he also offered

7      on --

8          THE COURT:  Where is that?  Because we looked at his

9      deposition testimony --

03:07   10         MS. MIRANDA:  I think --

11         THE COURT:  -- today about Holmes.  And as I recall,

12     at the end of it he got to the point where he says he just

13     didn't know.

14         MS. MIRANDA:  I think he was indicating that he didn't

03:07   15     know why Norma -- I believe that he was saying -- he offered

16     some reasons, but he didn't know what she was thinking.

17         THE COURT:  No.  He said, "I don't know what we were

18     thinking about at the time," as to why that strike was

19     executed.

03:08   20         MS. MIRANDA:  But I believe that prior to that he had

21     offered some reasons that they could have been thinking.

22         THE COURT:  Right.

23         MS. MIRANDA:  And I think -- and I think that the

24     other thing is in this case, in light of the fact that it is --

03:08   25     it has been, you know, 23 years, it is not difficult to imagine

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:08   1   that they might not know the exact reason.  I mean, they've

2   testified to that with regard to all of these jurors, that they

3   look at and they say, "Okay.  This is what stands out, this is

4   what stands out, this is what stands out."

03:08   5           And in this case, he's, like, "It could have been

6   this, it could have been this; but I can't tell you for sure

7   what the reason was."  But that doesn't mean that they haven't

8   offered a race neutral reason for that, your Honor.

9           And my argument was not that they don't have to

03:08   10  offer a race neutral reason.  It was simply that because there

11  is not a race neutral reason that is compelling, like in many

12  of these other jurors, that simply because it's not as

13  compelling, to jump to the assumption that it must, therefore,

14  be based on -- that the strike was based on something like race

03:09   15  instead of her other proffered explanation, which was that

16  there may have been something -- obviously, from her testimony

17  or whatever, that we didn't like.

18          So, I'm not at all suggesting that she didn't

19  have to offer race neutral.  I'm just arguing that the

03:09   20  assumption shouldn't necessarily be made that because the

21  reason was not as compelling as the rest of them that it had to

22  have been race.

23          THE COURT:  But she didn't give a reason.  She just

24  said, "Must have been something I didn't like."  Is that a

03:09   25  reason really?  Is that an articulated race neutral reason,

03:09   1   "Must have been something I didn't like about her"?

2   MS. MIRANDA:  Your Honor, I believe, in the context of

3   voir dire, it can be.  I mean, I believe that you can question

4   people -- there's -- I mean -- that you can question someone

03:09   5   and you can say, "They give me the right answers, they do the

6   right things; but I don't know.  There's just something that I

7   can't articulate."  And I do believe that she testified that

8   there were times --

9   THE COURT:  Isn't that what the Supreme Court said,

03:10   10   that we have to sort of cut through -- I mean, doesn't that

11   just completely gut Batson and Miller-El, for them to just be

12   able to say, "I don't have to give a reason.  I just didn't

13   like them"?  I mean, that's what the Supreme Court said they

14   shouldn't be able to do.

03:10   15   MS. MIRANDA:  Right.

16   THE COURT:  They said that you should be able to give

17   a race neutral reason and it can't be, "I just didn't like that

18   person."

19   MS. MIRANDA:  Right.

03:10   20   And I understand with Ms. Davenport that she

21   wasn't able to articulate a reason, but Mr. Henderson had some

22   that he did offer.

23   THE COURT:  Okay.

24   MS. MIRANDA:  And, again, your Honor, just in closing,

03:10   25   to argue the totality of the voir dire in considering whether

03:10   1   or not this was a case in which jurors were struck on the basis

        2   of race, not just to pick apart and pull apart certain

        3   instances, but to look at each one of them in a holistic

        4   approach, as the prosecutors have to do when they're making

03:11   5   those decisions.

        6           THE COURT:  You said that.

        7           MS. MIRANDA:  Thank you.

        8           THE COURT:  But thanks for reminding me to do my job.

        9           MS. MIRANDA:  Okay.

03:11   10          THE COURT:  Anything else from the petitioner?

        11          MS. SWARNS:  I would just like to make four very small

        12   points.

        13              The argument that Ms. Miranda has asserted, that

        14   your Honor has to find two identical jurors, was specifically

03:11   15   reject -- it was argued by her office in Miller-El, it was

        16   adopted by the Fifth Circuit in Miller-El, and it was

        17   specifically rejected by the United States Supreme Court in

        18   Miller-El.

        19              The United States Supreme Court in Miller-El said

03:11   20   jurors are not cookie cutters, you will never be able to find

        21   two jurors with the exact same constellation of

        22   characteristics.  And, then, the Court, of course, as your

        23   Honor knows, went on to do exactly what we have done, which is

        24   to examine the explanations that were offered by the

03:11   25   prosecutors and determine whether they were applied to

similarly situated White jurors.  So, that argument simply has no basis in law.

I would also like your Honor to remember that the strikes that were exercised by Ms. Davenport were exercised before Batson came down.

THE COURT:  Right.  I remember.

MS. SWARNS:  Okay.  And so, obviously, Ms. Davenport, as she acknowledged, had no reason to believe that she was prohibited at the time she exercised these strikes, by the law, against Black jurors, to do so.  So, there's reason to believe that that's exactly what she was doing.

Ms. Miranda argues that the 23 year lapse, you know, should be taken into consideration.  And I want to make very clear, as I think your Honor knows, Mr. Rosales had been arguing and asking to be heard on this claim for every minute of those 23 years.  He first raised this claim during the jury selection, and he has not stopped raising it since.

It is the prosecutors' offices that have consistently asserted that his claim should not be heard and the merits should not be considered.  It's the reason that it has taken 23 years for us to have a prosecutor take a witness stand and offer those reasons.

THE COURT:  Well, I know.  But that doesn't mean that I can't take into consideration --

MS. MIRANDA:  I know but --

03:13   1          THE COURT:  Stop.  I'm talking.

2               -- that I can't and shouldn't take into

3    consideration that in 23 years the prosecutor's memory with

4    respect to some of these issues might be a little bit shaky.  I

03:13   5    mean, I can't just ignore the fact that 23 years have passed

6    and that some of their testimony and some of their answers are

7    obviously going to be, you know, influenced by the fact that

8    they probably can't remember half of this stuff.  So, I don't

9    know.

03:13   10              The fault at this point in time is totally

11   irrelevant in terms of whether or not the passage of time is

12   relevant to my consideration of the veracity of their answers.

13   Anyway --

14          MS. SWARNS:  I understand, your Honor.

03:13   15              And my only other point was to say that

16   Mr. Rosales, in his consistent litigation of this claim, has

17   always asserted that -- a challenge with respect to all

18   stricken minority jurors.  It has never changed.  It has never

19   wavered.  It has always been the same.  All minority jurors was

03:14   20   the basis of his challenge.

21              I have nothing further.

22          THE COURT:  Oh, in terms of whether or not that was

23   raised before --

24          MS. SWARNS:  Exactly.

03:14   25          THE COURT:  -- the people had the opportunity to do

03:14   1    their affidavits?

2         MS. SWARNS:  Exactly.

3         THE COURT:  Even in his initial pleadings in this

4    case?

03:14   5         MS. SWARNS:  Yes, uh-huh.

6         THE COURT:  Okay.  You guys want to do any more

7    briefing?

8         MS. SWARNS:  I don't believe we will; but if any

9    additional, very small discrete legal issue may present itself,

03:14  10    can we submit something within the next ten days?

11         THE COURT:  What is today?  Today is Tuesday, the

12    29th?

13              By the end of next week.  What's the end of next

14    week, next Friday?  What's the date?

03:15  15         A CLERK:  It is --

16         THE COURT:  Should be, like, May the --

17         A CLERK:  May the 2nd.

18         THE COURT:  No.  That would be this Friday.  It should

19    be, like, May the 9th.

03:15  20         A CLERK:  Oh, I think it's the 10th.  It's May 6th.

21         THE COURT:  I'm sorry.  Shouldn't it be May the 9th,

22    next Friday?

23         A CLERK:  It is May 9th.

24         THE COURT:  Okay.  May 9th, then.  If you have

03:15  25    anything else you want to send me on some discrete issue --

03:15   1    don't rehash the whole thing.  I don't want to see that.  Trust

2    me, I got enough briefing and argument and evidence from you

3    guys.  You don't have to sort of just re-summarize that for me.

4    That will not help me.  That will just delay me being able to

03:15   5    get this done.

6            If you find something else, I need to have it

7    from you by May the 9th.

8            MS. SWARNS:  Thank you, your Honor.

9            THE COURT:  And any response by May the 19th.

03:16   10           I'm going to try to get something to you guys at

11   least by the end of May, maybe and maybe not.  I mean, because

12   it just depends how long takes me to read it.  Obviously, I'm

13   not going to be rushed on it.  So, I might get it by the end of

14   May or I might not get it by the end of May.

03:16   15           Sometimes I take cases like this and I read the

16   thing, like, one month and then I put it down and decide I'm

17   going to wait another month before I read it again, you know.

18   It's isn't something, after 23 years, that I'm going to be

19   rushed to come to a conclusion on.  So, I'll --

03:16   20           MS. SWARNS:  I understand.

21           THE COURT:  But I am going to start looking at some

22   things, you know, pretty quickly.  So, I have to -- so, I just

23   want you to know that, to the extent that you're interested in

24   sending me anything, because I am going to be reading some

03:17   25   things over relatively quickly.

03:17   1            All right.  I'm keeping my set of exhibits that

2   you guys provided to me.  I got that new exhibit that you just

3   gave me today.

4            The Donna Douglas Cooper questionnaire, that was

03:17   5   going to be Exhibit Number 5, Ms. Miranda.

6            So, I've got all five of the exhibits; and I

7   thank you.

8            Mr. Rosales, we are going to be signing off at

9   this time, sir.  And thank you for your participation, and I'm

03:17   10   sorry for the little glitch that we had earlier but glad that

11   we were able to get you back online so that you could hear what

12   was going on.  All right, sir?

13         MR. ROSALES:  Yes, ma'am.  Yes, your Honor.

14            Can I say something -- can I say something now?

03:17   15         THE COURT:  Yes, sir.

16         MR. ROSALES:  Can I say something?

17         THE COURT:  Yes, sir.

18         MR. ROSALES:  Okay.  I don't know if there's anybody

19   from the -- from the Balboa family or from the Rodriguez family

03:17   20   there in the court, ma'am; but I want to apologize to them --

21         THE COURT:  No, there's not --

22         MR. ROSALES:  -- because I want to apologize to --

23         THE COURT:  Go ahead, sir.  I just didn't hear you.

24         MR. ROSALES:  I want to apologize for all the trouble

03:18   25   that I cause the Court and the judicial system, ma'am.  And I

03:18   1   just want to say that.

2   THE COURT:  All right.  There were some other folks

3   here yesterday.  Who else was here yesterday?

4   MS. SWARNS:  All the family of Mr. Rosales.

03:18   5   THE COURT:  Well, who was here?

6   UNIDENTIFIED MALE:  My brother was here, Mariano, Jr.

7   THE COURT:  Mariano was here yesterday.

8   These are people you didn't get to see yesterday

9   because of the configuration, and I feel badly that I didn't

03:18   10   think about that until today.  But Mariano was here yesterday.

11   UNIDENTIFIED MALE:  Hector.

12   THE COURT:  And Hector.

13   UNIDENTIFIED MALE:  Elvis.

14   THE COURT:  And Elvis.

03:18   15   UNIDENTIFIED MALE:  Ruben.

16   THE COURT:  And Ruben.

17   UNIDENTIFIED MALE:  And Victoria.

18   THE COURT:  And Victoria were all here yesterday.

19   MR. ROSALES:  Yes, ma'am.  Yes, ma'am.  Thank you,

03:18   20   your Honor.

21   THE COURT:  But nobody from --

22   UNIDENTIFIED MALE:  Nobody from the other family.

23   THE COURT:  But nobody was here from the other family

24   yesterday, just to let you know who was here.  I apologize for

03:18   25   not explaining that to you earlier.

03:18   1              Did you know everybody that was here on behalf of

        2   you, in terms of your attorneys?  Were you ever able to see all

        3   the folks --

        4              MR. ROSALES:  Yes, your Honor.

03:19   5              THE COURT:  You were?

        6              MR. ROSALES:  No.  I seen Christina -- I saw Christina

        7   Swarns, but I didn't see the rest of them.

        8              THE COURT:  You never saw all the rest of your

        9   lawyers?

03:19  10              Come on up here, Mr. Gray.  Stand up here so he

       11   can see you.  He should be at least able to lay his eyes on the

       12   person whose voice he's been listening to for a couple of days.

       13              MR. GRAY:  Hello, sir.

       14              THE COURT:  And there's Mr. Gray, who was your lawyer

03:19  15   who was questioning the witnesses on yesterday.  All right?

       16              MR. ROSALES:  Good to see you, sir.

       17              Yes, ma'am.  Thank you, your Honor.

       18              THE COURT:  And Ms. Swarns was here.  You know

       19   Ms. Swarns, though, right?

03:19  20              MR. ROSALES:  Yes.  Yes, ma'am, I know Ms. Swarns.

       21              THE COURT:  Okay.  I just wanted to make sure that you

       22   got to see who was here for you in the case.

       23              All right.  Well, we're going to be signing off,

       24   then.

03:19  25              MR. ROSALES:  Thank you, your Honor.

03:19    1              THE COURT:  I don't know how we sign off, but somebody

         2    will help me figure that out.

         3                   Thank you, sir.

         4        *(Proceedings adjourned)*

         5                         * * * * *

         6              COURT REPORTER'S CERTIFICATION

         7         I certify that the foregoing is a correct transcript from
              the record of proceedings in the above-entitled cause.
         8

         9    Date:  July 22, 2008

        10

        11                         /s/   Cheryll K. Barron

        12                    Cheryll K. Barron, CSR, CMR, FCRR
                             Official Court Reporter
        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25