# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| MARIANO JUAREZ ROSALES, | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-03-1016 |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Mariano Juarez Rosales ("Petitioner") seeks federal habeas relief from his capital conviction and death sentence. For the past 23 years, Petitioner has raised the issue that the prosecution intentionally excluded minorities from the jury that sat at his trial. When the Petitioner first advanced that claim in state court, the Court of Criminal Appeals found that he insufficiently preserved error for appellate review. On March 21, 2003, Petitioner filed a federal habeas petition raising, among other claims, the argument that the prosecution violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by peremptorily dismissing minority jurors because of their race. On September 28, 2004, this Court entered a Memorandum and Order that denied habeas relief on substantive and procedural grounds, finding specifically that the state procedural ruling prevented full federal review of his *Batson* claim. (Docket Entry No. 37). While affirming this Court's judgment with respect to the other issues raised by Petitioner's federal habeas action, the Court of Appeals for the Fifth Circuit found that procedural law did not preclude federal review of Petitioner's *Batson* claim. The Fifth Circuit remanded this case for an evidentiary hearing. The Court will adjudicate Petitioner's *Batson* claim in the first instance.

The parties have fully and comprehensively briefed the issues in this case. On April 28, and 29, 2008, this Court held an evidentiary hearing in which the parties had the opportunity to extensively probe the prosecution's use of peremptory strikes during jury selection. The Court now issues the following order on the Petitioner's writ.

## I.    Background

The State of Texas tried Petitioner for murder in 1985. Petitioner was tried in the 230th District Court of Harris County, Texas, with the Honorable Joe Kegans presiding. Because the Court's original Memorandum and Order adequately summarized the murders that led to Petitioner's arrest and his post-conviction proceedings, (Docket Entry No. 37 at 1-4), the Court will not review the factual background of Petitioner's case. The Court's inquiry focuses on the narrow question of whether the prosecution violated the Equal Protection Clause by excluding minorities from jury service.

Two attorneys represented the State of Texas during Petitioner's trial: Norma Davenport was the lead prosecutor and Keno Henderson sat as second chair. Ms. Davenport explained that the prosecutors developed a set of questions to ask potential jurors. Deposition of Norma Davenport taken March 24, 2008, at 28 (cited hereinafter as "Ms. Davenport Depo. at __"). The prosecutors "used the same set with everyone." Ms. Davenport Depo. at 28. As is the practice in Texas capital prosecutions, the trial court and the parties questioned each prospective juror individually. Each day, the trial court called in a small group of prospective jurors for examination. The parties then received the information cards and questionnaires that the panel members had previously completed. The trial court began the voir dire of each panelist by giving general information and asking questions common to capital trials. The parties each had 30 minutes to talk with each individual.

The prosecution examined each panelist before the defense. The prosecutors took turns interviewing the prospective jurors. The prosecutors, however, consulted together before striking panel members.

At the time of Petitioner's trial, the law did not hold prosecutors accountable for their use of peremptory strikes. While the Supreme Court in *Swain v. Alabama*, 380 U.S. 202 (1965), had condemned any longstanding, historical trend of removing minorities from juror panels, the *Swain* Court preserved the peremptory challenge's role as "one exercised without a reason stated, without inquiry and without being subject to the court's control." 380 U.S. at 222. The *Swain* court refused to "hold that the Constitution requires an examination of the prosecutors' reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court." *Id.* To show a constitutional violation under *Swain*, "a defendant was required to show that prosecutors repeatedly exercised peremptory challenges to remove blacks who had been selected as qualified jurors and who survived challenges for cause." *Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992).

As a practical matter, lower courts used *Swain* to place on defendants "a crippling burden of proof." *Id* As the Supreme Court later noted, *Swain* "left prosecutors' use of peremptories largely immune from constitutional scrutiny." *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005) ("*Miller-El II*") (quotation omitted); *see also United States v. Wilson*, 816 F.2d 421, 424 (8th Cir. 1987) ("Prosecutors seem . . . to have been relying on *Swain*'s evidentiary standard to insulate themselves from being forced by the district court to provide the reasons for their use of peremptory strikes to eliminate black jurors."). At the time of Petitioner's trial prosecutors were under no obligation to justify their use of peremptory challenges. As a general rule, prosecutors had little fear that their strikes against minorities would invalidate a subsequent conviction. *Swain*'s failure to protect

3

against racism in jury selection frames the prosecutorial actions in the instant case.  Against this

backdrop, jury selection began in Petitioner's trial on October 14, 1985.

On the first day of Petitioner's jury selection, the parties questioned seven potential jurors.

The prosecution used peremptory challenges to remove Esmeralda Lopez, Alicia Taylor, and

Raymond Trevino.  Tr. Vol. 2 at 55, 138, 175.  The next morning, trial counsel Walter Boyd objected

to the prosecution's peremptory strikes:

> Mr. Boyd:     Your Honor, the other matter I would like to take up with the Court is the familiar patterns already developing, Your Honor, on the selection of these jurors, and the State has exercised strikes on two Mexican Americans and one black woman, and *I feel that this defendant has a constitutional right to a cross section of his peers, and if the State is going to persist in using their peremptories to eliminate all minorities, both Mexican Americans and Chicanos and the black people, this defendant is going to be denied his right to a fair trial by his peers.*  My proposal is this – we know the State has a right to peremptor[y] challenges.  I think the Court may not favor their striking minorities without reason.  I think if in the future the State strikes what is obviously a minority juror, that they state in the record their particular reasons for exercising that peremptory challenge, and I so propose it and request it and move the Court to so follow that procedure.

> Trial court:     I will deny your request to have them specify the reason for the exercise of peremptory challenges.

> Mr. Boyd:     May I have a running objection to that?

> Trial court:     Yes, sir.

> Mr. Boyd:     May I have in the record, Your Honor, after each juror is selected, that I – and leaves the room, that we state in the record what the race of that juror is, and if there is any problem about it, then we can straighten it out then, if there is any issue of fact as to what color or race that particular juror is, but I would like to have that in the record specifically on the peremptory challenges the State exercises in the future.

> Trial court:   Very well.  I as recall, obviously, Ms. Lopez, juror number one, and
> Mr. Trevino, number six, were both Mexican.  Ms. Taylor was a
> black female.

Tr. Vol. 2 at 229-30 (emphasis added).  On subsequent days, the prosecution struck James Hamilton,

Tr. Vol. 6 at 40; Mohamed Deen, Tr. Vol. 7 at 504; Marianne Walker, Tr. Vol. 7 at 534; Edward

Saenz, Tr. Vol. 9 at 1033; and Yvette Homes, Tr. Vol. 10 at 1243.  The parties did not always

contemporaneously identify each prospective juror's race, though it is unquestioned that Mr.

Hamilton, Ms. Walker, and Ms. Holmes were each African-American; Mr. Deen was apparently of

East Indian descent; and Mr. Saenz was Hispanic.  Of those minority panelists struck after the first

day of jury selection, Petitioner only made a constitutional objection to the dismissal of Mr.

Hamilton:

> Trial counsel:  Your Honor, that appears just blatantly a racial strike, Your Honor,
> and I respectfully ask the State to justify using a strike on that juror.
> I think it's discriminatory.  *It violates this defendant's right to a jury
> of his peers and a cross section of the community,* and if the Court
> would check over this information sheet, this juror is qualified from
> the State's point of view as any juror I have ever seen and they use a
> strike on him, and I move the Court to have the State justify this
> strike.

Tr. Vol. 6 at 40-41 (emphasis added).  The trial court summarily denied Petitioner's objection to the

strike against Mr. Hamilton.  Tr. Vol. 6 at 40.

The prosecution did not justify its strikes against any minority jurors.  During the voir dire

process, the prosecution used more than half its peremptory challenges against minority panel

members.  The prosecution accepted the following jurors: Douglas M. Busker; Pearl R. Plander;

Beverly F. Willett; Joyce E. Woodyla; Cheryl D. Williamson; Michael J. Arndt; Jeanette L.

Richmond; Bethel S. Nickles; Blas Solorzano; Gaylon B. Overton; Margaret Legget; Charles Smith;

Kenneth Kelley (alternate juror). Trans. 124-36. The prosecution also accepted Jacklynn R. Lyles, though she was later excused from service. The jury that convicted Petitioner consisted of ten Caucasians, one African-American (Jeanette Richmond), and one Hispanic juror (Blas Solorzano).

After Petitioner's conviction, but before the finality of his direct appeal, the Supreme Court decided *Batson v. Kentucky*, 476 U.S. 79 (1986). *Batson* held that the prosecution violates the Equal Protection Cause when striking potential jurors solely based on race. *Batson* established a three-part burden shifting scheme to address allegations of race-based peremptory challenges:

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (quotations and citations omitted)*; see also Johnson v. California*, 545 U.S. 162, 168 (2005); *Miller-El II*, 545 U.S. at 251-52.

*Batson* applied to all cases not yet final when it was handed down. *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). Subsequent cases grappled with how to handle *Batson* issues in cases pending on appeal. The lower courts wrestled with which pre-*Batson* objections sufficiently preserved a *Batson* issue for appeal. When Petitioner raised his *Batson* claim on direct appeal, the Court of Criminal Appeals began applying a stringent procedural bar if the trial objection did not sufficiently mirror a newly created *Batson* claim. *See Rosales*, 841 S.W.2d at 379-80. The Court of Criminal Appeals found that Petitioner defaulted his *Batson* claim by not making a sufficient

contemporaneous objection.  The procedural ruling on direct appeal precluded judicial review when Petitioner again attempted to place a *Batson* claim before the state habeas court.  The state habeas court made historical factual findings and reviewed the procedural history of Petitioner's *Batson* claim, but because a different judge presided over his habeas action than oversaw his trial, the state habeas court made no findings about the parties or panel members' demeanor.  Also, the procedural bar foreclosed state habeas review over the substance of Petitioner's *Batson* claim.

Petitioner presented his *Batson* claim again in his federal habeas petition filed on February 21, 2003.  This Court previously found that the state-imposed procedural bar impeded full federal consideration of Petitioner's claim.  On appeal, the Fifth Circuit found that Texas' "procedural bar was not firmly established and regularly followed by the Texas Court of Criminal Appeals for cases like Rosales', which were on direct appeal when *Batson* was decided." *Rosales v. Dretke*, 444 F.3d 703, 710 (5th Cir. 2006).  As a result, the Fifth Circuit remanded this action for full consideration of Petitioner's *Batson* claim on April 3, 2006.

Because this Court is the first to adjudicate the merits of Petitioner's *Batson* claim, there is no state court decision that requires deference under the Anti-Terrorism and Effective Death Penalty Act.  *See* 28 U.S.C. § 2254(d).  As the state habeas court held that procedural error previously shielded the merits of the claim, this Court is the first to allow full factual development.  To assist in the Court's review, Respondent submitted affidavits from the two trial prosecutors.  This Court has twice considered and denied summary judgment motions filed by the Respondent on this issue.  Thereafter, the Court allowed the parties to conduct discovery and deposed the two prosecutors.  An evidentiary hearing was held on April 28, and 29, 2008.

In the deposition testimony of the prosecutors, Mr. Henderson primarily discussed the

training and practice of prosecutors in the Harris County District Attorney's Office. Ms. Davenport also testified about those issues, but discussed more extensively her justifications for the specific peremptory strikes used in this case.

At the evidentiary hearing, Ms. Davenport further testified and explained her use of peremptory challenges, describing in detail the reasons for every peremptory challenge the prosecution used against minority jurors. The other prosecutor, Mr. Henderson, did not testify. Petitioner also called as a witness Mr. Craig Washington, a local attorney, to testify concerning Harris County's historic use of peremptory strikes against minorities and his previous knowledge of and experience with the prosecutors involved in this case. The parties have now been given a full opportunity to address the legal and factual issues. This case is ripe for adjudication.

## II.     The *Batson* Standard

As previously noted, *Batson* established a tripartite burden-shifting model for ferreting out intentional discrimination in jury selection. A defendant must first make a prima facie showing that the prosecutor has exercised his peremptory challenges on the basis of race. The prosecution must then provide a race neutral justification for the strike. The reviewing court must then decide whether the defense has met his burden of showing purposeful discrimination. The Court will address Petitioner's claim under that framework.

### A.     *Batson's First Step*

"[A] defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170. On the first day of jury selection, Petitioner complained about "the familiar patterns already developing" where the prosecution used peremptory strikes on minority jurors. Tr.

Vol. 2 at 229-30.  On subsequent days of jury selection, the defense alleged that the prosecution

continued striking prospective jurors because of their race.  The prosecution eventually used eight

of the peremptory strikes it employed to remove minority venire members. Petitioner has established

a prima facie case of discrimination, thus meeting *Batson*'s first step.

B.     *Batson's Second Step*

Under the second part of the *Batson* burden-shifting scheme, the prosecution must provide

race-neutral justifications for its use of peremptory challenges.  "Unless a discriminatory intent is

inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett*

*v. Elem*, 514 U.S. 765, 768 (1995); *see also Hernandez v. New York*, 500 U.S. 352, 359-60 (1991).

"In such cases, a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny

equal protection." *Elem*, 514 U.S. at 769; *see also Rice*, 546 U.S. at 338; *Johnson*, 545 U.S. at 171.

When first moving for summary judgment after remand, Respondent filed a summary

judgment motion that speculated on why the prosecution disfavored the challenged jurors.

Respondent initially did not rely on affidavits or other verifiable statements from the trial prosecutors

but guessed why a reasonable attorney may have stricken the minority jurors.  This Court denied the

summary judgment motion, noting that the Supreme Court has emphasized:

> when illegitimate grounds like race are in issue, a prosecutor simply has got to state
> his reasons as best he can and stand or fall on the plausibility of the reasons he gives.
> A *Batson* challenge does not call for a mere exercise in thinking up any rational
> basis. If the stated reason does not hold up, its pretextual significance does not fade
> because a trial judge, or an appeals court, can imagine a reason that might not have
> been shown up as false.

*Miller-El II*, 545 U.S. at 252.  Since then, both trial prosecutors have provided the Court with

detailed justifications for their strikes.  Both Ms. Davenport and Mr. Henderson gave affidavits

9

listing several reasons for dismissing each prospective juror (except Ms. Holmes). The parties deposed both prosecutors, examining their strategy during jury selection and their specific use of strikes. Additionally, Ms. Davenport testified in an evidentiary hearing before this Court. The prosecutors have been provided ample opportunity to explain their use of peremptory strikes and they have provided various reasons for dismissing the minority venire members.

As a preliminary matter, the Court must approach the prosecution's justifications for the strikes – provided 23 years after jury selection – with some suspicion. *See Jones v. Butler*, 864 F.2d 348, 370 (5th Cir. 1988) ("Years after trial, the prosecutor cannot adequately reconstruct his reasons for striking a venireman."). Such justifications are "subject to the usual risks of imprecision and distortion from the passage of time." *Miller-El v. Cockrell*, 537 U.S. 322, 343 (2003) ("*Miller-El I*"). Such *post hoc* explanations generally "reek[] of afterthought." *Miller-El II*, 545 U.S. at 246. Because the Texas state courts refused to consider Petitioner's *Batson* claim, this Court has been placed in the uncomfortable position that the Supreme Court sought to avoid soon after the *Batson* decision. The Supreme Court did not apply *Batson* to already-final cases so that courts would not have to "hold hearings, often years after the conviction became final, to determine whether the defendant's proof concerning the prosecutor's exercise of challenges established a prima facie case of discrimination." *Allen v. Hardy*, 478 U.S. 255, 260 (1986). The passage of time and the accompanying blurring of memories cloud attorneys' recollection, hindering their ability to articulate the discrete reason for which they exercised a peremptory challenge years before.

This case, however, requires the prosecutors to provide race neutral explanations for their strikes, something that the law did not require them to do when they dismissed the jurors. Asking the prosecution to explain their strikes long after trial is "a task that would be impossible in virtually

10

every case since the prosecutor, relying on *Swain*, would have had no reason to think such an explanation would someday be necessary." *Allen*, 478 U.S. at 260. Because the law did not require a race-neutral reason to strike jurors under *Swain*, the prosecutors' recitation of such justifications over two decades later presumes that they not only had the foresight to anticipate *Batson*, but also that they have acute recollection of the reasons why they dismissed certain jurors. The pre-*Batson* context and the time that has passed since trial weaken the credibility of late race-neutral justifications.

Be that as it may, *Batson* now requires the prosecutors from Petitioner's trial to explain why they struck minority jurors. Here, both prosecutors have reviewed the voir dire transcript, the jury cards, and the jury questionnaires. From that review – and presumably their recollection – both prosecutors have provided several reasons for dismissing each challenged minority juror. Most of these justifications, while providing facially neutral reasons for exercising peremptory strikes, do not seem to reflect the on-the-spot decisions attorneys make during the thick of jury selection. The prosecutors' justifications most likely flow from their experience in the two decades since *Batson* in which attorneys have increasingly become comfortable with explaining why they exercised peremptory strikes.

The post-trial recreation of a *Batson* hearing inherently raises the concern that prosecutors may not give contemporaneous reasons for their strikes, but instead provide reasonable-sounding excuses for their actions. The *Batson* inquiry does not examine *possible* reasons why a prosecutor could have stricken a potential juror, but asks for the *real* reasons for the strikes. *See Miller-El II*, 545 U.S. at 252 (refusing to limit *Batson* to "a mere exercise in thinking up any rational basis"); *Johnson*, 545 U.S. at 172 ("The *Batson* framework is designed to produce actual answers[.]");

*Williams v. Runnels*, 432 F.3d 1102, 1109 (9th Cir. 2006) ("[T]he question is not whether the prosecutor might have had good reasons, but what were the prosecutor's real reasons for the challenges."). This Court must cut through any post-trial rationalization to expose the contemporaneous reasons for the prosecution's peremptory challenges.

Nevertheless, at the second step the "race-neutral explanation tendered by the proponent need not be persuasive, or even plausible." *United States v. Huey*, 76 F.3d 638, 641 (5th Cir. 1996). Indeed, the explanation "simply must be race-neutral and honest." *Webster*, 162 F.3d at 349. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360. As the prosecutors have provided several facially neutral reasons for striking each juror, the Court will proceed to the third step of the *Batson* inquiry.

### C.    *Batson's Third Step*

At *Batson*'s third step, the focus shifts "the persuasiveness of the justification" by asking whether Petitioner has "carried his burden of proving purposeful discrimination." *Elem*, 514 U.S. at 768. A petitioner only needs to show that the prosecution dismissed a single juror for discriminatory reasons. *See Snyder v. Louisiana*, ___ U.S. ___, 128 S. Ct. 1203, 1208 (2008). In *Batson* the Supreme Court noted that the finding of intentional discrimination is a factual finding that "largely will turn on evaluation of credibility." *Batson*, 476 U.S. at 98 n.21. In making such determinations, the trial court usually evaluates the State's explanation, but also observes the demeanor of the prosecutor and the prospective jurors. *See Hernandez*, 500 U.S. at 365 (stating that "the best evidence often will be the demeanor of the attorney who exercises the challenge"). "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how

reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El I*, 537 U.S. at 339. "[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-biased." *United States v. Bentley-Smith*, 2 F.3d 1368, 1375 (5th Cir. 1993). In essence, "the decisive question will normally be whether a proffered race-neutral explanation should be believed." *Id.* at 1373.

As a general rule, "[t]here will seldom be any evidence that the claimant can introduce – beyond arguing that the explanations are not believable or pointing out that similar claims can be made about non-excluded jurors who are not minorities." *Id.* at 1373-74. The Supreme Court, however, has identified various factors that may give rise to an inference of discrimination. In *Miller-El II*, a case where the "selection process [was] replete with evidence that the prosecutors were selecting and rejecting potential jurors because of race," 545 U.S. at 265, the Supreme Court looked at "broader patterns of practice during the jury selection" to find that the prosecution used its peremptory challenges in a discriminatory manner. *Id.* at 253. The *Miller-El II* Court noted a "remarkable" pattern of excluding black prospective jurors from the panel: "Out of 20 black members of the 108-person venire panel for Miller-El's trial, only 1 served. Although 9 were excused for cause or by agreement, 10 were peremptorily struck by the prosecution." *Id.* at 240-41. In a side-by-side comparison between the challenged black potential jurors and the white ones, the *Miller-El* record revealed that white jurors were accepted when voicing views similar to the excluded jurors and showed that the prosecution questioned the black prospective jurors differently than others. The prosecutor's explanations also did not jibe with the record of potential juror questioning. Finally, the *Miller-El II* Court criticized the lower courts for blindly accepting the prosecutor's

13

explanations and, in some cases, creating new justifications for the peremptory strikes. The Court believes *Miller-El* should serve as a guide in approaching the validity of the prosecutors' explanation in *Batson*'s third-step inquiry.

**III.    The Totality of the Circumstances Suggest that Race was a Consideration in the Prosecution's Peremptory Strikes**

Before turning to the viability of the justifications given by the trial prosecutors, the Court will first look at various factors which suggest that race played a part in jury selection. "[T]he rule in *Batson* . . . requires the judge to assess the plausibility of [the prosecutor's reason for striking a juror] in light of all evidence with a bearing on it." *Miller-El II*, 545 U.S. at 251-52. Several factors lead to the inference that the prosecution struck prospective jurors because of their race. These elements, while not conclusively proving discrimination, suggest that race was on the prosecutors' minds as they selected the jury.

*First*, the prosecution used a heavily disproportionate number of strikes against minority jurors. Of the thirteen peremptory strikes used by the prosecution, eight were against minority prospective jurors. While not dispositive, the strikes against minorities raise the specter of discrimination. *See Miller-El II*, 545 U.S. at 240-41.

*Second*, Ms. Davenport made contemporaneous notations on her copy of the jury questionnaires. Ms. Davenport made note of "anything that stuck out." Transcription of the April 28 and 29, 2008, Evidentiary Hearing at 45 (hereinafter cited as "E.H. at ___"). Her notations recorded the race of minority, but not white, potential jurors. For instance, by Esmeralda Lopez's name she noted "M/F" (Mexican female) and by Alicia Taylor's name "B/F" (black female). She implicitly recognized race by emphasizing when the jury questionnaires showed that jurors read

14

magazines intended for a minority audience.  Also, Ms. Davenport's notations lamented that they "didn't get on the record [one juror's] color," but noted that he used a word common to minority youth in his questioning.  Tellingly, on the questionnaire of a prospective juror who was born in Puerto Rico, Ms. Davenport wrote: "Do we want him?  Follower – will he identify with the [defendant]?"  On another juror's form, Ms. Davenport wrote: "is his heritage Asian or Mexican? or both?"

Ms. Davenport could not adequately explain these notations.  Ms. Davenport first alleged that she made the notations in response to the defense's *Swain* objection, hoping to remember which minority jurors she struck.  E.H. at 46.  Ms. Davenport, however, began noting race well before the defense objected.  E.H. at 47.  Ms. Davenport then claimed that the notations would allow her to remember the individual jurors.  E.H. at 51, 53.  She could not account, however, for why that was necessary when she questioned jurors individually, not as a group.  Also, she did not account for why she chose race and not other obvious characteristics to remember jurors.

The prosecution did not, however, record the race of all minority venire members.  For instance, Ms. Davenport did not note the race of Mr. Hamilton or Ms. Holmes.  Ms. Davenport did not explain why she only noted the race of some prospective jurors but not others.

*Third*, the prosecutors admitted that they worried about a shared racial identity between the defendant and jurors.  At one point, Ms. Davenport explained: "I don't think I was consciously aware or concerned with having a racial balance on the juries.  If the individual juror seemed like an honest person who would listen to the evidence, I don't care what color they were."  Ms. Davenport Depo. at 93.  She testified that she would not seek or exclude jurors of the same race as the defendant.  Ms. Davenport Depo. at 94.  Ms. Davenport testified that she was concerned with even asking questions

15

that appeared to use race as a means of excluding jurors: "And I didn't want [the prosecution's questioning] to even have the appearance of something like [racism] because that's not who I am." Ms. Davenport Depo. at 130.

At the same time, however, Ms. Davenport admitted that "I think that's probably general knowledge – not only around the District Attorney's office, but anywhere – that blacks tend to be more sympathetic toward blacks, just as anybody in any group tends to be more sympathetic to people within that group; doesn't matter what kind of group it is. . . . . [I]t's just one more factor to be considered with an individual juror." Ms. Davenport Depo. at 132.  In the evidentiary hearing, Ms. Davenport testified: "if you have two people who are from the same background and have the same outlook on life, if they see someone they identify with, then you may – you'd probably have a hurdle, to get over that personal identification with them." E.H. at 33-34.  Ms. Davenport was most concerned when the defendant and the juror shared an "ethnic" background. E.H. at 34.

Ms. Davenport's statements make an implicit assumption about the juror's race: "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson*, 476 U.S. at 89.  As one concurring judge in *Batson* recognized:

> Exclusion of blacks from a jury, solely because of race, can no more be justified by a belief that blacks are less likely than whites to consider fairly or sympathetically the State's case against a black defendant than it can be justified by the notion that blacks lack the intelligence, experience, or moral integrity to be entrusted with that role.

*Batson*, 476 U.S. at 104-05 (Marshall, J., concurring) (quotation omitted).  Even at the time of trial, *Swain* "should have warned prosecutors that using peremptories to exclude blacks on the assumption

16

that no black juror could fairly judge a black defendant would violate the Equal Protection Clause."

*Batson*, 476 U.S. at 101 (White, J., concurring). The prosecutors' affidavits reveal that they believed that minorities were not favorable to the prosecution and so they scrutinized the answers of minorities more strenuously, but that in itself is not wholly impermissible as long as the prosecution otherwise properly justifies its strikes.

*Fourth*, the only other witness who testified in the evidentiary hearing, attorney Craig Washington, confirmed that race was commonly a factor in jury selection at the time of Petitioner's trial. Mr. Washington testified that, in his experience as a criminal defense attorney, "assistant district attorneys, both in capital and non capital cases, would endeavor to eliminate as many minorities from the jury as they could." E.H. at 188. Mr. Washington testified that prosecutors at the time of Petitioner's trial routinely "use[d] a disproportionate number of peremptory challenges on minority persons[,]" even if they were favorable to the State. E.H. at 189-90. Prosecutors would use various tactics to eliminate minority jurors, including "[a]ttempting to get the venire person to disqualify herself and himself on some aspect of the case, other than to have to use a challenge" or by "approach[ing] the questioning of minority persons in a different way than they did [non-minorities]." E.H. at 189.

Mr. Washington testified that occasionally there would be minority jurors that he "would have stricken . . . except [he] knew the State was going to use a strike on them and [the State] had to go first." E.H. at 190. Other times, Mr. Washington limited his questioning of jurors because he perceived that the prosecution would use a racially based peremptory strike:

> In many instances, you could tell from the – the way that they were asking questions that they were going to – they were going to – they wanted to get rid of the juror by whatever means were necessary. And so, basically, you could relax and not

17

have to spend a lot of time rehabilitating or preparing the witness to be a potential juror.

For instance, if I know a person is going, I could spend another 30 minutes with that person, talking about empowerment; if you get to be a juror, having your own opinion; mitigation; whatever the factors were.  But basically, in a lot of instances, I wouldn't have to waste my time on that because you can – you can close your eyes and – without even knowing what race the person is, and you can tell whether the prosecution is trying to eliminate them by some other means.

And if they're trying to eliminate them on a – for cause, then you can pretty much bet that if the cause attempt fails that they're going to exercise a peremptory on them; so, I can kind of save my jaws from moving a lot.

E.H. at 190-91. Mr. Washington, however, testified that the State's racist use of peremptory strikes

"got better" after *Batson*. E.H. at 199.

Mr. Washington's testimony in this case echoed his statements in another case two decades

ago which prompted comment from a Supreme Court justice:

Craig Washington, a defense attorney in the county, testified that in the past decade he had participated in roughly 140 criminal cases in which the complaining witness was white and the defendant Negro. In only two of these cases did Negroes ultimately sit on the jury, and in these cases it was only because the prosecution ran out of peremptory challenges.

*Harris v. Texas*, 467 U.S. 1261, 1263 (1984) (Marshall, J., dissenting from the denial of certiorari).

The *Harris* case also presented other testimony contemporaneous with the climate at the time of

Petitioner's trial showing that prosecutors in Harris County routinely based peremptory challenges

on a potential juror's race:

At a hearing held before the trial court, Judge Joseph Guarino, a Texas District Judge with 28 years of experience in the county's criminal justice system, testified on behalf of petitioner. Judge Guarino stated he could not recall a single instance in which a Negro juror sat on a petit jury in a criminal case in which the complainant was white and the defendant Negro. Judge Miron Love, another judge from the county, agreed that in "most of those cases" the prosecution "'would eliminate most of the black jurors'" through the exercise of peremptory challenges." The testimony

of Judge Guarino and Judge Love was corroborated by a variety of informed witnesses. . . Jacquelyn Miles, a court reporter in Harris County, stated that over the last four years she had transcribed testimony in 20 to 25 criminal cases with white complaining witnesses and Negro defendants, and she could not recollect a single case in which a prospective Negro juror had been empaneled. Other witnesses for petitioner, including lawyers who had served under the county's District Attorney, confirmed that in this class of cases, the exclusion of Negro jurors was "the general rule."

*Harris*, 467 U.S. at 1263 (Marshall, J., dissenting from the denial of certiorari).

*Fifth*, both prosecutors in this case have previously been accused of striking potential jurors because of their race. In 1981, Ms. Davenport prosecuted a capital murder case against Phillip Daniel Thompkins, the only other death penalty case she tried. At Thompson's trial, Ms. Davenport used peremptory challenges to remove all blacks from the jury. Because his appeal was pending when the Supreme Court decided *Batson*, the Court of Criminal Appeals ordered the trial court to hold an evidentiary hearing on Thompkins's claim of discrimination. Testimony in that hearing revealed that prosecutors were "wary" and "cautious" of minority jurors and that "everybody" in the Harris County District Attorney's Office talked about "the undesirability of minorities on juries."

On appeal, the Court of Criminal Appeals found that Thompkins "did establish that black jurors have been relatively uncommon on capital murder juries in Harris County during the past several years," but did not find that any explicit policy excluded minorities. *Thompkins v. State*, 774 S.W.2d 195, 203 (Tex. Crim. 1987). While ultimately finding that race neutral justifications supported Ms. Davenport's strikes, the Court of Criminal Appeals expressed discomfort with the tenuous nature of the reasons she gave.

Also, Petitioner draws the Court's attention to Mr. Henderson's prosecution against Arthur Lee Williams, Jr. The defense accused Mr. Henderson of improperly striking all black panel

members.  While the Court of Criminal Appeals found that Mr. Henderson provided race neutral

justifications for his strikes, testimony in the related evidentiary hearing showed that prosecutors in

general, and Mr. Henderson specifically, rarely if ever allowed minorities to sit on capital juries.

Defense attorneys testified that prosecutors used disparate questioning techniques in an effort to

disqualify minority jurors.  While the state courts found no error in that case, the testimony given

therein proved that few minorities served on Harris County juries.  *See Williams v. State*, 804 S.W.2d

95 (Tex. Crim. App. 1991).

   *Sixth*, the prosecution's questioning of jurors in this case varied depending on the juror's

race.  Contrasting the voir dire questions the prosecution asked of minority panel members against

the individuals selected to serve as jurors may reveal a disparate approach attributable only to racial

considerations.  *See Miller-El II*, 545 U.S. at 253-61.  While the subject of the questioning did not

vary greatly between minority and white prospective jurors, the nature of the questioning sometimes

did – particularly with Mr. Deen and Ms. Taylor.  The questions asked of minority jurors seemed

geared toward a disqualifying answer.  For instance, the prosecution asked some minority jurors

open-ended and confusing questions, seeking their opinion on legal issues without providing any

context. The prosecution, in contrast, led white jurors through difficult legal concepts by providing

preparatory explanations and by asking questions that presupposed a favorable response.  As this

Court's examination of the stricken jurors will show, the prosecution questioned some minority

jurors differently than white ones, creating a presumption of racism.

   The factors identified above do not conclusively prove that the prosecution struck the jurors

because of their race, but each fact individually suggests that racism played a part in jury selection.

Taken together, various inferences create a backdrop against which the Court must evaluate the

prosecution's justifications.  As discussed below, the prosecutions' justifications do not withstand

scrutiny with respect to at least three venire members.

**IV.**     **The Prosecution Used Race as a Factor in Dismissing Potential Jurors at Petitioner's**
            **Trial**

At *Batson*'s third step, this Court must evaluate the persuasiveness of the proffered

explanations for striking panelists.  This inquiry involves gauging the veracity of the trial attorneys,

weighing the integrity of their justifications, and comparing the stricken panel members against those

who served.  This Court's review indicates that race played a part in the prosecution's use of

peremptory strikes against Ms. Holmes, Mr. Deen, and Ms. Taylor.

**A.**     **The Prosecutors' Credibility**

The Court's role is to assess the credibility of the prosecutor's statements regarding the

reasons they have articulated for making their strikes.  *See Hernandez*, 500 U.S. at 365 ("In the

typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral

explanation for a peremptory challenge should be believed. There will seldom be much evidence

bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises

the challenge.").  Asking the prosecutors to review their notes, the jury questionnaires, and the

transcripts of the jurors' testimony to prepare an affidavit regarding their reasons for striking a

particular juror is a starting point for this process.  Being able to hear the prosecutor testify adds to

the Court's credibility assessment as well.

Undoubtedly, the trial judge is the best suited to make an assessment of the prosecutor's

motives in striking a particular juror.  From that vantage point, the trial court has some opportunity

to judge the nuances that the prosecutor is seeing – the juror who is slouched in their seat, who is

rolling their eyes, who may be looking into space, their attitude as they are answering the questions of the prosecutor or defense attorney. The trial judge obviously also has the chance to observe the interaction between the lawyers. It is not lost on a prosecutor when a defense attorney seems to be favorably inclined toward a juror and vice versa. When that occurs the trial judge certainly has the opportunity to view this interaction as well and is in a position to evaluate the extent to which this subtle and nuanced observation impacts the decision of a lawyer to disfavor a particular juror.

Nonetheless, this Court is required to evaluate the credibility of the prosecutor at this stage, including decisions made by them which are not easy to articulate. Both prosecutors emphatically denied striking jurors because of their race. That denial, however, cannot carry the day. As a concurring opinion in *Batson* acknowledged,

> It is even possible that an attorney may lie to himself in an effort to convince himself that his motives are legal. A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is "sullen," or "distant," a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported. . . . [P]rosecutors' peremptories are based on their "seat-of-the-pants instincts" as to how particular jurors will vote. Yet "seat-of-the-pants instincts" may often be just another term for racial prejudice. Even if all parties approach the Court's mandate with the best of conscious intentions, that mandate requires them to confront and overcome their own racism on all levels – a challenge I doubt all of them can meet.

*Batson*, 476 U.S. at 106 (Marshall, J., concurring).

Because Mr. Henderson did not testify at the evidentiary hearing, the Court cannot make any credibility finding regarding his justifications beyond that disclosed by the naked record. Ms. Davenport's evidentiary hearing testimony, however, provides an additional basis to evaluate the veracity of her explanations. The Court's observations of Ms. Davenport reveal a prosecutor who was able to articulate intelligently reasons for favoring and disfavoring certain types of jurors that

are well-recognized by lawyers as having attitudes or beliefs that would not benefit the prosecution. She disfavored engineers as too picky, she disliked educators because she believed them to be too sympathetic based on her own family experience, she did not want jurors whose own families had been involved in the criminal justice system. It is clear from the evidence that there were certain minority jurors who possessed the characteristics that she disapproved. However, even though she was able to articulate her reasons for disfavoring or favoring certain types of jurors, she was not particularly credible when giving reasons for striking specific venire panel members.

Given the many years that have passed since trial, Ms. Davenport understandably could not remember the dress, appearance, or individual characteristics of the prospective jurors. E.H. at 39. When she refreshed her recollection with the jury selection transcripts, Ms. Davenport could "remember some of the conversation," Ms. Davenport Depo. at 20, but seemed understandably unable to remember all the details from the decades-old jury selection. While Ms. Davenport used her trial notes to refresh her recollection of jury selection, she agreed that the justifications she provided were largely a "guess as to what was likely the reasons [she] struck the jurors[.]" E.H. at 41-42. In some cases, however, Ms. Davenport retreated from the explanations she gave in her affidavits to disclose the "real reason" that they struck a prospective juror. E.H. at 144. Other than the explanations flowing from her contemporaneous notes, Ms. Davenport agreed that the reasons she gave for striking panel members were "speculation." E.H. at 41-42.

In the end, much of Ms. Davenport's testimony came across as *post hoc* rationalization, giving reasons that a reasonable prosecutor *may have stricken* the panelists, but not a clear recollection of what she was thinking at the time of trial. This was particularly the case with respect to the strike against Ms. Holmes for whom she was surprisingly unable to give an adequate race-

neutral justification. The examination of Ms. Holmes, as well as that of Mr. Deen and Ms. Taylor, convince the Court that race motivated the prosecution's strikes.

### B.    The Peremptory Challenge Against Yvette Holmes

Throughout these federal proceedings, Petitioner has challenged the prosecution's use of peremptory challenges against all minority panel members, including Ms. Yvette Holmes. Respondent has repeatedly asserted that procedural law foreclosed consideration of the challenge against Ms. Holmes. Respondent provided no excuse for Ms. Holmes' dismissal in the summary judgment motions. The prosecutors' affidavits did not explain why they peremptorily challenged her. After this Court rejected Respondent's argument that procedural law foreclosed consideration of the strike against her, the prosecutors finally provided some explanation for their strike against Ms. Holmes. Justification for Ms. Holmes' strike only comes through the prosecutors' depositions and the evidentiary hearing testimony. Even then, Respondent's proposed findings of fact and conclusions of law do not refer to Ms. Holmes.

In her deposition testimony, Ms. Davenport conveyed no independent recollection of why she struck Ms. Holmes. Ms. Davenport Depo. at 43. After reviewing her jury questionnaire and questioning, Ms. Davenport "ha[d] sort of an idea" and "suspect[ed] that it was because of her answers on the special issues." Ms. Davenport Depo. at 44. Mr. Henderson displayed even less certainty as to why the prosecution dismissed Ms. Holmes. Mr. Henderson explained: "I don't know what was going through [Ms. Davenport's] mind . . . I don't know what we were thinking about at the time as to why that strike was executed." Deposition of Keno Henderson taken March 24, 2008, at 57 (cited hereinafter as "Mr. Henderson Depo. at __"). Both prosecutors were unable to articulate in their deposition with any certainty the precise reason for the strike. Instead, they speculated, based

24

on their review of the record and their standard practice, what they may have been thinking.

In the evidentiary hearing, however, Ms. Davenport revealed "the real reason [she] exercised a peremptory on Ms. Holmes." E.H. at 69. Ms. Davenport was concerned that defense counsel "thought that she would hang the jury for us . . . I think that Mr. Boyd was counting on her to hang the jury. . . . I think Mr. Boyd wanted her on the jury, and I think she would have hung the jury for him; and I think that's what he was counting on." E.H. at 69. Ms. Davenport clarified that was the sole justification she could remember for dismissing Ms. Holmes. E.H. at 70-71.

*The "Real Reason" for Dismissing Ms. Holmes* - Ms. Davenport did not specify what gave her the impression that Mr. Boyd wanted Ms. Holmes to sit on the jury. She mentioned that "Mr. Boyd could get quite animated when he would get excited when he thought that he had something to work with," but could not remember whether Mr. Boyd was animated during his questioning of Ms. Holmes. E.H. at 73. The trial record does not reveal anything about Mr. Boyd's deportment that would suggest that he favored Ms. Holmes. This Court has no basis upon which to review Mr. Boyd's demeanor during Ms. Holmes' questioning – or even the demeanor of Ms. Holmes herself. *See Snyder*, ___ U.S. at ___, 128 S. Ct. at 1209 (refusing to accept post-trial speculation as to trial demeanor absent express contemporaneous fact findings); *Haynes v. Quarterman*, 526 F.3d 189, 199-200 (5th Cir. 2008) (applying *Snyder*). In fact, Ms. Davenport could not remember any specific cue from Mr. Boyd that would show that he favored Ms. Holmes. E.H. at 73.

The brief record of Mr. Boyd's questioning reveals little to suggest that Ms. Holmes would favor the defense. Mr. Boyd told Ms. Holmes that he "just want[ed] to ask . . . a few questions," and then asked four questions about her ability to stand her ground if the other jurors disagreed with her. Tr. Vol. 10 at 1242. The prosecution then abruptly interrupted and exercised a peremptory strike

against Ms. Holmes. Tr. Vol. 10 at 1243. In her deposition, Ms. Davenport suggested: "I noticed that when Mr. Boyd started questioning her and was just drilling on the issue of whether she would stand her ground if the rest of the jury was trying to persuade her [that] she was the only one who was wrong, that the State interrupted and excused the juror. So apparently it was pretty obvious at that point to us." Ms. Davenport Depo. at 45. Mr. Henderson conjecturally agreed: "Maybe when the defense attorney was talking with the juror for a page and a half here, that she was – seemed that she might be influencable to the point that if she made up her mind, she might not be able to change her mind, no amount of discussion would cause her to change her mind." Mr. Henderson Depo. at 55-56. In the evidentiary hearing, Ms. Davenport speculated that Ms. Holmes' ability to stand her ground was important because it was the first question Mr. Boyd asked. E.H. at 72-77. However, the prosecution cut off defense questioning before it could become clear how important the issue was for the defense.

Ms. Holmes indeed testified that she would persist in her views, even if all other jurors disagreed, "[u]nless they could show [her] where [she] was wrong[.]" Tr. Vol. 10 at 1243. The record of her statements does not show that she favored the defense, but would impartially consider the evidence. A juror's firmness in her convictions inures to both parties' benefit. Importantly, Ms. Holmes never testified that she would be so firm in her beliefs that she could not impartially consider the evidence. Ms. Holmes testified that her inflexibility would only last until shown that the evidence contradicted her opinion.

The strike against Ms. Holmes because of her alleged inflexibility is especially weak when compared to jurors who served at trial. "[S]ide-by-side comparisons of [minority] venire panelists who were struck and white panelists allowed to serve" provides a powerful basis for uncovering

pretextual racial bias. *Miller-El II*, 545 U.S. at 241. "[I]f a [party's] proffered reason for striking [a prospective juror of one race] applies just as well to an otherwise-similar [juror of a different race] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El II*, 545 U.S. at 241; *see also United States v. Stephens*, 514 F.3d 703, 711 (7th Cir. 2008) (noting a "party's consistency in applying its non-discriminatory justification"). Jurors accepted by the State such as Ms. Willett and Ms. Williamson displayed a similar, if not more stubborn, determination to hold their ground. Tr. Vol. 2 at 312; Tr. Vol. 4 at 47.

In the end, Ms. Davenport's assertion – that Mr. Boyd wanted Ms. Holmes to serve as a juror – is little more than "rebut[ting] the defendant's case merely by denying that he had a discriminatory motive or affirming his good faith in making individual selections." *Batson*, 476 U.S. at 98 (internal quotations and citation omitted). *Batson* requires specific justifications, not vague and conclusory statements made after reviewing the transcript. *See Bui v. Haley*, 321 F.3d 1304, 1316 (11th Cir. 2003) (finding the striking of those "favorable to acquit" to be a pretext). The justification that Ms. Holmes was a favorable defense witness does not adequately explain the strike used against her.

*Additional Justifications* - In their deposition testimony, the prosecutors speculated on why Ms. Holmes would not be a favorable juror. Ms. Davenport provided three additional reasons which may have been why she struck Ms. Holmes. First, Ms. Davenport opined that Ms. Holmes "did not have good answers on the special issues, particularly the issue of mitigation about temporary insanity due to voluntary intoxication." Ms. Davenport Depo. at 45. Mr. Henderson tentatively agreed: "The only thing I see or one of the things I see is that she stumbled a bit on the temporary insanity due to intoxication . . . and that causing a problem with answering the questions or making a decision with regard to the case." Mr. Henderson Depo. at 55-56. Ms. Davenport, however, seemed most

concerned with the fact that the discussion about temporary insanity "goes on for at least three or four pages. Other than that, I don't know what kind of interaction we had with her, she smiled, I smiled, or, you know, when somebody looks at you with disapproval." Ms. Davenport Depo. at 49. While admitting that Ms. Holmes demonstrated an ability to follow the law after her questioning, Ms. Davenport opined that she only would have been satisfied "if that had been her first answer[.]" Ms. Davenport Depo. at 49.

While Ms. Holmes had some difficulty in expressing how she would assess an intoxication defense, a comparison to other jurors suggests that the extended questioning was simply an attempt by the prosecution to elicit disqualifying answers. The length of the examination of Ms. Holmes in this instance seemed to come from the prosecution's maladroit questioning and desire to evoke an unfavorable response. For instance, Ms. Davenport asked Ms. Holmes if she could consider intoxication as a mitigating factor and then added: "Some people feel like the punishment should not be so harsh because the man was so intoxicated that he was temporarily insane." Tr. Vol. 10 at 1238-39. Ms. Davenport then tried to corner Ms. Holmes into admitting that she would exclude the death penalty as a sentencing option if he had been drinking when he killed. Tr. Vol. 10 at 1239-40. The trial court repeatedly had to interrupt the questioning to clarify questions or responses. Even so, Ms. Holmes showed an ability to consider the evidence without preconception. Tr. Vol. 10 at 1241-42. Ms. Davenport 's effort to trip up Ms. Holmes failed and she provided acceptable answers. A juror cannot be expected to give an impartial statement as her "first answer" when the nature of the questioning is designed to preclude that result. The State accepted Ms. Willett though she took much longer to understand legal concepts. Tr. Vol. 2 at 276-81.

For her second additional reason for striking Ms. Holmes, Ms. Davenport explained:

You'll notice a number of times in there the Court has interjected to either clarify what she thought I was saying or to tell the . . . juror that "You've got to tell us, we can't read your mind. And that happens on a number of times, the atmosphere in the room would get tense and the juror or venireman would get tense and a little insulted and angry and the jury would as well.

I remember a number of times when that happened, when the judge kept inserting comments in there. And sometimes it was just not worth the chance of putting a juror on trial, on the jury, who was already angry at the judge or me.

Ms. Davenport Depo. at 44. Ms. Davenport offered that Ms. Holmes "was usually tense when Judge Kegans interrupted[.]" Ms. Davenport Depo. at 47. Ms. Davenport suspected that Judge Kegans was irritated when she interrupted because she had "seen her get angry . . . questioning somebody who she thinks won't take a stand one way or the other" but did not "know if Judge Kegans was angry at this particular time." Ms. Davenport Depo. at 48. Ms. Davenport, however, would not strike every juror who the judge interrupted: "not unless I felt that I should, but no, not every time, no." Ms. Davenport Depo. at 47.

Ms. Davenport could not remember whether the trial judge was actually angry. Ms. Davenport Depo at 48. Absent a specific finding by the trial court who observed the proceedings, this Court cannot make any finding about the atmosphere during jury selection. *See Snyder*, ___ U.S. at ___, 128 S. Ct. at 1209; *Haynes*, 526 F.3d at 199-200. The inability to discern demeanor from the cold record extends to the supposition that the trial judge expressed irritation at Ms. Holmes, which would then somehow prejudice her against the prosecution. The trial judge in this case actively interrupted the questioning of many potential jurors, clarifying the parties' questions, seeking additional explanation from prospective jurors, and making additional inquiries. The trial judge often disrupted the flow of questioning, to the point of repeatedly reassuring a juror that no one was mad at her. Tr. Vol. 10 at 276-81. The trial judge also told other panel members that she was

29

not quarreling with them, giving the same inference of tension on which Respondent relies to justify striking Ms. Holmes.  The record does not show tension in the courtroom during Ms. Homes' questioning that would justify the strike against her.

Third, Ms. Davenport also explained that "[s]he, obviously, hadn't worked very long at [her] job, it was two months[.]"  Ms. Davenport Depo. at 45.  Ms. Davenport, however, did not explain why this is a reason to strike a juror.  The answer seems more like afterthought and pretext, especially since it does not relate to the "real reason" Ms. Davenport used her strike against Ms. Holmes.

The record suggests that Ms. Holmes would have been a favorable juror for the prosecution, even more so than some of the jurors who sat at trial.  In the evidentiary hearing, Respondent was at a loss to explain the strike against Ms. Holmes.  Respondent, instead, argued that the Court should not automatically assume that racism drove the prosecution's use of peremptory strikes even in the absence of valid race neutral explanations.  E.H. at 270-71.  This statement captures the problem with the dismissal of Ms. Holmes – nothing in the record satisfactorily explains her dismissal other than her race.  When considered against the inferences of racism previously mentioned and when contrasted with the jurors that the prosecution selected, "[t]he strikes correlate with no fact as well as they correlate with race[.]"  *Miller-El*, 545 U.S. at 266.  The Court finds that Petitioner has met his *Batson* burden with respect to Ms. Holmes.

### C.     The Peremptory Challenge Against Mohammed Deen

Mr. Deen was born in Guyana.  Ms. Davenport circled his place of birth on his jury questionnaire, suggesting that the prosecution was concerned about Mr. Deen's nationality or race. Mr. Deen has a B.S. degree in engineering, which fit with the prosecution's preference for choosing

educated jurors. Ms. Davenport testified:

> [S]marter people are better for the State. . . . [T]hey understand what you're talking
> about. There are a lot of people who come in and go through voir dire and don't have
> a clue what you've asked them, or else they are so nervous that they can't concentrate
> on what you're asking them, and that's not the kind of a juror you want. . . . It's hard
> enough to try to explain the difference between intentional and deliberate and then
> premeditation or mitigating – rather, mitigation factors, and when you get a different
> answer to every question you ask them about, it's – it's hard enough just explaining
> it, and I'm sure it's tough for them to understand it as they're sitting there.

Ms. Davenport Depo. at 139. The State, nonetheless, used a peremptory challenge to remove Mr.

Deen from the jury pool.

The "Main Concern" in Dismissing Mr. Deen - The prosecutors' affidavits provide several

reasons for striking Mr. Deen. The main or most important reason given was that he would favor

the defense. In her affidavit, Ms. Davenport explained: "To the best of my recollection, this juror

was struck by the State because he was obviously a good juror for the defense and not for the State."

In the evidentiary hearing, Ms. Davenport again asserted that her "concern mainly was that . . . it was

obvious Mr. Boyd wanted him. He only asked five questions. That was very unusual for Mr. Boyd."

E.H. at 78-79.

The record does not expressly show that Mr. Boyd wanted Mr. Deen to serve on the jury.

Relying on such justifications in a retrospective *Batson* hearing asks the Court to make assumptions

about the tone and tenor of questioning that the record does not reveal. *Batson* at its progeny

removed from the prosecution the ability to rely on amorphous explanations and gut-feeling

justifications to dodge a *Batson* challenge. The prosecution must articulate a race-neutral reason,

not generally state that a juror seemed inclined to favor one side or that one party seemed to favor

the juror. The Court simply cannot make any finding about Mr. Boyd's demeanor that suggested that

31

he wanted Mr. Deen to serve.

The only objective indicator that the prosecutors offered to show that Mr. Boyd wanted Mr. Deen as a juror was that the questions he asked "were [not] even substantive." E.H. at 79. The inadequacy of this explanation becomes apparent when considering the fact that the defense did not only ask Mr. Deen weak questions. To provide context to the defense's questioning, the prosecution initially sought to dismiss Mr. Deen for cause, alleging that he could never answer the deliberateness question "no" once he found the defendant guilty of an intentional murder. Mr. Boyd rehabilitated Mr. Deen after discussing the difference between intentional and deliberate behavior. The trial court denied the challenge for cause and the prosecution again questioned Mr. Deen. When the prosecution finished, the defense asked questions that Ms. Davenport labeled "nonsubstantive," but reached the heart of the reasons given for striking Mr. Deen. Tr. Vol. 7 at 503. Mr. Boyd questioned Mr. Deen about his ability to be a fair juror, to keep an open mind, and to apply the reasonable doubt standard. Nothing about his answers suggested that Mr. Deen favored the defense, rather Mr. Deen showed that he could be an impartial juror.

Even the brevity of the defense questioning does not mean that Mr. Boyd favored Mr. Deen. As noted by Craig Washington, sometimes defense attorneys may strategically limit their questioning when it is obvious that the prosecution will use a race-based peremptory strike. Even assuming that the prosecutor struck Mr. Deen due to the brevity of defense questioning, the prosecution did not consider that important with respect to white jurors. For example, the defense only asked a few questions of the same type to Ms. Plander, but the parties still selected her for jury service. Tr. Vol. 2 at 256-58. The State's justification that the defense considered Mr. Deen a favorable juror finds no support in the record.

*Additional Justifications* - Before the evidentiary hearing, Ms. Davenport provided additional reasons for striking Mr. Deen. Ms. Davenport claimed that the prosecution struck him because (1) he would always answer the first special issue "yes" and (2) he was previously challenged for cause. Mr. Henderson expressed that he worried that: (1) Mr. Deen did not favor the death penalty; (2) he would hold the prosecution to a standard higher than that required by law; and (3) he would require Petitioner to testify before he could make a decision. The Court will evaluate each of these justifications.

Ms. Davenport stated that the prosecution struck Mr. Deen because he would always answer the first special issue yes; that is, once he found that the defendant committed an intentional murder he would find that he also acted deliberately. Ms. Davenport she could not remember striking him on that basis when questioned in the evidentiary hearing. E.H. at 78-79. A juror who will always answer the first special issue "yes" is favorable to the prosecution. Sensible prosecutorial strategy would favor having Mr. Deen serve on the jury. *See Miller-El II*, 537 U.S. at 339 (looking at whether the reason for the strikes "has some basis in accepted trial strategy").

The prosecution, nonetheless, claims that answering the special issues in that manner would make Mr. Deen an unfavorable juror. By way of contrast, the prosecution accepted white jurors who did not initially understand the murky and undefined difference between intentional and deliberate. The prosecution accepted white jurors like Ms. Wojdyla who displayed similar, if not more entrenched, attitudes toward the deliberateness issue Tr. Vol. 2 at 456-57. Ms. Wojdyla admitted that there had "to be a grey area" between the definitions of intentional and deliberate, but she could not understand the difference. Tr. Vol. 2 at 457. Ms. Willett also thought that the terms had "an overlapping definition" and could only "possibly" think of a circumstance in which she would

33

answer the deliberateness question "no." Tr. vol. 2 at 288-89. The prosecution accepted other jurors, such as Mr. Smith, who stated that they would always answer the first special issue "yes." Tr. Vol. 10 at 1384. In the case of Mr. Smith, the prosecution only weakly questioned him about his predisposition to answer the first special issue "yes," though the defense later rehabilitated him. Tr. Vol. 10 at 1407-08. Mr. Smith stated that he "felt pretty firm" that he would always answer the deliberateness question "yes" once he found that the defendant committed an intentional killing. Tr. Vol. Vol. 10 at 1384. Ms. Davenport could not explain the difference between Mr. Deen and those individuals who held similar views but were allowed to sit on the jury. E.H. at 82. That the prosecution belabored the issue with Mr. Deen suggests that something else motivated their desire to keep him from serving on the jury.

In her deposition, Ms. Davenport stated that she felt "compelled to strike" Mr. Deen because the prosecution first unsuccessfully challenged him for cause. In the evidentiary hearing, Ms. Davenport conceded that she did not always use peremptory challenges against jurors that they previously challenged for cause. E.H. at 82. The rehabilitation of Mr. Deen and lack of a consistent policy for striking previously challenged jurors invalidates that justification. Ms. Davenport failed to provide an adequate reason for striking Mr. Deen.

Mr. Henderson provided several excuses for dismissing Mr. Deen. First, Mr. Deen answered on the jury questionnaire that "there were some cases in which he could not vote for the death penalty even if the law allowed it." Mr. Henderson was "concerned about [his] ability to follow the court's instructions and consider the full range of punishment." The prosecution, however, had no problem with Ms. Nickles who answered similarly. Tr. Vol. 8 at 758. Mr. Smith's questionnaire likewise showed only qualified support for capital punishment.

Insofar as the prosecution dismissed Mr. Deen for his opinion on the death penalty, Ms. Davenport explained that a juror's opinion of capital punishment was only one component of their decision to strike a juror:

| Mr. Gray: | Under what circumstances would you strike a juror for his attitude toward the death penalty? |
|---|---|
| Ms. Davenport: | It goes back to all those things we talked about when we first started today, how they looked at me, how they responded to me, how they looked at Mr. Boyd and how they responded to him, their attitude generally. |
| Mr. Gray: | I'm asking towards the attitude towards the death penalty. |
| Ms. Davenport: | And I'm trying to answer you. With respect to that, in and of itself, doesn't mean anything. |

Ms. Davenport Depo. at 111. While Mr. Deen disagreed on the jury questionnaire that "capital punishment is just and necessary," he later explained that "[t]he question was so impromptu at the time . . . and [he] hadn't given it a lot of thought really in answering that question[.]" Tr. Vol. 7 at 477-78. After considering the issue, Mr. Deen expressed no qualms with return a verdict leading to a capital sentence. Other jurors accepted by the State, such as Ms. Plander, had much deeper and entrenched views against the death penalty.

In a related vein, Mr. Henderson also allegedly worried that Mr. Deen would hold the prosecution to a higher standard than that required by law. Mr. Henderson reported that Mr. Deen "stated that he would need 'extra ordinary doubt' rather than reasonable doubt when deciding a case." The questioning of Mr. Deen proves that this excuse is a pretext. When asked about his answer on the jury questionnaire about capital punishment, Mr. Deen clarified:

. . . I'm sure there are cases which it might seem without any reasonable doubt that a person had committed a crime, then there might be still some doubt. It might be

> proven that there is no doubt there with the law, but within myself there might be
> doubt about it and if it's not completely qualified or clear, I could not give a death
> penalty.

Tr. Vol. 7 at 477-78. Ms. Davenport then briefly explained the concept of beyond a reasonable doubt

to Mr. Deen, and asked: "In feeling the way that you have expressed to us, do you feel like in a case

as serious as a death penalty case would be that it ought to be a higher burden than just beyond a

reasonable doubt." Tr. Vol. 7 at 478-79. Mr. Deen stated that "it should be higher." Tr. Vol. 7 at

479. When Ms. Davenport asked if he believed that the prosecution should prove its case beyond

all doubt, Mr. Deen states: "Everything must be very, very clear."

> The trial court at that point interjected:

> Trial court:    Let me intercede there. Nobody is quarreling with you about it. We
>                 just have to know how you feel about something. The law requires
>                 the State to prove their case beyond a reasonable doubt. Are you
>                 saying in something like a capital case that you would require a
>                 greater burden of the State than what the law requires of them?

> Mr. Deen:       If that's the state –

> Trial court:    That is the law.

> Mr. Deen:       I would certainly abide by the laws of the state.

Tr. Vol. 9 at 479. The trial court then asked two more questions to assure that Mr. Deen would not

subject the State to a high burden of proof. Mr. Deen assured that "that is quite clear there" and he

would only hold the State to a reasonable doubt standard. Tr. Vol. 9 at 480.

> The prosecution then engaged Mr. Deen in a series of questions whose purpose only could

have been to disqualify him as a juror. Notwithstanding his answers to the trial court, Ms. Davenport

goaded Mr. Deen: "some folks feel like . . . for something that may end up in a death penalty for a

defendant [the burden of proof] ought to be a little bit higher, and apparently you feel like it ought

to be, but you have indicated to the Judge that if the law says that it's beyond a reasonable doubt, then you will kind of force feed your thinking into that. Would you be uncomfortable with it?" Tr. Vol. 7 at 480-81. Even though Mr. Deen answered, "No, not at all." Ms. Davenport asked: "Okay, so you wouldn't require us to prove it to you beyond all doubt?" Tr. Vol. 7 at 481. Dr. Deen answered, "Extra ordinary doubt. No, I would not." Tr. Vol. 7 at 481. Ms. Davenport then asked still one more question about the correct standard.

While the prosecution belabored the beyond-a-reasonable-doubt standard with other jurors who sat at trial – asking and then repeating questions even though it was apparent that they understood the concept – in Mr. Deen's case the questioning tried to force him toward an unfavorable response. In contrast, Ms. Davenport also asked white juror Michael Arndt questions about the beyond-a-reasonable-doubt standard well after he obviously understood the concept, but phrased the questions in a manner that would make his responses favorable to the State. Ms. Davenport asked Mr. Arndt, "so, would you agree with me just because there may be conflicts in the evidence doesn't necessarily mean that there is not proof [beyond a reasonable doubt]," "can you also agree with me all we would have to do is convince [the jury] beyond a reasonable doubt," or that the prosecution "could never convince them beyond all doubt." Tr. Vol. 6 at 91-92. With other jurors that the prosecution accepted such as Mr. Busker, the questioning left little room for an answer that would not favor the State: "I could never prove anything to you beyond any doubt . . . . So I think you can agree and see why that determination is beyond a reasonable doubt instead of beyond any or all doubt." Tr. Vol. 8 at 714; *see also* Tr. Vol. 11 at 1498. When the prosecution questioned Mr. Kelley, the flow of the questioning encouraged a favorable response: "Okay, the State has to prove its case beyond a reasonable doubt. You have heard that term before? . . . It does not say

37

beyond all about or beyond any doubt. I could never prove anything to you beyond any or all doubt

unless you observed something occur. Would you agree with me there?" Tr. Vol. 11 at 1498. With

Mr. Overton, the prosecution stacked questions that ensured a favorable response:

> This is a death penalty case and our burden of proof is the same in this case as it
> would be in any other case, whether it be a shoplifting, burglary or whatever kind of
> case, the law says it's still the same, beyond a reasonable doubt. Do you think that's
> fair? Do you have any disagreement with that being the law? Do you think that the
> State's burden of proof should be higher because it [is] a capital murder case?

Tr. Vol. 10 at 1098. By then following up with questions like "do you pretty well get the idea" and

"[i]f you will just use your common sense, I don't think you will have any difficulty with that term,"

the prosecution cemented a favorable answer. Tr. Vol. 10 at 110.

Mr. Deen's questioning did not reveal an inability to understand or apply legal principles, but

an unfamiliarity with complex concepts that had not yet been adequately explained to him. As the

Fifth Circuit recently noted in a different context,

> [l]ay persons come to the courthouse with varying levels of education and thought
> about capital punishment. The opening of a capital trial is an alien environment to
> citizens called from jobs and homes. Lay persons are confronted by skilled lawyers
> engaged in an adversarial contest who probe their views on a profound and divisive
> social issue, usually with a goal of retention or exclusion shaping the questions. We
> know from experience that the result is often a series of responses that seem to shift
> and turn and even conflict as questions are framed, reframed and just repeated. A
> stranger to the trial reading the bare transcript is left with incomplete sentences and
> elliptic answers with no reconciling theme.

*Ruiz*, 460 F.3d at 646. The prosecution never explained difficult legal concepts to Mr. Deen before

asking his opinion. In contrast, the prosecution explained to Mr. Busker the difference between

"beyond a reasonable doubt," "preponderance of the evidence," and "beyond all doubt or beyond a

shadow of a doubt," and then asked questions such as "So, I think you can agree with me and see

why that determination is beyond a reasonable doubt instead of beyond any or all doubt." Tr. Vol.

8 at 713-14.  The prosecution also told Ms. Willett that a "beyond a doubt" standard was "an impossible burden."  Tr. Vol. 2 at 274-75.  When Ms. Willett expressed some confusion, the prosecution accepted her though she stated that she could not allow a death sentence if she had any doubt.  Tr. Vol. 2 at 278-79.  The prosecutor asked a similar question of Ms. Lyles.  Tr. Vol. 2 at 186.  Also, Ms. Willett took longer that Mr. Deen to agree that she could follow the law regarding reasonable doubt.  Tr. Vol. 2 at 278-81.  Jurors that the State accepted had equal, if not greater, concerns about the level of doubt applicable in capital cases.

Most troubling, the excuse that Mr. Deen would hold the prosecution to an "extraordinary doubt" standard is not just pretextual, it is flatly wrong.  Mr. Deen expressed his personal opinion and then, when informed of the law, repeatedly stated that he would follow it.  The statement which Mr. Henderson points to does not affirm that he will only apply "extraordinary doubt."  Instead, the context makes it clear that Mr. Deen was only summing up the essence of the question put to him and then stating that he would only apply the beyond-a-reasonable-doubt standard.  The State's misconstruction of the record as an excuse for striking Mr. Deen raises concerns that racial motives actually underlied his dismissal.

Mr. Henderson also excused the strike by stating, "when asked whether he could assess the death penalty based solely on the facts of the primary offense, [Mr. Deen] stated that he would need to know more facts about the defendant.  In the event that Mr. Rosales elected not to testify or present evidence, I was concerned that [Mr. Deen] would not be able to find against Mr. Rosales even if the State met the legal burden of proof because he 'had not heard all the facts.'"  Mr. Deen, while initially stating otherwise (likely because he was not informed on the law), indicated that he could answer the special issues on the basis of the facts alone.  Tr. Vol. 7 at 498.  Ms. Plander stated

that she would require a defendant to testify before she could convict him.  Tr. Vol. 2 at 244-45. While she retreated slightly from that position, she still opined, "Well, I could probably go on without his testimony, and I would say that I would do that, but now, if it came right down to it, I don't know if I would or not."  Tr. Vol. 2 at 246.  The prosecution still accepted Ms. Plander but not Mr. Deen.

Other jurors showed a greater inability to answer decide without hearing from the defense. Mr. Busker testified that, if the defendant did not testify, "if he sat there silently, he must be agreeing with what [the prosecution is] saying," though he retreated from that position.  Tr. Vol. 8 at 715-16. Mr. Kelley also expressed a preference to hear both sides before reaching a verdict.  The prosecution, however, identified with his opinion ("You are not alone.  Most people have that feeling . . . which is quite natural[.]") and then taught him about a defendant's right to remain silent.  Tr. Vol. 11 at 1496-97.  Ms. Williamson also preferred to hear from both sides.  Tr. Vol. 4 at 31.

With other jurors accepted by the State, the questioning presumed a response that was favorable to the prosecution or impartial.  With Mr. Nickles, the prosecutor explained the defendant's right to silence and then guaranteed a favorable response by stating: "Would you be willing to give him that right?"  Tr. Vol. 8 at 761.  With Mr. Overton, after explaining the standard the State asked "[d]o you have any problem with that being the law."  Tr. Vol. 10 at 1101.  These examples clash with the questioning of Mr. Deen, which seemed focused on tripping him up.

The reasons the prosecution gave for dismissing Mr. Deen are inadequate, not universally applied to jurors who sat at trial, and wrong.  The Court finds that Petitioner has met his burden of showing racial discrimination in the peremptory strike of Mr. Deen.

### D.      The Peremptory Challenge Against Alicia Taylor

Ms. Davenport wrote on Ms. Taylor's jury questionnaire that she was a "B/F" – a black female. Ms. Davenport could not remember in the evidentiary hearing why she struck Ms. Taylor. E.H. at 88. The excuses the prosecutors gave in their affidavits and depositions for Ms. Taylor's dismissal seem weaker than those given for other jurors.

Some of the reasons given by the prosecution evade review at this late date. Mr. Henderson's affidavit explains that Ms. Taylor seemed irritated with him for asking repetitive questions. He also alleged that the tenor of her answers suggested that she could not follow instructions. Ms. Davenport wrote on her form that she was inarticulate. These are factors that this Court cannot perceive from the cold record.

Other excuses that the prosecution rely on are not only wrong, but are the result of deceptive prosecutorial questioning. Both prosecutors claimed to have dismissed her because she equated "reasonable doubt" with "no doubt." In reality, the prosecution questioned Ms. Taylor about the reasonable doubt standard and she agreed that it did not mean "beyond all doubt." There followed, however, a series of questions probing the subject that are at best inartful and at worst intentionally confusing. Ms. Taylor's answers did not show that she could not comprehend the reasonable doubt standard, but could not understand the awkward questioning. The trial court even had to stop Mr. Henderson's questioning because he was misrepresenting the answers Ms. Taylor gave. Tr. Vol. 2 at 117.

The prosecutors also stated that Ms. Taylor could not factor the number of victims killed into her calculus of future dangerousness. The answer upon which the prosecutors base this statement, however, results from deceptive questioning:

41

| | |
|---|---|
| Mr. Henderson: | And what I am trying to find out is if the facts were bad enough in the case would you require the State to bring you anything else before you could answer that yes?  In other words, could you say because the facts of this crime were so bad I believe there is a probability this defendant would commit criminal acts of violence? |
| Ms. Taylor: | Yes, I could answer that yes. |
| Mr. Henderson: | Would the fact that perhaps there was more than one person killed have any influence on your answering that question. |
| Ms. Taylor: | No. |
| Mr. Henderson: | Okay, it wouldn't make any differen[ce] to you if it involved killing one or ten, as far as his future dangerousness? |
| Ms. Taylor: | No. |

Tr. Vol. 2 at 128.  Taken out of context, the final two questions make it sound like Ms. Taylor would not find Petitioner more likely to be a future danger because he killed more than one person.  In the context of the question asked first, however, it is obvious that Ms. Taylor meant that she could answer the second special issue question "yes," if the murder itself was bad enough regardless of the number of victims.  Ms. Williamson also expressed that "whether he killed one, two, or more people, I would still feel the same," Tr. Vol. 4 at 23, yet the prosecution allowed her to serve.  Ms. Davenport could not adequately explain the difference between Ms. Taylor and Ms. Williamson's answers.  E.H. at 97.

Mr. Henderson claimed that he struck Ms. Taylor because she would not impose a death sentence in all applicable cases.  Ms. Davenport, however, noted that Ms. Taylor could "feel it if the proper case came up."  Ms. Davenport also circled on her jury form where Ms. Taylor disagreed that "[c]apital punishment is just and necessary."  The prosecutors rely on that statement to support the

support for capital punishment. Tr. Vol. 2 at 240. With Ms. Williamson, Ms. Davenport even noted on her jury questionnaire that "initially -- wants more proof than BRD at penalty stage," "makes no diff to her how many people were killed," and "wants to hear from [defendant]," all reasons for which the prosecution allegedly struck Ms. Taylor. Ms. Davenport testified that Ms. Taylor's answers showed that she could impose a death sentence. E.H. at 91.

Ms. Taylor fit many characteristics of the type of juror the prosecution looked for, primarily, one that was well educated. In the end, the prosecutors identified the reason they struck Ms. Taylor: she was a "B/F." The Court finds that Petitioner has met his burden of showing purposeful discrimination with respect to the strike against Ms. Taylor.

### E.     The Peremptory Challenges Against the Remaining Potential Jurors

With respect the remaining jurors, the Court finds that Petitioner has not met his burden of showing that purposeful discrimination drove the prosecution to strike them from the jury panel. Some of the prosecutors' justifications unquestionably reflect their thinking at the time of trial and are fully supported by the record. For instance, both prosecutors stated that they struck Raymond Trevino because he "thought he recognized the defendant as someone he saw in his church[.]" Mr. Henderson Depo. at 3; E.H. at 144, 155. During his questioning, Mr. Trevino asked to speak to the judge. He whispered to the judge that he may have known Petitioner from church. The parties and the trial court then questioned Mr. Trevino extensively about whether or not he knew Petitioner. Mr. Trevino could not give a definitive answer, but told the prosecution "I don't think I could be a fair juror, because if he is the person that I think he is, you know, I have been to that church before." Tr. Vol. 2 at 168. After questioning by both parties, Mr. Trevino continually said he could not judge the issues fairly if he indeed knew Petitioner, but could not articulate why the relationship would impair

juror, because if he is the person that I think he is, you know, I have been to that church before." Tr.

Vol. 2 at 168. After questioning by both parties, Mr. Trevino continually said he could not judge the

issues fairly if he indeed knew Petitioner, but could not articulate why the relationship would impair

his impartiality. The trial court's efforts to rehabilitate Mr. Trevino helped little:

| | |
|---|---|
| Mr. Boyd: | Well, all we – some has to be jurors. Some people have to be jurors in the cause and you could be a – just take into account and you could be a fair juror, couldn't you? You are a fair man. Couldn't you be a fair juror and just? |
| Trial court: | Let him answer. You asked him three times without letting him answer yet. Fish or cut bait, Mr. Trevino. |
| Mr. Trevino: | No, I don't think I could. |
| Mr. Boyd: | And why not? |
| Mr. Trevino: | I don't know. |
| Trial court: | You are going to have to give us a reason. It's not that easy. |
| Mr. Trevino: | Well, maybe because if he is the man I think he is, I don't think I would be fair to serve as a juror. |
| Trial court: | Why? |
| Mr. Trevino: | To be one of the ones to give the punishment. |
| Mr. Boyd: | You mean you would be too easy or too hard. |
| Mr. Trevino: | No, sir, I just wouldn't want to be a juror. |
| Trial court: | Mr. Trevino, let me tell you right now, the fact that you don't want to be is not going to get you off of the jury, so you can stop the idea of I don't want to be. |
| Mr. Trevino: | Okay. |
| Trial court: | It's according to whether you can be a fair and impartial juror. If you can't be, say I can't be. If you can be, say you can be, and let's get on |

44

about our business.

Mr. Trevino:   Okay.  I can be a fair juror.

Trial court:   You can or cannot.

Mr. Trevino:   I can.

Tr. Vol. 2 at 171.  While the prosecution's subsequent questioning did not return to that issue, it is obvious from the record that his possible acquaintance with Petitioner made Mr. Trevino uneasy to the point of infringing on his impartiality.  The prosecution's strike of Mr. Trevino on that basis does not camouflage racial motives.

On Ms. Lopez's questionnaire, Ms. Davenport wrote "not too bright" and "conflicting answers."  Both prosecutors cited her conflicting answers on the jury questionnaire and her difficulty answering questions as reasons supporting her strike.  The record indicates that Ms. Lopez expressed confusion and an inability to comprehend the questions asked of her.  Ms. Lopez largely agreed with whatever question she was asked, but when required to give more than a yes/no response gave simplistic and confused answers.  The prosecutor's reluctance to have her serve on the jury does not seem to stem from race.  Mr. Saenz likewise gave inconsistent, varying answers.  The record bears out the prosecution's justification that he gave his contradictory and vacillating answers.

The prosecutors expressed concern with James Hamilton because his brother murdered his wife and stepson and was found insane.  Tr. Vol. 6 at 18.  Ms. Davenport noted his brother's crime twice on the jury questionnaire.  In this case especially, where multiple murders took place and the defense claimed that the defendant was insane due to his intoxication, the prosecution could worry about a juror whose family member had been in a similar situation.  The prosecution's challenge to Mr. Hamilton does not reveal racial bias.

The prosecutors gave several reasons for striking Marianne Walker. Ms. Davenport stated that, because teachers are naturally sympathetic to defendants, the prosecution would strike them as a general rule. Ms. Davenport Depo. at 69. While this would normally excuse the strike against Ms. Walker who was a teacher, the prosecution accepted two teachers (Charles Smith and Jacklynn Lyles) to serve on the jury without questioning them in a way that would disclose whether their intrinsic sympathies would be with the defendant. Other justifications given by the prosecutors, however, are supported by the record. For instance, Ms. Walker displayed difficulty with considering the evidence if the defendant did not testify. Also, Ms. Walker indicated that she would only answer the second special issue with difficulty. The prosecution's reasons for striking Ms. Walker survive scrutiny.

In the end, the prosecution satisfactorily explained some of its strikes. Nevertheless, race seemed foremost on the prosecutors' minds as they questioned panel members Ms. Holmes, Mr. Deen, and Ms. Taylor. The prosecutors offered pretexual excuses for dismissing three panelists; "pretextual explanation[s] naturally give rise to an inference of discriminatory intent." *Snyder,* ___ U.S. at ___, 128 S. Ct. 1212; *see also United States v. Williamson*, 533 F.3d 269, 277 (5th Cir. 2008) (relying on *Snyder*). The inadequacy of the State's justifications, the factors suggesting the presence of racism in jury selection, and the disparate questioning and acceptance of comparable white jurors confirms that – at least with respect to Ms. Holmes, Mr. Deen, and Ms. Taylor – "[t]he strikes correlate with no fact as well as they correlate with race[.]" *Miller-El I*, 545 U.S. at 266. Petitioner has met his burden of showing purposeful discrimination in the prosecution's selection of jurors.

46

## V.    Conclusion

"Discrimination on the basis of race, odious in all respects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979). The Constitution entitles Petitioner to a trial free from racial discrimination. For the reasons discussed above, the Court finds that Petitioner has met his burden of showing that the prosecution exercised at least three peremptory challenges based on potential jurors' race. Because the State of Texas violated the Equal Protection Clause in selecting jurors for Petitioner's trial, the Court grants a conditional writ of habeas corpus. Respondent Nathaniel Quarterman, Director, Texas Department of Criminal Justice, Correctional Institutions Division, shall release Petitioner Mariano Juarez Rosales from custody unless the State of Texas institutes new criminal proceedings against him within 180 days from (1) the exhaustion of appellate remedies *or* (2) the expiration of the time period in which to file such appellate proceedings. The Court's conditional writ of habeas corpus is stayed until the exhaustion of appellate remedies or the time to seek such remedies. All other outstanding motions are hereby denied.

Signed at Houston, Texas, on _____December 12____, 2008.


_____
VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE